David A. Fox (SBN 254651)
dave@foxlawapc.com
Joanna L. Fox (SBN 272593)
joanna@foxlawapc.com
Russell A. Gold (SBN 179498)
russ@foxlawapc.com
Michael F. Gosling (SBN305845)
mike@foxlawapc.com
**FOX LAW, APC**
225 W. Plaza Street, Suite 102
Solana Beach, CA 92075
Tel: 858-256-7616
Fax: 858-256-7618

Alan M. Mansfield (SBN: 125998)
alan@clgca.com
**Consumer Law Group of California**
16870 W. Bernardo Drive, Suite 400
San Diego, CA 92127
(619)308-5034

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC KETAYI, and MIRYAM KETAYI, both individually and on behalf of all others similarly situated and for the benefit of the general public, | CASE NO. '20CV1198 GPC KSC |
| | **CLASS ACTION** |
| Plaintiffs, | |
| | **CLASS ACTION COMPLAINT FOR DAMAGES, RESTITUTION, AND INJUNCTIVE RELIEF** |
| v. | |
| HEALTH ENROLLMENT GROUP, a Florida corporation; ADMINISTRATIVE CONCEPTS, INC., a Pennsylvania corporation; AXIS, a Bermuda corporation d/b/a Axis Insurance Company; AXIS SPECIALTY U.S. SERVICES, INC., a Delaware corporation; ALLIANCE FOR CONSUMERS USA, a Nebraska corporation; LIBERTY HEALTH, an entity of unknown form; HEALTH PLAN INTERMEDIARIES HOLDINGS, LLC, a Delaware Corporation; HEALTH INSURANCE INNOVATIONS HOLDINGS, INC., a Delaware Corporation; FIRST HEALTH GROUP, CORP., a | **DEMAND FOR JURY TRIAL ON ALL CAUSES OF ACTION SO TRIABLE** |

Delaware Corporation, MARC MUNOZ, an
individual; KEVIN ROMERO, an
individual, and JUANITA NICOLUCCI, an
individual, inclusive,

        Defendants.

-1-

Plaintiffs Eric Ketayi and Miryam Ketayi ("Plaintiffs") bring this Class Action Complaint ("Complaint") against Health Enrollment Group ("HEG"), Liberty Health ("Liberty Health"), Alliance for Consumers USA ("ACUSA"), Administrative Concepts, Inc. ("ACI"), AXIS, AXIS Specialty U.S. Services, Inc. ("AXIS Specialty"), Health Plan Intermediaries Holdings, LLC ("HPI"), Health Insurance Innovations Holdings, Inc. ("HII"), First Health Group, Corp. ("First Health"), Marc Munoz ("Munoz"), Kevin Romero ("Romero"), and Juanita Nicolucci ("Nicolucci"), inclusive (collectively, "Defendants").  Plaintiffs bring this action individually and on behalf of all others similarly situated and for the benefit of the general public, and allege the following upon personal knowledge as to Plaintiffs' acts and experiences as specifically identified, and as to all other allegations based on information and belief based on, among other things, investigation into such allegations conducted by Plaintiffs' attorneys.

## I.   <u>INTRODUCTION</u>

1.   This case concerns the deceptive, false, fraudulent, unlawful, and/or unfair advertising, marketing, and sale of sham health insurance by Defendants.

2.   Using a convoluted web of companies, Defendants trick consumers, like Plaintiffs and the putative class members, into purchasing "health insurance" limited benefit plans and medical discount memberships that, as Defendants are well aware, provide little to no value.  Employing numerous websites promising "comprehensive coverage," names that sound like legitimate insurance companies, and salespeople trained to follow a strict sales script on phone calls that is to be uniformly delivered to all potential customers, Defendants promote, advertise, offer for sale, and/or sell consumers, like Plaintiffs and the putative class members, products that those consumers believe to be low-cost, comprehensive, "PPO" medical health insurance coverage.  It does not appear that Defendants (at least some of them) are licensed to sell such insurance in California or in many other states throughout the country where they do so.

3.     Defendants represent that they are able to provide such comprehensive coverage at a low cost by aggregating consumers into a plan in the same way a large corporation would.  Defendants make consumers believe that they can "beat the system" and receive comprehensive insurance that meets the requirements of the 2010 Affordable Care Act ("ACA") when, in fact, what they receive is essentially worthless because it covers only a fraction of most health care costs.  In short, Defendants' claims and omissions of material fact are likely to and did deceive consumers, like Plaintiffs and the putative class members, into paying "premiums" (sometimes for years on end) for what they believe is health insurance coverage that they will never receive when they need it—and which is illusory when they use it.

4.     Defendants either know or reasonably should be aware that the products and services they offer are essentially worthless.  Nonetheless, Defendants' business is based on duping consumers into believing that they are paying for, and receiving, valuable medical insurance coverage.  Through deceptive advertising, material misstatements, and critical omissions, Defendants convince consumers, like Plaintiffs and the putative class members, that they are purchasing the type of comprehensive health insurance coverage like that provided through a Preferred Provider Organization ("PPO").  In truth, consumers are paying for a product—represented to be "insurance"—that is often worth less than the "premiums" it costs and that does not provide the coverage Defendants promised.

5.     Even after the sale is made, Defendants continue to deceive consumers.  Defendants make statements on the "insurance" cards provided to consumers through the mail that include the phrase "Preferred Provider (PPO) Network Access," and point consumers to a "PPO" Network website that represents to be "your national choice for PPO network solutions."  Defendants do so with knowledge that they have not actually sold, underwritten, or provided any

-3-

sort of PPO plan or other comprehensive coverage to consumers.

6.     Once consumers realize they have been cheated, it is too late. Consumers are out hundreds or thousands of dollars in payments to Defendants for sham health care coverage.  If they realize the issue at the point when they have incurred an injury or loss, it is difficult to get replacement health care coverage—especially coverage that would cover the actual injury or loss.  In some instances, consumers may also owe tens of thousands of dollars in payments to medical providers for services that Defendants claimed the insurance covered, when in fact no coverage was available or the coverage was, at best, minimal.

7.     Defendants have victimized consumers all over the country and profited at their expense.  Plaintiffs now seek damages, restitution of all "premiums" paid based on Defendants' illegal, deceptive, false, fraudulent, and unfair advertising, marketing, and sale of limited benefit plans and medical discount plans.  In addition, to help put an end to and redress these illegal, deceptive, false, fraudulent, and unfair business practices, Plaintiffs and the putative class ask the Court to preliminarily and permanently enjoin Defendants from continuing to peddle this sham "health insurance" to thousands of unwitting Americans.  Plaintiffs thus bring numerous causes of action against Defendants on behalf of themselves and all others similarly situated and for the benefit of the public, as applicable, and seek all appropriate equitable and legal remedies under those causes of action.

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     Alternatively, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which (1) there are

-4-

over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendants; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interests and costs.

10.   In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Counts V and VI, for violations of the federal civil RICO statute, arise under federal law, and the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.   This Court has personal jurisdiction over Defendants because all Defendants have all purposely availed themselves of the privilege and benefits of conducting business activities in California through their active marketing, advertising, sale, and provision of "health insurance" services in the State of California, because they maintain systematic and continuous business contacts with this State, and because there are many plan members who are residents of this State who do business with Defendants.

12.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants engage in continuous and systematic business activities within the State of California, a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities in this district, Defendants received substantial compensation from transactions and business activities in this district, and Plaintiffs reside in this district.

**III.   PARTIES**

**PLAINTIFFS**

13.   Plaintiff Eric Ketayi ("Eric") is a resident of San Diego County and over the age of eighteen.  On or about November 22, 2016, Defendants sold Eric what Eric reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care coverage that was represented to be in the form of a PPO health insurance plan.  Eric reasonably believed he was receiving comprehensive medical coverage based on false

statements and other misrepresentations contained on Defendants' websites, as well as Defendants' numerous uniform representations to Eric over the phone that he and his wife, Miryam, were purchasing a PPO plan for their family, and that he could see any doctor and have, in Defendants' words, full medical coverage under this plan.   In fact, as he only recently discovered, Eric had purchased a limited benefit plan, which was deceivingly marketed, advertised, sold, and administered by Defendants and did not provide the promised scope of coverage.  Eric paid Defendants what amounted to $379 per month starting in November 2016, via credit card charges using internet and/or mail.  Eric surrendered more in these transactions than he would have otherwise paid if the true facts had been disclosed and lost money or property as a result of Defendants' illegal conduct.

