1   David A. Fox (SBN  254651)
    dave@foxlawapc.com
2   Joanna L. Fox (SBN 272593)
    joanna@foxlawapc.com
3   Russell A. Gold (SBN 179498)
    russ@foxlawapc.com
4   Michael F. Gosling (SBN305845)
    mike@foxlawapc.com
5   **FOX LAW, APC**
    225 W. Plaza Street, Suite 102
6   Solana Beach, CA 92075
    Tel:  858-256-7616
7   Fax: 858-256-7618

8   Alan M. Mansfield (SBN: 125998)
    alan@clgca.com
9   **Consumer Law Group of California**
    16870 W. Bernardo Drive, Suite 400
10  San Diego, CA 92127
    (619)308-5034
11
    *Attorneys for Plaintiffs*
12

13

14              **IN THE UNITED STATES DISTRICT COURT**

15           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

16

17  ERIC KETAYI, and MIRYAM KETAYI,      CASE NO. 20cv1198 GPC (KSC)
    both individually and on behalf of all
18  others similarly situated and for the    **CLASS ACTION**
    benefit of the general public,
                                             **FIRST AMENDED**
19              Plaintiffs,                  **CLASS ACTION COMPLAINT**
                                             **FOR DAMAGES,**
20  v.                                       **RESTITUTION, AND**
                                             **INJUNCTIVE RELIEF**
21  HEALTH ENROLLMENT GROUP, a
    Florida corporation; ADMINISTRATIVE
22  CONCEPTS, INC., a Pennsylvania          **DEMAND FOR JURY TRIAL**
    corporation; AXIS, a Bermuda           **ON ALL CAUSES OF ACTION**
23  corporation d/b/a Axis Insurance        **SO TRIABLE**
    Company; AXIS SPECIALTY U.S.
24  SERVICES, INC., a Delaware
    corporation; ALLIANCE FOR
25  CONSUMERS USA, a Nebraska
    corporation;; HEALTH PLAN
26  INTERMEDIARIES HOLDINGS, LLC,
    a Delaware Corporation; HEALTH
27  INSURANCE INNOVATIONS
    HOLDINGS, INC., a Delaware
28

FIRST AMENDED CLASS ACTION COMPLAINT

1   Corporation; FIRST HEALTH GROUP,
    CORP., a Delaware Corporation, MARC
2   MUNOZ, an individual; and KEVIN
    ROMERO, an individual, inclusive,
3
4                   Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-

Plaintiffs Eric Ketayi and Miryam Ketayi ("Plaintiffs") bring this First Amended Class Action Complaint ("First Amended Complaint") against Health Enrollment Group ("HEG"), Alliance for Consumers USA ("ACUSA"), Administrative Concepts, Inc. ("ACI"), AXIS ("Axis Insurance Company"), AXIS Specialty U.S. Services, Inc. ("Axis Specialty"), Health Plan Intermediaries Holdings, LLC ("HPI"), Health Insurance Innovations Holdings, Inc. ("HII"), First Health Group, Corp. ("First Health"), Marc Munoz ("Munoz"), and Kevin Romero ("Romero"), inclusive (collectively, "Defendants").  Plaintiffs bring this action individually and on behalf of all others similarly situated and for the benefit of the general public, and allege the following upon personal knowledge as to Plaintiffs' acts and experiences as specifically identified, and as to all other allegations based on information and belief based on, among other things, investigation into such allegations conducted by Plaintiffs' attorneys.

## I.  **INTRODUCTION**

1.  This case concerns the deceptive, false, fraudulent, unlawful, and/or unfair advertising, marketing, sale, and underwriting of sham "health insurance" by Defendants.

2.  Using a convoluted web of companies, Defendants trick consumers, like Plaintiffs and the putative class members, into purchasing limited benefit plans and medical discount memberships that, as Defendants are aware, provide little to no value.  Employing numerous websites promising "comprehensive coverage," names that sound like legitimate insurance companies, and salespeople and underwriting agents trained to follow a strict sales script that is uniformly delivered to all potential customers during phone calls, Defendants promote, advertise, offer for sale, and/or sell consumers, like Plaintiffs and the putative class members, products that those consumers believe to be low-cost, comprehensive, Preferred Provider Organization ("PPO") medical health

insurance coverage.[1]

3.     Defendants represent that they can provide such comprehensive coverage at a low cost by aggregating consumers into a plan in the same way a large corporation would.  Together, Defendants make consumers believe that they can "beat the system" and receive comprehensive insurance that meets the requirements of the 2010 Affordable Care Act ("ACA") when, in fact, what they receive is essentially worthless, because it covers only a fraction of most health care costs.

4.     Defendants know, or should reasonably know, that the products and services they offer are essentially worthless.  But Defendants' business is based on duping consumers into believing that they are paying for, and receiving, valuable medical insurance coverage.  Through deceptive advertising, material misstatements, and critical omissions, Defendants convince consumers, like Plaintiffs and the putative class members, that they are purchasing the type of comprehensive health insurance coverage like that provided through a PPO.  In truth, consumers are paying for a product—represented to be "insurance"—that is often worth less than the "premiums" it costs and that does not provide the coverage Defendants promise.

5.     Even after the sale is made, Defendants continue to deceive consumers.  Defendants make statements on the "insurance" cards provided to consumers through the mail that include the phrase "Preferred Provider (PPO) Network Access" and point consumers to a "PPO" Network website that represents to be "your national choice for PPO network solutions."  Defendants do so with knowledge that they have not actually sold, underwritten, or provided any sort of PPO plan or other comprehensive coverage to consumers.  Throughout the

---

[1] As described herein, some Defendants are not licensed to sell health insurance in California or in many other states throughout the country where they purport to do so.

life of the scheme, Defendants' claims and omissions of material fact are likely to, and did, deceive consumers like Plaintiffs and the putative class members into paying, or continuing to pay, "premiums" (sometimes for years on end) for what they believe is health insurance coverage that is illusory when they use it.

6.     Once consumers realize they have been cheated, it is too late. Consumers are out hundreds or thousands of dollars in payments to Defendants for sham health care coverage.  If they realize the issue at the point when they have incurred an injury or loss, it is difficult to get replacement health care coverage—especially coverage that would cover the actual injury or loss.  In some instances, consumers may also owe tens of thousands of dollars in payments to medical providers for services that Defendants claimed the insurance covered when in fact no or minimal coverage was available.

7.     Defendants have victimized consumers all over the country and profited at their expense.  Plaintiffs now seek damages and restitution of all "premiums" paid based on Defendants' illegal, deceptive, false, fraudulent, and unfair advertising, marketing, and sale of limited benefit plans and medical discount plans.  In addition, to help put an end to and redress these illegal, deceptive, false, fraudulent, and unfair business practices, Plaintiffs and the putative class ask the Court to preliminarily and permanently enjoin Defendants from continuing to peddle this sham "health insurance" to thousands of unwitting Americans.  Plaintiffs thus bring numerous causes of action against Defendants on behalf of themselves and all others similarly situated and for the benefit of the public, as applicable, and seek all appropriate equitable and legal remedies under those causes of action.

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of

-4-

1    interest and costs.

2        9.    Alternatively, this Court has subject matter jurisdiction over this action

3    pursuant to 28 U.S.C. § 1332(d) because this is a class action in which (1) there are

4    over 100 members in the proposed class; (2) members of the proposed class have a

5    different citizenship from Defendants; and (3) the claims of the proposed class

6    members exceed $5,000,000 in the aggregate, exclusive of interests and costs.

7        10.    In addition, this Court has subject matter jurisdiction over this action

8    pursuant to 28 U.S.C. § 1331 because Counts V and VI, for violations of the

9    federal civil RICO statute, arise under federal law, and the Court has supplemental

10   jurisdiction pursuant to 28 U.S.C. § 1367.

11       11.    This Court has personal jurisdiction over Defendants because all

12   Defendants have sufficient contacts with California and Plaintiffs' claims and

13   causes of action alleged herein arise out of Defendants' respective contacts with

14   the State.  Moreover, all Defendants have purposely availed themselves of the

15   privileges and benefits of conducting business activities in California through their

16   active marketing, advertising, sale, underwriting, and provision of "health

17   insurance" services in the State of California.  As detailed below, Defendants

18   maintain systematic and continuous business contacts with California, and many

19   California residents do business with Defendants.

20       12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)

21   because Defendants engage in continuous and systematic business activities within

22   the State of California, a substantial portion of the underlying transactions and

23   events complained of occurred and affected persons and entities in this district,

24   Defendants received substantial compensation from transactions and business

25   activities in this district, and Plaintiffs reside in this district.

26   **III.   <u>PARTIES</u>**

27                              **PLAINTIFFS**

28       13.    Plaintiff Eric Ketayi ("Eric") is a resident of San Diego County and

-5-

over the age of eighteen.  On or about November 22, 2016, Defendants sold Eric what Eric reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care coverage that was represented to be in the form of a PPO health insurance plan.  Eric reasonably believed he was receiving comprehensive medical coverage based on false statements and other misrepresentations contained on Defendants' websites, including websites run, paid for, and/or maintained by Defendants HEG, HPI and HII and their affiliates, employees, or agents, as well as the uniform representations to Eric over the phone that he and his wife, Miryam, were (i) purchasing a PPO plan for their family, (ii) could see any doctor in the plan, and (iii) would have full medical coverage under this plan.  This "plan," which was called a "Liberty Health" plan under the Alliance for Consumers USA Group (the marketing name developed by HII and HPI for the plan) was underwritten by Defendants Axis Insurance Company and Axis Specialty and purported to be part of Defendant First Health's PPO Network.   In fact, as he only recently discovered, Eric had purchased a limited benefit plan, which was deceivingly marketed, advertised, sold, and administered,  and did not provide the promised scope of coverage.  Eric paid what amounted to $379 per month in "premium" payments starting in November 2016 based on his belief that he had purchased comprehensive PPO access to Defendant First Health's PPO network through the "Liberty Health" plan.  Eric paid via credit card charges using the internet, other wires and/or the mail.  Eric surrendered more in these transactions than he would have otherwise paid if the true facts had been disclosed, and he lost money or property as a result of the illegal scheme to defraud consumers.

