1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   ERIC KETAYI and MIRYAM KETAYI,        Case No.:  20-cv-1198-GPC-KSC
     both individually and on behalf of all
12   others similarly situated and for the    **ORDER:**
     benefit of the general public,
13                                            **(1) GRANTING IN PART AND**
14                              Plaintiffs,   **DENYING IN PART DEFENDANTS'**
                                              **MOTIONS TO DISMISS; AND**
15   v.
                                              **(2) GRANTING IN PART AND**
16   HEALTH ENROLLMENT GROUP, a               **DENYING IN PART PLAINTIFFS'**
     Florida corporation; ADMINISTRATIVE     **REQUEST FOR JURISDICTIONAL**
17   CONCEPTS, INC., a Pennsylvania          **DISCOVERY**
     corporation; AXIS, a Bermuda
18   corporation d/b/a Axis Insurance         **[ECF Nos. 63, 64, 65, 66, 69, 76, 80.]**
     Company; AXIS SPECIALTY U.S.
19   SERVICES, INC., a Delaware
     corporation; ALLIANCE FOR
20   CONSUMERS USA, a Nebraska
     corporation; HEALTH PLAN
21   INTERMEDIARIES HOLDINGS, LLC, a
     Delaware corporation; HEALTH
22   INSURANCE INNOVATIONS
     HOLDINGS, INC., a Delaware
23   corporation; FIRST HEALTH GROUP,
     CORP., a Delaware corporation; MARC
24

25

26

27
                                    1
28

1
2
3
4
5
6

MUNOZ, an individual; and KEVIN
ROMERO, an individual, inclusive,

Defendants.

7    Before the Court are the Motions to Dismiss the First Amended Complaint of

8  Plaintiffs Eric Ketayi and Miryam Ketayi ("Plaintiffs"), filed by Defendants Health

9  Enrollment Group, Administrative Concepts, Inc., Axis, Axis Specialty U.S. Services,

10 Inc., Health Plan Intermediaries Holdings, LLC, Health Insurance Innovations Holdings,

11 Inc., First Health Group, Corp., Marc Munoz, and Kevin Romero (collectively

12 "Defendants"[1]).  ECF Nos. 63, 64, 65, 66, 69.  The motions have been fully briefed.  ECF

13 Nos. 76, 77, 78, 79, 80, 82, 83, 84, 85, 86, 87.  Upon consideration of the briefing of the

14 parties and for the reasons set for the below, the Court GRANTS in part and DENIES in

15 part the motions to dismiss.  The Court further GRANTS in part and DENIES in part

16 Plaintiffs' request for jurisdictional discovery.

17 **I.    BACKGROUND[2]**

18   Plaintiffs Eric and Miryam Ketayi are married with two children and live in San

19 Diego County.  ECF No. 53 ("FAC") ¶¶ 13–14, 74.  Until the fall of 2016, Plaintiffs had

20 health insurance through Blue Cross/Blue Shield that provided coverage for themselves

21 and their children.  *Id.* ¶ 74.  In the face of increasing premiums, Plaintiffs decided to

22 look for less expensive insurance options that provided comparable PPO coverage to their

23
24

25 [1] In this order, the Court refers only to the moving Defendants. This includes all Defendants except
26 Defendant Alliance for Consumers USA ("ACUSA"), against which a default has been entered by the
    Clerk.  ECF No. 75.
27 [2] The factual background in this section is drawn from Plaintiffs' First Amended Complaint.

2

existing plan. *Id.* Plaintiffs came across the website of Defendant Health Enrollment Group ("HEG"), which included statements like "Our PPO's work with over 80% of physicians Nationwide," and "We work with Major Insurance Companies in all 50 states" to provide "Private Health Insurance," "Obamacare," and "PPO" plans. *Id.* ¶¶ 15, 75. During three separate calls on November 22, 2016, Plaintiffs spoke with who they believed to be a representative of HEG, but "may have been" a representative of Defendant Health Plan Intermediaries Holdings, LLC ("HPI"), or Defendant Health Insurance Innovations Holdings, Inc. ("HII"). *Id.* ¶ 76, n.8. The representative described the plan to Plaintiffs as a PPO plan and compared it to Plaintiffs' existing Blue Cross/Blue Shield coverage. *Id.* The representative followed a script that confused Plaintiffs, and claimed that Plaintiffs would have small co-pays, no deductible, and that this seemingly comprehensive coverage would apply were Plaintiffs or their children to visit almost any doctor in the country. *Id.* ¶ 77. The representative also told Plaintiffs that the PPO plan would cost $379 per month, less than Plaintiffs' Blue Cross/Blue Shield plan, because Defendants aggregated individuals from all over the country and could negotiate "great deals" for consumers. *Id.* ¶ 78. In responding Plaintiffs' questions about what the plan would cover, the representative stated the coverage was PPO and comprehensive and excluded pregnancy and mental health care. *Id.* ¶ 79. Relying on the statements of the representative and Defendants, Plaintiffs then decided to initiate the process of purchasing what they believed to be comprehensive health insurance. *Id.*

The representative then told Plaintiffs they would be transferred to an agent who could verify that they qualified for the Plan, who Plaintiffs believe was an employee of Defendants Administrative Concepts, Inc. ("ACI") or Axis Defendants.[3] *Id.* ¶ 81. Before

---

[3] Plaintiffs use the term "Axis Defendants" to refer collectively to Defendant Axis and Defendant Axis Specialty U.S. Services, Inc. ("Axis Specialty"). FAC ¶ 29.

the representative transferred Plaintiffs to the agent, he told them that the agent would read them a series of statements and that Plaintiffs would need to say yes to all of the statements if they wished to purchase Defendants' product, that Plaintiffs should ignore statements that did not apply to them or the product they were purchasing, and that Plaintiffs should not interrupt or ask questions, or they would be forced to start the process over. *Id.* ¶ 81.  Plaintiffs felt pressured to agree to the agent's verification statements based on the representative's directions and accordingly answered yes to every question, despite not understanding or agreeing with everything that was being said. *Id.* ¶ 82.

On the same day, November 22, 2016, Plaintiffs purchased Defendants' product (the "Liberty Health plan") and continued to pay "premiums" for Defendants' coverage from November 2016 until at least August 2017. *Id.* ¶¶ 13–14, 83, 84.  After Plaintiffs' purchase, Defendants mailed Plaintiffs a card that said "Preferred Provider (PPO) Network Access" and included the URL to a website for Defendant First Health Group, Corp. ("First Health"), which stated it was "[y]our national choice for PPO network solutions." *Id.* ¶¶ 84, 40.  Plaintiffs assert that Defendants made these representations with the knowledge that they had not actually sold, underwritten, or provided any sort of PPO plan or otherwise comprehensive coverage to Plaintiffs. *Id.* ¶ 84.

On July 29, 2017, Plaintiff Eric Ketayi was admitted to Cedars-Sinai Hospital for back surgery. *Id.* ¶ 85.  For his six-night hospital stay, surgery, and other necessary care, the health plan Plaintiffs had purchased from Defendants covered $1,500. *Id.* ¶ 86. Plaintiffs were responsible for $194,366.73. *Id.*  Plaintiffs attempted to dispute the lack of coverage, but Axis Defendants—the only Defendant Plaintiffs were able to reach—did not alter its level of coverage or agree to further contribute. *Id.* ¶ 87.

1       On June 26, 2020, Plaintiffs filed their initial putative class action complaint.[4]

2   ECF No. 1.  On September 11, 2020, Plaintiffs filed their First Amended Complaint

3   ("FAC"), asserting putative class claims for (1) violations of the California Unfair

4   Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (2) false and

5   misleading advertising under the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code

6   § 17500 *et seq.*; (3) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ.

7   Code § 1750 *et seq.*; (4) fraud and deceit, Cal. Civ. Code § 1709; (5) violation of the

8   Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*;

9   (6) conspiracy to violate federal civil RICO, 18 U.S.C. § 1961 *et seq.*; and (7)

10  "restitution, money had and received, unjust enrichment, quasi-contract and/or

11  assumpsit."  FAC ¶¶ 102–177.  On October 9, 2020, Defendants Axis, Axis Specialty,

12  First Health, HII, HPI, and ACI filed motions to dismiss the FAC.  ECF Nos. 63, 64, 65,

13  66.  On October 13, 2020, Defendants HEG, Marc Munoz, and Kevin Romero filed a

14  motion to dismiss the FAC.  ECF No. 69.

## II.      REQUESTS FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE

17      The Court will first consider the parties' evidentiary arguments submitted in

18  connection with these motions to dismiss.

19      The incorporation-by-reference doctrine and judicial notice pursuant to Federal

20  Rule of Evidence 201 are the two exceptions to the general rule that the Court may not

21  consider material outside the pleadings when ruling on a motion to dismiss for failure to

22  state a claim.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

23  Federal Rule of Evidence 201 provides that a court "may judicially notice a fact that is

---

[4] Plaintiffs' initial complaint included as defendants Liberty Health and Juanita Nicolucci, who are not included as defendants in the FAC.

5

not subject to reasonable dispute," either because it is (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  A court can therefore "take judicial notice of matters of public record" at the motion to dismiss stage.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

Axis and Axis Specialty request that the Court take judicial notice of  the following exhibits: (A) the Group Hospital Indemnity Insurance Certificate downloaded by Eric Ketayi; (B) the Group Accident Insurance Certificate downloaded by Eric Ketayi; (C) AXIS Insurance's California Department of Insurance Certificate of Authority; (D) AXIS Insurance's California Secretary of State Certificate of Qualification.  As to Exhibits A and B, what Axis and Axis Specialty refer to as the "Plan Documents," the Court notes that Axis and Axis Specialty conflate the distinct doctrines of judicial notice and incorporation by reference.  *See Khoja*, 899 F.3d at 998 ("Both of these procedures permit district courts to consider materials outside a complaint, but each does so for different reasons and in different ways.").  Axis and Axis Specialty have provided no argument as to why the elements of judicial notice are met with respect to the Plan Documents, nor do they pinpoint specific facts in the documents that they ask the Court to consider.  ECF No. 63-3.  Further, the Court finds that it is inappropriate to consider the Plan Documents incorporated by reference into the FAC because Axis and Axis Specialty only appear to rely on the documents for an improper purpose, that is, to contest disputed facts. *Cf. Khoja*, 899 F.3d at 1006  Even if the Court were to reason that the Plan Documents serve as a foundation for an element to Plaintiffs' claims because they could indicate whether or not Plaintiffs did, in fact, purchase a limited benefit plan, Plaintiffs do not dispute that they purchased a limited benefit plan, that they received the coverage offered by the limited benefit plan's terms, or that the Plan Documents contained disclosures; their claims all essentially arise from their allegation

that Defendants fraudulently induced them to purchase a limited benefit plan before reading the Plan Documents.  *Cf. Sons v. DB Ins. Co.*, No. CV-2019-94-JGBSHKX, 2020 WL 7263536, at *4 (C.D. Cal. Oct. 22, 2020) (incorporating by reference insurance policy because claims were premised on plaintiffs' coverage under the policy).  Instead, Axis and Axis Specialty only reference the Plan Documents in connection with their argument that there were no misrepresentations or Plaintiffs were unreasonable in relying on any misrepresentations.[5]  ECF No. 63-1 at 16–17, 34.[6]  Use of the Plan Documents in this way "merely creates a defense to the well-pled allegations in the complaint." *Khoja*, 899 F.3d at 1003.

However, the Court agrees that Exhibit C is properly subject to judicial notice. The Certificate of Authority issued by the State of California is a matter of public record. *See Lee*, 250 F.3d at 688.  The record is independently confirmable by the California Department of Insurance website.[7]  *See Gerritsen v. Warner Bros. Entm't Inc.*, 112 F.Supp.3d 1011, 1034 (C.D. Cal. 2015).  The Court therefore takes judicial notice of the existence of the California Department of Insurance Certificate of Authority.  The Court declines to take judicial notice of Exhibit D at this time because Axis has not explained why it is relevant to its motion to dismiss and it is not necessary to the resolution of the motion.

---

[5] To the extent Axis and Axis Specialty also include facts in their motion to dismiss that are contrary to or go beyond what is alleged in the FAC, the Court does not consider those allegations.  *E.g.*, ECF No. 63-1 at 16 ("The Ketayis then received a 'Welcome Email' providing information on the Liberty Health Plan, FAQs, billing information, and directions for registering and downloading insurance certificates, Schedule of Benefits, and other plan documents.").

[6] All page references to electronically filed documents refer to the CM/ECF pagination.

[7] As the Court "accurately and readily determined" the fact of Axis's California Department of Insurance Certificate of Authority and California Secretary of State Certificate of Qualification "from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201, the Court therefore need not address Plaintiffs' arguments concerning the declaration of Dominick Zenzola.

7

Additionally, Plaintiffs raise several objections to declarations filed by Defendants in connection with their motions to dismiss. The Court does not consider the declarations of Paul Lavin, Juanita Nicolucci, or Dominick Zenzola in deciding Defendants' motions to dismiss for failure to state a claim. *Khoja*, 899 F.3d at 998. However, "[i]n the context of a motion to dismiss under Rule 12(b)(2), the Court may consider affidavits, along with the pleadings, to determine whether the plaintiff has made a prima facie showing of personal jurisdiction." *Uhlig v. Fairn & Swanson Holdings, Inc.*, No. 20-CV-00887-DMS-MSB, 2020 WL 6872881, at *2 (S.D. Cal. Nov. 23, 2020) (citing *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001)); *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011). The Court therefore considers the Lavin and Nicolucci declarations in connection with First Health and ACI's motions under 12(b)(2).[8]

## III.   MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendants First Health, HII, HPI, and ACI move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(2). Plaintiffs oppose.