14.   Plaintiff Miryam Ketayi ("Miryam") is a resident of San Diego County and over the age of eighteen.  On or about November 22, 2016, Defendants sold Miryam what Miryam reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care coverage that was represented to be in the form of a PPO health insurance plan. Miryam reasonably believed she was receiving comprehensive medical coverage based on false statements and other misrepresentations contained on Defendants' websites, as well as Defendants' numerous uniform representations to Miryam over the phone that she and Eric were purchasing a PPO plan, and that she could see any doctor and have, in Defendants' words, full medical coverage under this plan.  In fact, as she only recently discovered, Miryam had purchased a limited benefit plan which was deceivingly marketed, advertised, sold, and administered by Defendants and did not provide the promised scope of coverage.  Miryam paid Defendants what amounted to $379 per month starting in November 2016, via credit card charges using internet and/or mail.  Miryam surrendered more in these transactions than she would have otherwise paid if the true facts had been disclosed and lost money or property as a result of Defendants' illegal conduct.

**CORPORATE DEFENDANTS**

15.    Defendant Health Enrollment Group ("HEG") is a Florida corporation with its principal place of business in Fort Lauderdale, Florida.  At all times relevant to this suit, HEG billed itself as a "full service National Health Brokerage firm specializing in helping individuals simplify the process of shopping for health insurance."[1]  HEG claimed to "work with Major Insurance Companies in all 50 states . . . ***to help you find the most comprehensive insurance plan*** for the lowest possible price."  In reality, however, HEG brokered only limited benefit plans and medical discount memberships that did not provide the promised coverage and were essentially worthless.  *See* **Figures 1, 2, and 3**.  Defendants did not offer, and/or had no intent to supply, comprehensive or ACA-qualified health care coverage.  In fact, to the best of Plaintiffs' knowledge, HEG is not licensed in the State of California to transact business or sell "health insurance" underwritten by Defendant AXIS.

16.    Defendant HEG knew or should have known that it was an active and integral participant in a scheme to defraud consumers who enrolled in such services, including Plaintiffs and putative class members.  Moreover, at all times relevant to this Complaint, Defendant HEG reaped the benefits of the scheme alleged and received compensation from consumers in the form of premiums or other monetary remuneration at the expense of these consumers.

///

///

///

---

[1] The figures included in these paragraphs are screenshots of HEG's website as it existed during at least a portion of the time period relevant to this action.

### Figure 1

**HEG's website proclaiming that HEG will "find the most comprehensive insurance plan"**



### Figure 2

**HEG's website promoting "Private Health Insurance Plans" and "Obamacare"**



///

///

-8-

**Figure 3**
**HEG's website promoting its "PPO" Plans**



17.     Defendant ACUSA is a Nebraska corporation with its principal place of business in Plano, Texas.  At all times relevant to this suit, ACUSA offered memberships that enabled its members to purchase limited benefit plans and medical discount memberships like the ones at issue here.  At all times relevant to this Complaint, Defendant ACUSA reaped the benefits of the scheme alleged and received compensation from consumers in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.  At all times relevant to this Complaint, ACUSA knew or should have known that it was an active and integral participant in a scheme to defraud consumers who enrolled in such services, including Plaintiffs and putative class members.

18.     Despite registering to do business in California in 2015, ACUSA is not in good standing with the California Franchise Tax Board (Entity ID 3795866).  **Figure 4** is a true and correct copy of the Entity Status Letter from the

California FTB providing that ACUSA "is **not** in good standing with the Franchise Tax Board."  ACUSA was not in good standing to do business in California at all times relevant to this Complaint.  Nor to the best of Plaintiffs' knowledge is ACUSA licensed in the State of California to broker or sell any form of health insurance. Accordingly, any contracts ACUSA entered into during the class period are voidable by Plaintiffs and by all putative class members.  *See* Cal. Rev. & Tax. Code § 23304.1.  Moreover, because ACUSA is not qualified to do business in California or defend itself in California courts, Plaintiffs and putative class members request default judgment be entered against ACUSA on all causes of action alleged herein.

**<u>Figure 4</u>**

**Franchise Tax Board Status Letter for ACUSA**



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
PO BOX 942857
SACRAMENTO CA 94257-0540

**Entity Status Letter**

Date:  5/13/2020

ESL ID: 5914868788

According to our records, the following entity information is true and accurate as of the date of this letter.

Entity ID:  3795866

Entity Name:   ALLIANCE FOR CONSUMERS USA, INC.

| | | |
|---|---|---|
| ☐ | 1. | The entity is in good standing with the Franchise Tax Board. |
| ☒ | 2. | The entity is **not** in good standing with the Franchise Tax Board. |
| ☐ | 3. | The entity is currently exempt from tax under Revenue and Taxation Code (R&TC) Section 23701. |
| ☐ | 4. | We do not have current information about the entity. |

19.     Defendant Liberty Health is an unregistered or entirely fictitious entity with a mailing address in Plainview, New York.  Liberty Health worked in association with Defendant ACUSA to provide limited benefit plans and medical discount memberships, like the ones at issue here.  Liberty Health uses a variety of legitimate looking websites to lure consumers into providing their personal health information to Liberty Health and affiliated entities that can use that information to sell consumers, like Plaintiffs and putative class members, sham health insurance.  Liberty Health uses Google ads and other schemes to attract consumers by making statements like "Top Rated Carriers" and "Avoid Tax Penalty" and "Health Insurance Quotes." *See* **Figures 5 and 6,** below.  At all times relevant to this Complaint, Liberty Health reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.   At all times relevant to this Complaint, Defendant Liberty Health knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  To the best of Plaintiffs' knowledge, Liberty Health is not licensed in the State of California to broker or sell any form of health insurance.

## Figure 5
### Liberty Health Google Advertisement

**Figure 6[2]**

**Liberty Health Insurance "Quote Generator" / Information Gathering Tool**



20.    Defendant AXIS is a foreign corporation with its headquarters in Bermuda.  AXIS and its affiliates and agents underwrite the sham health insurance plans that were sold by other Defendants to Plaintiffs and putative class members.  AXIS stock is sold on the New York Stock Exchange under the symbol AXS.  At 2019 year-end, AXS boasted of $7.4 billion in total capital and $25.6 billion in total assets.  Defendant AXIS and/or its state-side affiliates, including but not limited to Defendant AXIS Specialty, conduct a "verification" process during the sale of the sham insurance policies at issue.  At all times relevant to this matter, AXIS knew or should have known that it was an integral participant in Defendants' scheme to sell sham health insurance to consumers who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount, and availability of coverage provided under the purported "insurance" plans.

21.    At all times relevant to this Complaint, Defendant AXIS reaped the

_____

2 https://quote.firstquotehealth.com/?campaign_source=NG_HE_GSNC1&
campaignmedium=search&s2=Liberty%20Health%20Insurance&s1=1394477420&
gclid=CjwKCAjwte71BRBCEiwAU_V9h78ol3RKwxrx8wvvsAUET2z8e1JywLo
HrDA4kHeIYswHqBZpUJEbThoCBagQAvD_BwE&utm_term=Liberty%20Healt
h%20Insurance&utm_medium=search&utm_campaign=1394477420&utm_source
=NG_HE_GSNC1 (last accessed June 25, 2020).

benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration.  Moreover, at all times relevant to this Complaint, Defendant AXIS induced and aided and abetted the other Defendants to sell the sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including Defendants here, who sold these services while knowing or not having a reasonable basis for believing that these health insurance plans did not provide the coverage that Defendants promised to consumers.

22.    Defendant AXIS Specialty is a Delaware Corporation and the U.S. subsidiary of Defendant AXIS.  AXIS Specialty and/or its affiliates, conduct a "verification" process during the sale of the sham insurance policies at issue.  At all times relevant to this matter, AXIS Specialty knew or should have known that it was an integral participant in Defendants' scheme to sell sham health insurance to consumers, who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount and availability of coverage provided under the purported "insurance" plans.  At all times relevant to this Complaint, AXIS Specialty reaped the benefits of the scheme alleged herein and received compensation in the form of premiums or other monetary remuneration.  Moreover, at all times relevant to this Complaint, AXIS Specialty induced and aided and abetted the other Defendants to sell the sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including Defendants here, who sold these services, while knowing that these plans did not provide the coverage that Defendants promised to consumers, and having no reasonable basis for believing that the plans provided the coverage that Defendants promised to consumers.