14.    Plaintiff Miryam Ketayi ("Miryam") is a resident of San Diego County and over the age of eighteen.  On or about November 22, 2016, Defendants sold Miryam what Miryam reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care

coverage that was represented to be in the form of a PPO health insurance plan.
Miryam reasonably believed she was receiving comprehensive medical coverage
based on false statements and other misrepresentations contained on Defendants'
websites, including websites run, paid for, and/or maintained by Defendants HEG,
HPI, HII and ACUSA, and their affiliates, employees, or agents, as well as the
uniform representations to Miryam over the phone that she and her husband, Eric,
were (i) purchasing a PPO plan for their family, (ii) could see any doctor in the
plan, and (iii) would have full medical coverage under this plan.  This "plan,"
which was called a "Liberty Health" plan under the Alliance for Consumers USA
Group (the marketing name developed by HII and HPI for the plan) was
underwritten by Defendants Axis Insurance Company and Axis Specialty and
purported to be part of Defendant First Health's PPO Network.   In fact, as she
only recently discovered, Miryam had purchased a limited benefit plan, which
was deceivingly marketed, advertised, sold, and administered and did not provide
the promised scope of coverage.  Miryam paid what amounted to $379 per month
in "premium" payments starting in November 2016, based on her belief that she
had purchased comprehensive PPO access to Defendant First Health's PPO
network through the "Liberty Health" plan.  She paid via credit card charges using
the internet, other wires and/or the mail.  Miryam surrendered more in these
transactions than she would have otherwise paid if the true facts had been
disclosed, and she lost money or property as a result of the illegal scheme to
defraud consumers.

## CORPORATE DEFENDANTS

### HEG

15.    Defendant HEG is a Florida corporation with its principal place of
business in Fort Lauderdale, Florida.  At all times relevant to this suit, HEG billed
itself as a "full service National Health Brokerage firm specializing in helping

individuals simplify the process of shopping for health insurance."[2]  HEG claimed to "work with Major Insurance Companies in all 50 states . . . ***to help you find the most comprehensive insurance plan*** for the lowest possible price."  In reality, however, HEG brokered only limited benefit plans and medical discount memberships that did not provide the promised comprehensive insurance coverage and were essentially worthless.  *See* **Figures 1–3**.  HEG did not offer, and/or had no intent to supply, comprehensive or ACA-qualified health care coverage as represented to consumers.  Defendant HEG knew or should have known that it was an active and integral participant in a scheme to defraud consumers who enrolled in such services, including Plaintiffs and putative class members.  Moreover, at all times relevant to this Complaint, Defendant HEG reaped the benefits of the scheme alleged and received compensation from consumers in the form of premiums or other monetary remuneration at the expense of these consumers.

<u>**Figure 1**</u>

**HEG's website proclaiming that HEG will "find the most comprehensive insurance plan"**



---

[2] Figures 1–3 are screenshots of HEG's website as it existed during at least a portion of the time period relevant to this action.

1

### Figure 2

2

### HEG's website promoting "Private Health Insurance Plans" and "Obamacare"

3

4



5

6

7

8

9

10

11

12

13

14

15

### Figure 3

16

### HEG's website promoting its "PPO" Plans

17



18

19

20

21

22

23

24

25

26

27

28

16.    HEG has multiple contacts with California and Plaintiffs' claims and arise out of HEG's contacts with the State.  HEG does business in the state as the Health Enrollment Group and also as Health Enrollment Insurance Agency.  HEG reached into California to contact Plaintiffs over the internet and through multiple phone calls.  HEG, through its agents, including Defendants Marc Munoz and Kevin Romero, made material misrepresentations to consumers in California, including Plaintiffs, about the products and services it was selling.  HEG advertised, marketed, and sold the sham insurance policy at issue to Plaintiffs, who are California residents, and advertised, marketed, and sold substantially similar products to other putative California class members.  In addition, HEG has contracts with the other Defendants, including HII, HPI, Axis Insurance Company, Axis Specialty, ACUSA and First Health to broker, advertise, generate sales and/or sell or administer insurance on their behalf in California.  HEG has invoked the benefits and protections of California law by, among other things, HEG registering with the California Department of Insurance as a non-resident "Life-Only" and "Accident and Health" agent, License No. 0K59431.

17.    At all times relevant to this Complaint, HEG knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  Moreover, HEG participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**ACUSA**

18.    Defendant ACUSA is a Nebraska corporation with its principal place of business in Plano, Texas.  At all times relevant to this suit, ACUSA offered memberships that enabled its members to purchase limited benefit plans and medical discount memberships like the ones at issue here, including the "Liberty Health" plan.  Upon purchasing the sham health insurance, Plaintiffs and putative

-10-

class members became ACUSA members.  ACUSA used its status the policyholder to induce Plaintiffs and putative class members into believing that they were getting comprehensive PPO medical coverage at a reduced price because ACUSA was the aggregator of  individuals from all over the country and could therefore negotiate "great deals" on health insurance for its members, including in California.  In fact, the HII/HPI "Liberty Health" plan sold by HEG and underwritten by Axis Insurance Company as part of the scheme to defraud consumers was essentially worthless and not comprehensive medical coverage negotiated on Plaintiffs' and putative class members' behalf.  ACUSA reaped the benefits of the scheme alleged and received compensation from consumers in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.

19.    ACUSA has minimum contacts with California that give rise to the claims in this First Amended Complaint.  ACUSA registered to do business in California in 2015 and markets and offers memberships to Californians through its interactive website.  In addition, ACUSA is an associate of, and the policyholder for, the Axis Insurance Company products that Plaintiffs and putative class members purchased in California, for coverage in California.

20.    Although ACUSA registered to do business in California, it is not in good standing with the California Franchise Tax Board (Entity ID 3795866).  **Figure 4** is a true and correct copy of the Entity Status Letter from the California FTB providing that ACUSA "is **not** in good standing with the Franchise Tax Board."  ACUSA was not in good standing to do business in California at all times relevant to this First Amended Complaint.  Nor to the best of Plaintiffs' knowledge is ACUSA licensed in the State of California to broker or sell any form of health insurance.  Accordingly, any contracts ACUSA entered into during the class period are voidable by Plaintiffs and by all putative class members.  *See* Cal. Rev. & Tax. Code § 23304.1.  Moreover, because ACUSA is not qualified to

-11-

1   do business in California or defend itself in California courts, Plaintiffs and

2   putative class members request default judgment be entered against ACUSA on

3   all causes of action alleged herein.

### Figure 4
**Franchise Tax Board Status Letter for ACUSA**



**STATE OF CALIFORNIA**
**FRANCHISE TAX BOARD**
PO BOX 942857
SACRAMENTO CA 94257-0540

**Entity Status Letter**

Date:   5/13/2020
ESL ID: 5914868788

According to our records, the following entity information is true and accurate as of the date of this letter.

Entity ID:  3795866

Entity Name:  ALLIANCE FOR CONSUMERS USA, INC.

☐  1.  The entity is in good standing with the Franchise Tax Board.
☒  2.  The entity is **not** in good standing with the Franchise Tax Board.
☐  3.  The entity is currently exempt from tax under Revenue and Taxation Code (R&TC) Section 23701.
☐  4.  We do not have current information about the entity.

21.   At all times relevant to this Complaint, ACUSA knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members. Moreover, ACUSA participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**Axis Insurance Company**

22.   Defendant Axis Insurance Company is a foreign corporation with its

FIRST AMENDED CLASS ACTION COMPLAINT

headquarters in Bermuda.[3]  Axis Insurance Company stock is sold on the New York Stock Exchange under the symbol AXS.  At 2019 year-end, AXS boasted of $7.4 billion in total capital and $25.6 billion in total assets.  Axis Insurance Company and its employees, affiliates, or agents "underwrite" the sham health insurance plans that were sold to Plaintiffs and putative class members.  Axis Insurance Company contracts with third-party administrators, including Defendants HII, HPI, and ACI, to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs, as well as substantially similar plans purchased by putative class members.  Axis Insurance Company knows that these plans are not comprehensive health insurance, despite being marketed and sold as such.  Specific to Plaintiffs, Axis Insurance Company knew that the "Liberty Health" plan was marketed by Axis Insurance Company's agents (HPI, HII, ACI and HEG) as a comprehensive PPO health plan that was part of Defendant First Health's PPO network when, in fact, it was no such thing.

23.    Axis Insurance Company and/or its state-side affiliates, including but not limited to Axis Specialty, also conduct a "verification" process during the sale of the sham insurance policies at issue.

24.    At all times relevant to this matter, Axis Insurance Company knew or should have known that it was an integral participant in the scheme to sell sham health insurance to consumers who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount, and availability of coverage provided under the purported "insurance" plans.  Axis Insurance Company reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary

---

[3] Axis Insurance Company has waived any challenge to personal jurisdiction because Axis Specialty made a general appearance and did not challenge personal jurisdiction.  Fed. R. Civ. Proc. 12(h).

FIRST AMENDED CLASS ACTION COMPLAINT

remuneration.  Axis Insurance Company induced and aided and abetted the sale of sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including Defendants HEG, HII, HPI, and ACI, which sold and administered the "Liberty Health" plan purporting to provide access to First Health's PPO Network, all while knowing or that these plans did not provide the coverage promised to consumers.  Moreover, Axis Specialty participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**Axis Specialty**

25.    Defendant Axis Specialty is a Delaware Corporation and the U.S. subsidiary of Defendant Axis Insurance Company.  Axis Specialty is registered to do business in California and describes its business as "Insurance Services."  Axis Specialty maintains multiple offices in California, including but not limited to offices located at (i) 550 Gateway Drive, Suite 101, Napa, CA 94558, (ii) 725 South Figueroa Street, Suite 2250, Los Angeles, CA 90017 and 450 Sansome Street, Suite 1600, San Francisco, CA 94111.[4]  Axis Specialty holds California Insurance License #0E28821, through which is it authorized to broker Property, Casualty, Special Lines and Surplus Lines insurance.  Notably, Axis Specialty is not an insurer providing "Health Insurance Coverage" in California.[5]

26.    Axis Specialty is Axis Insurance Company's operational support entity and provides back-end support to Axis Insurance Company, allowing Axis Insurance Company to underwrite the "Liberty Health" coverage purchased by Defendants.  Axis Specialty contracts with third-party administrators, including

_____

[4] Axis Specialty has waived any challenge to personal jurisdiction because Axis Specialty made a general appearance and did not challenge personal jurisdiction.  Fed. R. Civ. Proc. 12(h).
[5] http://www.insurance.ca.gov/01-consumers/110-health/20-look/hcpcarriers.cfm (last accessed August 25, 2020).