### A. Legal Standard

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Under California's long-arm statute, California state courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." Cal. Civ. Proc. Code § 410.10. California's long-arm statute is coextensive with federal

---

[8] The Court also independently takes judicial notice of Exhibits A and B to the Nicolucci declaration, ACI's Pennsylvania Articles of Incorporation, as a matter of public record for the fact that ACI was incorporated in Pennsylvania. However, the point is largely irrelevant because Plaintiffs allege that "ACI is a Pennsylvania corporation with its principal place of business in Wayne, Pennsylvania." FAC ¶ 29. Plaintiffs' other evidentiary objections to the declarations are mere citations to the Rules of Evidence and are not supported by argument, and the Court therefore does not consider them.

due process requirements, so "the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004).  For the exercise of jurisdiction to be consistent with due process, a defendant must have sufficient "minimum contacts" with the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotations omitted).

When there has been no evidentiary hearing, a plaintiff need only put forth a *prima facie* showing of jurisdictional facts.  *See CollegeSource*, 653 F.3d at 1073; *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).  "Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger*, 374 F.3d at 800 (internal citations and quotation marks omitted).  "It is only if the court takes evidence on the issue or rules on the personal jurisdiction question in the context of a trial that a heightened, preponderance of the evidence standard applies." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).

## B. Discussion

Plaintiffs argue that the Court has both specific and general personal jurisdiction over First Health, HII, HPI, and ACI.  First Health, HII, HPI, and ACI argue that the Court lacks both general personal jurisdiction and specific personal jurisdiction over them.  The Court considers each of these potential jurisdictional bases in turn.

### i. General personal jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  As to corporations, "the place of incorporation and principal place of business

are 'paradig[m] . . . bases for general jurisdiction." *Daimler*, 571 U.S. at 137 (citation omitted).  Outside of these paradigm bases, only "in an exceptional case" should a court find a corporation's operations in the forum to be "so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19.  Exceptional circumstances, as noted in *Daimler*, do not exist merely whenever "a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,'" but only when "that corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'" *Id.* at 139 (quoting *Goodyear*, 564 U.S. at 919).  The Supreme Court in *Daimler* cited to its decision in *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952) to exemplify what constitutes "an exceptional case." *Id.* at 139 n.19.  In *Perkins*, the Court held that an Ohio court could exert general jurisdiction over an out-of-state corporation located in the Philippines, because Ohio was the corporations' principal, albeit temporary, place of business during the Japanese wartime occupation of the Philippines. *Perkins*, 342 U.S. at 447–48.

The Ninth Circuit has noted the "demanding nature of the standard for general personal jurisdiction over a corporation." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014).  The *Daimler* court rejected the argument that a court has general jurisdiction over a corporation when it "engages in a substantial, continuous, and systematic course of business" in a state. *Daimler*, 571 U.S. at 138; *see also Kipp v. Ski Enter. Corp. of Wisconsin*, 783 F.3d 695, 698 (7th Cir. 2015) ("*Daimler* raised the bar for general jurisdiction and "require[s] more than the 'substantial, continuous, and systematic course of business' that was once thought to suffice."); *Amiri v. DynCorp Int'l, Inc.*, Case No. 14cv3333 SC, 2015 WL 166910, at *3 (N.D. Cal. Jan. 13, 2015) (noting that "in the overwhelming majority of cases there will be no occasion to explore whether a *Perkins*-type exception might apply").

The general jurisdiction inquiry does not "focus solely on the magnitude of the defendant's in-state contacts," but must take into account a "corporation's activities in their entirety, nationwide and worldwide." *Daimler*, 571 U.S. at 139 n.20. Therefore, any general jurisdiction analysis must involve a comparative assessment of the defendant's business activities in different locations. *See Lindora, LLC v. Isagenix Int'l, LLC*, 198 F. Supp. 3d 1127, 1137 (S.D. Cal. 2016) (no general jurisdiction where the plaintiff failed to make a comparative assessment and instead solely focused on the defendant's extensive contacts in California). "If the magnitude of a corporation's business activities in the forum state substantially exceeds the magnitude of the corporation's activities in other places, general jurisdiction may be appropriate in the forum state." *Id.*

Plaintiffs assert that although First Health, HII, HPI, and ACI are not incorporated and do not have their principal places of business in California, their contacts with California are sufficiently continuous and systematic to render these Defendants subject to this Court's general personal jurisdiction. However, Plaintiffs make no specific factual allegations as to how Defendants First Health, HII, HPI, and ACI are "essentially at home" in California. *Daimler*, 571 U.S. at 119 (quoting *Goodyear*, 564 U.S. at 919); FAC ¶ 11; ECF No. 76 at 13; ECF No. 79 at 12–13; ECF No. 80 at 21–22. The facts alleged in the FAC do not amount to "an exceptional case" that justifies the exercise of general personal jurisdiction over a corporation in a state other than its principal place of business or place of incorporation. *See Daimler*, 571 U.S at 139 n.19. Merely doing business or contracting to do business with the other Defendants in California, registering or being licensed as an insurance agent or administrator in California, being registered to do business in California, or maintaining an office in California does not give Defendants First Health, HII, HPI, and ACI the sufficient continuous and systematic contacts with the state to support the exercise of general personal jurisdiction. FAC ¶¶ 29, 32, 36, 38; *see*

11

*Daimler*, 571 U.S. at 158 (Sotomayor, J., concurring) (noting that the majority held

Daimler AG, the German manufacturer of Mercedes–Benz automobiles, was not subject

to general jurisdiction in California "despite its multiple offices, continuous operations,

and billions of dollars' worth of sales there"); *Brown v. Lockheed Martin Corp.* 814 F3d

619, 628–31 (2nd Cir. 2016) (finding that defendant's registration to do business,

operation of multiple leased locations, and employment of up to 70 employees in the state

"fell well below the high level needed" for defendant to be essentially "at home" there);

*Lindora*, 198 F. Supp. 3d at 1136–37 (finding defendant's registration to do business,

significant sales volume, direct marketing, and holding of events in California

insufficient to establish personal jurisdiction); *Carter v. Round Point Mortg.*, No. EDCV

20-240 JGB (SHKx), 2020 WL 6032653, at *3 (C.D. Cal. Aug. 4, 2020) (registration as

mortgage company in California insufficient).  Further, Plaintiffs have not provided any

factual basis upon which the Court can conclude that these Defendants are more "at

home" in California than they are in other states.  *See Ranza v. Nike, Inc.*, 793 F.3d 1059,

1070 (9th Cir. 2015); *Lindora*, 198 F. Supp. 3d at 1137.

Accordingly, the Court finds that Plaintiffs have not made a *prima facie* case that

Defendants First Health, HII, HPI, and ACI are subject to general personal jurisdiction in

California.

### *ii. Specific personal jurisdiction*

Where a forum seeks to assert specific jurisdiction over an out-of-state defendant

who has not consented to suit there, the exercise of jurisdiction is consistent with due

process if the defendant has "purposefully directed" activities at residents of the forum,

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), and the litigation results

from alleged injuries that "arise out of or relate to" those activities, *Helicopteros*

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  The Ninth Circuit

20-cv-1198-GPC-KSC

applies the following three-prong test for determining if the court has specific jurisdiction over a non-resident defendant:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227 (9th Cir. 2011) (citing *Schwarzenegger*, 374 F.3d at 802).

Plaintiffs argue that their claims arise out of and relate to the purposeful contacts with California made by First Health, HII, HPI, and ACI. Plaintiffs also allege that this Court's personal jurisdiction over First Health is supported by the other Defendants' contacts with California under an agency, ratification, or foreseeability theory.

**Defendant ACI**

As to ACI, Plaintiffs allege that ACI purposefully directed activities to, consummated transactions in, and invoked the benefits of California's laws by serving as the claims administrator for the plan purchased by Plaintiffs in California; registering with the California Department of Insurance; contracting with other Defendants to perform sales and administrative services related to insurance plans including the plan purchased by Plaintiffs in California; actively administering Plaintiffs' plan in California; and acting as an agent of other Defendants and being involved in the sales and verification process for the plan purchased by Plaintiffs in California. FAC ¶¶ 29, 30, 81, 86. Plaintiffs also point to ACI's knowledge that these plans were marketed and sold in California as comprehensive health insurance, ACI's contact information on the Liberty Health plan card mailed to Plaintiffs in California, ACI's payment of the benefit amount to the California hospital and mailing of the statement of benefits to Plaintiffs in

13

California, and ACI's participation in a scheme perpetuated in California to defraud California consumers.  *Id.* ¶¶ 29, 31, 43, 86.

ACI puts forth the declaration of Juanita Nicolucci, former Chief Executive Officer and current Chairman of the Board of Directors of ACI, attesting to ACI's business practices.  ECF No. 85-2 ("Nicolucci Decl.").  Ms. Nicolucci attests that "ACI does not market, solicit or sell insurance to customers in California," that "ACI administers claims through its computer system" in Pennsylvania, and has only one employee who lives and works in California and uses ACI's computer system to pay claims in several states, including California.  *Id.* ¶¶ 5, 6.  ACI contends that none of ACI's contacts with California give rise to Plaintiffs' claims.

As Plaintiffs have not put forth any evidence to support their opposition to ACI's motion to dismiss, the Court must only accept as true the "uncontroverted allegations in the complaint."  *Schwarzenegger*, 374 F.3d at 800.  Because Plaintiffs have not provided evidence to the contrary, the Court finds for the purposes of the present motion that ACI does not market, solicit, or sell insurance in California.  Nicolucci Decl. ¶ 5.  However, both parties agree that ACI administers insurance claims made by customers residing in California, and the Nicolucci Declaration does not contest some of the other California-related allegations in the FAC, including that ACI paid the benefit amount to the California hospital and that ACI is registered with the California Department of Insurance as a non-resident administrator.  *Id.* ¶ 6.

The Court first considers whether these facts suffice to show that ACI purposefully directed activity towards California or purposefully availed itself of doing business in California.  ACI asserts that because Plaintiffs assert tort claims, the Court should apply the "effects" test laid out in *Calder v. Jones*, 465 U.S. 783 (1984), which requires the defendant to have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum

state." *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020) (quoting *Mavrix*, 647 F.3d at 1228).  ACI's administration of the insurance claim and payment of the insurance claim constitute intentional acts.  Additionally, as Plaintiffs were California residents, it would be apparent to the claim administrator that any underpayment of benefits, as compared to what Plaintiffs contend they were promised, would cause harm to Plaintiffs in California.  A closer question is whether ACI's administration of insurance claims for consumers residing in California, and the administration of Plaintiffs' claims and payment of the benefit amount to the California hospital in particular, indicates that ACI "expressly aimed" its conduct at the forum state.

Other cases arising from health insurance disputes, although sounding in contract, provide useful comparison points.  In *Hirsch v. Blue Cross, Blue Shield of Kansas City*, the Ninth Circuit found that the defendant insurance company purposefully availed itself of the protection and benefits of California as a result of its knowing and voluntary agreement to provide coverage to California employees in exchange for premiums paid by California residents.  *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1480 (9th Cir. 1986).  District courts have come to the same conclusion when the insurer entered into a transaction with a California resident regarding insurance services to be provided in California.  *See Healthcare Ally Mgmt. of California, LLC v. Blue Cross Blue Shield of Massachusetts*, No. CV 2:18-05268 SJO (AGRx), 2018 WL 6340756, at *5 (C.D. Cal. Sept. 10, 2018) ("By promising to pay the California-based Medical Provider for Patient's Medical Care, which was to be provided in California, Defendant create[d] a continuing obligation to a California resident and promoted the transaction of business in California" and thus purposefully availed itself of the benefits of California law); *ABC Servs. Grp., Inc. v. Health Net of California, Inc.*, No. SA CV 19-00243-DOC-DFM, 2020 WL 2121372, at *10 (C.D. Cal. May 4, 2020) (having "no difficulty" finding defendants subject to personal jurisdiction where they "contracted to sell insurance

policies to California patients, who then sought treatment and reimbursement at a California facility," and defendants "authorized that California facility to provide treatment.").

In contrast, the Ninth Circuit has found defendant insurance companies not subject to personal jurisdiction in California when the unilateral acts of the insurance beneficiary were the only connection tying the defendant to the forum state. *See Davis v. American Family Mutual Insurance Company*, 861 F.2d 1159, 1162 (9th Cir. 1988) (finding insurance company did not avail itself of the benefits and protections of Montana law when its only contacts with Montana "resulted solely from the fact that [plaintiff] returned to his home in Montana" after being in a car accident with the insured, who lived in North Dakota); *Hunt v. Erie Insurance Group*, 728 F.2d 1244, 1247 (9th Cir. 1984) (finding no purposeful availment of California law by East Coast insurance company when its contacts with California stemmed from plaintiff's decision to move to California following car accident).

Although these cases involve contract claims and thus invoked the "purposeful availment" test applicable to contract claims, *see Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006), they confirm that the crux of the purposefulness inquiry present in both the contract and tort tests is whether the defendant's affiliation with the state is a result of merely "random, fortuitous, or attenuated contacts" or the "unilateral activity" of the plaintiff. *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  In this case, ACI is registered to administer insurance in California and administers the claims of customers residing in California.  FAC ¶ 29; ECF No. 85 at 11. Unlike *Davis* and *Hunt*, this is not a case in which ACI's contacts with California arise from Plaintiffs' unilateral decision to move to or seek care in California, as Plaintiffs lived in California during the relevant time period.  FAC ¶¶ 13–14.  The relevant acts in

this case were therefore expressly aimed at California, as ACI's administration of Plaintiffs' plan in California and the payment of benefits to the California hospital were a result not of "random" or "fortuitous" events, *Walden*, 571 U.S. at 286, but a seemingly regular part of its business, given its registration in California.  Accordingly, the uncontroverted allegations in Plaintiffs' complaint establish that ACI did direct some activities at the forum state.  *See Mavrix*, 647 F.3d at 1227.