23.    Defendant Administrative Concepts, Inc. ("ACI") is a Pennsylvania corporation with its principal place of business in Wayne, Pennsylvania.  ACI is a claims administrator for the sham health insurance plans sold to Plaintiffs and the

putative class members. At all times relevant to this Complaint, ACI reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value. At all times relevant to this Complaint, ACI knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members. *See* **Figure 7**.

### Figure 7

**ACI working as Claims Administrator for Defendant AXIS, Group Name Liberty Health - ACUSA**



24. Despite registering to do business in California in 1990, ACI is not in good standing with the California Franchise Tax Board (Entity ID 1671859). **Figure 8** is a true and correct copy of the Entity Status Letter from the California FTB providing that ACI "is **not** in good standing with the Franchise Tax Board." ACI was not in good standing to do business in California at all times relevant to this Complaint. Nor to the best of Plaintiffs' knowledge is ACUSA licensed in the State of California to broker or sell any form of health insurance. Accordingly, any contracts ACI entered into during the class period are voidable by Plaintiffs and by all putative class members. *See* Cal. Rev. & Tax. Code § 23304.1. Moreover, because ACI is not qualified to do business in California or defend

-14-

itself in California courts, Plaintiffs and putative class members request default judgment be entered against ACI on all causes of action alleged herein.

### Figure 8
### Franchise Tax Board Status Letter for ACI



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
PO BOX 942857
SACRAMENTO CA 94257-0540

**Entity Status Letter**

Date:   6/25/2020

ESL ID: 2016870918

**Why You Received This Letter**

According to our records, the following entity information is true and accurate as of the date of this letter.

Entity ID:  1671859

Entity Name:  ADMINISTRATIVE CONCEPTS, INC.

| | | |
|---|---|---|
| ☐ | 1. | The entity is in good standing with the Franchise Tax Board. |
| ☒ | 2. | The entity is **not** in good standing with the Franchise Tax Board. |
| ☐ | 3. | The entity is currently exempt from tax under Revenue and Taxation Code (R&TC) Section 23701 . |
| ☐ | 4. | We do not have current information about the entity. |
| ☐ | 5. | The entity was administratively dissolved/cancelled on                through the Franchise Tax Board Administrative Dissolution process. |

25.    Defendant Health Plan Intermediaries Holdings, LLC ("HPI") is a Delaware Corporation with its principal place of business in Tampa, Florida.  At all times relevant to this Complaint, HPI reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.  At all times relevant to this Complaint,

-15-

HPI knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members. HPI provided funding, trained the other Defendants' sales agents, and/or approved the script used to sell the insurance products and services.  HPI is a subsidiary and/or affiliate of Defendant HII.  Other states have already issued cease and desist orders against HPI for using fraudulent and dishonest practices in attempting to sell sham health insurance within those states.[3]

26.   Defendant Health Insurance Innovations Holdings, Inc. ("HII") is a Delaware Corporation with its principal place of business in Tampa, Florida.  At all times relevant to this Complaint, HII reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.  At all times relevant to this Complaint, HII knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members. HII is not licensed in the State of California to broker or sell any form of health insurance to the best of Plaintiffs' knowledge.  HII provided funding, trained the other Defendants' sales agents, and/or approved the script used to sell the insurance products and services.  HII is a subsidiary and/or affiliate of Defendant HPI.  Other states have already issued cease and desist orders against HPI for using fraudulent and dishonest practices in attempting to sell sham health insurance within those states.[4]

27.   Defendant First Health Group Corp. is a Delaware Corporation with its principal place of business in Rockville, Maryland.  At all times relevant to this Complaint, First Health reaped the benefits of the scheme alleged and received

---

[3] https://www.insurancejournal.com/news/southcentral/2016/03/28/403241.htm (last accessed June 25, 2020).

[4] *Id.*

compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.  At all times relevant to this Complaint, First Health knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.   First Health purports to provide the Preferred Provider (PPO) Network Access for the sham insurance at issue.  Indeed, First Health's website is listed on the back side of the "insurance" card provided to Plaintiffs and putative class members through the mail after they purchased what they believed to be PPO coverage (but was, in fact, not).  *See* **Figure 9**, below.  When you visit the website listed on the back of the health insurance card, www.firsthealthlbp.com, it states that you can locate a provider within your PPO network.  First Health's slogan reads: "Quality, value and accessibility – your national choice for PPO Network Solutions."  *See* **Figure 10**, below.  But First Health and all Defendants knew or should have known that they were not selling, underwriting or otherwise providing Plaintiffs or putative class members with comprehensive or PPO insurance coverage.  Moreover, to the best of Plaintiffs' knowledge First Health is not licensed in the State of California to broker or sell any form of health insurance.

<u>**Figure 9**</u>

**Back Side of Eric Ketayi's Insurance Card (Highlighting Added)**



**<u>Figure 10</u>**

**Website Identified on Mr. Ketayi's Insurance Card (www.firsthealthlbp.com)**



28.   Because these Defendants purposefully disguise the entity that is responsible for each step in Defendants' coordinated scheme, Plaintiffs direct each and every allegation in this Complaint, individually and collectively, to each and every Defendant.  Each Defendant has aided and abetted every other Defendant's acts, conspired in furtherance of Defendants' overall scheme, furthered the means for each Defendant's wrongdoing, or served as an agent of every other Defendant.

29.   At all times relevant to this Complaint, HEG, Liberty Health, ACUSA, ACI, AXIS, AXIS Specialty, HPI, HII, and First Health (collectively, "Corporate Defendants") have operated as a common enterprise and in a common course of conduct while engaging in the deceptive acts and practices and other violations of law alleged herein.  Corporate Defendants have conducted the business practices described below through interrelated companies, many of which have common ownership, officers, managers, business functions, and office locations, which have co-mingled assets, and hold themselves out as "Liberty

Health" to consumers.  *See* **Figure 11**.

### Figure 11

**Eric's "insurance" card identifying Defendants AXIS, Liberty Health, ACUSA and First Health**

 

30.   Corporate Defendants operated as a common enterprise to accomplish the wrongs complained of in this Complaint.  The purpose and effect of this common enterprise and common course of conduct complained of was to financially benefit Corporate Defendants at the expense of Plaintiffs and putative class members.  Each defendant was a direct, necessary, and substantial participant in the common enterprise and common course of conduct complained of herein and was aware of its overall contribution to, and furtherance of, the common enterprise and common course of conduct.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

### INDIVIDUAL DEFENDANTS

31.   Defendant Munoz is the President of Defendant HEG and is not a resident of the State of California.  Munoz incorporated HEG in the State of Florida in 2015.  At all times relevant to this Complaint, Munoz, through HEG, reaped the benefits of Defendants' scheme and received income or other monetary remuneration at the expense of consumers, who expended money on these services, which were of little to no value.  Munoz knew or should have known

that he was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  Munoz is associated with other entities that also purport to provide medical or health services as part of the scheme described in this Complaint, including but not limited to Comfort Medical.  To the best of Plaintiffs' knowledge, Munoz is not licensed in the State of California to broker or sell insurance underwritten by Defendant AXIS or AXIS Specialty.

32.   Defendant Romero is the Senior Vice President of Defendant HEG and is not a resident of the State of California.  At all times relevant to this Complaint, Romero, through HEG, reaped the benefits of Defendants' scheme alleged herein and received income or other monetary remuneration at the expense of consumers, who expended money on these services, which were of little to no value.  Romero knew or reasonably should have known that he was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  To the best of Plaintiffs' knowledge, Romero is not licensed in the State of California to broker or sell any form of health insurance.

33.   Defendant Juanita Nicolucci is the President of Defendant ACI and is not a resident of the State of California.  At all times relevant to this Complaint, Nicolucci through ACI, reaped the benefits of Defendants' scheme alleged herein and received income or other monetary remuneration at the expense of consumers, who expended money on these services, which were of little to no value. Nicolucci knew or reasonably should have known that he was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  To the best of Plaintiffs' knowledge, Nicolucci is not licensed in the State of California to broker or sell any form of health insurance.

34.   Defendants Munoz, Romero, and Nicolucci (collectively the "Individual Defendants") have formulated, directed, controlled, had the authority

-20-

to control, participated in and/or substantially aided in the acts and practices of the Corporate Defendants identified above that constitute the common enterprise. The Individual Defendants are therefore jointly and severally liable for the acts and omissions of the Corporate Defendants.