Defendants HII, HPI, and ACI, to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs, as well as substantially similar plans purchased by putative class members. Axis Insurance Company knows that these plans are not comprehensive health insurance, despite being marketed and sold as such. Specific to Plaintiffs, Axis Specialty knew that the "Liberty Health" plan was marketed by Axis Specialty's agents (HPI, HII, ACI and HEG) as a comprehensive PPO health plan that was part of Defendant First Health's PPO network when, in fact, it was no such thing. Additionally, Axis Specialty and/or its employees, affiliates, or agents conducted a sham "verification" process during the sale of the "insurance" policies sold to Plaintiffs and putative class members.

27.   At all times relevant to this matter, Axis Specialty knew or should have known that it was an integral participant in the scheme to sell sham health insurance to consumers, who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount and availability of coverage provided under the purported "insurance" plans. Axis Specialty reaped the benefits of the scheme alleged herein and received compensation in the form of premiums or other monetary remuneration.

28.   At all times relevant to this Complaint, Axis Specialty induced and aided and abetted the other Defendants to sell the sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including Defendants who sold these services, while knowing that these plans did not provide the coverage that Defendants promised to consumers and having no reasonable basis for believing that the plans provided the coverage that Defendants promised to consumers. Moreover, Axis Specialty participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**ACI**

29.   Defendant ACI is a Pennsylvania corporation with its principal place of business in Wayne, Pennsylvania.  ACI is a claims administrator for the sham health insurance plans sold to Plaintiffs and the putative class members.  ACI is registered with the California Department of insurance as a non-resident administrator, License No. 0C38805.  ACI contracts with Axis Insurance Company and/or Axis Specialty (together, "the Axis Defendants") to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs and substantially similar plans purchased by putative class members.  ACI knew that these plans are marketed and sold as comprehensive health insurance when they are not.

30.   With regard to Plaintiffs, ACI was instructed by the Axis Defendants to pay the benefit amount at issue and to send statements of benefits to Plaintiffs in California.  ACI purposefully ignored Plaintiffs' requests for information concerning the "benefits" provided in order to protect itself and other Defendants, including the Axis Defendants.  ACI reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.

31.   At all times relevant to this Complaint, ACI knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  *See* **Figure 5**. Moreover, ACI participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

///

///

-16-

1
2
3
4
5
6
7
8
9
10
11

**Figure 5**

**ACI working as Claims Administrator for Defendant AXIS, Group Name "Liberty Health" - ACUSA**



12    **HPI**

13       32.    Defendant HPI is a Delaware Corporation with its principal place of

14    business in Tampa, Florida.  HPI is a wholly owned subsidiary of Defendant HII.

15    HPI has contacts with California and the claims and causes of action at issue in

16    this First Amended Complaint arise out of HPI's contacts with this state.  HPI

17    maintains an office in California, located at 444 Castro Street, #917, Mountain

18    View, CA 94041.  HPI is registered to do business in California and describes the

19    business or services it provides as "Insurance."  HPI has invoked the benefits and

20    protections of California law by, among other things, holding California Insurance

21    License No. 0I21968 as an "Accident and Health" administrator.  Pursuant to this

22    license, HPI is authorized to transact and did transact business in California on its

23    own behalf and on behalf of other Defendants, including Defendants Axis

24    Insurance Company, Axis Specialty, First Health, ACUSA, and HEG related to

25    the sale of sham insurance.  HPI has subjected itself to jurisdiction in the State by

26    maintaining an office here, registering to do business here, and obtaining a license

27    to sell insurance here.

28       33.    Through its contacts in California that gave rise to the claims alleged

-17-

herein, HPI reaped the benefits of the scheme and received compensation in the form of "premiums" or other monetary remuneration at the expense of consumers who expended money on these services.  HPI directed the other Defendants, as detailed further herein, including Axis, HEG, and ACUSA to use "Liberty Health" as the marketing name for the limited benefit plan that was sold to Plaintiffs and putative class members in this state and across the country.

34.    HPI provided funding, trained the other Defendants' sales and underwriting agents, and issued the script used by HEG and Axis Insurance Company to sell the "Liberty Health" insurance plan.  HPI entered into contracts with Axis Insurance Company, Axis Specialty, and the other Defendants related to HPI's activities in California that gave rise the claims alleged here, including but not limited to contracting to perform consumer sales and administrative services related the "Liberty Health" policy and other policies sold in this State. **Figures 6 and 7** reflect HII and HPI "lead generators" that were used to sell the "Liberty Health" plan, including in California.

## **Figure 6**
### **"Liberty Health" Google Advertisement**



**Liberty Health** Insurance **Plans** - Enter a ZIP Code and Get Deals
Ad  quote.firstquote**health**.com/ ▾
**Plans** Start At $24 / Month. Get A Free Quote In 5 Minutes! We Find The Best Deals So You Don't Have To. Quick, Easy & Free. **Healthy** Living Discounts. Find Lowest Prices. Cheapest **plans**. Free 5 Minute Quote. 5 Minute Quotes. Lowest Prices. We Help You Save. Top Rated Carriers. Avoid Tax Penalty. All Available Discounts. Insurance coverage: **Health** Insurance Quotes, Compare Insurance Prices.
► Visit Website

///

///

-18-

1

### Figure 7[6]

2

### "Liberty Health" Insurance "Quote Generator" / Information Gathering Tool

3

4



5

6

7

8

9

10

11    35.    At all times relevant to this Complaint, HPI knew or should have

12    known that it was an active and integral participant in a scheme to defraud

13    consumers, including Plaintiffs and putative class members.  Other states have

14    already issued cease and desist orders against HPI for using fraudulent and

15    dishonest practices in attempting to sell sham health insurance within those

16    states.[7]  Moreover, HPI participated in a conspiracy with the other Defendants in

17    this matter, in which at least one conspirator committed overt acts in California in

18    furtherance of the conspiracy.

19    **HII**

20    36.    Defendant HII is a Delaware Corporation with its principal place of

21    business in Tampa, Florida.  HII is the parent company of Defendant HPI.  HII

22    has contacts with California and the claims and causes of action at issue in this

23

24        [6] https://quote.firstquotehealth.com/?campaign_source=NG_HE_GSNC1&
25    campaignmedium=search&s2=Liberty%20Health%20Insurance&s1=1394477420&
      gclid=CjwKCAjwte71BRBCEiwAU_V9h78ol3RKwxrx8wvvsAUET2z8e1JywLo
26    HrDA4kHeIYswHqBZpUJEbThoCBagQAvD_BwE&utm_term=Liberty%20Healt
      h%20Insurance&utm_medium=search&utm_campaign=1394477420&utm_source
27    =NG_HE_GSNC1 (last accessed June 25, 2020).
          [7]https://www.insurancejournal.com/news/southcentral/2016/03/28/403241.ht
28    m (last accessed June 25, 2020).

First Amended Complaint arise out of HII's contacts with this state.  Specifically, HII contracts with the Axis Defendants to perform consumer sales and administrative services related to insurance plans, including the "Liberty Health" plan purchased by Plaintiffs in California and substantially similar plans purchased by putative class members across the country.  Through its contacts in California that gave rise to the claims alleged herein, HII reaped the benefits of the scheme and received compensation in the form of "premiums" or other monetary remuneration at the expense of consumers who expended money on these services.

37.  At all times relevant to this Complaint, HII knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  Moreover, HII participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**First Health**

38.  Defendant First Health is a Delaware Corporation with its principal place of business in Rockville, Maryland.  First Health contracts with its various payer clients, including third-party administrators, insurance carriers, employers, trusts, and government entities, to allow access to First Health's network of health care providers.  First Health has contacts with California and the claims and causes of action at issue in this First Amended Complaint arise out of First Health's contacts with this State.  For example, First Health's contracts with the entities described above, some of which invoke the benefits and protections of California law, give rise to the PPO network advertised on Plaintiffs' "insurance" card, which served to mislead Plaintiffs and putative class members and perpetuate Defendants' scheme.

39.  Specifically, First Health permitted ACUSA and the Axis Defendants

to advertise and market First Health's PPO network on the "Liberty Health" plan "insurance" card that was provided to Plaintiffs as part of the ACUSA group plan. Indeed, First Health's website is listed on the back side of the "insurance" card provided to Plaintiffs and putative class members through the mail after they purchased what they believed to be PPO coverage (but was, in fact, not). *See* **Figure 8**.

**Figure 8**

**Back Side of Eric Ketayi's Insurance Card (Highlighting Added)**

40.     When consumers visit the website listed on the back of the health insurance card, www.firsthealthlbp.com, it states that they can locate a provider within their PPO network.  First Health's slogan reads: "Quality, value and accessibility – your national choice for PPO Network Solutions."  **Figure 9**.

///

///

///

**<u>Figure 9</u>**

**Website Identified on Mr. Ketayi's Insurance Card (www.firsthealthlbp.com)**



41.    First Health knew, when it allowed ACUSA and the Axis Defendants to advertise and market its PPO network on the "Liberty Health" plan, that the "Liberty Health" plan, and substantially similar plans purchased by putative class members, did not actually give Plaintiffs or class members any access to First Health's PPO network.  First Health reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.  First Health knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  Moreover, First Health participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

42.    Although Defendants purposefully disguise the entity that is responsible for each step in Defendants' coordinated scheme, each Defendant has aided and abetted every other Defendant's acts, conspired in furtherance of every

other Defendant's fraud, and agreed to an overall fraudulent scheme, furthered by each Defendant's wrongdoing as alleged herein.  Moreover, each Defendant served as an agent of every other Defendant for purposes of effectuating the fraudulent scheme alleged herein.

43.   At all times relevant to this Complaint, HEG, ACUSA, ACI, Axis Insurance Company, Axis Specialty, HPI, HII, and First Health (collectively, "Corporate Defendants") have operated as a common enterprise and in a common course of conduct while engaging in the deceptive acts and practices and other violations of law alleged herein.  Corporate Defendants have conducted the business practices described below through interrelated companies, many of which have common ownership, officers, managers, business functions, and office locations, which have co-mingled assets, and hold themselves out as "Liberty Health" to consumers. *See* **Figure 10**.