To satisfy the second prong of the specific jurisdiction test, Plaintiffs' "claim must be one which arises out of or relates to [ACI]'s forum-related activities." *Id.* "In determining whether [a plaintiff's] claims arise out of [a defendant's] forum-related conduct, 'the Ninth Circuit follows the 'but for' test.'" *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (quoting *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir.2001)).  "[I]f the plaintiff would not have suffered loss 'but for' the defendant's activities, [the 'arising out of'] element is satisfied." *Bartel v. Tokyo Elec. Power Co., Inc.*, 371 F. Supp. 3d 769, 787 (S.D. Cal. 2019), *appeal dismissed*, No. 19-55442, 2019 WL 5260743 (9th Cir. July 30, 2019).  The question is therefore whether Plaintiffs' claims would have arisen but for ACI's administration of Plaintiffs' claim in California or its other California-related activities.  Although ACI was not involved in the marketing or selling of plans, Plaintiffs contend that ACI paid a benefit amount far smaller than what they believed they were signing up for when they purchased the Liberty Health plan.  Had ACI paid out a benefit in line with the comprehensive plan Plaintiffs allege they had intended to purchase, Plaintiffs would have no claim.  ACI's administration of the plan and disbursement of $1,500 towards Plaintiff Eric Ketayi's medical bills is therefore necessarily related to Plaintiffs' alleged injuries in this case.[9]  Plaintiffs' claims

---

[9] In conducting this personal jurisdiction analysis for ACI, HII, HPI, and First Health, the Court makes no determination of whether Plaintiffs have stated a claim for relief against these Defendants, considered *infra*.  Indeed, it is irrelevant whether ACI's contacts with California were "wrongful." *See Yahoo!*, 433

therefore "arise[] out of or relate[] to" ACI's California-related activities. *Mavrix*, 647 F.3d at 1227.

Lastly, the Court considers whether exercising personal jurisdiction over ACI would "comport with fair play and substantial justice, i.e. [is] reasonable." *Mavrix*, 647 F.3d 1228. ACI bears the burden of presenting a "compelling case that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King*, 471 U.S. at 476–78). The Court considers seven factors to determine reasonableness:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1132 (9th Cir. 2003) (quoting *Core–Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993)). ACI does not address these factors. Although ACI contends that it would be unreasonable to subject it to this Court's jurisdiction because Plaintiffs state nothing more than "vague allegations that ACI was part of a fraudulent scheme, without any specific factual allegations implicating ACI," ECF No. 85 at 11, the Court does not agree with ACI's characterization of the FAC. Assuming for the purposes of this personal jurisdiction analysis that ACI administered a plan for California residents pursuant to its California administration registration and paid benefits for medical services sought at a California hospital, the Court does not see any patent unfairness in subjecting ACI to jurisdiction in California for claims arising out of its administration of the plan. *Cf. ABC Servs.*, 2020 WL 2121372, at *10 (quoting *Burger King*, 471 U.S. at 474) ("[A]n

---

F.3d at 1208 ("[W]e do not read *Calder* necessarily to require in purposeful direction cases that all (or even any) jurisdictionally relevant effects have been caused by wrongful acts.").

insurance company can 'reasonably anticipate being haled into [a California] court' when it is accused of failing to reimburse the cost of treatment at a California facility under contracts formed with California residents.").  Whether ACI's alleged activities can subject them to liability is a different matter.

Additionally, although the Court need not conduct a thorough analysis of each reasonableness factor where the defendant fails to do so, *see CollegeSource*, 653 F.3d at 1079–80 (considering only factors addressed by defendant), none suggest that California would be an unreasonable forum.  ACI voluntarily contracted to administer plans for California residents and California has a significant interest in adjudicating a dispute involving the administration of insurance plans in California, moreso than Pennsylvania.  ACI, a business with customers around the country, faces no obvious burden in litigating in California beyond the ordinary inconveniences of litigation by an out-of-state corporate litigant.  *See Menken*, 503 F.3d at 1060 ("[W]ith the advances in transportation and telecommunications and the increasing interstate practice of law, any burden is substantially less than in days past.").  Given that Plaintiffs assert claims against a number of businesses of various domiciles purportedly acting in concert to harm consumers in California, both judicial efficiency and the Plaintiffs' convenience favor resolution of this case in a single forum to the extent possible.  The Court therefore finds that ACI has not met its burden to show that this Court's exercise of personal jurisdiction would be unreasonable.

Accordingly, the Court DENIES Defendant ACI's motion to dismiss for lack of personal jurisdiction.

### HII and HPI

With respect to HPI, Plaintiffs allege that HPI maintains an office in California, is registered to do business in California and describes the business or services it provides as "insurance," and holds a California Insurance License.  FAC ¶ 32.  Plaintiffs allege

that HPI "transact[s] business in California . . . related to the sale of sham insurance." *Id.* ¶¶ 32, 63–64. Plaintiffs further asserts that HPI received compensation from consumers arising from its contacts in California and that HPI entered into contracts with other Defendants related to its activities in California. *Id.* ¶ 33. Plaintiffs also allege that HPI provided funding, trained the other Defendants' sales and underwriting agents, and issued the script used by other Defendants to sell the plan Plaintiffs purchased in California and contracted with other Defendants to perform consumer sales and administrative services related to the plans sold in California. *Id.* As to HII, Plaintiffs allege that HPI is the parent company of HII and that HII contracts with the Axis Defendants to perform consumer sales and administrative services related to insurance plans, including that purchased by Plaintiffs in California, and that HII received compensation from sales to California consumers. *Id.* ¶ 36. Plaintiffs also contends that HPI and HII had "lead generator" websites used to sell the plan, including in California. *Id.* ¶ 33. As HII and HPI have provided no controverting evidence of these allegations, the Court must accept them as true to the extent they assert facts rather than legal conclusions. *See Schwarzenegger*, 374 F.3d at 800; *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007).

The Court first considers whether HPI and HII purposefully directed activities at the forum state, again applying the effects test laid out in *Calder*, 465 U.S. 783 (1984). *See AMA Multimedia*, 970 F.3d at 1208. Although some of Plaintiffs' allegations against HII and HPI, such that they "transact business" in California, are conclusory, Plaintiffs' FAC includes sufficient factual allegations regarding HII and HPI's role in the alleged scheme to show that HII and HPI "committed an intentional act" through their maintenance of an office, registration, and licensing in California, actions related to the sale of insurance, creation of a lead generator website, and the training and funding provided to other Defendants. *Id.*

However, as the Court noted with respect to ACI's contacts, the more difficult question is whether HPI and HII expressly aimed these activities at California. *Id.* HII and HPI allegedly created a lead generating website accessible to California consumers, FAC ¶ 33, but the Ninth Circuit has held that "maintenance of a passive website alone cannot satisfy the express aiming prong." *Mavrix*, 647 F.3d at 1229 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010)). The Court must consider whether HII and HPI did "something more" in conjunction with the website to target the forum. *Id.* "In determining whether a nonresident defendant has done 'something more,'" the Ninth Circuit has "considered several factors, including the interactivity of the defendant's website, the geographic scope of the defendant's commercial ambitions, and whether the defendant 'individually targeted' a plaintiff known to be a forum resident." *Id.* (internal citations omitted).

HPI sought and received a California Insurance License and maintains an office in California, activities which were certainly aimed at California. FAC ¶ 32. Plaintiffs allege that HPI conducted activities pursuant to its California Insurance License. FAC ¶ 32. Additionally, Plaintiffs allege that consumers connect to HII and HPI representatives or agents by phone, who use scripts written and disseminated by HII and HPI to offer consumers comprehensive health coverage. *Id.* ¶¶ 32, 36, 59–63. However, Plaintiffs do not clearly allege that HPI or HII directly engaged in the sale of insurance to Plaintiffs themselves, as they presume they spoke with a representative of HEG. *Id.* ¶ 76. Although the FAC asserts that HII and HPI took part in the scripted calls that included misleading or fraudulent statements, *id.* ¶¶ 59–69, it does not assert that it did so for California consumers, noting only that HPI "transact[ed] business in California . . . related to the sale of sham insurance at issue here" and that HII and HPI contracted "to perform consumer sales and administrative services related to insurance plans, including the 'Liberty Health' plan purchased by Plaintiffs in California," *id.* ¶¶ 32, 34, 36.

Despite Plaintiffs' argument in their opposition that HII and HPI "create[d], market[ed], and [sold] the 'Liberty Health' insurance policy in this state," ECF No. 76 at 12, the FAC does not allege sufficient details from which the Court can conclude that HII or HPI aimed any of the sales activities described in the FAC at California.  Accordingly, the Court finds that HPI purposefully directed some activity towards California, namely through HPI's obtaining of an insurance license and maintaining of an office in California, but Plaintiffs have failed to adequately allege that HPI and HII's other "activities" in California were directed at the state.  HPI's insurance license and use of office space in California is likewise insufficient to constitute the "something more" needed to show that its lead generating websites targeted the California market in particular.  *See Mavrix*, 647 F.3d at 1229.

Despite HPI's insurance license and office in the state, Plaintiffs have not sufficiently alleged that their injuries arise from HPI or HII's activities in California. Because Plaintiffs have not alleged that HII and HPI sold insurance to Plaintiffs or to other California consumers, as opposed to consumers generally, the Court cannot conclude that HPI's maintenance of an office in California or California Insurance License is the 'but for' cause of Plaintiffs' claims.  *See Menken*, 503 F.3d at 1058.  The assertion that HII and HPI generally "transact business" in California related to the sale of sham insurance is not enough to connect HII and HPI to Plaintiffs' injuries.

Because Plaintiffs have not met their burden with respect to the first two prongs of the specific personal jurisdiction test, the Court need not reach the reasonableness prong. *See Schwarzenegger*, 374 F.3d at 802. The Court therefore GRANTS Defendants HII and HPI's motion to dismiss for lack of personal jurisdiction.

**First Health**

Lastly, the Court turns to Defendant First Health.  Plaintiffs argue that the FAC alleges "First Health touted access to its 'PPO Network' to Plaintiffs in California," ECF

No. 80 at 11, seemingly a reference to the FAC's assertion that First Health's PPO network is advertised on Plaintiffs' 'insurance card.'  FAC ¶ 38.  Plaintiffs further assert that First Health allowed other Defendants to advertise First Health's PPO network to California consumers via the Liberty Health plan, knowing it did not give access to First Health's PPO Network and was being used to perpetuate fraud on California consumers. *Id.* ¶¶ 38, 41, 71.  Plaintiffs also argue that First Health has contacts with California because Plaintiffs sought treatment from a California provider within First Health's PPO Network.[10]  ECF No. 80 at 12.  First Health submits the declaration of Paul Lavin, its Executive Director responsible for overseeing client management and sales, which states that First Health does not sell or market insurance plans and has no control over its clients' marketing or administration of plans that allow access to First Health's network. ECF No. 64-1 ("Lavin Decl.") ¶¶ 5, 9, 10, 15.  Mr. Lavin also states that First Health does not issue or provide insurance or membership cards to individuals.  *Id.* ¶ 17.  Based on the Lavin Declaration, the Court finds that it need not accept as true Plaintiff's characterization that First Health "touted" its PPO Network through the insurance card mailed to Plaintiffs in California, as First Health did not issue the insurance card and had no role in other Defendants' marketing or administration of the insurance plan.  *Id.* ¶¶ 10, 11, 17.  However, the Court will accept as uncontroverted Plaintiffs' assertions that First Health contracted with other Defendants knowing that they would market First Health's PPO Network to consumers in California.  *See Schwarzenegger*, 374 F.3d at 800.

Applying the *Calder* effects test, *see AMA Multimedia*, 970 F.3d at 1208, the Court finds Plaintiffs have not shown First Health directed activity at the forum state.  First Health's knowledge that other Defendants would take action with respect to California

---

[10] The Court cannot locate this specific allegation in the FAC, but Defendants do not appear to contest that "certain providers in First Health's PPO network . . . provide medical services in California."  ECF No. 82 at 3.

23

residents does not constitute an intentional act aimed at California, as other Defendants' contacts cannot be imputed to First Health. *See Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980); *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990). Additionally, Plaintiffs' scant allegations regarding First Health's PPO network in California, to the extent discernable, fall short of showing that First Health took action expressly aimed at California.

Plaintiffs' efforts to establish this Court's personal jurisdiction over First Health through a theory of agency, ratification, or foreseeability also fall short. "Fundamental tenets of agency theory require that an agent 'act on the principal's behalf and subject to the principal's control.'" *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2017) (quoting Restatement (Third) of Agency § 1.01 (2006)). Assuming an agent's contacts with the forum state can give rise to specific personal jurisdiction over the principal, *but see id.* at 1023–24, Plaintiffs still have not alleged uncontroverted facts, or presented any evidence, to demonstrate an agency relationship between First Health and any of the other Defendants. Specifically, Plaintiffs have not put forth any evidence to counter the Lavin Declaration's statement that "First Health has no control over, and plays no role in connection, its clients' marketing, advertising, issuing, or selling of the benefit plans, programs, or policies that allow access to First Health's network."[11]  Lavin Decl. ¶ 10. All of the other Defendants' relevant California contacts arise out of their marketing, advertising, issuing, or selling of the "sham" insurance plan Plaintiffs purchased in California. Just because First Health *could* structure its relationships with the other Defendants in such a way that allowed it to maintain control over the marketing

---

[11] As First Health notes, Plaintiffs' reference to a page entitled "Insurance Card Samples" does not appear to be directed to entities that are designing insurance cards, but rather to providers so that they "can identify members of a health plan" using First Health's network. *See* ECF No. 80 at 18. This at most shows First Health's knowledge of how insurance cards bearing its logo appear.

of plans does not establish a *prima facie* case that it actually did have control over any other entity in this case.