## III.    FACTUAL ALLEGATIONS

### Defendants' Bait and Switch Scheme Traps Consumers

35.    Defendants target consumers who are seeking comprehensive health insurance.  These consumers typically either do not have health insurance or pay high premiums for their insurance and are seeking comprehensive coverage that costs less than their current plans.

36.    Comprehensive health insurance plans generally involve an arrangement between an insurance company licensed to do business in the State of California and a consumer in which the company agrees to pay a substantial portion of the healthcare expenses that the consumer might incur in exchange for a consumer's premium payments.

37.    A preferred provider organization plan, commonly referred to as a PPO plan, is a type of comprehensive health insurance plan.  In a PPO plan, medical providers such as hospitals and doctors contract with an insurer or a third-party administrator to provide health care at reduced rates to the insurer's or the administrator's clients.

38.    Since at least November 2016 and at all times relevant during the class period, Defendants have uniformly claimed to offer consumers like Plaintiffs and putative class members comprehensive health insurance plans, including PPO plans.  Defendants lead consumers to reasonably believe that they will receive a comprehensive PPO health insurance plan that will cover preexisting medical conditions, prescription drug medications, primary and specialty care treatment, inpatient and emergency hospital care, surgical procedures, and medical laboratory testing.

-21-

39.     In their advertising and promotional materials that were made available since at least November 2016, including on their websites (examples of which are set forth above), Defendants uniformly claim to offer a broad selection of comprehensive health care insurance policies.  Those plans, in reality, do not exist.  HEG, for example, claimed its "PPO's work with over 80% of physicians Nationwide." (*See* **Figure 3**, above).  HEG also claimed to "work with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance" and "Obamacare."  (*See* **Figures 1 & 2**, above.)  In using the term "Obamacare," HEG effectively misleads consumers into believing that Defendants are offering comprehensive, ACA-qualified health plans.

40.     The products sold by Defendants to consumers like Plaintiffs are not, in fact, comprehensive health insurance or ACA-qualified health plans.  Nor do those products provide consumers with the benefits that Defendants promise.  Instead, Defendants enroll consumers in limited benefit plans, also known as limited benefit indemnity plans or hospital indemnity plans, and medical discount and wellness program memberships.  Limited benefit plans, in contrast to PPO plans, provide non-comprehensive coverage capped at a specific amount for a specific service, treatment, condition, or disease.  There is no agreement by which the company agrees to pay a substantial portion of the healthcare expenses that the consumer might incur in exchange for the consumer's premium payments.  Moreover, the "insurer" incurs no risk whatsoever when a consumer enrolls in a limited benefit plan, because often the premiums paid to obtain the plan based on the representations that the plan is a PPO plan exceed the maximum amount of coverage that the limited plan provides.

41.     In addition, to the best of Plaintiffs' knowledge, several of these Defendants are not licensed in California to solicit, sell, broker, offer to sell, underwrite, effect or enter into contracts or otherwise claim to provide health insurance coverage or plans, whether authentic or sham.  As a result, all of their

-22-

conduct is illegal, and all resulting contracts voidable and subject to rescission pursuant to, among other statutes, California Insurance Code section 1621 ("a person shall not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities defined in Article 1 (commencing with Section 1621) unless the person holds a valid license from the commissioner authorizing the person to act in that capacity.").

42.    Along with maintaining their own websites, Defendants advertise their limited benefit plans and medical discount plans, in part, through a network of lead generation websites. Consumers typically find these websites by conducting internet searches for "health insurance" and related terms.  Defendants own some of these sites themselves and also pay lead generators for leads generated on third-party sites.  **Figure 12** is an example of one of these lead generating websites:

**Figure 12**

**Example of Lead Generating Website**



43.    After consumers are lured in by misleading websites offering "comprehensive" health insurance, consumers typically connect with Defendants by phone.  Consumers speak to one of Defendants' trained sales representatives, who may identify themselves as an insurance agent supposedly licensed in the

-23-

consumer's state.  Consumers may also first speak to a pre-qualification representative who gathers personal background information about the consumer before transferring the call to another agent.   These "agents" typically are not properly licensed insurance agents, and, in fact, may not even be working under a licensed insurance agent.

44.    Using preapproved scripts that direct their sales representatives to make these statements to every potential customer, Defendants' agents promise the plans they sell will cover preexisting medical conditions, prescription medication, hospitalization, lab work, and access to primary care physicians, specialists, and other healthcare providers.  During their scripted speeches, Defendants' sales representatives refer to the monthly payments consumers must make as "premiums" and use other insurance terms of art, such as "PPO," "copay," "deductible," "coverage," and "preexisting conditions."  Because Defendants are not providing comprehensive health insurance, these terms have no relevance to the limited benefit plans and discount memberships that Defendants sell, and their use is false and misleading.

45.    These statements are all part of a script that experienced sales representatives and brokers are trained to deliver to each potential customer in order to deceive consumers, like Plaintiffs, into purchasing this sham health insurance service.  One former employee of Defendant HEG described their role as "mak[ing] calls to try to scam people into buying sub-par health insurance . . . ."  This is exactly what happened to Plaintiffs and the putative class members.

46.    Defendants tell consumers that the purported PPO health insurance plan they are offering is widely accepted by doctors in the consumers' geographical area, or that it is accepted by virtually all doctors in the country. Consumers such as Plaintiffs and putative class members reasonably rely on these representations in purchasing "insurance" from Defendants, believing they are purchasing comprehensive health coverage when in fact they are being offered a

-24-

limited benefit plan or medical discount membership that does not provide the represented coverage.

47. Further, consumers such as Plaintiffs and putative class members reasonably rely on Defendants' representations and believe they are receiving comprehensive health insurance and/or ACA-qualified plans. Defendants uniformly represent to consumers that the plans they offer are "comprehensive," (*see* **Figure 1**), or Obamacare (*see* **Figure 2**), or will allow them to "avoid tax penalties," (*see* **Figure 5**), none of which is true of the limited benefit plans and medical discount plans that Defendants offer.

48. Once a consumer expresses interest in purchasing a plan, Defendants arrange for payment by asking for the consumer's credit card information. Just before taking the consumer's payment information, Defendants' sales representatives transfer the call to a different person who, to the best of Plaintiffs' knowledge, works for Defendant AXIS or Defendant AXIS Specialty and guides the consumer through the "verification" process. Just before the transfer, Defendants' representatives instruct consumers to disregard any statements in the sham "verification" process that may indicate that the consumer will not be receiving comprehensive health insurance that covers preexisting medical conditions. Defendants' representatives also direct consumers to disregard statements made by the verification agent that are inconsistent with Defendants' sales pitch, assuring consumers that the insurance they are sold during the sales process (as opposed to the verification process) is the insurance that they will receive.

49. During the verification process, consumers are asked to confirm a series of complex, lengthy statements that are read from a script by the verification agent. The trained salespersons, following their scripts, caution consumers not to ask any questions during the verification process because, if they do, the entire process will be required to start over again.

50.     Defendants purposefully have a disclosure in the verification process that, in essence, asks the consumer to confirm that the consumer understands that the insurance will be governed by plan documents (to be provided at a later date) and not by the representations made by the sales agents.  Because consumers have been instructed to do so by Defendants' representatives, consumers (including Plaintiffs and putative class members) answer "yes" and do not ask questions concerning this disclosure.  Duped consumers, including Plaintiffs and putative class members, follow the instructions of the agent because they are told this is the required way for them to obtain the comprehensive coverage that they have been promised during the sales calls.  They are not provided the documentation to confirm such statements until after the process is completed, if at all, and thus would have no reason to believe that the paperwork will contradict everything they have been told in order to get them to enter into the transaction.

51.     After convincing consumers to proceed through the "verification" process, Defendants immediately request and obtain consumers' credit card information to begin charging their sale of such services.  Defendants do not offer consumers the opportunity to receive or review plan documents before Defendants charge consumers.

52.     Defendants record and save the verification calls with consumers. Defendants record only those portions of the conversation during which the consumers are told to ultimately assent to Defendants' verification statements in order to purchase the product offered.   Defendants apparently do not record the sales portions of their calls with consumers in an attempt to avoid a trail of evidence of their deception.