### Figure 10

**Eric's "insurance" card identifying Defendants AXIS, "Liberty Health," ACUSA and First Health**

 

44.   Corporate Defendants operated as a common enterprise to accomplish the wrongs complained of in this Complaint.  The purpose and effect of this common enterprise and common course of conduct complained of was to financially benefit Corporate Defendants at the expense of Plaintiffs and putative class members.  Each of the Corporate Defendants was a direct, necessary, and

-23-

substantial participant in the common enterprise and common course of conduct complained of herein and was aware of its overall contribution to, and furtherance of, the common enterprise and common course of conduct.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices detailed herein.

## INDIVIDUAL DEFENDANTS

45.   Defendant Munoz is the President of Defendant HEG.  Munoz incorporated HEG in the State of Florida in 2015 but is registered with the California Department of Insurance, license number 0K35356, as a non-resident broker of "Life-Only and "Accident and Health" insurance.  At all times relevant to this Complaint, Munoz, through HEG, reaped the benefits of Defendants' scheme and received income or other monetary remuneration at the expense of consumers, who expended money on these services, which were of little to no value.  Munoz knew or should have known that he was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  Munoz is associated with other entities that also purport to provide medical or health services as part of the scheme described in this Complaint, including but not limited to Comfort Medical.  To the best of Plaintiffs' knowledge, Munoz is not licensed in the State of California to broker or sell insurance underwritten by Defendant AXIS or Axis Specialty.

46.   Defendant Romero is the Senior Vice President of Defendant HEG. Romero is registered with the California Department of Insurance, license number 4001623, as a non-resident broker of "Life-Only and "Accident and Health" insurance.  At all times relevant to this Complaint, Romero, through HEG, reaped the benefits of Defendants' scheme alleged herein and received income or other monetary remuneration at the expense of consumers, who expended money on these services, which were of little to no value.  Romero knew or reasonably should have known that he was an active and integral participant in a scheme to

-24-

defraud consumers, including Plaintiffs and putative class members.  To the best of Plaintiffs' knowledge, Romero is not licensed in the State of California to broker or sell any form of health insurance.

47.     Defendants Munoz and Romero (collectively the "Individual Defendants") have formulated, directed, controlled, had the authority to control, participated in and/or substantially aided in the acts and practices of HEG, as well as the Corporate Defendants identified above that constitute the common enterprise.  The Individual Defendants are therefore jointly and severally liable for the acts and omissions of HEG and the Corporate Defendants.

## III.    FACTUAL ALLEGATIONS

### Defendants' Bait and Switch Scheme Traps Consumers

48.     Defendants work together to target consumers who are seeking comprehensive health insurance.  These consumers typically either do not have health insurance or pay high premiums for their insurance and are seeking comprehensive coverage that costs less than their current plans.

49.     Comprehensive health insurance plans generally involve an arrangement between an insurance company licensed to do business in the State of California and a consumer in which the company agrees to pay a substantial portion of the healthcare expenses that the consumer might incur in exchange for a consumer's premium payments.

50.     A preferred provider organization plan, commonly referred to as a PPO plan, is a type of comprehensive health insurance plan.  In a PPO plan, medical providers such as hospitals and doctors contract with an insurer or a third-party administrator to provide health care at reduced rates to the insurer's or the administrator's clients.

51.     Since at least November 2016 and at all times relevant during the class period, Defendants HEG, HPI, and HII have uniformly claimed to offer consumers like Plaintiffs and putative class members comprehensive health

insurance plans, including PPO plans.  Defendants HEG, HPI, and HII lead consumers to reasonably believe that they will receive a comprehensive PPO health insurance plan that will cover preexisting medical conditions, prescription drug medications, primary and specialty care treatment, inpatient and emergency hospital care, surgical procedures, and medical and laboratory testing.  Defendants HEG, HPI, and HII do so through their own websites and lead generation websites run either by them, or by third party agents on their behalf.

52.    Consumers often find these websites by conducting internet searches for "health insurance" or "Obamacare" and related terms.  Defendants own some of these sites themselves and also pay lead generators for leads generated on third-party sites.  **Figure 11** is an example of one of these lead generating websites:

### Figure 11

### Example of Lead Generating Website



53.    In their advertising and promotional materials that were made available since at least November 2016, including on their websites (examples of which are set forth above), Defendants HEG, HII, and HPI uniformly claim to offer a broad selection of comprehensive health care insurance policies.  Those plans, in reality, do not exist.

54.    HEG, for example, claimed its "PPO's work with over 80% of

-26-

physicians Nationwide." *See* **Figure 3**. HEG also claimed to "work with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance" and "Obamacare." **Figures 1–2**. In using the term "Obamacare," HEG misleads consumers into believing that they are being offering comprehensive, ACA-qualified health insurance plans.

55. With regard to the "Liberty Health" plan purchased by Plaintiffs (and substantially similar plans purchased by putative class members), HPI and HII advertising promised "Top Rated Carriers," "Health Insurance," and "Avoid Tax Penalty." Use of these phrases mislead consumers like Plaintiffs and putative class members into believing that they are being offered comprehensive, ACA-qualified health insurance plans. *See* **Figure 6**.

56. In reality, HEG, HII, and HPI have no intent to sell consumers comprehensive health coverage, and the plans sold to consumers like Plaintiffs are not comprehensive health insurance or ACA-qualified health plans. Rather, Defendants HEG, HII, and HPI have already contracted with Defendants ACUSA and the Axis Defendants to sell limited benefit plans, also known as limited benefit indemnity plans or hospital indemnity plans, and medical discount and wellness program memberships that are essentially worthless.

57. In contracting with Defendants HEG, HII, and HPI to market the plans they underwrite, the Axis Defendants necessarily know how Defendants HEG, HII, and HPI will market and sell those plans—i.e. as comprehensive, ACA-qualified health insurance plans. But the Axis Defendants also know that they do not underwrite any such comprehensive plans. Accordingly, the Axis Defendants understand, adopt, and endorse the other Defendants' unfair, false, and fraudulent conduct and advertising.

58. The products advertised, sold, and underwritten by Defendants do not provide consumers with the benefits promised. Limited benefit plans, in contrast to PPO plans, provide non-comprehensive coverage capped at a specific amount

-27-

for a specific service, treatment, condition, or disease.  There is no agreement by which a health insurer agrees to pay a substantial portion of the healthcare expenses that the consumer might incur in exchange for the consumer's premium payments.  Moreover, the "insurer" incurs no risk whatsoever when a consumer enrolls in a limited benefit plan, because often, as was the case with Plaintiffs here, the "premiums" paid to obtain the plan based on the representations that the plan is a PPO plan exceed the maximum amount of coverage that the limited plan provides.

59.    After consumers are lured in by misleading websites offering "comprehensive" health insurance, consumers typically connect with a sales representative of HEG, HII, HPI, or ACI by phone, who is acting as an agent for HEG, HII, HPI, or ACI and also as an agent or broker on behalf of ACUSA and the Axis Defendants (the policyholder and underwriter).  Consumers speak to one of the trained sales representatives, who may identify themselves as an insurance agent supposedly licensed in the consumer's state.  Sometimes consumers may also first speak to a pre-qualification representative who gathers personal background information about the consumer before transferring the call to another agent.  These "agents" typically are not properly licensed insurance agents and may not even be working under a licensed insurance agent.  Rather, they are simply salespeople at a call center.

60.    In fact, several of these Defendants are not licensed in California to solicit, sell, broker, offer to sell, underwrite, effect or enter into contracts or otherwise claim to provide health insurance coverage or plans, whether authentic or sham.  As a result, their conduct is illegal, and all resulting contracts voidable and subject to rescission pursuant to, among other statutes, California Insurance Code section 1621 ("[A] person shall not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities defined in Article 1 (commencing with Section 1621) unless the person holds a valid license from the commissioner

-28-

authorizing the person to act in that capacity.").

61.   Using scripts written and disseminated by HPI and HII for use on sales calls like those directed at Plaintiffs, the sales representatives make uniform statements to every potential customer, promising that the plans will cover preexisting medical conditions, prescription medication, hospitalization, lab work, and access to primary care physicians, specialists, and other healthcare providers. During the scripted speeches, sales representatives refer to the monthly payments consumers must make as "premiums" and use other insurance terms of art, such as "PPO," "copay," "deductible," "coverage," and "preexisting conditions." Because they are not actually providing comprehensive health insurance, these terms have no relevance to the limited benefit plans and discount memberships and their use is false and misleading.

62.   These statements are all part of a script that experienced sales representatives and brokers are trained by HEG, HPI, HII and ACI to deliver to each potential customer in order to deceive consumers, like Plaintiffs, into purchasing this sham health insurance service.  One former employee of Defendant HEG described his role at the company as "mak[ing] calls to try to scam people into buying sub-par health insurance . . . ."  This is exactly what happened to Plaintiffs and the putative class members.

63.   During these scripted calls, consumers are told by HPI, HII, HEG, and ACI that the "PPO" health insurance plan they are offering is widely accepted by doctors in the consumers' geographical area, or that it is accepted by virtually all doctors in the country.  Consumers such as Plaintiffs and putative class members reasonably rely on these representations in purchasing "insurance" from Defendants, believing they are purchasing comprehensive health coverage when in fact they are being offered a limited benefit plan or medical discount membership that does not provide the represented coverage.  These representations are uniformly made and convince consumers that the plans they

-29-

are being offered are "comprehensive," **Figures 1–2**, or Obamacare, **Figure 2**, or will allow them to "avoid tax penalties," **Figure 6**.  None of this is true.

64.    Once a consumer expresses interest in purchasing a plan, the HPI, HII, HEG or ACI sales agent arranges for payment by asking for the consumer's credit card information.  Just before taking the consumer's payment information, the sales representatives transfers the call to a different person who, to the best of Plaintiffs' knowledge, works for the Axis Defendants or ACI and guides the consumer through a  "verification" process.  Just before the transfer, the sales representatives instruct consumers to disregard any statements in the sham "verification" process that may indicate that the consumer will not be receiving comprehensive health insurance that covers preexisting medical conditions.  The sales representatives also direct consumers to disregard statements made by the verification agent that are inconsistent with Defendants' sales pitch, assuring consumers that the insurance they are sold during the sales process (as opposed to the verification process) is the insurance they will receive.

65.    During the verification process, consumers are asked to confirm a series of complex, lengthy statements that are read from a uniform script by the verification agent.  The trained salespersons, following their scripts, caution consumers not to ask any questions during the verification process because, if they do, the entire process will have to start over again.