Plaintiffs' argument that "the existence of an agency relationship is a factual question for the trier of fact," ECF No. 80 at 17 (quoting *Garlock Sealing Techs., LLC v. NAK Sealing Techs, Corp.*, 148 Cal. App. 4th, 937, 965 (2007)), overlooks the requirement that Plaintiffs put forth a *prima facie* case of jurisdictional facts in response to a motion under Rule 12(b)(2). *See CollegeSource*, 653 F.3d at 1073; *In re Gasoline Spot Litig.*, No. 20-CV-03131-JSC, 2020 WL 7431843, at *7 (N.D. Cal. Dec. 18, 2020) ("Plaintiffs have not alleged facts that satisfy their burden of making a prima facie showing that SK Trading controlled SK Energy's activities."); *cf. Williams*, 851 F.3d at 1025 n.5 (disregarding vague description of agency relationship as "a conclusory legal statement unsupported by any factual assertion"). Likewise, Plaintiffs have failed to provide evidence that First Health ratified any of the in-state acts of the other Defendants, and the mere foreseeability of the other Defendants' California-oriented actions, even taken alongside First Health's scant other connections to California, is insufficient to show the requisite minimum contacts. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1158 (9th Cir. 2006) (citation omitted) ("[T]here can be no doubt that we still require 'something more' than just a foreseeable effect to conclude that personal jurisdiction is proper.").

Accordingly, the Court GRANTS Defendant First Health's motion to dismiss for lack of personal jurisdiction.

### iii. Jurisdictional discovery

In their opposition, Plaintiffs request jurisdictional discovery should the motions to dismiss for lack of personal jurisdiction be granted. *See* ECF No. 79 at 9 n.2; ECF No. 80 at 22. Jurisdictional "[d]iscovery should ordinarily be granted where 'pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory

showing of the facts is necessary.'" *Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv.*, Inc., 788 F.2d 535, 540 (9th Cir. 1986) (quoting *Data Disc*, 557 F.2d at 1285 n.1).  The decision to permit or deny jurisdictional discovery lies in the Court's discretion, but "[i]t would . . . be counterintuitive to require a plaintiff, prior to conducting discovery, to meet the same burden that would be required in order to defeat a motion to dismiss." *Orchid Biosciences, Inc., v. St. Louis Univ.*, 198 F.R.D. 670, 673 (S.D. Cal. 2001).  At the same time, however, the plaintiff "must at least make a 'colorable' showing that the Court can exercise personal jurisdiction over the defendant." *Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007).  Jurisdictional discovery should be denied where "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Wells Fargo & Co v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir.1977).  A district court does not abuse its discretion when the plaintiff's request for jurisdictional discovery is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).

The Court will deny jurisdictional discovery to the extent Plaintiffs seek discovery into HII, HPI, or First Health's contacts with California that do not relate to the claims in the FAC, as Plaintiffs have failed to make even a minimal showing that these Defendants would be subject to general personal jurisdiction in California.  However, the Court recognizes that Plaintiffs allege that "Defendants purposefully disguise the entity that is responsible for each step in Defendants' coordinated scheme," FAC ¶ 53, and that they are therefore unable to discern with precision each Defendants' role in the alleged scheme.  In particular, Plaintiffs assert that HII or HPI have an office in California, have a California Insurance License, were involved in consumer sales, and may have been involved in the sale of the Liberty Health plan to Plaintiffs.  Limited jurisdictional discovery "'might well' demonstrate facts sufficient to constitute a basis for jurisdiction"

over HII and HPI in California. *Gasoline Spot Litig.*, 2020 WL 7431843, at \*8  (quoting *Harris Rutsky*, 328 F.3d at 1135).  The Court will therefore permit Plaintiffs limited jurisdictional discovery into HII and HPI's involvement in the sale, marketing, or administration of insurance plans to Plaintiffs.

Plaintiffs' allegations of California-directed conduct by First Health, however, are far more speculative.  The FAC and Plaintiffs' opposition mainly attempt to impute other Defendants' contacts with the forum state to First Health.  Plaintiffs have not put forth any evidence, or even alleged specific facts, showing that other Defendants acted subject to First Health's control in creating the insurance card that was mailed to Plaintiffs. Accordingly, the Court finds that Plaintiffs have not made even a "colorable" showing that the Court could exercise specific personal jurisdiction over First Health, and thus denies Plaintiffs' request for jurisdictional discovery related to First Health.

## IV.    MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

All Defendants move to dismiss all claims against them on the basis that the FAC fails to state a claim or meet the requisite pleading standard under Rules 12(b)(6), 8, and 9(b).  Fed. R. Civ. P. 8; 9(b); 12(b)(6).

### A. Legal Standard

Rule 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *See Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citations omitted).

**B. Discussion**

  i.  *Rule 8*

The Court first notes that several Defendants argue that the FAC does not comply with Rule 8, requiring "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), because its liberal use of group pleading does not "give the defendant fair notice of what the [plaintiffs'] claim is and the grounds upon which it rests." *Updike v. Multnomah Cty.*, 870 F.3d 939, 952 (9th Cir. 2017) (citation omitted).

The Court recognizes that Plaintiffs use the term "Defendants" in laying out their general theory of the case, but do tie certain allegations to certain Defendants elsewhere in the FAC. While the group pleading taken in isolation may not give Defendants fair notice of the allegations against them, the Court finds that the FAC's reference to "Defendants" as a whole at some points does not render the more specific allegations in the FAC directed at particular Defendants unintelligible or confusing, with a few exceptions noted below. *See Schmidt v. Herrmann*, 614 F.2d 1221, 1224 (9th Cir. 1980).

*ii.    Fraud claims*

Defendants assert that Plaintiffs have failed to meet the heightened pleading standard set forth in Rule 9(b) for all of Plaintiffs' fraud-based claims and thus fail to state a claim for fraud, as well as other fraud-based claims.  Plaintiffs counter that they have pleaded Defendants engaged in fraudulent conduct with the requisite particularity.

The Federal Rules of Civil Procedure provide a heightened pleading standard for complaints alleging fraud.  Under Rule 9(b), a complaint must state with particularity the circumstances constituting fraud.  Fed. R. Civ. P. 9(b).  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.  *Id.*  To satisfy this heightened pleading requirement, the plaintiff must set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (internal citations omitted).  In addition, the complaint must indicate "what is false or misleading about a statement, and why it is false" and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done anything wrong."  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (internal citations omitted).

"In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'"  *Swartz*, 476 F.3d at 756 (9th Cir 2007) (quoting *Moore v. Kayport Package Express*, 885 F.2d 531, 541 (9th Cir. 1989)).  A plaintiff "must provide each and every defendant with enough information to enable them 'to know what misrepresentations are attributable to them and what fraudulent conduct they are charged with.'"  *Vegas v. JPMorgan Chase Bank, N.A.*, 654 F. Supp. 2d 1104, 1115 (E.D. Cal. 2009) (quoting *Pegasus Holdings v. Veterinary Centers of America, Inc.*, 38 F. Supp. 2d 1158, 1163 (C.D. Cal. 1998)). A plaintiff cannot lump multiple defendants together but must state the allegations as to

each defendant separately concerning that defendant's alleged participation in the fraud. *Swartz*, 476 F.3d 756, 764–65 (9th Cir. 2007) (quotation omitted).  However, "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant." *Id.* at 764.

Plaintiffs allege three categories of misrepresentations made by various Defendants in connection with the scheme.  First, Plaintiffs allege that several defendants made misrepresentations via website advertisements.  Plaintiffs allege that HEG stated on their website that it will help customers "find the most comprehensive insurance plan for the lowest possible price."  FAC ¶ 15.  On the "Products" page of HEG's website, HEG listed "Private Health Insurance" and "Obamacare."  *Id.*  On the "Providers" page of HEG's website, HEG stated "Our PPO's [sic] work with over 80% of physicians Nationwide."  *Id.*  Plaintiffs allege that these statements were false or misleading because HEG brokered only limited benefit plans and medical discount memberships, which differ from PPO plans, and did not offer and had no intent to supply comprehensive or ACA-qualified health care coverage.  *Id.* ¶¶ 15, 58.  Plaintiffs state that HEG's website included these statements on their website since at least November 2016, when Plaintiffs signed up for the Liberty Health plan after viewing HEG's website.  *Id.* ¶¶ 53, 75–76. These allegations allege with particularity the time, place, and content of the statements HEG included on its website, and further explain "what is false or misleading about [the] statement[s]," *Vess*, 317 F.3d at 1107, by alleging that HEG did not actually sell or broker comprehensive health insurance, PPO plans, or ACA ("Obamacare")-qualified health care coverage.  Similarly, Plaintiffs allege that since at least November 2016, HII and HPI created "lead generators," websites used to advertise the Liberty Health plan. FAC ¶ 34.  The lead generators advertise "Top Rated Carriers," "Health Insurance," and "Avoid Tax Penalty," which Plaintiff alleges are false representations because they have

no intent to sell comprehensive health insurance or ACA-qualified health plans. *Id.* ¶¶ 34, 53–56. Like for the HEG website, these allegations give sufficient notice of what Plaintiffs claim is misleading about the statements—namely, that the statements led consumers to believe the sites advertise health insurance that will allow them to avoid the ACA penalty for not being enrolled in a qualified health insurance plan, when in reality they do not. Although the FAC does not specifically parse out whether HPI, HII, or both operated or owned each particular website, "a complaint need not distinguish between defendants that had the exact same role in a fraud." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018).

Second, Plaintiffs allege that several Defendants made misrepresentations over the phone on sales calls. Plaintiffs allege that they spoke with representatives from HEG, HPI, or HII during three separate calls on November 22, 2016. FAC ¶ 76. Plaintiffs had called after viewing the statements on HEG's website, and assumed they were talking to HEG representatives, but "may have been talking to a representative of another Defendant." *Id.* ¶ 75, 76 n.8. Plaintiffs allege HPI and HII wrote and disseminated the script used on these sales calls, so that "sales representatives make uniform statements to every potential customer." *Id.* ¶ 61. Plaintiffs allege that on the November 22, 2016 calls, the sales representative described the plan as a PPO plan and compared it to their existing Blue Cross/Blue Shield coverage. *Id.* ¶ 76. Plaintiffs allege the representative claimed Plaintiffs would have very small co-pays and no deductible and assured them that this seemingly comprehensive coverage would apply if Plaintiffs or their children were to visit almost any doctor in the country; Plaintiffs explain these statements were misleading because the plan being offered provided little to no coverage at almost any provider. *Id.* ¶ 77. Plaintiffs also allege the representative stated the coverage was a PPO and comprehensive and stated that pregnancy and mental health care were excluded; Plaintiffs explain these statements are misleading because the plan offered was not a

comprehensive PPO plan and did not cover far more than just pregnancy and mental health care.  *Id.* ¶ 79.  Finally, Plaintiffs allege that the representative told them to agree to the verification agent's statements, indicated that some of the verification statements may not apply to Plaintiffs or what they were purchasing, and assured them that despite whatever was said during the verification call, Plaintiffs would receive the comprehensive health insurance the sales representative had described; Plaintiffs claim these statements were false because Plaintiffs ultimately did not receive comprehensive health insurance.  *Id.* ¶¶ 81, 85.

Plaintiffs have therefore provided sufficient detail of the time and content of the alleged misrepresentations during the sales call, and has explained why they are false or misleading.  And although Plaintiffs have only alleged that they "believe" the sales representative worked for HEG, in "instances of corporate fraud [where it is] difficult to attribute particular fraudulent conduct to each defendant as an individual[,] the allegations should include the misrepresentations themselves with particularity and, *where possible*, the roles of the individual defendants in the misrepresentations."  *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (emphasis added).  Here, Plaintiffs have provided enough information about the sales representative and the circumstances of the call that Defendants can defend against the charge. For example, Plaintiffs allege that they called to inquire about health insurance after viewing HEG's website, that Defendants contract with one another to sell the Liberty Health plan, and that the representative was following a script.  Plaintiffs therefore do not allege that this was one rogue sales representative offering misleading statements, and HEG should be able to determine whether or not it was responsible for conducting sales calls initiated through its own website in November 2016.  *See Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (noting that elements of fraud claim can be pleaded "on information and belief" when plaintiff provides basis for that belief and fact is one that is within

1    defendant's knowledge); *Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp.

2    3d 882, 890 (E.D. Cal. 2019) (noting that plaintiffs must allege the names of employees

3    that made fraudulent statements or, "at a minimum identify them by their titles and/or job

4    responsibilities") (citation omitted).

5         Third, Plaintiffs allege that their Liberty Health plan card included false or

6    misleading statements.  Plaintiffs allege the card they received in the mail after signing

7    up for the Liberty Health plan included the phrase "Preferred Provider (PPO) Network

8    Access" and pointed them to First Health's website, which stated it was a "national

9    choice for PPO network solutions."  FAC ¶ 84.  Plaintiffs explain that the inclusion of

10   this statement on their Liberty Health plan card was misleading because the Liberty

11   Health plan was not a PPO plan, whereas the reference to "PPO Network access"

12   reasonably suggested that the Liberty Health plan provided access to a PPO Network.  *Id.*

13   ¶¶ 85.  Plaintiffs' card indicates the name "AXIS" on the top of the card and "ACUSA"

14   at the bottom of the card and contains ACI's contact information, and Plaintiffs assert

15   that Axis Defendants and ACUSA advertised and marketed First Health's PPO network

16   on the card with First Health's permission.  *Id.* ¶¶ 39, 43.  Defendants thus have fair

17   notice, as well as a picture, of the particular misrepresentation on the Liberty Health plan

18   card that Plaintiffs refer to, such that Defendants can defend against the charge.