53.     Even after the sale is made, Defendants continue to deceive consumers.  To this end, Defendants make statements on the "insurance" cards provided to consumers through the mail that include the phrase "Preferred Provider (PPO) Network Access," and point consumers to a "PPO" Network

-26-

website that represents to be "your national choice for PPO network solutions." *See* **Figure 10**, above.  Defendants do so with knowledge that they have not actually sold, underwritten, or provided any sort of PPO plan or otherwise comprehensive coverage to consumers.

54.    Defendants' scheme has left thousands of consumers, including Plaintiffs and putative class members, with far less than the comprehensive health insurance they thought they were purchasing and essentially worthless health care coverage.  In addition to paying "premiums" for Defendants' limited benefit plans and medical discount memberships that provide benefits equal to or less than their cost, many of these consumers have incurred substantial medical expenses under the mistaken belief that these expenses would be covered by the health insurance they thought Defendants had sold them.  As the situation with Plaintiffs show, such premiums total thousands of dollars annually per class member—for Plaintiffs, close to $5,000 per year.  Defendants have thus fraudulently and/or illegally obtained millions of dollars from Plaintiffs and putative class members.

55.    Courts have rightly put a stop to similar predatory schemes that follow the same practice engaged in by Defendants here.  In May 2019, for example, a judge in the United States District Court for the Southern District of Florida entered a preliminary injunction against six corporate defendants and a related individual engaged in a "bait and switch scheme [that] led consumers to believe they were receiving comprehensive health insurance when, in fact, they received limited indemnity plans or discount memberships." *Fed. Trade Comm'n v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1353 (S.D. Fla. 2019).  There, as here, the defendants preyed on consumers who searched for health insurance online. *Id.* at 1354.  There, as here, the defendants employed a sales script that "g[a]ve consumers the impression that the coverage provided by [the defendants'] limited benefit plan was equal to, if not better than, major medical insurance" and required consumers to complete a sham "verification" process. *Id.* at 1355–56.

And there, as here, "Defendants made numerous misrepresentations to perpetrate their bait and switch scheme, including that: Defendants' limited benefits plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance; [and] Defendants' limited benefit plans and medical discount memberships are qualified health insurance plans under the ACA." *Id.* at 1356.  Based on this conduct, the court found that the defendants had "devised a fraudulent scheme to use consumer funds to enrich themselves" and, accordingly, entered an injunction against them. *Id.* at 1365.  The Eleventh Circuit affirmed the court's ruling earlier this year. *Fed. Trade Comm'n v. Simple Health Plans, LLC*, 801 F. App'x 685 (11th Cir. 2020).

### **Eric and Miryam Fall Victim to Defendants' Scheme**

56.    Eric and Miryam emigrated from Israel to the United States in 2004. Until the fall of 2016, they had comprehensive health insurance through Blue Cross/Blue Shield for themselves and their two children.  But they were caught in the "death spiral" of ever-increasing premiums, so they set out to look for less expensive options that provided comparable comprehensive PPO coverage.

57.    After searching for various options, Eric and Miryam found HEG's website.  They responded positively to the material claims, examples of which are set forth above, including that HEG's "PPO's work with over 80% of physicians Nationwide," and that HEG "work[ed] with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance," "Obamacare," and "PPO" plans.  Most material to Eric and Miryam was HEG's statement that it took pride in its "ability to help you find the most comprehensive insurance plan for the lowest possible price."

58.    To learn more, Eric and Miryam spoke with representatives from HEG[5] during three separate calls on November 22, 2016.  The "insurance" they

---

[5] As stated herein, part of Defendants' scheme is keeping consumers in the dark as to which entity is actually selling and providing the "insurance" plan.  Thus,

-28-

were offered sounded just like the comprehensive insurance coverage they sought. The sales representative described the plan to Eric and Miryam as a PPO plan and compared it to the Blue Cross/Blue Shield coverage that they had at the time. Defendants' representative knew, or reasonably should have known, however, that the plan being promoted was not a comprehensive PPO plan and was not comparable to the Plaintiffs' Blue Cross/Blue Shield comprehensive coverage.

59.   Defendants' representative followed their script, confusing Eric and Miryam with industry lingo and falsely stating the care and coverage that the plan offered.  The representative claimed that Eric and Miryam would have very small co-pays and no deductible.  The representative also assured Eric and Miryam that this seemingly comprehensive coverage would apply if Eric, Miryam, or their children were to visit almost any doctor in the country.   Yet Defendants' representative knew or reasonably should have known that the plan being offered and sold would provide little to no coverage when used at almost any medical provider's office.

60.   Defendants' sales representative told Eric and Miryam that Defendants could offer the PPO for their family for $379 per month—a significant amount but still much less than Eric and Miryam had been paying for their Blue Cross/Blue Shield coverage—because Defendants aggregated individuals from all over the country like a large corporation and could therefore negotiate "great deals" on behalf of consumers.  HEG's website at the time said, "Remember we work for you not the insurance company."

61.   When Eric and Miryam asked what the plan would cover, Defendants' representative again stated that the coverage was PPO and comprehensive, and listed only two types of excluded care: pregnancy and mental health.  The implication, of course, was that the plan would cover all other types

_____

Plaintiffs presume they were talking to a representative from HEG but may have been talking to a representative of another Defendant.

of care.  Defendants knew or reasonably should have known that these were misrepresentations and omissions of material fact.  Yet Defendants' representative apparently intended that Eric and Miryam reasonably rely on these misrepresentations and omissions of material fact to sign up for the "insurance" coverage promised.  Because Eric and Miryam were not planning to have another child, and because Defendants' representative made the plan sound so attractive, Eric and Miryam were willing to forgo their existing mental health coverage.

62.    Eric and Miryam were justified in relying on, and did reasonably rely on, Defendants' material representations and omission of material fact, examples of which are set forth above, and initiated the process of purchasing what they were led to believe was comprehensive health insurance.

63.    Defendants' representative then prepared to transfer Eric and Miryam to an agent[6] who could verify that Eric and Miryam "qualified" for the plan.  Before he did, though, the representative told Eric and Miryam that the verification agent would read them a series of statements, and that Eric and Miryam needed to say yes to all of those statements if they wanted to purchase Defendants' product.  The representative also told Eric and Miryam to ignore any statements that did not apply to them or the product they were purchasing.  The representative directed Eric and Miryam not to interrupt or ask questions during the process.  The representative told them that if they did, or if they answered no to any question, they would be forced to start the entire process over from the beginning.  The representative assured Eric and Miryam that, whatever was said during the verification call, Eric and Miryam would receive the comprehensive health insurance that Defendants had touted and that the representative had described.

_____

[6] Plaintiffs recall that the "verification" agent was named George or Joel.   It appears for some reason most if not all of Defendants' verification agents are named George or Joel.

64.   Even though they did not understand or agree with everything that was being said during the process, Eric and Miryam felt pressured to agree with all of the verification statements based on the representative's directions to them. And because they wanted to obtain what Defendants had characterized as comprehensive PPO health insurance for a low price, Eric and Miryam obeyed the representative's command and answered yes to every question.

65.   With the sham verification completed, and at Defendants' request, Eric and Miryam immediately provided their credit card information to cover the first month's payment on their purchase.  Once done, Eric and Miryam believed that they had successfully obtained comprehensive health insurance that covered their entire family.  They paid the "premiums" for this coverage beginning in November 2016.

66.   Even after the sale was made, Defendants continued to deceive Eric and Miryam.  As an example, the back of the "insurance" cards provided to Eric and Miryam through the mail include the phrase "Preferred Provider (PPO) Network Access" and pointed Eric and Miryam to a "PPO" Network website that represented to their "national choice for PPO network solutions."  Defendants did so with knowledge that they had not actually sold, underwritten, or provided any sort of PPO plan or otherwise comprehensive coverage to Eric and Miryam.

67.   Eric and Miryam eventually discovered that the plan they had purchased, and for which they were paying, was almost entirely worthless.  On July 29, 2017, Eric was admitted to Cedars-Sinai Hospital for back surgery.  He stayed in the hospital for six nights before he was discharged on August 4, 2017.  It was a major surgery and a painful recovery.

68.   The recovery was made even more painful when Eric received Explanation of Benefits (EOBs) statements from "Axis Insurance Company" and ACI regarding his "LIBERTY HEALTH – ACUSA" insurance in or about November 2017.  For the six-night hospital stay, Defendants paid only $1,500.