66.    Purposefully included in the verification process is a statement that, in essence, asks the consumer to confirm that he or she understands that the insurance will be governed by plan documents (to be provided at a later date) and not by the representations made by the sales agents.  Because consumers have been instructed to do so by the sales representatives, consumers (including Plaintiffs and putative class members) answer "yes" and do not ask questions concerning this disclosure.

67.    Duped consumers, including Plaintiffs and putative class members,

-30-

follow the instructions of the agent because they are told this is the required way for them to obtain the comprehensive coverage that they have been promised. But the consumers are not provided the documentation to confirm such statements until after the process is completed, if at all, and thus would have no reason to believe that the paperwork will contradict what they have been told in order to get them to enter into the transaction. Further, the consumers have been told to disregard any statements during the verification process that contradict what they were told during the sales pitch.

68.    After consumers proceed through the "verification" process, the agents from HII, HPI, ACI, and/or HEG immediately request and obtain consumers' credit card information to begin charging their sale of such services. Consumers are not given the opportunity to receive or review plan documents before they are charged.

69.    The Axis Defendants and/or ACI record and save the "verification" calls with consumers. Only those portions of the conversation during which the consumers ultimately assent to the verification statements in order to purchase the product offered are recorded. The sales portions of the calls with consumers are not recorded in an attempt to avoid a trail of evidence of the deep deception that is being perpetrated on everyday people, including Plaintiffs and putative class members.

70.    The deception continues even after the initial sale is made. Statements on the "insurance" cards provided to consumers through the mail include the phrase "Preferred Provider (PPO) Network Access" and point consumers to a "PPO" Network website that represents to be "your national choice for PPO network solutions." *See* **Figures 8–9**. This is done despite Defendants' knowledge that they have not actually offered (ACUSA), sold (HEG, HII, HPI), underwritten (Axis Defendants), administered (ACI) or otherwise provided (First Health) any sort of PPO plan or other comprehensive coverage to

-31-

consumers.  Indeed, the false representation by First Health on the ACUSA/Axis "Liberty Health" Insurance Card—that the "Liberty Health" plan offered access to First Health's PPO network—was designed to, and did, induce Plaintiffs and putative class members to continue paying "premiums" long after the initial sale transaction was completed.

71.   First Health permitted ACUSA and the Axis Defendants to use its logo on the "Liberty Health" plan insurance card with knowledge that the "Liberty Health" plan did not, in fact, give consumers access to the PPO Network.  First Health was an active participant in this fraud on consumers because it received renumeration in return for the use of logo and website on the insurance card.  First Health knew its logo and website were being used to perpetrate this fraud on consumers in California and across the country.

72.   This fraudulent scheme has left thousands of consumers, including Plaintiffs and putative class members, with far less than the comprehensive health insurance they thought they were purchasing and essentially worthless health care coverage.  In addition to paying "premiums" for limited benefit plans and medical discount memberships that provide benefits equal to or less than their cost, many of these consumers have incurred substantial medical expenses under the mistaken belief that these expenses would be covered by the health insurance they thought they had purchased.  As the situation with Plaintiffs shows, such premiums total thousands of dollars annually per class member—for Plaintiffs, close to $5,000 per year.  This amount has been fraudulently and/or illegally obtained, and stolen millions of dollars from Plaintiffs and putative class members.

73.   Courts have rightly put a stop to similar predatory schemes that follow the same practice engaged in here.  In May 2019, for example, a judge in the United States District Court for the Southern District of Florida entered a preliminary injunction against six corporate defendants and a related individual engaged in a "bait and switch scheme [that] led consumers to believe they were

-32-

receiving comprehensive health insurance when, in fact, they received limited indemnity plans or discount memberships." *Fed. Trade Comm'n v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1353 (S.D. Fla. 2019).  There, as here, the defendants preyed on consumers who searched for health insurance online.  *Id.* at 1354.  There, as here, the defendants employed a sales script that "g[a]ve consumers the impression that the coverage provided by [the defendants'] limited benefit plan was equal to, if not better than, major medical insurance" and required consumers to complete a sham "verification" process.  *Id.* at 1355–56. And there, as here, "Defendants made numerous misrepresentations to perpetrate their bait and switch scheme, including that: Defendants' limited benefits plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance; [and] Defendants' limited benefit plans and medical discount memberships are qualified health insurance plans under the ACA."  *Id.* at 1356.  Based on this conduct, the court found that the defendants had "devised a fraudulent scheme to use consumer funds to enrich themselves" and, accordingly, entered an injunction against them.  *Id.* at 1365.  The Eleventh Circuit affirmed the court's ruling earlier this year.  *Fed. Trade Comm'n v. Simple Health Plans, LLC*, 801 F. App'x 685 (11th Cir. 2020).

### **Eric and Miryam Fall Victim to Defendants' Scheme**

74.    Eric and Miryam emigrated from Israel to the United States in 2004. Until the fall of 2016, they had comprehensive health insurance through Blue Cross/Blue Shield for themselves and their two children.  But they were caught in the "death spiral" of ever-increasing premiums, so they set out to look for less expensive options that provided comparable comprehensive PPO coverage.

75.    After searching for various options, Eric and Miryam found HEG's website.  They responded positively to the material claims, examples of which are set forth above, including that HEG's "PPO's work with over 80% of physicians Nationwide," and that HEG "work[ed] with Major Insurance Companies in all 50

states" to provide, among other products, "Private Health Insurance," "Obamacare," and "PPO" plans.  Most material to Eric and Miryam was HEG's statement that it took pride in its "ability to help you find the most comprehensive insurance plan for the lowest possible price."

76.    To learn more, Eric and Miryam spoke with representatives from HEG, HPI, or HII[8] during three separate calls on November 22, 2016.  The "insurance" they were offered sounded just like the comprehensive insurance coverage they sought.  The sales representative described the plan to Eric and Miryam as a PPO plan and compared it to the Blue Cross/Blue Shield coverage that they had at the time.   The representative knew, or reasonably should have known, however, that the plan being promoted was not a comprehensive PPO plan and was not comparable to the Plaintiffs' Blue Cross/Blue Shield comprehensive coverage.

77.    The representative followed the script, confusing Eric and Miryam with industry lingo and falsely stating the care and coverage that the plan offered.  The representative claimed that Eric and Miryam would have very small co-pays and no deductible.  The representative also assured Eric and Miryam that this seemingly comprehensive coverage would apply if Eric, Miryam, or their children were to visit almost any doctor in the country.   Yet the representative knew or reasonably should have known that the plan being offered and sold would provide little to no coverage when used at almost any medical provider's office.

78.    The sales representative told Eric and Miryam that Defendants could offer the PPO for their family for $379 per month—a significant amount but still much less than Eric and Miryam had been paying for their Blue Cross/Blue Shield coverage—because Defendants aggregated individuals from all over the country

---

[8] As stated herein, part of Defendants' scheme is keeping consumers in the dark as to which entity is actually selling and providing the "insurance" plan.  Thus, Plaintiffs presume they were talking to a representative from HEG but may have been talking to a representative of another Defendant.

like a large corporation and could therefore negotiate "great deals" on behalf of consumers.  HEG's website at the time said, "Remember we work for you not the insurance company."

79.   When Eric and Miryam asked what the plan would cover, the sales representative again stated that the coverage was PPO and comprehensive, and listed only two types of excluded care: pregnancy and mental health.  The implication, of course, was that the plan would cover all other types of care. Defendants knew or reasonably should have known that these were misrepresentations and omissions of material fact.  Yet the representative apparently intended that Eric and Miryam reasonably rely on these misrepresentations and omissions of material fact to sign up for the "insurance" coverage promised.  Because Eric and Miryam were not planning to have another child, and because the representative made the plan sound so attractive, Eric and Miryam were willing to forgo their existing mental health coverage.

80.   Eric and Miryam were justified in relying on, and did reasonably rely on, Defendants' material representations and omission of material fact, examples of which are set forth above, and initiated the process of purchasing what they were led to believe was comprehensive health insurance.

81.   The sales representative then prepared to transfer Eric and Miryam to an agent[9] who could verify that Eric and Miryam "qualified" for the plan.  To the best of Plaintiffs' knowledge, the "agent" was an employee of ACI or the Axis Defendants.  Before he did, though, the representative told Eric and Miryam that the verification agent would read them a series of statements, and that Eric and Miryam needed to say yes to all of those statements if they wanted to purchase Defendants' product.  The representative also told Eric and Miryam to ignore any

---

[9] Plaintiffs recall that the "verification" agent was named George or Joel.   It appears for some reason most if not all of Defendants' verification agents are named George or Joel.

statements that did not apply to them or the product they were purchasing.  The representative directed Eric and Miryam not to interrupt or ask questions during the process.  The representative told them that if they did, or if they answered no to any question, they would be forced to start the entire process over from the beginning.  The representative assured Eric and Miryam that, whatever was said during the verification call, Eric and Miryam would receive the comprehensive health insurance that Defendants had touted and that the representative had described.

82.   Even though they did not understand or agree with everything that was being said during the process, Eric and Miryam felt pressured to agree with all of the verification statements based on the representative's directions to them. And because they wanted to obtain what Defendants had characterized as comprehensive PPO health insurance for a low price, Eric and Miryam obeyed the representative's command and answered yes to every question asked by the agent.

83.   With the sham verification completed, and at Defendants' request, Eric and Miryam immediately provided their credit card information to cover the first month's payment on their purchase.  Once done, Eric and Miryam believed that they had successfully obtained comprehensive health insurance that covered their entire family.  They paid the "premiums" for this coverage beginning in November 2016.

84.   Even after the sale was made, Defendants continued to deceive Eric and Miryam.  As an example, the back of the "insurance" cards provided to Eric and Miryam through the mail included the phrase "Preferred Provider (PPO) Network Access" and pointed Eric and Miryam to a "PPO" Network website that represented to their "national choice for PPO network solutions."  Defendants did so with knowledge that they had not actually sold, underwritten, or provided any sort of PPO plan or otherwise comprehensive coverage to Eric and Miryam.

85.   Eric and Miryam eventually discovered that the plan they had

-36-

purchased, and for which they were paying, was almost entirely worthless.  On July 29, 2017, Eric was admitted to Cedars-Sinai Hospital for back surgery.  He stayed in the hospital for six nights before he was discharged on August 4, 2017.  It was a major surgery and a painful recovery.