19        Altogether, Plaintiffs sufficiently allege the elements of the false representations

20   they note in the FAC.  *See, e.g.*, *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp.

21   3d 1141, 1150 (S.D. Cal. 2014) (concluding that the plaintiff had alleged false

22   representations with specificity by identifying which statements were false, detailing who

23   made the statements, the date on which they were made, and in what form they were

24   said).

25        Plaintiffs have also particularly alleged that they reasonably relied on the

26   misrepresentations of Defendants in deciding to purchase the Liberty Health plan and

27

28

continue paying premiums.  "[A]t the motion to dismiss stage, 'actual reliance ... is inferred from the misrepresentation of a material fact.'"  *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1021 (9th Cir. 2020) (quoting *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017)).  Taken as true, the alleged misrepresentations—generally that Plaintiffs were purchasing a comprehensive PPO plan when they were actually buying a limited benefit plan—are material, as Plaintiffs allege they sought to purchase comprehensive PPO coverage.  FAC ¶ 74.  Plaintiffs' FAC additionally does not suggest that their reliance on Defendants' representations was unreasonable as a matter of law, even though Plaintiffs allege that they agreed to the verification statements.  Although Defendants argue that Plaintiffs cannot state a claim because they agreed to the verification statements and were given plan documents, taking the facts alleged in the FAC as true, Plaintiffs were directly told by the sales representative that they would receive comprehensive health insurance if they agreed to the verification statements and Plaintiffs relied upon those representations, and Plaintiffs gave their credit card information before receiving any plan documents.  *Id.* ¶¶ 66, 83; *compare In re First All. Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006) (upholding jury determination that borrowers justifiably relied on loan officers' oral misrepresentations despite signing documents that contradicted the oral statements, because "whole scheme was built on inducing borrowers to sign documents without really understanding the terms") *with Kuyper v. Parks*, 974 F.2d 1342 (9th Cir. 1992) (finding justifiable reliance not alleged as a matter of law where plaintiffs did not "allege that they were told not to read or to otherwise ignore the disclaimers" warning them not to rely on allegedly misleading statements).  At this stage of the proceedings, it is premature to determine whether Plaintiffs' reliance on Defendants' alleged misrepresentations was reasonable.

The Court therefore turns to whether Plaintiffs have adequately "inform[ed] each defendant separately of the allegations surrounding [its] alleged participation in the

fraud," as is required by Rule 9(b), *see Swartz*, 476 F.3d at 764–65 (citation omitted), and simultaneously considers if Plaintiffs have stated a claim against each Defendant for fraud or deceit under Rule 12(b)(6).

Under California law, "one commits fraudulent deceit 'who willfully deceives another with intent to induce him to alter his position to his injury or risk.'"  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1146 (9th Cir. 2012) (quoting Cal. Civ. Code § 1709).  The elements of an action for fraud or deceit are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 839 (9th Cir. 2004) (citation omitted).

**Axis**

Starting with Axis and Axis Specialty, Plaintiffs assert that Axis Defendants[12] created and underwrote the Liberty Health plan and contracted with others to advertise and sell the plan as a comprehensive, Affordable Care Act-compliant PPO health insurance plan, knowing it was only a medical discount plan.  Plaintiffs also allege that Axis Defendants directly misrepresented that Plaintiffs had "Preferred Provider (PPO) Network Access" on Plaintiffs' insurance card when they did not have PPO access,

---

[12] The FAC describes Axis Specialty as the U.S. subsidiary of Axis and its "operational support entity." Plaintiffs' failure to distinguish between Axis and Axis Specialty in the FAC is not fatal to their claim at the motion to dismiss stage, as the division of responsibility between Axis and its subsidiary is a subject "peculiarly within the opposing party's knowledge," and it is plausible that a combination of Axis and Axis Specialty engaged in the acts alleged.  *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 493–94 (9th Cir. 2019) (citation omitted); *cf.* ("[A]t this early stage in the proceedings, Plaintiffs have essentially been forced to lump the Bosch companies because the Bosch Defendants have chosen to operate a specific way . . . such that plausibly both Bosch companies played a role."); *Tan v. Quick Box, LLC*, No. 3:20-CV-01082-H-DEB, 2020 WL 7226440, at *26 (S.D. Cal. Dec. 8, 2020) (holding that plaintiff's "group pleading" against numerous entities with the same registered agent did not violate Rule 9(b)).

causing Plaintiffs to continue paying premiums for the Liberty Health plan.  This level of detail sufficiently alleges Axis Defendants' role in the alleged fraudulent scheme to meet the Rule 9(b) pleading standard.  Further, Plaintiffs state a claim for fraud or deceit against Axis Defendants, at least as to one of the misrepresentations alleged in the FAC.

Plaintiffs allege that Axis Defendants knowingly made the false representations above directly (on the health plan card) or through its agents (on the sales call and websites) as part of a scheme intended to defraud customers.  As for the sales calls and websites, Plaintiffs allege that Axis Defendants contracted with the other Defendants to sell the Liberty Health plan underwritten by Axis on Axis's behalf and that Axis Defendants "necessarily know how" the other defendants will market and sell the plans. *See* FAC ¶ 57.  However, Plaintiffs do not allege that Axis retained the right to control the manner in which the other Defendants carried out the sales or ratified their conduct, possible bases for a plausible assertion of an agency relationship.  *See* Restatement (Third) Of Agency § 1.01 (2006).  Although the existence of an agency relationship is a question of fact, *Daniels v. United States*, No. 3:16-CV-02077-BTM-DHB, 2017 WL 3478765, at *5 (S.D. Cal. Aug. 11, 2017), to meet their burden, Plaintiffs must do more than allege that a contract for selling the Liberty Health plan existed between the parties.

However, Plaintiffs further allege that the Axis/ACUSA health plan card also included a misrepresentation as to the Liberty Health plan's offering of PPO network access.  FAC ¶ 39, 41, 43.  Plaintiffs allege this misrepresentation led them to continue to make monthly payments on the plan.  *See In re First All. Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006) (misrepresentation can be the basis of fraud if it is a "substantial factor" in inducing the plaintiff to act).  And, as noted above, Plaintiffs allege that they justifiably relied on the misrepresentations and accrued financial damages as a result.  Accordingly, the Court finds that Plaintiffs have stated a claim for fraud or deceit against Axis Defendants arising from the statements on the Liberty Health plan card.

**HEG**

As to HEG, Plaintiffs allege that HEG's website represented that it offered comprehensive health insurance plans, which induced Plaintiffs to purchase their product. Plaintiffs also allege that a person they believe to be HEG's sales representative[13] misrepresented the Liberty Health plan as comprehensive health insurance when Plaintiffs spoke to the representative over the phone.  Plaintiffs have therefore provided adequate detail of the role they assert HEG played in the scheme to meet the requirements of Rule 9(b).  Likewise, Plaintiffs plausibly assert that HEG knowingly made false or misleading representations with the intent to defraud, as HEG presumably knew the product it was selling was a limited health plan and Plaintiffs detail the sales representative's tactics to assure Plaintiffs that the verification agent's disclosures would not affect their ability to get comprehensive health insurance.  Because Plaintiffs allege they reasonably relied on those representations in deciding to purchase the Liberty Health plan, Plaintiffs have stated a claim against HEG for fraud or deceit.

**ACI**

With respect to ACI, although Plaintiffs' general allegation that ACI contracts with Axis Defendants "to perform consumer sales and administrative services" does not shed much light on what ACI is alleged to have done with respect to the fraudulent scheme. Plaintiffs also allege that ACI, as the claims administrator for the Liberty Health plan, paid the limited benefits to Plaintiffs that were inconsistent with the representations made by other Defendants.  Plaintiffs also allege that an ACI employee may be the individual that conducted Plaintiffs' "sham" verification process.  *Id.* ¶¶ 81, 83.  While these details

---

[13] HEG inaccurately describes the FAC in arguing that "the 'agent' who first made statements to the Plaintiffs was allegedly an employee of 'ACI or the Axis Defendants,' not HEG."  ECF No. 69 at 25. The paragraph of the FAC referenced by HEG refers to the "verification agent" as an employee of ACI or Axis, not the sales representative with whom Plaintiffs first spoke.  FAC ¶ 81.

may offer sufficient notice of ACI's role in the scheme to satisfy the Rule 9(b) pleading standard, Plaintiffs fail to state a direct claim for fraud against ACI as they do not clearly attribute any false or misleading statement to ACI or allege facts that would suggest an agency relationship between ACI and the entities responsible for sales.[14]  Plaintiffs appear to attempt to state a secondary liability claim—such as an aiding and abetting or conspiracy theory—against ACI and several other Defendants, but, with the exception of their RICO conspiracy claim, they do not tie their conclusory allegations of "aiding and abetting" or "conspiracy" to any particular cause of action.  FAC ¶ 31.  Plaintiffs therefore fail to plead the elements of a secondary liability fraud claim.  For example, Plaintiffs do not allege that ACI had knowledge of a particular underlying fraudulent act and that it provided substantial assistance, as is required to state an aiding and abetting fraud claim, *see Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003), or facts related to the formation and operation of the conspiracy that implicate ACI, as is required for a conspiracy to commit fraud claim, *see ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016).  The Court therefore finds that Plaintiffs have failed to state a claim for fraud or deceit against ACI.

**HII and HPI**

Although the Court does not have personal jurisdiction over HII and HPI based on the facts before it, the Court observes Plaintiffs would satisfy the Rule 9(b) pleading requirement with respect to Defendants HII and HPI, as Plaintiffs specifically allege that

---

[14] Even if the Court presumed that the verification agent was an ACI employee, FAC ¶ 81, Plaintiffs do not allege that the verification agent, as opposed to the sales representative, made false statements. Additionally, although Plaintiffs allege at some parts of the FAC that ACI may employ sales representatives, they do not allege that the sales representative they spoke to was an employee of ACI. FAC ¶¶ 59, 76.  Because of Plaintiffs' inconsistency regarding whether or not ACI had responsibility for sales, the Court finds that these allegations, in particular, do not provide ACI with sufficient notice of the nature of claims against it arising from alleged sales activities.

HPI and HII had lead generator websites with misleading statements and wrote and disseminated the script for use on sales calls like those directed at Plaintiffs.

Plaintiffs also allege that HPI and HII sales representatives conduct the calls using the script that contains misleading statements; however, Plaintiffs do not clearly allege that HII and HPI did so in their case, as they believe that the representative was an employee of HEG.  FAC ¶ 76 n.8.  Nor do Plaintiffs allege that they themselves saw the lead generator website advertisements they attribute to HII and HPI.  These misrepresentations therefore cannot have served as the basis for Plaintiffs' reliance or the cause of Plaintiffs' injuries.   At most, with respect to their own case, Plaintiffs allege that HII and HPI created the script used on their sales call and provided training to sales agents.  But without asserting that HII and HPI made the misrepresentation to them or a plausible allegation that HEG acted as HII or HPI's agent, Plaintiffs' fraud or deceit claim could only survive as a secondary liability claim, which as noted with respect to ACI, has not been explicitly alleged.  FAC ¶¶ 35, 37.  Plaintiffs therefore fail to state a claim for fraud or deceit against HII or HPI.

**First Health**

As for First Health, the FAC identifies the role First Health played in the alleged fraudulent scheme—namely, permitting other Defendants to advertise the First Health PPO network on the Liberty Health plan card—and thus potentially meets the requirements of Rule 9(b).  However, Plaintiffs do not attribute a misrepresentation to First Health (as opposed to a misrepresentation made by others regarding First Health) and, again, do not actually allege the elements of a secondary theory of liability, such as aiding and abetting or conspiracy to commit fraud, that would render First Health liable for fraud or deceit.  FAC ¶ 43.  Accordingly, Plaintiffs fail to state a claim against First Health for fraud or deceit.

/ / /

**Marc Munoz and Kevin Romero**

Lastly, the Court considers the fraud claims against the individual Defendants, Marc Munoz and Kevin Romero.  Plaintiffs only allege that Munoz and Romero were the President and Senior Vice President, respectively, of HEG; that they knew or should have known they were active participants of the scheme; that they reaped the benefits of the scheme; and that they "formulated, directed, controlled, had the authority to control, participate in and/or substantially aided in the acts and practice of HEG, as well as the Corporate Defendants identified above that constitute the common enterprise."  FAC ¶ 45–47.  Under California law, "directors and officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position."  *NTD Architects v. Baker*, 950 F. Supp. 2d 1151, 1158 (S.D. Cal. 2013).  Although they can be held liable if they "specifically authorized, directed or participated in the allegedly tortious conduct," *id.*, Plaintiffs here do not allege with particularity any facts to show that Munoz or Romero themselves participated in the scheme.  Plaintiffs' fraud and deceit claims against Munoz and Romero thus both fail under the pleading standard set out by Rule 9(b) and fail to state a claim against Munoz and Romero for any cause of action.