Eric's responsibility was $176,786.49.  For the surgery itself, Defendants paid $0.
Eric's responsibility was $16,250.  And for other necessary care provided during
Eric's stay, Defendants paid $0 and Eric's responsibility was $1,330.24.  All told,
the "insurance" that Defendants had advertised, marketed, and sold as
comprehensive PPO health insurance covered only $1,500 for Eric's surgery,
while Eric was left to cover $194,366.73.  Yet by that time, Plaintiffs had paid
Defendants about $4,500 in "premiums"—around three times the amount that
Defendants would ultimately cover for Eric's surgery.  Plaintiffs thus have been
injured in fact, suffered damage, and lost money or property as a result of
Defendants' illegal, fraudulent, deceptive, and misleading business acts and
practices.

69.    After receiving these EOBs, Eric contacted AXIS to dispute the lack
of coverage under what Defendants represented to be comprehensive coverage.
Despite Eric's complaints and attempts to resolve this issue prior to initiating
action, AXIS did not alter its level of coverage or agree to further contribute to
Eric's care.  Eric was unable to reach any other Defendant to discuss the issue.

70.    Eric and Miryam now face debt collectors who are seeking to recover
the extensive medical bills for which Defendants promised, but failed, to pay.

71.    Plaintiffs' experience does not appear to be an isolated, atypical, or
unique occurrence.  There are hundreds of reports online from victims nationwide
which corroborate Plaintiffs' allegations in this Complaint: that Defendants claim
to provide comprehensive health coverage but, in reality, offer a product that is
virtually worthless.[7]

## IV.   CLASS ALLEGATIONS

72.    Plaintiffs bring this action as a class action pursuant to Federal Rule

---

[7] *See, e.g.*, https://chicago.cbslocal.com/2019/02/11/simple-health-plans-insurance-scam-lawsuit-ftc-deceptive-sales-tactics/, where AXIS underwrote the at-issue sham "insurance."  (Last accessed June 25, 2020.)

of Civil Procedure 23 on behalf of a Nationwide Class or, in the alternative, a Multi-State Class or California-Only Class (collectively "Class"):

**Nationwide Class**

All persons within the United States who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

**Multi-State Class**

All persons within California and other states with similar laws who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

**California-Only Class**

All persons in California who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

73.    The Class includes all persons who purchased such services during the period at least four years from the date of the filing of this Complaint, and continues until the date that notice of this action is disseminated to putative class members.

74.    Excluded from any class are: (i) Defendants and their officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

75.    Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

76.    This action is properly maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) for the reasons set forth below.

-33-

77.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**
Prospective class members, however defined, are readily ascertainable by way of
Defendants' records and are so numerous that joinder of all members is
impracticable.  Defendants have ready access to records that can easily determine
the number of persons who have purchased these products.  Based on the number
of complaints about this practice that they have seen online, Plaintiffs estimate
that members of the class consist of thousands of individual consumers.

78.     **Commonality—Federal Rule of Civil Procedure 23(a)(2).**  There
are numerous and substantial questions of law or fact common to all members of
the class that predominate over any individual issues.  Included within the
common questions of law or fact are:

     a.    Whether Defendants engaged in unlawful, unfair, or fraudulent
business acts or practices in advertising, marketing, selling, or
administering limited benefit plans and medical discount plans that
are systematically represented to be comprehensive health
insurance, and omitted material facts to the contrary;

     b.    Whether Defendants made untrue or misleading statements or
omitted material facts in connection with advertising, marketing,
selling, or administering limited benefit plans and medical
discount plans that are systematically represented to be
comprehensive health insurance;

     c.    Whether Defendants engaged in a pattern or practice of making
material misrepresentations or omissions of material fact to
individuals in the process of advertising, marketing, selling, or
administering limited benefit plans and medical discount plans that
are systematically represented to be comprehensive health
insurance;

     d.    Whether Plaintiffs and the class members are entitled to equitable

monetary and/or injunctive relief;

e.  Whether Plaintiffs and the class members have sustained damage as a result of Defendants' unlawful conduct; and

f.  The proper measure of damages sustained by Plaintiffs and class members.

79.  **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the members of the class they seek to represent. Plaintiffs, like the class members, purchased Defendants' products after falling victim to Defendants' uniformly deceptive advertising and marketing scheme, including systematic false and misleading statements and omissions of material fact related to those products.  Thus, Plaintiffs' claims arise from the same practices and course of conduct and are based on the same legal theories that give rise to the claims of the other class members.  Defendants' unlawful, unfair, and/or fraudulent business acts and practices, including the use of a internet websites and a scripted sales pitch, concern the same business practices described, irrespective of where they occurred or were experienced.  Plaintiffs and the class members also sustained similar injuries arising out of Defendants' conduct.

80.  **Adequacy—Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate representatives of the class they seek to represent because their interests do not materially or irreconcilably conflict with the interests of other members of the class.  On the contrary, Plaintiffs will fairly, adequately, and vigorously protect the interests of class members and have retained counsel experienced and competent in the prosecution of complex cases, including complex class action litigation.

81.  **Appropriate Class-wide Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**  For the reasons described, Defendants have acted on grounds generally applicable to the class, thereby making final injunctive or equitable relief appropriate with respect to the class as a whole.

82.     **Predominance and Superiority—Federal Rule of Civil Procedure 23(b)(3).**  As described above with respect to commonality, there are numerous and substantial questions of law or fact common to class members that predominate over any questions that affect only individual members.  In addition, class treatment is superior to other available group-wide methods for the fair and efficient adjudication of the this action because it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and burden on the courts that individual actions would entail.

83.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are superior to any other method available for the fair and efficient group-wide adjudication of these claims.  Absent a class action, it would be highly unlikely that Plaintiffs or any other putative class members would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

## <u>COUNT I</u>

**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.***

84.     Plaintiffs reallege and incorporate by reference all allegations set forth in the proceeding paragraphs as if fully set forth verbatim herein.

85.     Plaintiffs bring this claim under California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.* ("section 17200"), on behalf of themselves and the class and for the benefit of the general public.  Section 17200 prohibits any "unfair," "fraudulent," or "unlawful" business act or practice.

86.     Defendants committed "fraudulent" business acts or practices by, as fully set forth above, making uniform misrepresentations and omissions of

-36-

material fact regarding the limited benefit plans and medical discount plans. Defendants' business practices as alleged herein are "fraudulent" under section 17200 because they are likely to deceive consumers into believing that the limited benefit plans and medical discount plans which Defendants offer are comprehensive PPO health insurance even though they are not.  This conduct is also fraudulent because Plaintiffs and consumers are reasonably led to believe that Defendants may legally offer such services, when in fact they are prohibited by law from doing so.

87.   Plaintiffs and the other members of the class have in fact been deceived as a result of Defendants' material representations, which are described above.

88.   Defendants committed "unfair" business acts or practices by, among other things: (1) making the false and misleading statements described herein; (2) falsely and deceptively advertising their products as described herein; (3) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs, class members and the public; (4) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs, class members, and the public; (5) engaging in conduct that undermines or violates the spirit or intent of section 17200 or the laws detailed herein; and (6) engaging in conduct that is expressly prohibited by law with respect to the unlicensed sale of health insurance.

89.   Defendants committed "unlawful" business acts or practices by, among other things: (1) not having the licenses required by California law and acting in violation of, inter alia, California Insurance Code section 1621; (2) falsely and deceptively advertising their services as described herein in violation of California Business & Professions Code section 17500; (3) engaging in conduct that violates numerous provisions of the Consumers Legal Remedies Act as set forth below; (4) engaging in conduct that constitutes fraud and deceit as

-37-

defined in California Civil Code section 1709; and (5) engaging in conduct that violates other state laws as may be identified in the course of this action.

90.   Plaintiffs, individually and on behalf of the other class members, reserves the right to allege other conduct that constitutes other unfair, fraudulent, or unlawful business acts or practices, as Defendants' conduct is ongoing.

91.   Plaintiffs have suffered injury in fact and lost money as a result of Defendants' unlawful, unfair, or fraudulent practices, as set forth above.  Plaintiffs and Class members were harmed by entering into transaction and paying for a product that is not what Defendants represented it to be, thereby surrendering more in a transaction than they otherwise would have if the true facts had been timely disclosed, if they would have entered into such transactions at all. Defendants were thereby unjustly enriched by such business acts and practices.