86.    The recovery was made even more painful when Eric received Explanation of Benefits (EOBs) statements from "Axis Insurance Company" and ACI regarding his "LIBERTY HEALTH – ACUSA" insurance in or about November 2017.  For the six-night hospital stay, Defendants paid only $1,500.  Eric's responsibility was $176,786.49.  For the surgery itself, Defendants paid $0.  Eric's responsibility was $16,250.  And for other necessary care provided during Eric's stay, Defendants paid $0 and Eric's responsibility was $1,330.24.  All told, the "insurance" that Defendants had advertised, marketed, and sold as comprehensive PPO health insurance covered only $1,500 for Eric's surgery, while Eric was left to cover $194,366.73.  Yet by that time, Plaintiffs had paid Defendants about $4,500 in "premiums"—around three times the amount that Defendants would ultimately cover for Eric's surgery.  Plaintiffs thus have been injured in fact, suffered damage, and lost money or property as a result of Defendants' illegal, fraudulent, deceptive, and misleading business acts and practices.

87.    After receiving these EOBs, Eric contacted the Axis Defendants to dispute the lack of coverage under what Defendants represented to be comprehensive coverage.  Despite Eric's complaints and attempts to resolve this issue prior to initiating action, the Axis Defendants did not alter its level of coverage or agree to further contribute to Eric's care.  Eric was unable to reach any other Defendant to discuss the issue.

88.    Eric and Miryam now face debt collectors who are seeking to recover the extensive medical bills for which Defendants promised, but failed, to pay.

89.    Plaintiffs' experience does not appear to be an isolated, atypical, or

-37-

unique occurrence.  There are hundreds of reports online from victims nationwide which corroborate Plaintiffs' allegations in this Complaint: that Defendants claim to provide comprehensive health coverage but, in reality, offer a product that is virtually worthless.[10]

## IV.   CLASS ALLEGATIONS

90.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Nationwide Class or, in the alternative, a Multi-State Class or California-Only Class (collectively "Class"):

### Nationwide Class

All persons within the United States who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

### Multi-State Class

All persons within California and other states with similar laws who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

### California-Only Class

All persons in California who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

91.    The Class includes all persons who purchased such services during the period at least four years from the date of the filing of this Complaint, and continues until the date that notice of this action is disseminated to putative class members.

92.    Excluded from any class are: (i) Defendants and their officers, directors, and employees; (ii) any person who files a valid and timely request for

---

[10] *See, e.g.*, https://chicago.cbslocal.com/2019/02/11/simple-health-plans-insurance-scam-lawsuit-ftc-deceptive-sales-tactics/, where AXIS underwrote the at-issue sham "insurance."  (Last accessed June 25, 2020.)

-38-

exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

93.   Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

94.   This action is properly maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) for the reasons set forth below.

95.   **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** Prospective class members, however defined, are readily ascertainable by way of Defendants' records and are so numerous that joinder of all members is impracticable.  Defendants have ready access to records that can easily determine the number of persons who have purchased these products.  Based on the number of complaints about this practice that they have seen online, Plaintiffs estimate that members of the class consist of thousands of individual consumers.

96.   **Commonality—Federal Rule of Civil Procedure 23(a)(2).**  There are numerous and substantial questions of law or fact common to all members of the class that predominate over any individual issues.  Included within the common questions of law or fact are:

a.   Whether Defendants engaged in unlawful, unfair, or fraudulent business acts or practices in advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health insurance, and omitted material facts to the contrary;

b.   Whether Defendants made untrue or misleading statements or omitted material facts in connection with advertising, marketing, selling, or administering limited benefit plans and medical

-39-

discount plans that are systematically represented to be comprehensive health insurance;

c.   Whether Defendants engaged in a pattern or practice of making material misrepresentations or omissions of material fact to individuals in the process of advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health insurance;

d.   Whether Plaintiffs and the class members are entitled to equitable monetary and/or injunctive relief;

e.   Whether Plaintiffs and the class members have sustained damage as a result of Defendants' unlawful conduct; and

f.   The proper measure of damages sustained by Plaintiffs and class members.

97.   **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the members of the class they seek to represent. Plaintiffs, like the class members, purchased Defendants' products after falling victim to Defendants' uniformly deceptive advertising and marketing scheme, including systematic false and misleading statements and omissions of material fact related to those products.  Thus, Plaintiffs' claims arise from the same practices and course of conduct and are based on the same legal theories that give rise to the claims of the other class members.  Defendants' unlawful, unfair, and/or fraudulent business acts and practices, including the use of internet websites and a scripted sales pitch, concern the same business practices described, irrespective of where they occurred or were experienced.  Plaintiffs and the class members also sustained similar injuries arising out of Defendants' conduct.

98.   **Adequacy—Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate representatives of the class they seek to represent because their

-40-

interests do not materially or irreconcilably conflict with the interests of other members of the class.  On the contrary, Plaintiffs will fairly, adequately, and vigorously protect the interests of class members and have retained counsel experienced and competent in the prosecution of complex cases, including complex class action litigation.

99. **Appropriate Class-wide Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**  For the reasons described, Defendants have acted on grounds generally applicable to the class, thereby making final injunctive or equitable relief appropriate with respect to the class as a whole.

100. **Predominance and Superiority—Federal Rule of Civil Procedure 23(b)(3).**  As described above with respect to commonality, there are numerous and substantial questions of law or fact common to class members that predominate over any questions that affect only individual members.  In addition, class treatment is superior to other available group-wide methods for the fair and efficient adjudication of the this action because it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and burden on the courts that individual actions would entail.

101. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are superior to any other method available for the fair and efficient group-wide adjudication of these claims.  Absent a class action, it would be highly unlikely that Plaintiffs or any other putative class members would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

///

///

## COUNT I

**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.***

102.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101, as if fully set forth herein.

103.  Plaintiffs bring this claim under California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.* ("section 17200"), on behalf of themselves and the class and for the benefit of the general public.  Section 17200 prohibits any "unfair," "fraudulent," or "unlawful" business act or practice.

104.  As specified in the preceding paragraphs, Defendants committed "unfair" business acts or practices by, among other things: (1) making the false and misleading statements described herein; (2) falsely and deceptively advertising their products as described herein; (3) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs, class members and the public; (4) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs, class members, and the public; (5) engaging in conduct that undermines or violates the spirit or intent of section 17200 or the laws detailed herein; and/or (6) engaging in conduct that is expressly prohibited by law with respect to the unlicensed sale of health insurance.

105.  As specified in the preceding paragraphs, Defendants committed "fraudulent" business acts or practices by making uniform misrepresentations and omissions of material fact regarding the limited benefit plans and medical discount plans.  Defendants' business practices as alleged herein are fraudulent under section 17200 because they are likely to deceive consumers into believing that the limited benefit plans and medical discount plans which Defendants offer are comprehensive PPO health insurance even though they are not.  This conduct is also fraudulent because Plaintiffs and consumers are reasonably led to believe

-42-

that Defendants may legally offer such services, when in fact they are prohibited by law from doing so.  Plaintiffs and the other members of the class have in fact been deceived as a result of Defendants' material representations, which outlined in detail above.

106.  As specified in the preceding paragraphs and as detailed in the factual and legal allegations in the Counts listed below, Defendants committed "unlawful" business acts or practices by, among other things: (1) violating California Insurance Code section 790.03(a), which makes it unlawful to make, or cause to be made, any misrepresentations regarding the terms, benefits, or advantages of an insurance policy; (2) violating California Insurance Code section 790.03(b), which makes it unlawful to make, or cause to be made, any untrue, deceptive, or misleading statements with respect to the business of insurance; (3) violating California Insurance Code section 790.036(a), which states that it is an unfair and deceptive act or practice in the business of insurance for an insurer to advertise insurance that it will not sell; (4) violating California Insurance Code section 780, which bars misrepresentations regarding the terms, benefits, or privileges of an insurance policy; (5) violating California Insurance Code section 781, which bars misrepresentation in order to induce a person to take out a policy of insurance; (6) not having the licenses required by California law and acting in violation of, inter alia, California Insurance Code section 1621; (7) falsely and deceptively advertising their services as described herein in violation of California Business & Professions Code section 17500; (8) engaging in conduct that violates numerous provisions of the Consumers Legal Remedies Act as set forth below; (9) engaging in conduct that constitutes fraud and deceit as defined in California Civil Code section 1709; (10) violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1961 *et seq.*; and/or (11) engaging in conduct that violates other state laws as may be identified in the course of this action.

107.  Plaintiffs, individually and on behalf of the other class members,

-43-

1    reserve the right to allege other conduct that constitutes other unfair, fraudulent, or

2    unlawful business acts or practices, as Defendants' conduct is ongoing.

3        108.  Plaintiffs have suffered injury in fact and lost money as a result of

4    Defendants' unlawful, unfair, or fraudulent business practices, as set forth above.

5    Plaintiffs and putative class members were harmed by entering into transaction

6    and paying for a product or service that is not what Defendants represented it to

7    be, thereby surrendering more in a transaction than they otherwise would have if

8    the true facts had been timely disclosed, if they would have entered into such

9    transactions at all.  Defendants were thereby unjustly enriched by such business

10   acts and practices.

11       109.  Pursuant to Business & Professions Code section 17203, Plaintiffs,

12   individually and on behalf of the class and for the benefit of the public, request all

13   applicable remedies and relief allowable under section 17200.  Plaintiffs seek an

14   order enjoining Defendants from engaging in the illegal business acts and

15   practices alleged herein.  Plaintiffs also seek an order awarding Plaintiffs and the

16   class restitution and restitutionary disgorgement of the money wrongfully

17   acquired and/or retained by Defendants by means of illegal business acts and

18   practices alleged herein.  This includes but is not limited to restitution of all

19   amounts paid in false "premiums" for "health insurance" that provided next to no

20   coverage, and the money and profits kept by Defendants as a result of not making

21   the payments for health care services and products that the Defendants promised

22   to make.  The remedies requested by statute are cumulative of and in addition to

23   any other remedies that are available to Plaintiffs and class members under the

24   other Counts set forth herein.

25       110.  Plaintiffs and the class members are further entitled to prejudgment

26   interest as a direct result of Defendants' illegal business acts and practices.  The

27   amount on which interest is to be calculated is a sum certain and capable of

28   calculation, in an amount according to proof.

111.  Plaintiffs' counsel are also entitled to fees and costs pursuant to, inter alia, California Code of Civil Procedure section 1021.5.