In sum, the Court finds that Plaintiffs have stated their fraud claims with the particularity necessary to give notice of the specific misconduct alleged against Corporate Defendants.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  The Court also finds that Plaintiffs have stated a claim for fraud or deceit against Axis Defendants and HEG.  However, as Plaintiffs only generally allege aiding and abetting or conspiracy liability and do not allege facts sufficient to support direct liability for fraud, Plaintiffs do not state a claim for fraud or deceit against ACI, HPI, HII, and First Health.  Plaintiffs additionally fail to specifically allege Munoz or Romero's role in the allegedly fraudulent scheme and fail to state a claim against them.

Accordingly, the Court DENIES the motion to dismiss the fraud and deceit claims against Defendants Axis, Axis Specialty, and HEG.  The Court GRANTS the motion to dismiss the fraud and deceit claims against Defendants ACI, HPI, HII, First Health, Munoz, and Romero.

iii.     *UCL claims*

A business act or practice may violate the UCL if it is either "unlawful," "unfair," or "fraudulent*." Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). Each of these three adjectives captures "a separate and distinct theory of liability." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (citing *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861 (1999)). To state a claim under the fraudulent prong of the UCL, a plaintiff must comply with Rule 9(b)'s heightened pleading standard and must allege that "members of the public are likely to be deceived" by the defendant's acts.  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008); *Kearns*, 567 F.3d at 1125.  The unlawful prong incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under the UCL.  *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir.2000).  As to the unfair prong, "[a]n unfair business practice is one that either 'offends an established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) (quoting *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal.App.3d 509, 530 (1984)).  The FAC alleges only claims under the fraudulent and unfair prongs.[15]  FAC ¶¶ 105, 106.

---

[15] Although Plaintiffs' oppositions argue that the FAC "contains dozens of paragraphs explaining the 'unfair' practices that the HII Defendants engaged in in violation of the UCL," the FAC does not tether these to the legal standard for unfairness under the UCL.

41

At the outset, the Court considers HII and HPI's argument that Plaintiffs' UCL claims fail because Plaintiffs have "not alleged that [they] lack[] an adequate remedy at law," citing to *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).  In *Sonner*, the Ninth Circuit held that "traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests restitution under the UCL and CLRA in a diversity action."  *Sonner*, 971 F.3d at 844.  In line with this, the court held that a plaintiff must allege that she "lacks an adequate legal remedy."  *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974) (holding that a complaint seeking equitable relief failed because it did not plead "the basic requisites of the issuance of equitable relief" including "the inadequacy of remedies at law")); *see also Anderson v. Apple Inc.*, Case No. 3:20-cv-02328-WHO, 2020 WL 6710101, at \*7 (N.D. Cal. Nov. 16, 2020) (noting that "the plaintiffs have not pleaded inadequate remedies at law to begin with and they offer no reason why the remedies at law they request in the complaint would be [in]adequate").  As "California courts have held that 'the UCL provides only for equitable remedies,'" *Sonner*, 971 F.3d at 839 n.2 (quoting *Hodge v. Superior Court*, 145 Cal. App. 4th 278 (2006)), Plaintiffs can therefore not state a claim under the UCL for restitution because they have not pleaded the absence of an adequate remedy at law.  Given that the FAC also requests compensatory damages, statutory damages and exemplary damages, it is possible that Plaintiffs' legal remedy is sufficient.

Plaintiffs argue that they have alleged there is no adequate remedy at law given that they are also seeking injunctive relief to help put an end to Defendants' business practices.[16]  See, FAC ¶ 7.  As such, the Court is required to determine whether Plaintiffs

---

[16] Although an injunction is also an equitable remedy, the *Sonner* court grappled solely with the plaintiff's equitable restitution claim and noted that "injunctive relief [was] not at issue."  *Sonner*, 971 F.3d at 842.  In arriving at its holding, the court reasoned that the plaintiff had failed to explain why, or

have demonstrated standing to seek injunctive relief.  *See B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999).  To have standing to seek injunctive relief, a "plaintiff must demonstrate that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with 'a sufficient likelihood that he will again be wronged in a similar way,'" such that the plaintiff's injuries could be redressed by the injunction.  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  Although "a previously deceived consumer may have standing to seek an injunction," even if the consumer now knows of the fraudulent practices, the consumer still must allege an actual threat of future harm.  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–71 (9th Cir. 2018).  Plaintiffs here have not alleged that they, as opposed to unnamed other consumers, face a threat of future harm from Defendants' business practices.  *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (named plaintiff must satisfy Article III standing requirements at time the complaint is filed and class is certified); FAC ¶ 7.  Thus, Plaintiffs have not pleaded sufficient facts to establish their standing to seek injunctive relief under the UCL.

---

even allege that, her damages claim for "the same amount of money for the exact same harm" as her equitable restitution claim was "inadequate or incomplete."  *Id.* at 844; *see also Anderson*, 2020 WL 6710101, at *7 (noting that plaintiffs had not argued "that the equitable restitution they request would go beyond the damages available to them").  Plaintiffs here have explained that with their claim for injunctive relief, they seek a remedy qualitatively different from their damages claim: an order preventing Defendants from using the allegedly fraudulent or unlawful business practices in the future, or in other words, from causing future harm for which damages are not calculable.  *See IntegrityMessageBoards.com v. Facebook, Inc.*, No. 18-CV-05286-PJH, 2020 WL 6544411, at *7 (N.D. Cal. Nov. 6, 2020) (holding that plaintiffs had adequately alleged they lacked an adequate remedy at law for future harm sought to be remedied by injunctive relief).  Accordingly, the Court finds that Plaintiffs have plausibly alleged they lack an adequate remedy at law for the relief they seek in their UCL claim for injunctive relief.

The Court accordingly GRANTS Defendants' motion to dismiss Plaintiffs' UCL claim and does not reach Defendants' other arguments.

### iv.   False or misleading advertising

California's FAL prohibits any "unfair, deceptive, untrue, or misleading advertising."  Cal. Bus. & Prof. Code § 17500.  "California laws prohibit not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."  *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020) (citations omitted).

Plaintiffs' false advertising claims fail for the same reasons as their UCL claims.  Like the UCL, the FAL only provides for equitable relief.  *See Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cty.*, 9 Cal.5th 279, 292 (2020) (cause of action under the FAL is equitable in nature); *Duttweiler v. Triumph Motorcycles (Am.) Ltd.*, No. 14-CV-04809-HSG, 2015 WL 4941780, at *8 (N.D. Cal. Aug. 19, 2015).  The Ninth Circuit's reasoning in *Sonner*, that a plaintiff must allege that she has no adequate remedy at law when pleading a claim for equitable relief, is thus applicable to the FAL. *See Sonner*, 971 F.3d at 844.  Again, Plaintiffs have not alleged that they lack an adequate remedy at law as required to plead a claim for equitable restitution. Additionally, Plaintiffs have not alleged facts that show they may suffer future harm such that they have standing to pursue injunctive relief.  *See Davidson*, 889 F.3d at 969–70.

Accordingly, the Court GRANTS Plaintiffs' motion to dismiss the false and misleading advertising claims.

### v.   CLRA

The CLRA prohibits particular unfair and deceptive acts and practices in a "transaction intended to result or which results in the sale or lease of goods or services to

any consumer." Cal. Civ. Code § 1770(a).  The statute defines goods and services as follows:

> (a) "Goods" means tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of real property, whether or not they are severable from the real property.
> (b) "Services" means work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods.

Cal. Civ. Code § 1761.

Defendants contend that Plaintiffs' CLRA claims fail because the CLRA does not apply to the transaction Plaintiffs describe because insurance does not qualify as a "good" or "service" under the CLRA.  Plaintiffs concede that, in some instances, the CLRA does not apply to "legitimate insurance," but argue that the medical discount plan sold to Plaintiffs was not insurance but rather akin to a coupon, which is expressly covered by the CLRA.

Defendants primarily rely on *Fairbanks v. Superior Court*, 46 Cal.4th 56, 61 (2009).  In *Fairbanks*, the California Supreme Court held that neither life insurance nor ancillary services to life insurance qualified as a "service" as defined by the CLRA. *Fairbanks*, 46 Cal.4th at 61, 65.  Finding the CLRA's statutory language unambiguous, the court reasoned that "an insurer's contractual obligation to pay money under a life insurance policy is not work or labor, nor is it related to the sale or repair of any tangible chattel."  *Id.* at 61.  Defendants argue that like life insurance, the Liberty Health plan is not "tangible chattel" and the underwriter's obligation to pay money under the plan is not "work or labor."

Plaintiff's objection that the Liberty Health plan was essentially a coupon, which is defined as a "good" under the CLRA, is unavailing.  The CLRA includes in its definition

of goods "certificates or coupons exchangeable for these goods;" there is no similar inclusion of coupons exchangeable for services.  Cal. Civ. Code § 1761(a), (b).  Plaintiffs could not exchange the Liberty Health plan for "tangible chattels."  *Id.*  In any case, Plaintiffs allege only that the Liberty Health plan offered them a right of payment to particular physicians that was capped in the amount of $1,500.  Plaintiffs have provided no convincing justification for why the *Fairbanks* court's reasoning regarding "legitimate" life insurance, or a contractual obligation to pay a sum of money to a beneficiary upon the death of the insured, *Fairbanks*, 46 Cal. 4th at 61, would apply differently to the Liberty Health plan, a contractual obligation to pay a limited amount of money to a medical provider upon the filing of a claim.  Although the *Fairbanks* court also considered the legislative history of the statute and found that the California Legislature had intentionally declined to include "insurance" in CLRA's definition of "services," it noted that it had "no need" to do so because the statutory language was unambiguous.  *Id.*  Therefore, the fact that Plaintiffs allege the Liberty Health plan was not legitimate insurance is not dispositive.

The other cases cited by Plaintiffs provide no succor.  *Sarun v. Dignity Health*, involving a transaction directly between a hospital patient and a hospital operator, stands for the proposition that the provision of medical care is presumably a "service" under the CLRA.  *Sarun v. Dignity Health*, 232 Cal. App. 4th 1159, 1162 (2014).  And as noted, even if the Liberty Health plan as described by Plaintiffs was a "coupon" for medical services, the CLRA by its terms only applies to coupons exchangeable for goods.  Cal. Civ. Code § 1761(a), (b).  The express inclusion of coupons in the definition of "goods" suggests the absence of reference to coupons in the definition of "services" was intentional.  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).  And *Poghosyan v. First Financial Asset Management, Inc.*, found that unlike life insurance, debt collection in connection to a car rental—the lease of a tangible good—falls under the

CLRA. *Poghosyan v. First Fin. Asset Mgmt., Inc.*, No. 1:19-CV-01205-DAD-SAB, 2020 WL 433083, at *3 (E.D. Cal. Jan. 28, 2020). The case distinguished *Fairbanks* and a California Court of Appeals opinion involving the issuance of credit cards, and reasoned that the debt collection "could be viewed as one that is either indirectly 'intended to result,' or incidentally 'results in the sale or lease of goods or services.'" *Id.* (quoting Cal. Civ. Code § 1770(a)). Here, the Liberty Health plan is far closer to the life insurance discussed in *Fairbanks* than the debt collection in *Poghosyan*. Further, Plaintiffs' purchase did not "result[] in the sale or lease of goods or services" as defined by the CLRA, as the "services" Plaintiffs allege were purchased are the health plans themselves, not medical services. Cal. Civ. Code §§ 1770(a), 1761(a), (b); FAC ¶ 125.

Thus, because the CLRA does not apply to the transactions alleged in the FAC, Plaintiffs have failed to state a claim against Defendants under the CLRA.

vi.     RICO claims

The RICO Act renders it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." 18 U.S.C. § 1962(c). RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). To recover under Section 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. *See Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

Defendants challenge various aspects of Plaintiffs' pleading of a RICO violation, including the predicate acts and pattern, the existence of an enterprise, the conduct of an enterprise, and injury elements, as well as Plaintiffs' pleading of a RICO conspiracy.

**Predicate acts**

Mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and § 1343, respectively, qualify as two predicate acts under RICO.  18 U.S.C. § 1961(1).  A mail or wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing a use of the United States mail or wires, in furtherance of the scheme; and (3) specific intent to deceive or defraud.  *See Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986) (mail or wire fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail or wires "for the purpose of executing such scheme or artifice or attempting so to do") (quoting 18 U.S.C. §§ 1341, 1343).  A plaintiff must allege facts with the particularity required by Rule 9(b) for predicate acts involving fraud for civil RICO claims.  *Edwards v. Marin Park. Inc.*, 356 F.3d 1058, 1065–66 (9th Cir. 2004).  "Allegations of mail fraud under section 1962(a)–1962(c) 'must identify the time, place, and manner of each fraud plus the role of each defendant in each scheme.'" *Schreiber*, 806 F.2d at 1401 (quoting *Lewis v. Sporck*, 612 F. Supp. 1316, 1325 (N.D. Cal. 1985)).

Here, Plaintiffs allege a scheme aimed at inducing consumers into purchasing "sham" health insurance that Defendants portrayed through internet advertising and sales calls as comprehensive, ACA-qualifying health care coverage offering access to PPO networks but were, in reality, "virtually worthless."  FAC ¶¶ 48–73, 89.  Plaintiffs allege that particular Defendants, HEG, HII, and HPI, were responsible for advertising the plans, conducting the scripted sales calls that mischaracterized the health plans, and, as to

48

HII and HPI, creating the script and training sales representatives.[17]  *Id.* ¶¶ 53–57, 61, 75, 76.  Plaintiffs allege that these sales representatives made statements intended to nullify the effect of disclosures made by agents of Axis Defendants, the plan underwriter, and its subsidiary, or ACI, the administrator, when they conducted their verification process, which Plaintiffs allege was no more than an attempt to shield Defendants from legal repercussions.  *Id.* ¶¶ 64–69, 81–83.