92.   Pursuant to Business & Professions Code section 17203, Plaintiffs, individually and on behalf of the class and for the benefit of the public, request all applicable remedies and relief allowable under section 17200.  Plaintiffs seek an order enjoining Defendants from engaging in the illegal business acts and practices alleged herein.  Plaintiffs also seek an order awarding Plaintiffs and the class restitution and restitutionary disgorgement of the money wrongfully acquired and/or retained by Defendants by means of illegal business acts and practices alleged herein.  This includes but is not limited to restitution of all amounts paid in false "premiums" for "health insurance" that provided next to no coverage, and the money and profits kept by Defendants as a result of not making the payments for health care services and products that the Defendants promised to make.

93.   Plaintiffs and the class members are further entitled to prejudgment interest as a direct result of Defendants' illegal business acts and practices.  The amount on which interest is to be calculated is a sum certain and capable of calculation, in an amount according to proof.

94.     Plaintiffs' counsel are also entitled to fees and costs pursuant to, inter alia, California Code of Civil Procedure section 1021.5.

<u>**COUNT II**</u>

**False And Misleading Advertising in Violation of California Bus. & Prof. Code § 17500 *et seq.***

95.     Plaintiffs reallege and incorporate by reference all allegations set forth in the proceeding paragraphs as if fully set forth verbatim herein.

96.     Defendants use and disseminate advertising to sell their limited benefit plans and medical discount plans, including through use of the internet.

97.     As set forth above, this advertising is deceptive, untrue, or misleading within the meaning of California Business & Professions Code section 17500 *et seq.* ("section 17500"), because the statements made on Defendants' websites, and by Defendants' sales representatives, are misleading and likely to deceive, and continue to deceive, members of the class and the general public regarding the services/products Defendants provide.

98.     In making and disseminating the statements alleged herein, Defendants knew or, by the exercise of reasonable care should have known, that the statements were untrue or misleading.

99.     The misrepresentations and omissions by Defendants of the material facts detailed above are false and misleading advertising and therefore violate section 17500 because it is likely that a significant portion of the general public and/or Defendants' targeted customers, acting reasonably under the circumstances, could be misled.

100.    As a result of these  acts and practices, Defendants have improperly and illegally obtained money from Plaintiffs and class members.

101.    Defendants' conduct is ongoing and continues to harm consumers, class members and the public.  Plaintiffs therefore seek the relief described in Count I.

## **COUNT III**

### **Violation of Consumers Legal Remedies Act (CLRA)**

### **California Civil Code § 1750 *et seq.***

102.  Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein, with the exception of any claims for damages. Plaintiffs do not assert a claim for damages under this count at this time.

103.  Under California Civil Code section 1770(a), the following "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of . . . services to any consumer are unlawful":

- "Representing that goods or services have sponsorship, approval, *characteristics*, ingredients, uses, *benefits*, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Civ. Code § 1770(a)(5).

- "Representing that goods or services are *of a particular standard, quality, or grade*, or that goods are of a particular style or model, if they are of another." *Id.* § 1770(a)(7).

- "Advertising goods or services *with intent not to sell them as advertised*." *Id.* § 1770(a)(9).

- "Representing that a transaction confers or involves *rights, remedies, or obligations which it does not have or involve, or which are prohibited by law*." *Id.* § 1770(a)(14).

(Emphasis added.)

104.  Here, in connection with Defendants proposing or engaging in transactions with consumers that were intended to result, or actually resulted in, the sale of services by Defendants as detailed more fully herein, Defendants, either by making affirmative misrepresentations as set forth above or omitting material facts from disclosure they were bound to disclose as set forth above, represented

-40-

that their health plans, rates and alternate offers of coverage are offered, administered, and provided in compliance with state law and are comparable to PPO health plans and/or failed to disclose the material fact that their health plans are not offered in compliance with state law.

105.  Such acts and practices were designed or intended by Defendants to convince class members and the public to purchase such services from Defendants in at least the following ways:

- Deceptively represented to class members that the individual health plans entered into with class members, and renewed monthly, involved rights and obligations that complied with applicable law and provided benefits required under the law which they do not in fact have, in violation of Civil Code section 1770(a)(5).

- Deceptively promoted their health plans as complying with applicable law and providing benefits consistent with and required under the law, with the intent not to sell them as advertised in violation of Civil Code section 1770(a)(9).

- Represented that the sale and monthly renewal of individual health plan contracts involved rights, remedies, or obligations, including rights, remedies and obligations defined by the Insurance Code and that they were authorized to solicit, offer and sell, which they do not have or involve or which are prohibited by law, in violation of Civil Code section 1770(a)(14).

106.  The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

107.  For purposes of the CLRA, a "'[t]ransaction' means an agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance

pursuant to, that agreement." Cal. Civ. Code § 1761(e).  Here, the "transactions" at issue are governed by the CLRA because they include both the original sale and the monthly renewals of the individual contracts made and entered into by Defendants, Plaintiffs, and class members, as well as Defendants' performance of their obligations under such agreements.

108.  In making decisions whether to obtain such services and pay the rates imposed by Defendants, Plaintiffs and other class members reasonably acted in positive response to the misrepresentations and omissions of material fact as set forth in detail above relating to the legality of their conduct, the rates they calculated and charged, and the scope of such coverage, or would have considered the omitted facts detailed herein material to their decisions to do so.  Consumers enrolled in such services without being informed of their rights, and suffered damage as a result of the material misrepresentations of fact and omitted material facts as set forth above.

109.  For purposes of the CLRA, "'[s]ervices' means work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods."  Cal. Civ. Code § 1761(b).  Here, the plans at issue constitute "services" as defined by the CLRA as they are services provided for personal family use.

110.  For purposes of the CLRA, "'[c]onsumer' means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes."  Cal. Civ. Code § 1761(d).  Here, Plaintiffs, class members, and members of the public are "consumers" because they obtained and renew monthly their individual contracts for the services in question for personal, family or household purposes.

111.  Plaintiffs and members of the class have suffered damage as a result of the wrongful acts and practices of Defendants set forth herein, as they have either been duped into paying higher rates than required by law, pay the same or more

-42-

money for lesser coverage, or enter into transactions with Defendants that were illegal under the law for Defendants to inter into.  Plaintiffs and members of the Class have also suffered transactional costs by expending time and resources in the form of correspondence and telephone conversations with Defendants in attempt to avoid the consequences of Defendants' unfair methods of competition and unfair or deceptive acts.  Plaintiffs and members of the class have also suffered opportunity costs by foregoing the opportunity to switch to other coverage offered by other companies and the resulting risk of having not done so.

112.  Notice pursuant to section 1782 of the CLRA will be provided to Defendants by certified mail.  If Defendants fail to provide all requested relief in response to that notice, Plaintiffs and class members will seek general, actual, consequential, and statutory damages.

113.  Plaintiffs seek equitable relief in the form of restitution of all monies paid to Defendants that are illegally retained and should be disgorged, an injunction for the benefit of class members and the public to prevent Defendants from illegally engaging in conduct as set forth above, and all appropriate fees and costs as are permitted under that statute, including Civil Code section 1780(d).

## COUNT IV

### Fraud and Deceit – Civil Code Section 1709

114.  Plaintiffs reallege and incorporate by reference all allegations set forth in the proceeding paragraphs as if fully set forth verbatim herein.

115.  As detailed above, Defendants made false representations, concealed material facts, and acted with an intent to deceive Plaintiffs and class members when uniformly advertising, marketing, selling, and administering their limited benefit plans and medical discount plans.

116.  Defendants' uniform scripted misrepresentations and omissions of material fact include, at minimum:

- That Defendants help consumers find the most comprehensive

insurance plan for the lowest possible price.

- That Defendants worked on behalf of consumers.
- That the "health insurance" Defendants offered was comparable to the comprehensive health insurance that consumers possessed and was comparable to PPO coverage.
- That Defendants' product would provide substantial coverage if Plaintiffs or class members were to visit almost any doctor in the country.
- That Defendants' product would cover every category of health care except pregnancy and mental health treatment.

117.  Defendants knew or reasonably should have known that their representations or omissions of material fact they were duty bound to disclose were false when made or made the representations recklessly and without regard for their truth.

118.  Defendants' statements, actions, and omissions were intended to deceive Plaintiffs and class members for Defendants' own benefit.

119.  Plaintiffs and class members justifiably relied on Defendants' misrepresentations and omissions, representative examples of which are set forth above.