<u>COUNT II</u>

**False And Misleading Advertising in Violation of California Bus. & Prof. Code § 17500 *et seq.***

112.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101, as if fully set forth herein.

113.  As specified in the preceding paragraphs, Defendants use and disseminate advertising to sell their limited benefit plans and medical discount plans, including through use of the internet.

114.  As set forth above, this advertising is deceptive, untrue, or misleading within the meaning of California Business & Professions Code section 17500 *et seq.* ("section 17500"), because the statements made on Defendants' websites, and by Defendants' sales representatives, are misleading or likely to deceive, and continue to deceive, members of the class and the general public regarding the services/products Defendants provide.

115.  In making and disseminating the statements alleged herein, Defendants knew or, by the exercise of reasonable care should have known, that the statements were untrue or misleading.

116.  The misrepresentations and omissions by Defendants of the material facts detailed above are false and misleading advertising and therefore violate section 17500 because it is likely that a significant portion of the general public and/or Defendants' targeted customers, acting reasonably under the circumstances, could be misled.

117.  As a result of these  acts and practices, Defendants have improperly and illegally obtained money from Plaintiffs and class members.

118.  Defendants' conduct is ongoing and continues to harm consumers, class members and the public.  Plaintiffs therefore seek the relief described in

-45-

Count I.

## <u>COUNT III</u>

### Violation of Consumers Legal Remedies Act (CLRA)

### California Civil Code § 1750 *et seq.*

119.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101, as if fully set forth herein.

120.  Under California Civil Code section 1770(a), the following "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of . . . services to any consumer are unlawful":

- "Representing that goods or services have sponsorship, approval, *characteristics*, ingredients, uses, *benefits*, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Civ. Code § 1770(a)(5).

- "Representing that goods or services are *of a particular standard, quality, or grade*, or that goods are of a particular style or model, if they are of another." *Id.* § 1770(a)(7).

- "Advertising goods or services *with intent not to sell them as advertised*." *Id.* § 1770(a)(9).

- "Representing that a transaction confers or involves *rights, remedies, or obligations which it does not have or involve, or which are prohibited by law*." *Id.* § 1770(a)(14).

(Emphasis added.)

121.  Here, in connection with proposing or engaging in transactions with consumers that were intended to result, or actually resulted in, the sale of services, Defendants, either by making affirmative misrepresentations as set forth above or omitting material facts from disclosure they were bound to disclose as set forth above, represented that their health plans, rates and alternate offers of coverage are

-46-

offered, administered, and provided in compliance with state law and are comparable to PPO health plans and/or failed to disclose the material fact that their health plans are not offered in compliance with state law.

122.  Such acts and practices were designed or intended by Defendants to convince class members and the public to purchase such services from Defendants in at least the following ways:

- Deceptively represented to class members that the individual health plans entered into with class members, and renewed monthly, involved rights and obligations that complied with applicable law and provided benefits required under the law which they do not in fact have, in violation of Civil Code section 1770(a)(5).

- Deceptively promoted their health plans as complying with applicable law and providing benefits consistent with and required under the law, with the intent not to sell them as advertised in violation of Civil Code section 1770(a)(9).

- Represented that the sale and monthly renewal of individual health plan contracts involved rights, remedies, or obligations, including rights, remedies and obligations defined by the Insurance Code and that they were authorized to solicit, offer and sell, which they do not have or involve or which are prohibited by law, in violation of Civil Code section 1770(a)(14).

123.  The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

124.  For purposes of the CLRA, a "'[t]ransaction' means an agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement."  Cal. Civ. Code § 1761(e).  Here, the "transactions"

-47-

at issue are governed by the CLRA because they include both the original sale and the monthly renewals of the individual contracts made and entered into by Defendants, Plaintiffs, and class members, as well as Defendants' performance of their obligations under such agreements.

125. For purposes of the CLRA, "'[s]ervices' means work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(b). Here, the plans at issue constitute "services" as defined by the CLRA as they are services provided for personal family use.

126. For purposes of the CLRA, "'[c]onsumer' means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d). Here, Plaintiffs, class members, and members of the public are "consumers" because they obtained and renew monthly their individual contracts for the services in question for personal, family or household purposes.

127. In making decisions whether to obtain such services and pay the rates imposed by Defendants, Plaintiffs and other class members reasonably acted in positive response to the misrepresentations and omissions of material fact as set forth in detail above relating to the legality of their conduct, the rates they calculated and charged, and the scope of such coverage, or would have considered the omitted facts detailed herein material to their decisions to do so. Consumers enrolled in such services without being informed of their rights, and suffered damage as a result of the material misrepresentations of fact and omitted material facts as set forth above.

128. Plaintiffs and members of the class have suffered damage as a result of the wrongful acts and practices of Defendants set forth herein, as they have either been duped into paying higher rates than required by law, have paid the same or more money for lesser coverage, or have entered into transactions with Defendants

-48-

that were illegal under the law for Defendants to inter into. Plaintiffs and members of the class have also suffered transactional costs by expending time and resources in the form of correspondence and telephone conversations with Defendants in attempt to avoid the consequences of Defendants' unfair methods of competition and unfair or deceptive acts. Plaintiffs and members of the class have also suffered opportunity costs by foregoing the opportunity to switch to other coverage offered by other companies and the resulting risk of having not done so.

129. Notice pursuant to section 1782 of the CLRA has been provided to Defendants by certified mail and Defendants have failed to provide all requested relief in response to that notice. Accordingly, Plaintiffs and class members seek general, actual, consequential, statutory damages, exemplary, and punitive damages as provided by statute.

130. Plaintiffs seek relief in the form of restitution of all monies paid to Defendants that are illegally retained and should be disgorged, an injunction for the benefit of class members and the public to prevent Defendants from illegally engaging in conduct as set forth above, and all appropriate fees and costs as are permitted under that statute, including Civil Code section 1780(d).

## COUNT IV

### Fraud and Deceit – Civil Code Section 1709

131. Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101, as if fully set forth herein.

132. As detailed above, Defendants made false representations, concealed material facts, and acted with an intent to deceive Plaintiffs and class members when uniformly advertising, marketing, selling, and administering their limited benefit plans and medical discount plans.

133. Defendants' uniform scripted misrepresentations and omissions of material fact include, at minimum:

- That Defendants help consumers find the most comprehensive

-49-

insurance plan for the lowest possible price.

- That Defendants worked on behalf of consumers.
- That the "health insurance" Defendants offered was comparable to the comprehensive health insurance that consumers possessed and was comparable to PPO coverage.
- That Defendants' product would provide substantial coverage if Plaintiffs or class members were to visit almost any doctor in the country.
- That Defendants' product would cover every category of health care except pregnancy and mental health treatment.

134.   Defendants knew or reasonably should have known that their representations or omissions of material fact they were duty bound to disclose were false when made or made the representations recklessly and without regard for their truth.

135.   Defendants' statements, actions, and omissions were intended to deceive Plaintiffs and class members for Defendants' own benefit.

136.   Plaintiffs and class members justifiably relied on Defendants' misrepresentations and omissions, representative examples of which are set forth above.

137.   Plaintiffs and class members suffered financial damage in the form of, among other things, wasted payments and unpaid medical bills as a direct result of Defendants' misrepresentations, material omissions, and deceptive acts.

138.   Defendants' conduct was intended to cause injury to members of the class and/or was despicable conduct carried on with a willful and conscious disregard of the rights of members of the class, subjected members of the class to cruel and unjust hardship in conscious disregard of their rights, and was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with the intention to deprive members of the class of money, property,

legal rights or to otherwise cause injury.  Such conduct constitutes malice, oppression, or fraud under California Civil Code section 3294 and entitles Plaintiffs and members of the class to punitive or exemplary damages in an amount appropriate to punish or set an example of and deter Defendants from engaging in such conduct.

## COUNT V

### Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C § 1961 *et seq.*

139.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101, as if fully set forth herein.

140.  Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

141.  Each Defendant violated 18 U.S.C. § 1962(c) and (d) by the acts described in this Complaint.  Specifically:

    a. Each Defendant's activities affected interstate commerce;

    b. Each Defendant conducted or participated, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity.

    c. Each Defendant conspired to participate, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity.

142.  **The Enterprise.**

    d. Defendants, and each of them, formed an association-in-fact for the common and continuing purpose described in this Complaint. Together, they constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.  Defendants, as the members of the enterprise, functioned as a continuing unit with ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

e.  Defendants, and each of them, knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning on 18 U.S.C § 1691 *et seq*.  The racketeering activity was made possible for Defendants' regular and repeated use of the facilities and services of the enterprise.  Defendants have the specific intent to engage in the substantive RICO violations alleged herein.

f.  Alternatively, Defendants HEG, ACI, ACUSA, Axis Insurance Company, Axis Specialty, HII, and HPI each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

g.  Alternatively, some of Defendants, together, constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

143.  Each enterprise has engaged in, and their activities have affected, interstate commerce.

144.  Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises alleged above by overseeing and coordinating the commission of multiple acts of racketeering as described below.

145.  **Pattern of Racketeering Activity.**  Defendants, each of whom are persons associated with, or employed by, the enterprise(s), did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), 1962(c), and 1962(d).  The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise.  Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

146.  Predicate acts of racketeering activity are acts which are indictable under the provisions of the U.S. Code listed in 18 U.S.C § 1961(1)(B) and which

-52-

are more specifically discussed herein.  Each Defendant committed at least two such acts or else aided and abetted such acts.

147.  These acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission.  Further, the acts of racketeering by Defendants have been continuous.  There was repeated conduct during a period of time continuing to the present, and there is a continued threat of repetition of such conduct.

148.  The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond their racketeering activity.  Rather, they existed separate and apart from the pattern of racketeering activity for legitimate business purposes.

149.  **Predicate Act: Use of Mails and Wires to Defraud.**  Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs and putative class members of money by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails, via the internet, via facsimile and/or by private or commercial interstate carriers, or received such therefrom.  Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals.

150.  The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

151.  Defendants carried out their scheme in different states and could not

-53-

have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

152.  In furtherance of their scheme alleged herein, Defendants communicated among themselves and with Plaintiffs and putative class members in furtherance of the scheme to defraud Plaintiffs and putative class members. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers.