Plaintiffs contend that the Axis-branded Liberty Health card mailed to plan purchasers confirmed the prior misrepresentations made on the internet and over the phone by leading consumers to believe that the plan provided access to First Health's PPO network.  *Id.* ¶¶ 43, 70, 71, 84.  In fact, according to Plaintiffs, Axis and its plan administrator ACI pay out only the minimal benefit the limited health plan provides, after taking in premiums from consumers who made monthly payments believing they had significantly more comprehensive coverage.  *Id.* ¶ 72, 86.  Plaintiffs allege that Defendants perpetrated this scheme through websites, sales calls, and mailing of the health plan card over the course of thousands of transactions with consumers and thus used United States mails and wires in furtherance of the scheme.  *Id.* ¶ 72.

**Rule 9(b)**

All Defendants challenge Plaintiffs' RICO claims on Rule 9(b) grounds.  As discussed previously, Plaintiffs have described the fraudulent conduct, and Corporate Defendants' role in connection to it, with the particularity required by Rule 9(b).  Additionally, for these predicate acts, "[i]t is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service [or wires] of the United States [were] used and intended to be used in the execution of the scheme.  *United States v.*

---

[17] As noted *supra*, Plaintiffs also allege ACI's involvement in the sales calls at some points in the FAC, but not at others, FAC ¶¶ 59, 62, 63, 64, 76, and thus the Court finds ACI's involvement in the calls is not pleaded with sufficient particularity.

1   *Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (quoting *Lustiger v. United States*, 386 F.2d

2   132, 138 (9th Cir. 1967)).  Plaintiffs have alleged specific facts to show, at the pleading

3   stage, that the alleged scheme was reasonably calculated to deceive consumers.

4   **Use of Mails of Wires**

5   Certain Defendants assert that they cannot be liable under RICO because Plaintiffs

6   do not allege that they, individually, used the mails or wires.  *E.g.*, ECF No. 65 at 30.

7   However, there is no requirement that, to commit mail or wire fraud, the defendant

8   personally use the mail or wires.  "[A] defendant may be held liable for mail or wire

9   fraud if (1) the defendant was a knowing participant in a scheme to defraud; (2) the

10  defendant had the intent to defraud; and (3) a co-schemer committed acts of mail or wire

11  fraud during the defendant's participation in the scheme, and those acts were within the

12  scope of the scheme."  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod.*

13  *Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30,

14  2017) (citing *United States v. Stapleton*, 293 F.3d 1111, 1117–18 (9th Cir. 2002)).  The

15  Ninth Circuit in *Stapleton* reasoned that the "scheme to defraud" element of the mail and

16  wire fraud statutes is akin to conspiracy.  *Stapleton*, 293 F.3d at 1116–17.  So while

17  Defendants may be correct that there is no private right of action for aiding and abetting a

18  RICO violation, the predicate acts of mail and wire fraud themselves do not require use

19  of the mail or wire by each member of the scheme.  *See In re Volkswagen*, 2017 WL

20  4890594, at *12.  As detailed above, Plaintiffs have adequately alleged that at least one

21  "co-schemer" committed acts of mail or wire fraud within the scope of scheme.

22  **Specific Intent to Defraud**

23  Axis Defendants and ACI also argue that Plaintiffs have failed to allege specific

24  intent to defraud.  However, as noted, "[t]he requirement of specific intent under [the

25  mail and wire fraud] statutes is satisfied by 'the existence of a scheme which was

26  reasonably calculated to deceive persons of ordinary prudence and comprehension, and

27

28

50

this intention is shown by examining the scheme itself.'" *Schreiber*, 806 F.2d at 1400 (quoting *Green*, 745 F.2d at 1207)).  Contrary to Axis's arguments in particular, Plaintiffs have alleged such a scheme, in which Axis Defendants intended to profit from the sale of limited benefit plans misleadingly marketed as comprehensive health insurance.  FAC ¶¶ 22, 57.  It makes no difference that Plaintiffs allege that Axis contracted with other parties to sell the plans on its behalf.  "[B]y examining the scheme itself," *Schreiber*, 806 F.2d at 1400, the Court finds Plaintiffs' allegation of specific intent as to Axis Defendants is plausible, as they stood to benefit financially from the other Defendants' misrepresentations by increasing the sale of the limited benefit plans Axis underwrites.  HEG, HII, and HPI's alleged participation in the creating and disseminating the alleged misrepresentations regarding the products they advertised or sold likewise plausibly suggest specific intent to defraud.

Although the question is closer with respect to ACI, the Court concludes Plaintiffs have plausibly alleged facts from which specific intent could reasonably be inferred.  Plaintiffs allege that ACI knew the limited health plans they administered were marketed as comprehensive plans, profited from their sale, and refused to respond to requests for information about the benefits administered by ACI "in order to protect itself and other Defendants."  FAC ¶¶ 29, 30.  "Knowledge of fraudulent purpose, as an aspect of intent to defraud, need not be shown by direct evidence, but may also be established by circumstantial evidence."  *United States v. Lothian*, 976 F.2d 1257, 1267 (9th Cir. 1992); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1056 (9th Cir. 2008) ("Because GE allegedly knew about the fraud, participated in gathering profits from the fraud, and did, in fact, profit from the fraud, its specific intent can be inferred.").  ACI's role as a plan administrator, responsible for interfacing with those who seek to file a claim only to find out they did not have comprehensive health insurance, plausibly suggests that they had knowledge of the scheme and intended to assist it by avoiding responding to

customer inquiries, permitting the scheme to continue undetected.  *Cf. United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992) (evidence that defendant had knowledge of complaints regarding the scheme was probative of specific intent to defraud).

However, the Court finds that Plaintiffs have not plausibly alleged First Health's specific intent, even considering reasonable inferences drawn from the scheme as a whole. The specific factual allegation pertaining to First Health is that it "permitted" ACUSA and Axis to include their logo and website on the Liberty Health plan card. *Id.* ¶ 39.  Because Plaintiffs allege that First Health contracts with entities "to allow access to First Health's network of health care providers," *id.* ¶ 38, it is not clear to the Court whether Plaintiffs are alleging that First Health actually intends to have entities like Axis use its logo and website for plans that do not allow access to First Health's network, or how First Health stands to benefit from such use.  The Court therefore finds that Plaintiffs have not plausibly alleged facts that demonstrate First Health's specific intent to defraud.

**Pattern of Racketeering**

Axis Defendants and HEG also contend Plaintiffs have failed to plead a "pattern" of racketeering activity.  The pattern element requires (i) that the predicate acts are related, and (ii) that they amount to or pose a threat of continued criminal activity. *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004).  The continuity requirement is satisfied if plaintiffs allege "either a series of related predicates extending over a substantial period of time, i.e., closed-ended continuity, or past conduct that by its nature projects into the future with a threat of repetition, i.e., open-ended continuity." *Howard v. America Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000).

The instances of mail and wire fraud alleged here are related, as they all served to induce Plaintiffs to sign up and continue paying for the Liberty Health plan by representing that it was comprehensive health insurance.  However, Plaintiffs allege in the FAC that they satisfy the 'continuity of conduct' element based upon Defendants'

acts from 2016 through at least the present, FAC ¶ 157, suggesting that Plaintiffs allege "closed-ended continuity," *Howard*, 208 F.3d at 749.  But Plaintiffs' complaint does not plead any instances of mail or wire fraud with the specificity required by Rule 9(b) except for the multiple instances experienced by Plaintiffs themselves in the month of November 2016.  This is not a sufficient length of time to constitute closed-ended continuity.  *See id.* at 750.

Because Plaintiffs also allege that "there is a continued threat of repetition of such conduct," FAC ¶ 147, the Court also considers whether they sufficiently plead open-ended continuity by showing that "the related predicates themselves involve a distinct threat of long-term racketeering activity."  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989).  "Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity."

Here, Plaintiffs allege that they continued paying premiums based on the false representations for almost a year, at least until they discovered that they had been deceived, indicating Defendants' alleged acts included the threat of continuity.  FAC ¶¶ 85–86.  Further, the Court in *Northwestern Bell* noted that "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  *Northwestern Bell*, 492 U.S. at 242; *see also Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995).  Plaintiffs have alleged that the predicate acts are part of the enterprise's regular way of doing business and cite several facts in support, including that the sales representative used a standard script that included the misleading statements and that the misleading "PPO Network" statement appeared on the standard Liberty Health card issued to Plaintiffs.  FAC ¶¶ 77, 84.  It is improbable that the Liberty Health card would be mailed only to Plaintiffs and not to

other consumers who purchased the plan.  Accordingly, the Court finds that Plaintiffs have sufficiently alleged a pattern of racketeering activity at the motion to dismiss stage.

**Enterprise**

"An enterprise is defined in section 1961(4) as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Schreiber*, 806 F.2d at 1396 (quoting 18 U.S.C. § 1961(4)).  "This expansive definition is 'not very demanding.'" *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Odom*, 486 F.3d at 548).  "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Odom*, 486 F.3d at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "To establish the existence of such an enterprise, a plaintiff must provide both 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" *Id.* The Ninth Circuit has held that an associated-in-fact enterprise need not have an "ascertainable structure." *Id.* at 551–52.

Several Defendants argue that beyond conclusory statements, Plaintiffs have alleged no more than that Defendants contracted with one another.  However, there is nothing in the Ninth Circuit's "RICO case law which instructs that two contracting business entities cannot form an 'enterprise' for RICO purposes and still be named as individual RICO defendants." *River City Markets, Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992).  Plaintiffs here have alleged more than that Defendants simply contracted with one another for legitimate purposes.  Plaintiffs have alleged a common purpose to advertise, sell, underwrite, and administer limited benefit plans under the guise that they are comprehensive health insurance, so that Defendants could collectively profit from the increased enrollment in the plans.  *Cf. Odom*, 486 F.3d at 552 ("Microsoft and Best Buy had a common purpose of increasing the number of people

54

using Microsoft's Internet service through fraudulent means."). Plaintiffs have also adequately alleged an ongoing organization by identifying the "coordinated nature" of Corporate Defendants' activities, *see id.* (quoting *United States v. Qaoud*, 777 F.2d 1105, 1117 (6th Cir. 1985)), in which Defendants HEG, HII, and HPI were responsible for the misleading advertisements and sales calls used to induce consumers to purchase the limited health plans underwritten by Axis Defendants and administered by ACI. One particular alleged fact that suggests coordination is the alleged phone hand-off of the consumer between the sales representatives and the verification agents, in which the sales representative warns the consumer that they should ignore verification statements that do not apply to them and answer "yes" to every question, which allows the verification agent to record consumers' consent while not recording any misrepresentations. FAC ¶¶ 64–69. Additionally, Plaintiffs allege that HII and HPI created and disseminated the script used on the sales calls and trained sales representatives, suggesting coordination between entities. *Cf. California Pharmacy Mgmt., LLC v. Zenith Ins. Co.*, 669 F. Supp. 2d 1152, 1165 (C.D. Cal. 2009) (finding plaintiff alleged association-in-fact between insurance company defendants and other insurers and claim administrators because defendants "engaged other carriers to communicate the manner in which its scheme to defraud . . . was to be effected," and "instructed the employees of other insurers and claims administrators to utilize identical tactics" to carry out scheme).

Plaintiffs also allege that Corporate Defendants functioned together as a continuing unit, as the sale of limited benefit plans using tactics designed to mislead consumers was allegedly part of their regular course of business since at least 2016 rather than "isolated activity." *Odom*, 486 F.3d at 553; *Hopkins v. Am. Home Mortg. Servicing, Inc.*, No. 13-4447 RS, 2014 WL 580769, at *5 (N.D. Cal. Feb. 13, 2014) ("Courts often look to the length of time that the associates have interacted to determine whether they functioned as

a continuing unit.").  Based on these allegations, the Court finds that Plaintiffs have adequately alleged the existence of an associated-in-fact enterprise.[18]

**Conduct**

In order to plead a violation of RICO, the pleading instrument must also allege sufficient facts to establish the "conduct" element.  *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).  "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  *Id.* at 179 (quoting 18 U.S.C. § 1962(c)).  "Of course . . . RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . [or] to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required."  *Id.*  In other words, "one must participate in the operation or management of the enterprise itself."  *Id.* at 185.

"In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal in that the defendant's position is 'vital' to the mission's success." *Tatung Co., Ltd. v. Hsu*, No. SA-CV-13-1743-DOC, 2015 WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (quoting *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)) (citations omitted).

Axis Defendants, HEG, and ACI contend that Plaintiffs have not met the "conduct" element.  Axis Defendants argues that Plaintiffs have not alleged Axis had

---

[18] The Court finds that Plaintiffs' allegation that certain Defendants each constitute a separate enterprise or some Defendants together constitute a separate enterprise is too conclusory to provide a basis for their RICO enterprise claims.

more than "routine business relationships with some Defendants" and thus cannot meet the "conduct" element of Section 1962(c).  ECF No. 63-1 at 31.  However, as the underwriter of the limited health plans, Axis's position was "vital" to the success of an alleged enterprise predicated on the sale of the limited health Plans—Plaintiffs essentially allege that the scheme revolved around the sale of Axis's product.  Plaintiffs' allegation as to Axis Defendants' conduct is therefore sufficiently plausible at the motion to dismiss stage.  The Court also finds that HEG, which raises the same argument, is also sufficiently implicated by the FAC to meet the "conduct" element as its sales activities were also vital to the scheme's success.