120.  Plaintiffs and class members suffered financial damage in the form of, among other things, wasted payments and unpaid medical bills as a direct result of Defendants' misrepresentations, material omissions, and deceptive acts.

121.  Defendants' conduct was intended to cause injury to members of the class and/or was despicable conduct carried on with a willful and conscious disregard of the rights of members of the class, subjected members of the class to cruel and unjust hardship in conscious disregard of their rights, and was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with the intention to deprive members of the class of money, property,

-44-

legal rights or to otherwise cause injury.  Such conduct constitutes malice, oppression, or fraud under California Civil Code section 3294 and entitles Plaintiffs and members of the class to punitive or exemplary damages in an amount appropriate to punish or set an example of and deter Defendants from engaging in such conduct.

<u>**COUNT V**</u>

**Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C §**
**1961 *et seq.***

122.  Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein

123.  Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

124.  Each Defendant violated 18 U.S.C. § 1962(c) and (d) by the acts described in this Complaint.  Specifically:

    a.  Each Defendant's activities affected interstate commerce;

    b.  Each Defendant conducted or participated, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity.

    c.  Each Defendant conspired to participate, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity.

125.  **The Enterprise.**

    d.  Defendants, and each of them, formed an association-in-fact for the common and continuing purpose described in this Complaint. Together, they constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.  Defendants, as the members of the enterprise, functioned as a continuing unit with ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

e. Defendants, and each of them, knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning on 18 U.S.C § 1691 *et seq.* The racketeering activity was made possible for Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants have the specific intent to engage in the substantive RICO violations alleged herein.

f. Alternatively, Defendants HEG, ACI, ACUSA, Liberty Health, Axis, Axis Specialty, HII, and HPI each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

g. Alternatively, some of Defendants, together, constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

126. Each enterprise has engaged in, and their activities have affected, interstate commerce.

127. Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises alleged above by overseeing and coordinating the commission of multiple acts of racketeering as described below.

128. **Pattern of Racketeering Activity.** Defendants, each of whom are persons associated with, or employed by, the enterprise(s), did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), 1962(c), and 1962(d). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

129. Predicate acts of racketeering activity are acts which are indictable under the provisions of the U.S. Code listed in 18 U.S.C § 1961(1)(B) and which

are more specifically discussed herein.  Each Defendant committed at least two such acts or else aided and abetted such acts.

130.  These acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission.  Further, the acts of racketeering by Defendants have been continuous.  There was repeated conduct during a period of time continuing to the present, and there is a continued threat of repetition of such conduct.

131.  The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond their racketeering activity.  Rather, they existed separate and apart from the pattern of racketeering activity for legitimate business purposes.

132.  **Predicate Act:  Use of Mails and Wires to Defraud.**  Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs and putative class members of money by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails, via the internet, via facsimile and/or by private or commercial interstate carriers, or received such therefrom.  Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals.

133.  The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

134.  Defendants carried out their scheme in different states and could not

-47-

have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

135.  In furtherance of their scheme alleged herein, Defendants communicated among themselves and with Plaintiffs and putative class members in furtherance of the scheme to defraud Plaintiffs and putative class members. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers.

136.  Specifically, Defendants used the wires and/or U.S. mail or private or commercial carriers for the purposes of their fraudulent scheme both in terms of the promotional materials set forth above and sending and/or obtaining documents from Plaintiffs and Class members.  Defendants also communicated by the wires and/or U.S. mail or private or commercial carriers to facilitate payment of the "premiums"' by Plaintiffs and Class members pursuant to their fraudulent scheme.

137.  In addition, in furtherance of their scheme, Defendants used the wires and/or U.S. mail or private or commercial carriers to induce Plaintiffs to purchase this sham health insurance.  Defendants also communicated by the wires and/or U.S. mail or private or commercial carriers to facilitate the sales and subsequent purchases, including accepting payments in the form of "premiums" over the Internet or by mail.

138.  Plaintiffs and putative class members reasonably and justifiably relied on Defendants' false misrepresentations and deceptive communications as alleged in this Complaint.

139.  Plaintiffs and putative class members have been damaged as a direct and proximate result of Defendants' participation in the enterprise.

140.  **Continuity of Conduct.**   Defendants' violations of state and federal laws as set forth in this Complaint, each of which directly and proximately injured Plaintiffs and putative class members, constituted a continuous course of conduct spanning a period of time encompassing at least 2016 through the present.

Defendants' conduct was intended to obtain money through false representations, fraud, deceit and other improper and other unlawful means, including the sale and underwriting of purported  "insurance" when Defendants were not licensed to do so, fraudulently convincing consumers to pay "premiums" for purported coverage that was worthless, and duping consumers into believing they were receiving ACA qualified coverage when, in fact, consumers were not.

141.  Accordingly, Plaintiffs and putative class members seek an award of actual damages.  Plaintiffs further seek an award three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by statute.

## COUNT VI

## Conspiracy to Violate Federal Civil RICO, 18 U.S.C § 1961 *et seq.*

142.  Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein

143.  In violation of 18 U.S.C. § 1962(d), Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in this Complaint.

144.  The conspiracy commenced at least as early as 2016 and is ongoing.

145.  The conspiracy's purpose was to defraud consumers, like Plaintiffs and putative class members, for their own benefit.

146.  Each Defendant committed at least one overt act in furtherance of the conspiracy.  These acts in furtherance of the conspiracy included, among others, creating scripts to solicit, mislead and fraudulently induce consumers to purchase sham health insurance, training sales agents to fraudulently induce consumers to purchase sham health insurance, creating websites to induce consumers to purchase sham health insurance, selling sham health insurance, underwriting sham health insurance, conducting a fraudulent "verification" process during the sale of

-49-

sham health insurance, funding the fraudulent activities of the other defendants, collecting debts from Plaintiffs and putative class members that were incurred based on Defendants' fraudulent misrepresentations, and/or facilitating any and all of Defendants' conduct as stated in this Complaint.

147.  Even if Defendants did not agree to harm Plaintiffs or putative class members specifically, the purpose of the acts they engaged in was to advance of the overall subject of the conspiracy, and harm to Plaintiffs and putative class members was a reasonably foreseeable consequence of Defendants' actions.

148.  Plaintiffs and putative class members have been injured and continue to be injured by Defendants' conspiracy.  The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs and putative class members.

149.  Plaintiffs and putative class members seek an award of damages in compensation for, among other things, the money Defendants fraudulently obtained from Plaintiffs and putative class members.  Plaintiffs further seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

///
///
///
///
///
///
///
///
///
///

CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, individually, and on behalf of all others similarly situated and for the benefit of the general public, as applicable, pray for relief pursuant to each cause of action set forth in this Complaint as follows:

A.     An order declaring that this action can be maintained as a class action, certifying the Nationwide Class as requested herein, or, in the alternative, the Multi-State Class or California-Only Class, designating Plaintiffs as class representatives and appointing the undersigned counsel as class counsel;

B.     Restitution in such amounts so as to restore the status quo ante;

C.     Restitutionary disgorgement of all profits and unjust enrichment that Defendants obtained as a result of Defendants' illegal conduct as set forth herein;

D.     Temporary, preliminary, and permanent injunctive relief, including enjoining Defendants from continuing the illegal practices as set forth herein and ordering Defendants to engage in a corrective advertising campaign;

E.     Compensatory damages (except as to the claims under section 17200, section 17500, and the CLRA);

F.     Punitive or exemplary damages (except as to the claims under section 17200, section 17500, and the CLRA);

G.     Three times the damages sustained pursuant to the applicable RICO statutes;

H.     Attorneys' fees and litigation costs under the theories and statutes set forth above;

I.     Pre- and post-judgment interest on any amounts awarded to Plaintiffs and class members; and

J.     Such other and further relief as may be just and proper.

///

///

///

1

**JURY TRIAL DEMANDED**

2

Plaintiffs demand a jury trial on all causes of action and issues so triable.

3

4    Dated:  June 26, 2020                         **FOX LAW, APC**

5

6                                                   /s/Dave A. Fox
                                                    David A. Fox
7                                                   Joanna L. Fox
                                                    Russell A. Gold
8                                                   Michael F. Gosling

9

10

11   Dated:  June 26, 2020                         **CONSUMER LAW GROUP OF
                                                    CALIFORNIA**

12                                                  /s/ Alan M. Mansfield
                                                    Alan M. Mansfield
13

14                                                  *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-52-