153.  Specifically, Defendants used the wires and/or U.S. mail or private or commercial carriers for the purposes of their fraudulent scheme both in terms of the promotional materials set forth above and sending and/or obtaining documents from Plaintiffs and Class members.  Defendants also communicated by the wires and/or U.S. mail or private or commercial carriers to facilitate payment of the "premiums"' by Plaintiffs and Class members pursuant to their fraudulent scheme.

154.  In addition, in furtherance of their scheme, Defendants used the wires and/or U.S. mail or private or commercial carriers to induce Plaintiffs to purchase this sham health insurance.  Defendants also communicated by the wires and/or U.S. mail or private or commercial carriers to facilitate the sales and subsequent purchases, including accepting payments in the form of "premiums" over the Internet or by mail.

155.  Plaintiffs and putative class members reasonably and justifiably relied on Defendants' false misrepresentations and deceptive communications as alleged in this Complaint.

156.  Plaintiffs and putative class members have been damaged as a direct and proximate result of Defendants' participation in the enterprise.

157.  **Continuity of Conduct.**   Defendants' violations of state and federal laws as set forth in this Complaint, each of which directly and proximately injured Plaintiffs and putative class members, constituted a continuous course of conduct spanning a period of time encompassing at least 2016 through the present.

Defendants' conduct was intended to obtain money through false representations, fraud, deceit and other improper and other unlawful means, including the sale and underwriting of purported  "insurance" when Defendants were not licensed to do so, fraudulently convincing consumers to pay "premiums" for purported coverage that was worthless, and duping consumers into believing they were receiving ACA qualified coverage when, in fact, consumers were not.

158.  Accordingly, Plaintiffs and putative class members seek an award of actual damages.  Plaintiffs further seek an award three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by statute.

**COUNT VI**

**Conspiracy to Violate Federal Civil RICO, 18 U.S.C § 1961 *et seq.***

159.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101 and 139 through 158, as if fully set forth herein.

160.  In violation of 18 U.S.C. § 1962(d), Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in this Complaint.

161.  The conspiracy commenced at least as early as 2016 and is ongoing.

162.  The conspiracy's purpose was to defraud consumers, like Plaintiffs and putative class members, for their own benefit.

163.  Each Defendant committed at least one overt act in furtherance of the conspiracy.  These acts in furtherance of the conspiracy included, among others, creating scripts to solicit, mislead and fraudulently induce consumers to purchase sham health insurance, training sales agents to fraudulently induce consumers to purchase sham health insurance, creating websites to induce consumers to purchase sham health insurance, selling sham health insurance, underwriting sham health insurance, conducting a fraudulent "verification" process during the sale of

-55-

sham health insurance, funding the fraudulent activities of the other defendants, collecting debts from Plaintiffs and putative class members that were incurred based on Defendants' fraudulent misrepresentations, and/or facilitating any and all of Defendants' conduct as stated in this Complaint.

164.  Even if Defendants did not agree to harm Plaintiffs or putative class members specifically, the purpose of the acts they engaged in was to advance of the overall subject of the conspiracy, and harm to Plaintiffs and putative class members was a reasonably foreseeable consequence of Defendants' actions.

165.  Plaintiffs and putative class members have been injured and continue to be injured by Defendants' conspiracy.  The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs and putative class members.

166.  Plaintiffs and putative class members seek an award of damages in compensation for, among other things, the money Defendants fraudulently obtained from Plaintiffs and putative class members.  Plaintiffs further seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute

## COUNT VII

### Restitution, Money Had and Received, Unjust Enrichment, Quasi-Contract and/or Assumpsit

167.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101, as if fully set forth herein.

168.  This Count is not derivative of the other Counts asserted above, but rather is recognized as a separate and independent alternative Count that may be submitted to the jury as a claim at law.  Other Counts may not permit Plaintiffs and class members to obtain the relief available under this Count, otherwise leaving them without a complete and adequate remedy at law in terms of the relief sought

-56-

herein.

169.  Based on the allegations set forth above, Plaintiffs and the putative class members may properly assert an independent Count for equitable restitution and/or restitutionary damages at law derived from the principles of restitution and unjust enrichment, based on common counts such as monies had and received and mistaken receipt or retention of monies, and/or by implying an obligation at law based on principles of quasi-contract or the common-law principle of assumpsit. Under such common law theories of recovery, it would be inequitable or unjust for Defendants to retain such benefits based on the conduct described above. Restitution may be awarded where, as here, Defendants obtained a benefit from the Plaintiffs by fraud, duress, conversion, or similar conduct.

170.  By receiving monies for the services at issue, Defendants received a benefit from Plaintiffs and class members.  Defendants owe Plaintiffs and class members specific sums that can be measured and calculated based on records that are available to Defendants.  Specifically, Plaintiffs seek, both for themselves and all others similarly situated, restitution at both equity and law measured by the payments expended for Defendants' services, plus any moneys or profits retained or made by Defendants on such amounts.  Such money or property belongs in good conscience to Plaintiffs and class members.

171.  Defendants are required to pay monies to Plaintiffs and class members under common law principles of restitution.  Plaintiffs conveyed a benefit on Defendants based on the illegal conduct or acts of mistake or fraud as set forth above.  Having received such benefits using misleading and illegal acts, practices, or policies, and omitting material facts as set forth in detail above, Defendants owe Plaintiffs restitution.

172.  Defendants are required to pay monies to Plaintiffs and class members under common law principles of unjust enrichment.  One who acquires a benefit may not justly retain such monies and thus must return such monies so as not to be

-57-

unjustly enriched.  Defendants have been unjustly enriched by class members through payments or retention of monies they were able to retain or not pay, and the resulting profits enjoyed by Defendants.  Defendants' unjust enrichment is related to and flowed from the conduct challenged in this First Amended Complaint.  Such monies were not intended to be used for Plaintiffs' and class members' benefit, but rather for Defendants' own personal profit.  Defendants are required to pay over such benefits when the retention of such would unjustly enrich Defendants under common law principles of common counts such as money had and received and mistaken receipt or retention of monies.

173.  Defendants are required to pay monies to Plaintiffs and class members under common law principles of quasi-contract.  Defendants entered into a series of implied-at-law obligations that resulted in a sum certain being unjustly retained by Defendants, either directly or indirectly, at the expense of Plaintiffs and class members.  Defendants had knowledge of such benefits.  This obligation is imposed by law, regardless of the intent of the parties.  Equity and good conscience dictate that under the circumstances Defendants as the benefitted party should make restitution to Plaintiffs and class members.

174.  Defendants are required to pay monies to Plaintiffs and class members under common law principles of assumpsit.  Defendants have an obligation created by law to ensure the status quo is obtained or retained and to restore Plaintiffs and class members to their former or rightful position by paying over monies Defendants are not lawfully entitled to retain.  As Defendants are unjustly retaining such benefits at the expense of Plaintiffs and class members, the unjustified retention of such monies entitles Plaintiffs and class members to restitution of such monies under common law principles of assumpsit.

175.  Pursuant to California Civil Code section 2224, one who gains or retains a thing (including money) by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, unless they have some other and better

right thereto, is an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.  Based on the facts and circumstances alleged above, in order to prevent Defendants from taking advantage of their own wrongdoing, Plaintiffs and class members are entitled to the establishment of a constructive trust, in a sum certain, of all monies that have been improperly retained by Defendants, as well as the monies made by Defendants on such monies, from which Plaintiffs and class members may seek restitution.

176.  In addition, in light of Defendants' knowledge of the true facts as set forth above, Defendants' conduct warrants an assessment of exemplary damages under this independent cause of action in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

177.  Based on the facts set forth above, Plaintiffs, both individually and on behalf of the class, seek appropriate restitution and/or restitutionary damages and exemplary damages as is permitted by law for such claims.  Plaintiffs, both individually and on behalf of the class, also request an order for an accounting of all such monies to which they are entitled and the imposition of a constructive trust over such monies.  Plaintiffs further seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, individually, and on behalf of all others similarly situated and for the benefit of the general public, as applicable, pray for relief pursuant to each cause of action set forth in this Complaint as follows:

A.     An order declaring that this action can be maintained as a class action, certifying the Nationwide Class as requested herein, or, in the alternative, the Multi-State Class or California-Only Class, designating Plaintiffs as class representatives and appointing the undersigned counsel as class counsel;

B.     Restitution in such amounts so as to restore the status quo ante;

C.      Restitutionary disgorgement of all profits and unjust enrichment that Defendants obtained as a result of Defendants' illegal conduct as set forth herein;

D.      Temporary, preliminary, and permanent injunctive relief, including enjoining Defendants from continuing the illegal practices as set forth herein and ordering Defendants to engage in a corrective advertising campaign;

E.      Compensatory damages (except as to the claims under section 17200 and section 17500);

F.      All available statutory damages, including under the CLRA.

G.      Punitive or exemplary damages (except as to the claims under section 17200, section 17500, and RICO);

H.      Three times the damages sustained under applicable RICO statutes;

I.      Attorneys' fees and litigation costs under the theories and statutes set forth above;

J.      Pre- and post-judgment interest on any amounts awarded to Plaintiffs and class members; and

K.      Such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial on all causes of action and issues so triable.

Dated:  September 11, 2020                    **FOX LAW, APC**

/s/ Joanna L. Fox
David A. Fox
Joanna L. Fox
Russell A. Gold
Michael F. Gosling

Dated:  September 11, 2020                    **CONSUMER LAW GROUP OF CALIFORNIA**

/s/ Alan M. Mansfield
Alan M. Mansfield

*Attorneys for Plaintiffs*

## **AFFIDAVIT OF VENUE**

I, Michael F. Gosling, declare as follows:

1.      I am an attorney admitted in the State of California and the United States District Court for the Southern District of California.  I am counsel for Plaintiffs in this action and make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.      At all relevant times, Defendants were and are entities and individuals that are located outside of California but have either registered to do business in California or are doing business in California and San Diego County.

3.      The Plaintiffs identified in the Complaint are customers of Defendants' businesses who currently reside in San Diego County.

4.      Some of the transactions that form the basis of this action occurred in San Diego County, and at least a portion of Defendants' obligations or liabilities arise in this County.

5.      The First Amended Complaint filed in this matter contains a cause of action for violation of California Civil Code section 1750 *et seq.*

6.      For the foregoing reasons, the CLRA cause of action in this First Amended Complaint has been properly commenced in the proper county for trial under the venue provisions of the CLRA.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.  Signed on September 11, 2020, in San Diego, California.


_____/s/ Michael F. Gosling_____

Michael F. Gosling