As for ACI, Plaintiffs have not clearly alleged did more than administer the limited benefit plans, pay the claims, and refuse to respond to Plaintiffs' request for information.[19]  FAC ¶ 30.  Plaintiffs' theory is that Defendants tricked Plaintiffs and other consumers into purchasing the limited benefit plan and continuing to pay premiums by making misrepresentations. Although Plaintiffs allege that ACI administered the limited benefit plan, ultimately benefiting the enterprise, it appears that Plaintiffs do not allege, except in broad statements referring to multiple Defendants, that ACI had any part in the misrepresentations.  In other words, although ACI may have been a "participant" in a general sense, Plaintiffs have not presented sufficient allegations to show that ACI was a vital component of the sham insurance scheme, or gave or took directions in the implementation of the scheme.  *Cf. Baumer v. Pachl*, 8 F.3d 1341, 1345 (9th Cir. 1993) (quoting *Univ. of Md. at Balt., et al. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993)) ("[S]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.").

─────────────────────

[19] Plaintiffs, at various points in the FAC, tie ACI to the sales or verification calls, but as noted previously the allegations as to ACI's involvement in those stages are inconsistent or alleged alternatively with other Defendants.

**Injury**

To successfully plead a RICO injury, Plaintiffs must satisfy two requirements.  *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 957 (N.D. Cal. 2018).  First, they must plausibly allege "a harm to a specific business or property interest."  *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc).  Second, they must plausibly allege that their injury has resulted in "concrete financial loss."  *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (quoting *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)), *abrogated on other grounds by Diaz*, 420 F.3d 897.

Certain Defendants argue that Plaintiffs have failed to allege a harm to a business or property interest.  However, "[i]n the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money."  *Canyon Cty.*, 519 F.3d at 976.  Contrary to Defendants' suggestion, Plaintiffs do not allege damages arising from personal injury, as Plaintiffs do not allege Defendants caused Eric Ketayi's physical injuries.  *Cf. Smith by Smith v. Cryolab Health Ben. Plan*, 988 F.2d 121 (9th Cir. 1993) (finding claim of damages resulting from improper medical care not to qualify as RICO injury, even if personal injuries affected plaintiff's "ability to earn a livelihood").  Plaintiffs claim an injury to property based upon their overpayment for the Liberty Health plan.  FAC ¶ 83.  *Cf. In re Chrysler-Dodge-Jeep,* 295 F. Supp. 3d at 959 ("Because money is a form of property, Plaintiffs' alleged overpayment constitutes a harm to a specific property interest.") (internal citations omitted).  Alternatively, Plaintiffs claim an injury to property based on Defendants' underpayment to the hospital, as Plaintiffs experienced the wrongful deprivation of their money when Defendants paid out only $1,500 for Plaintiffs' almost $200,000 surgery, requiring Plaintiffs to cover the rest.

Accordingly, the Court GRANTS Defendants ACI and First Health's motion to dismiss Plaintiffs' Section 1962(c) RICO claims.  The Court DENIES Defendants Axis, Axis Specialty, HPI, HII, and HEG's motion to dismiss Plaintiffs' Section 1962(c) RICO claims.

### vii.   RICO Conspiracy

"To establish a violation of section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard*, 208 F.3d at 751.  To be liable under 1962(d), the defendant need not have personally played a role in the operation or management of the RICO enterprise, as long as the defendant "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005); *cf. Salinas v. United States*, 522 U.S. 52, 64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."). The defendant must also be "aware of the essential nature and scope of the enterprise and intend[ ] to participate in it." *Fernandez*, 388 F.3d at 1230.

Defendants argue that Plaintiffs are precluded from stating a RICO conspiracy claim because they do not plead a substantive violation of RICO, *see Howard*, 208 F.3d at 751, and that Plaintiffs have failed to allege facts that demonstrate a RICO conspiracy. Because the Court finds that Plaintiffs have stated a claim for a substantive violation of RICO as to at least one Defendant, the remaining question is whether Plaintiffs have properly pleaded that each Defendant knowingly agreed to facilitate the scheme and intended to participate in it.  Defendants contest as conclusory Plaintiffs' allegations of an agreement between the Defendants.  *See* FAC ¶ 42 ("each Defendant . . . agreed to an overall fraudulent scheme").  Although Defendants contest the lack of specificity of

Plaintiffs' allegations regarding the agreement, Plaintiff "is not required to prove every detail of the agreement" when alleging conspiracy, particularly at the motion to dismiss stage. *United States v. Collazo*, --- F.3d ----, 2021 WL 129792, at *5 (9th Cir. Jan. 14, 2021) (noting that government need only prove "that a defendant had a knowing connection with an extensive enterprise . . . and had reason to know of its scope" for the fact-finder to "infer that the defendant agreed to the entire unlawful scheme").  In addition to agreement, Plaintiffs plead facts that plausibly suggest that Axis Defendants, ACI, HEG, HPI, and HII were aware of the scope of the enterprise.  The knowledge of Axis Defendants, HEG, HPI, and HII could be inferred through their alleged participation in the misleading sales and verification process.  Plaintiffs' allegation as to ACI's knowledge of the nature and scope of the enterprise is plausible, given that ACI was allegedly responsible for administering claims and purposefully declined to give Plaintiffs more information when they called to contest the limited benefits they received.  FAC ¶ 30.  *Cf. Hamilton v. Willms*, No. CV F 02 6583 AWI SMS, 2005 WL 3797562, at *10 (E.D. Cal. Oct. 28, 2005) ("Evidence that Defendant . . . knew what the other conspirators 'were up to' and knew or suspected that she was part of a larger enterprise is sufficient."); *United States v. Taren-Palma*, 997 F.2d 525, 530 (9th Cir. 1993), *overruled on other grounds by United States v. Shabani*, 513 U.S. 10 (1994) ("Every member of the conspiracy need not know every other member nor be aware of all acts committed in furtherance of the conspiracy.").  However, for the same reasons as described above, the Court finds Plaintiffs have failed to plausibly allege facts from which the Court can infer that First Health agreed or intended to participate in the enterprise.

The Court therefore GRANTS Defendant First Health's motion to dismiss Plaintiffs' Section 1962(d) RICO conspiracy claims.  The Court DENIES Defendants Axis, Axis Specialty, ACI, HPI, HII, and HEG's motion to dismiss Plaintiffs' Section 1962(d) RICO conspiracy claims.

20-cv-1198-GPC-KSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

###### viii.   *Equitable claims*

Plaintiffs include a number of equitable claims under Count Seven, entitled "Restitution, Money Had and Received, Unjust Enrichment, Quasi-Contract and/or Assumpsit."  Defendants dispute that the terms on this list constitute causes of action under California law.  Defendants also argue that even if Plaintiffs could invoke these equitable causes of action, Plaintiffs have failed to meet their requirements.

The Ninth Circuit has noted that under California law, "there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'"  *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350 (2010)).  Instead, "they describe the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'"  *Id.* (quoting 55 Cal. Jur. 3d Restitution § 2).  Quasi-contract is a typical cause of action that seeks such a remedy, and a court may construe an allegation of unjust enrichment as a quasi-contract claim seeking restitution.  *Id.* (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)).  A quasi-contract is a legal fiction in which the court implies a contract when the defendant obtained a benefit from the plaintiff by fraud, duress, coercion, or similar conduct.  *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010); *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016).  "However, 'an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.'"  *Saroya v. Univ. of the Pac.*, --- F.Supp.3d ----, 2020 WL 7013598, at *6 (N.D. Cal. Nov. 27, 2020) (quoting *Rutherford Holdings*, 223 Cal. App. 4th at 231).

Plaintiffs assert no claims sounding in contract, and indeed allege that their purchase of the Liberty Health plan was procured by fraud.  It is immaterial that Plaintiffs have not expressly pleaded that no enforceable contract exists.  *See Obertman v.*

*Electrolux Home Care Prod., Inc.*, --- F.Supp.3d ----, 2020 WL 5107615, at *6 (E.D. Cal. Aug. 31, 2020) ("[T]hat plaintiff has not pleaded the absence of an enforceable contract does not doom the [quasi-contract] claim at the motion to dismiss stage, particularly because the claims here do not expressly arise out of any breach of contract.").  Plaintiffs' allegations are similar to those found sufficient to survive a motion to dismiss in *Astiana*, where plaintiffs alleged that defendant "'entic[ed]' plaintiffs to purchase their products through 'false and misleading' labeling, and that [defendant] was 'unjustly enriched' as a result." *Astiana*, 783 F.3d at 762.  Plaintiffs also allege that Defendants received a benefit, directly or indirectly, from Plaintiffs through their payment of premiums; it is of no consequence whether there was a direct payment or privity between Plaintiffs and the particular Defendant.  *See Fid. & Deposit Co. of Md. v. Harris*, 360 F.2d 402, 409 (9th Cir. 1966).  However, the sufficiency of Plaintiffs' claim that each Defendant obtained the benefit through fraud rises and falls with Plaintiffs' common law fraud claims.  Because the Court finds that Plaintiffs have only stated a claim for fraud against Axis Defendants and HEG, Plaintiffs have not adequately alleged that the other Defendants obtained a benefit from Plaintiffs through fraud.  The Court therefore finds that Plaintiffs have stated a quasi-contract claim (encompassing the remedy of restitution or unjust enrichment) against only Axis, Axis Specialty, and HEG.

"To establish a claim for money had and received, a plaintiff must show that the defendant 'is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff.'" *Farmers Ins. Exch. v. Zerin*, 53 Cal.App.4th 445, 460, 61 Cal. Rptr. 2d 707, 715 (1997) (citations omitted).  The parties' briefing on this cause of action is thin.  But based on the Court's review of the FAC, Plaintiffs have not connected the facts alleged in the complaint to the elements needed to state a claim for money had and received.  Accordingly, the Court finds Plaintiff have not sufficiently alleged a claim for money had and received.

Although the Court finds that Plaintiffs have pled sufficient facts with respect to the elements of their quasi-contract claims against some Defendants,[20] the Court finds that Plaintiffs have failed to plead that legal remedies are inadequate, as is required to state a claim for an equitable remedy.  Although Plaintiff is correct that Rule 8 permits pleading in the alternative, Fed. R. Civ. P. 8(a)(3), the Ninth Circuit's recent decision in *Sonner* requires that a complaint seeking equitable relief allege that legal remedies are inadequate.  *Sonner*, 971 F.3d at 844.

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiffs' claims for restitution, money had and received, unjust enrichment, quasi-contract and/or assumpsit.

## V.    LEAVE TO AMEND

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber*, 806 F.2d at 1401).  In other words, where leave to amend would be futile, the Court may deny leave to amend.  *See id.*; *Schreiber*, 806 F.2d at 1401.  Plaintiff can potentially cure some of the deficiencies in the FAC.  The Court therefore GRANTS Plaintiff leave to amend, except as to their CLRA claims, as these claims cannot be saved by the allegation of additional facts consistent with the FAC.  *See DeSoto*, 957 F.2d at 658.

\ \ \

---

[20] Plaintiffs also include a claim for assumpsit, "an ancient quasi-contractual theory of recovery." *Eshagh v. The Terminix Int'l Co., L.P.*, No. 1:11-CV-00222, 2011 WL 3055310, at *3 n.3 (E.D. Cal. July 25, 2011) (citing *Jogani v. Superior Court*, 165 Cal.App.4th 901, 905–906 (Cal. Ct. App. 2008)). However, based on the Court's reading of the FAC, "[i]t appears Plaintiff's assumpsit claim is in fact an unjust enrichment claim." *Id.* While Plaintiffs are permitted to plead duplicative causes of action, *Astiana*, 783 F.3d at 762, if Plaintiffs wish to plead a claim for assumpsit distinct from their quasi-contract theory, they must do so more clearly in any amended complaint.

**VI.    CONCLUSION**

For the reasons set forth above, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss. Specifically, the Court:

1. GRANTS Defendants HPI, HII, and First Health's motion to dismiss for lack of personal jurisdiction; and DENIES Defendant ACI's motion to dismiss for lack of personal jurisdiction;

2. GRANTS Plaintiffs' request for limited jurisdictional discovery as to the Court's specific jurisdiction over HII and HPI; and DENIES Plaintiffs' request for jurisdictional discovery as to the Court's jurisdiction over First Health;

3. GRANTS Defendants Marc Munoz, Kevin Romero, and First Health's motion to dismiss for failure to state a claim on all counts (Counts I through VII);

4. GRANTS Defendants' motion to dismiss Plaintiffs' UCL claims (Count I);

5. GRANTS Defendants' motion to dismiss Plaintiffs' FAL claims (Count II);

6. GRANTS Defendants' motion to dismiss Plaintiffs' CLRA claims (Count III), and dismisses them WITH PREJUDICE;

7. GRANTS Defendants ACI, HII, and HPI's motion to dismiss Plaintiffs' fraud or deceit claims (Count IV); and DENIES Defendants Axis, Axis Specialty, and HEG's motion to dismiss Plaintiffs' fraud or deceit claims;

8. GRANTS Defendant ACI's motion to dismiss Plaintiffs' Section 1962(c) RICO claim (Count V); and DENIES Defendants Axis, Axis Specialty, HII, HPI, and HEG's motion to dismiss Plaintiffs' Section 1962(c) RICO claims;

9. DENIES Defendants Axis, Axis Specialty, ACI, HII, HPI, and HEG's motion to dismiss Plaintiffs' Section 1962(d) RICO conspiracy claims (Count VI); and

10. GRANTS Defendants' motion to dismiss Plaintiffs' claims for restitution, money had and received, unjust enrichment, quasi-contract and/or assumpsit (Count VII).

1

2          Plaintiffs may file a second amended complaint within 20 days of the filed date of

3    this order.

4

5          **IT IS SO ORDERED.**

6    Dated:  February 1, 2021

7                                                      Hon. Gonzalo P. Curiel
                                                       United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20-cv-1198-GPC-KSC