David A. Fox (SBN 254651)
dave@foxlawapc.com
Joanna L. Fox (SBN 272593)
joanna@foxlawapc.com
Russell A. Gold (SBN 179498)
russ@foxlawapc.com
**FOX LAW, APC**
225 W. Plaza Street, Suite 102
Solana Beach, CA 92075
Tel:  858-256-7616
Fax: 858-256-7618

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC KETAYI, and MIRYAM KETAYI, both individually and on behalf of all others similarly situated and for the benefit of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>HEALTH ENROLLMENT GROUP, a Florida corporation; ADMINISTRATIVE CONCEPTS, INC., a Pennsylvania corporation; AXIS, a Bermuda corporation d/b/a Axis Insurance Company; AXIS SPECIALTY U.S. SERVICES, INC., a Delaware corporation; ALLIANCE FOR CONSUMERS USA, a Nebraska corporation; HEALTH PLAN INTERMEDIARIES HOLDINGS, LLC, a Delaware Corporation; HEALTH INSURANCE INNOVATIONS HOLDINGS, INC., a Delaware Corporation; COST CONTAINMENT GROUP, Inc., a Delaware Corporation,<br><br>Defendants. | CASE NO. 20cv1198 GPC (KSC)<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, PROFIT DISGORGEMENT, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL ON ALL CAUSES OF ACTION SO TRIABLE** |

1    Plaintiffs Eric Ketayi and Miryam Ketayi ("Plaintiffs") bring this Second
2    Amended Class Action Complaint ("Second Amended Complaint") against Health
3    Enrollment Group ("HEG"), Alliance for Consumers USA ("ACUSA"),
4    Administrative Concepts, Inc. ("ACI"), AXIS ("Axis Insurance Company"), AXIS
5    Specialty U.S. Services, Inc. ("Axis Specialty"), Health Plan Intermediaries
6    Holdings, LLC ("HPI") and Health Insurance Innovations Holdings, Inc. ("HII")
7    and Cost Containment Group, Inc. inclusive (collectively, "Defendants").
8    Plaintiffs bring this action individually and on behalf of all others similarly
9    situated and for the benefit of the general public and allege the following upon
10   personal knowledge as to Plaintiffs' acts and experiences as specifically identified,
11   and as to all other allegations based on information and belief based on, among
12   other things, investigation into such allegations conducted by Plaintiffs' attorneys.

## I.   **INTRODUCTION**

14       1.    This case concerns the deceptive, false, fraudulent, unlawful, and/or
15   unfair advertising, marketing, sale, underwriting and administration of sham
16   "health insurance" by Defendants.

17       2.    Using a convoluted web of companies, Defendants trick consumers,
18   like Plaintiffs and the putative class members, into purchasing limited benefit
19   plans and medical discount memberships that, as Defendants are aware, provide
20   little to no value to the purchaser.  Employing numerous websites promising
21   "comprehensive coverage," names that sound like legitimate insurance
22   companies, and salespeople, telephone operators and underwriting agents trained
23   to follow a strict sales script that is uniformly delivered to all potential customers
24   during phone calls, Defendants promote, advertise, offer for sale, sell and
25   administer to consumers, like Plaintiffs and the putative class members, products
26   that those consumers believe to be low-cost, comprehensive, Preferred Provider

Organization ("PPO") medical health insurance coverage.[1]

3.     Defendants represent that they can provide such comprehensive coverage at a low cost by aggregating consumers into a plan in the same way a large corporation would.  Together, Defendants make consumers believe that they can "beat the system" and receive comprehensive insurance that meets the requirements of the 2010 Affordable Care Act ("ACA") when, in fact, what they receive is essentially worthless, because it covers only a fraction of most health care costs.  In the end, what consumers receive is decidedly not ACA-compliant health coverage.

4.     Defendants and each of them know, or should reasonably know, that the products and services they offer are essentially worthless.  But Defendants' business is based on duping consumers into believing that they are paying for, and receiving, valuable health insurance coverage.  Through deceptive advertising, material misstatements, and critical omissions, Defendants convince consumers, like Plaintiffs and the putative class members, that they are purchasing comprehensive health insurance coverage like that provided through a legitimate PPO.  In truth, consumers are paying for a product—represented to be "insurance"—that is often worth less than the "premiums" it costs and that does not provide the coverage promised.

5.     Even after the sale is made, Defendants continue to deceive consumers.  Defendants make statements in fulfillment materials and on the "insurance" cards provided to consumers through the mail that include the phrase "Preferred Provider (PPO) Network Access" and point consumers to a "PPO" Network website that represents to be "your national choice for PPO network solutions."  Defendants do so with knowledge that they have not actually sold,

---

[1] As described herein, some Defendants are not licensed to sell health insurance in California or in many other states throughout the country where they purport to do so.

underwritten, or provided any sort of PPO plan or other comprehensive coverage to consumers.

6.     Throughout the life of the scheme, Defendants' affirmative claims and omissions of material fact are likely to, and did, deceive consumers like Plaintiffs and the putative class members into paying and/or continuing to pay, "premiums" (sometimes for years on end) for what they believe is PPO health insurance coverage that turns out to be illusory when they use it.

7.     Once consumers realize they have been cheated, it is too late. Consumers are out hundreds or thousands of dollars in "premium" payments to Defendants for sham health care coverage.  If they realize the issue at the point when they have incurred actual injury or loss, it is difficult to get replacement health care coverage—especially coverage that would cover the actual injury or loss.  In some instances, consumers may also owe tens or hundreds of thousands of dollars in payments to medical providers for services that Defendants claimed the "insurance" covered when in fact no or minimal coverage was available.

8.     Defendants are presently under investigation by the California Department of Insurance related to this scheme—which is pervasive and has deceived consumers throughout California.  Indeed, Defendants have victimized consumers all over the country and profited at consumers' expense.

9.     Plaintiffs and putative class members now seek damages and restitution of all "premiums" paid based on Defendants' illegal, deceptive, false, fraudulent, and unfair advertising, marketing, and sale of limited benefit plans and medical discount plans.  In addition, to help put an end to and redress these illegal, deceptive, false, fraudulent, and unfair business practices (which practices are on-going), Plaintiffs and the putative class ask the Court to preliminarily and permanently enjoin Defendants from continuing to peddle this sham "health insurance" to thousands of unwitting Americans.  There is an imminent threat of actual future harm to Plaintiffs because Defendants' lead generating and other

1    websites are still functional, Defendants still employ sales agents using the same

2    uniform script, and Defendants continue to engage in a fraudulent scheme to sell

3    consumers, including Plaintiffs and putative class members, sham health

4    insurance products.  Plaintiffs and putative class members therefore will be unable

5    to rely on Defendants' advertising, websites, sales agents, and insurance

6    administrators in the future and may again be deceived into purchasing sham

7    insurance products from Defendants in the future.

8         10.   Plaintiffs and putative Plaintiffs thus bring numerous causes of action

9    against Defendants on behalf of themselves and all others similarly situated and

10   for the benefit of the public, as applicable, and seek all appropriate equitable and

11   legal remedies under those causes of action.

12   **II.    JURISDICTION AND VENUE**

13        11.   This Court has subject matter jurisdiction over this action pursuant to

14   28 U.S.C. § 1332(a) because the action is between citizens of different states and

15   the matter in controversy exceeds the sum or value of $75,000, exclusive of

16   interest and costs.

17        12.   Alternatively, this Court has subject matter jurisdiction over this action

18   pursuant to 28 U.S.C. § 1332(d) because this is a class action in which (1) there are

19   over 100 members in the proposed class; (2) members of the proposed class have a

20   different citizenship from Defendants; and (3) the claims of the proposed class

21   members exceed $5,000,000 in the aggregate, exclusive of interests and costs.

22        13.   In addition, this Court has subject matter jurisdiction over this action

23   pursuant to 28 U.S.C. § 1331 because Counts V and VI, for violations of the

24   federal civil RICO statute, arise under federal law, and the Court has supplemental

25   jurisdiction pursuant to 28 U.S.C. § 1367.

26        14.   This Court has personal jurisdiction over Defendants because all

27   Defendants have sufficient contacts with California.  Plaintiffs' claims and causes

28   of action alleged herein arise out of Defendants' respective contacts with this State.

-4-

Moreover, all Defendants have purposely availed themselves of the privileges and benefits of conducting business activities in California through their active marketing, advertising, sale, underwriting, administration, and provision of "health insurance" services in the State of California.  Moreover, Defendants HII and HPI have consented to the jurisdiction of this Court.  (ECF No. 94 ("The Court has personal jurisdiction over the HII Defendants in this case based on the HII Defendants consent to the exercise of such jurisdiction and the HII Defendants shall not raise jurisdictional challenges to the Second Amended Complaint").)  As further detailed below, Defendants maintain systematic and continuous business contacts with California, and many California residents do business with Defendants.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants engage in continuous and systematic business activities within the State of California, a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities in this district, Defendants received substantial compensation from transactions and business activities in this district, and Plaintiffs reside in this district.

**III.    PARTIES**

**PLAINTIFFS**

16.    Plaintiff Eric Ketayi ("Eric") is a resident of San Diego County and over the age of eighteen.  On or about November 22, 2016, Defendants sold Eric what Eric reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care coverage that was represented to be in the form of a PPO health insurance plan.  Eric reasonably believed he was receiving comprehensive medical coverage based on false statements and other misrepresentations contained on Defendants' websites, including websites run, paid for, and/or maintained by Defendants HEG, HPI and HII and their affiliates, employees, or agents, as well as the uniform

-5-

representations to Eric over the phone that he and his wife, Miryam, were (i) purchasing a PPO plan for their family, (ii) could see any doctor in the plan, and (iii) would have full medical coverage under this plan. This "plan," which was called a "Liberty Health" plan under the Alliance for Consumers USA Group (the marketing name developed by HII and HPI for the plan) was underwritten by Defendants Axis Insurance Company and Axis Specialty and purported to be part of Defendant First Health's PPO Network. In fact, as he only recently discovered, Eric had purchased a limited benefit plan, which was deceivingly marketed, advertised, sold, and administered and did not provide the promised scope of coverage. Eric paid what amounted to $379 per month in "premium" payments starting in November 2016 based on his belief that he had purchased comprehensive PPO access to Defendant First Health's PPO network through the "Liberty Health" plan. Eric paid via credit card charges using the internet, other wires and/or the mail. Eric surrendered more in these transactions than he would have otherwise paid if the true facts had been disclosed, and he lost money or property because of the illegal scheme to defraud consumers.

17. Plaintiff Miryam Ketayi ("Miryam") is a resident of San Diego County and over the age of eighteen. On or about November 22, 2016, Defendants sold Miryam what Miryam reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care coverage that was represented to be in the form of a PPO health insurance plan. Miryam reasonably believed she was receiving comprehensive medical coverage based on false statements and other misrepresentations contained on Defendants' websites, including websites run, paid for, and/or maintained by Defendants HEG, HPI, HII and ACUSA, and their affiliates, employees, or agents, as well as the uniform representations to Miryam over the phone that she and her husband, Eric, were (i) purchasing a PPO plan for their family, (ii) could see any doctor in the plan, and (iii) would have full medical coverage under this plan. This "plan,"

which was called a "Liberty Health" plan under the Alliance for Consumers USA Group (the marketing name developed by HII and HPI for the plan) was underwritten by Defendants Axis Insurance Company and Axis Specialty and purported to be part of Defendant First Health's PPO Network.   In fact, as she only recently discovered, Miryam had purchased a limited benefit plan, which was deceivingly marketed, advertised, sold, and administered and did not provide the promised scope of coverage.  Miryam paid what amounted to $379 per month in "premium" payments starting in November 2016, based on her belief that she had purchased comprehensive PPO access to Defendant First Health's PPO network through the "Liberty Health" plan.  She paid via credit card charges using the internet, other wires and/or the mail.  Miryam surrendered more in these transactions than she would have otherwise paid if the true facts had been disclosed, and she lost money or property because of the illegal scheme to defraud consumers.

## CORPORATE DEFENDANTS

### HEG

18.    Defendant HEG is a Florida corporation with its principal place of business in Fort Lauderdale, Florida.  At all times relevant to this suit, HEG billed itself as a "full service National Health Brokerage firm specializing in helping individuals simplify the process of shopping for health insurance."[2]  HEG claimed to "work with Major Insurance Companies in all 50 states . . . ***to help you find the most comprehensive insurance plan*** for the lowest possible price."  In reality, however, HEG brokered limited benefit plans and medical discount memberships that did not provide the promised comprehensive insurance coverage. These plans were essentially worthless.  *See* **Figures 1–3**.  HEG did not offer, and/or had no

---

[2] Figures 1–3 are screenshots of HEG's website as it existed during at least a portion of the time period relevant to this action.

intent to supply, comprehensive or ACA-qualified health care coverage as represented to consumers.

19.   To the extent these HEG advertisements are not demonstrably false, they nonetheless have a tendency to decieve and/or confuse the public, and, in fact, did exactly that to Plaintiffs and putative class members.

20.   HEG knew or should have known that it was an active and integral participant in a scheme to defraud consumers who enrolled in such services, including Plaintiffs and putative class members.  Moreover, at all times relevant to this Complaint, Defendant HEG reaped the benefits of the scheme alleged and received compensation from consumers in the form of premiums, commissions, or other monetary remuneration at the expense of these consumers.

**Figure 1**

**HEG's website proclaiming that HEG will "find the most comprehensive insurance plan"**



///
///
///
///
///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Figure 2

**HEG's website promoting "Private Health Insurance Plans" and "Obamacare"**



### Figure 3

**HEG's website promoting its "PPO" Plans**



-9-

21.  HEG has multiple contacts with California and Plaintiffs' claims and arise out of HEG's contacts with the State.  HEG does business in the state as the Health Enrollment Group and also as Health Enrollment Insurance Agency.  HEG reached into California to contact Plaintiffs over the internet and through multiple phone calls.  HEG, through its agents, including agent David Martinez made material misrepresentations to consumers in California, including Plaintiffs, about the products and services it was selling.

22.  HEG advertised, marketed, and sold the sham insurance policy at issue to Plaintiffs, who are California residents, and advertised, marketed, and sold substantially similar products to other putative California class members.  In addition, HEG has contracts and relationships with the other Defendants, including HII, HPI, Axis Insurance Company, Axis Specialty, ACUSA and First Health to broker, advertise, generate sales and/or sell or administer insurance on their behalf in California.  HEG has invoked the benefits and protections of California law by, among other things, HEG registering with the California Department of Insurance as a non-resident "Life-Only" and "Accident and Health" agent, License No. 0K59431.

23.  At all times relevant to this Second Amended Complaint, HEG knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.

24.  HEG participated in this conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**ACUSA**

25.  Defendant ACUSA is a Nebraska (purported) non-profit corporation with its principal place of business in Plano, Texas.  It purports to be a "Public Benefit Corporation" providing lifestyle benefits service to its institutional and corporate members, franchise members and trade group members that address the

-10-

needs of today's consumers."[3] Despite being a Nebraska Corporation, ACUSA's corporate documents were notably executed in Palm Beach, Florida.

26.   At all times relevant to this suit, ACUSA offered memberships that enabled its members to purchase limited benefit plans and medical discount memberships like the ones at issue here, including the "Liberty Health" plan that was purchased by Plaintiffs.  Upon purchasing the sham health insurance, Plaintiffs and putative class members became "ACUSA Members."  ACUSA used its status the policyholder on "insurance" underwritten by the AXIS Defendants to induce Plaintiffs and putative class members into believing that they were getting comprehensive PPO medical coverage at a reduced price because ACUSA was the aggregator of individuals from all over the country and could therefore negotiate "great deals" on health insurance for its members, including in California.

27.   In fact, the HII/HPI "Liberty Health" plan sold by HEG and underwritten by the AXIS Defendants as part of the scheme to defraud consumers was essentially worthless and not comprehensive medical coverage negotiated on Plaintiffs' and putative class members' behalf.  Nonetheless, ACUSA reaped the benefits of the scheme alleged and received compensation from consumers and the other Defendants in this case in the form of premiums, commissions, or other monetary remuneration at the expense of consumers who expended money on the health "insurance" plans, which were actually of little to no value.

28.   In the Liberty Health Plan fulfillment materials, ACUSA describes itself as "a network of hard working Americans, small business owners, hourly workers and the self-employed across our country. We are focused on educating and providing an array of programs and services that can help our member make

---

[3] ACUSA's Articles of Incorporation state that the purpose of ACUSA is for charitable and educational purposes.

sound financial, personal and health decisions."

29.   ACUSA also touts that through ACUSA membership, plan participants would have the First Health PPO Network available to them, making members believe that they had, indeed, purchased a PPO plan.  This was stated in the plan "Welcome Package" was sent to plan purchasers like Plaintiffs and putative class members.  *See* Figure 4, Except from Plan Welcome Package (highlighting added).  These fulfillment materials are a form of advertising in their own right.  To the extent they are not false, taken together with the representations made during the sales call they are likely to and have a tendency to decieve and/or confuse the public, and did exactly that to Plaintiffs.

**Figure 4, Excerpt from ACUSA "Insurance" Fulfillment Materials**



30.   ACUSA has minimum contacts with California that give rise to the claims in this Second Amended Complaint.  ACUSA registered to do business in

-12-

California in 2015 and markets and offers memberships to Californians through its interactive website.  In addition, ACUSA is an associate of, and the policyholder for, the Axis Insurance Company products that Plaintiffs and putative class members purchased in California, for coverage in California.  ACUSA reached into California through provision of fulfillment materials and otherwise and purposefully availed itself of doing business in the state by enrolling California residents as ACUSA, including Plaintiffs and putative class members.

31.    Although ACUSA registered to do business in California, it is not currently in good standing with the California Franchise Tax Board (Entity ID 3795866).  **Figure 5** is a true and correct copy of the Entity Status Letter from the California FTB providing that ACUSA "is **not** in good standing with the Franchise Tax Board."  ACUSA was not in good standing to do business in California at all times relevant to this Second Amended Complaint.  Nor to the best of Plaintiffs' knowledge is ACUSA licensed in the State of California to broker or sell any form of health insurance.  Accordingly, any contracts ACUSA entered during the class period are voidable by Plaintiffs and by all putative class members.  *See* Cal. Rev. & Tax. Code § 23304.1.  Moreover, because ACUSA is not qualified to do business in California or defend itself in California courts, Plaintiffs and putative class members request default judgment be entered against ACUSA on all causes of action alleged herein.

[INTENTIONALLY LEFT BLANK]

-13-

**Figure 5** – **Franchise Tax Board Status Letter for ACUSA**



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
PO BOX 942857
SACRAMENTO CA 94257-0540

**Entity Status Letter**

Date:    4/22/2021
ESL ID: 1119807327

**Why You Received This Letter**
According to our records, the following entity information is true and accurate as of the date of this letter.

Entity ID:  3795866

Entity Name:   ALLIANCE FOR CONSUMERS USA, INC.

☐   1.   The entity is in good standing with the Franchise Tax Board.

☒   2.   The entity is **not** in good standing with the Franchise Tax Board.

☐   3.   The entity is currently exempt from tax under Revenue and Taxation Code (R&TC) Section 23701 .

☐   4.   We do not have current information about the entity.

☐   5.   The entity was administratively dissolved/cancelled on              through the Franchise Tax Board
         Administrative Dissolution process.

32.    At all times relevant to this Second Amended Complaint, ACUSA knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.

33.    ACUSA participated in this conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

///

///

-14-

1    **Axis Insurance Company**

2    34.   Defendant Axis Insurance Company is a foreign corporation with its

3    headquarters in Bermuda.[4]  Axis Insurance Company stock is sold on the New

4    York Stock Exchange under the symbol AXS.  At 2019 year-end, AXS boasted of

5    $7.4 billion in total capital and $25.6 billion in total assets.  As of March 31,

6    2021, AXS's stock price is $50.17 per share.

7    35.   Axis Insurance Company and its employees, affiliates, or agents

8    "underwrite" the sham health insurance plans that were sold to Plaintiffs and

9    putative class members.  Axis Insurance Company sold the Liberty Health Plan to

10   policyholder ACUSA, underwrote the policy as a whole and underwrote the

11   individual policies that ACUSA issued to consumers like Plaintiffs and the

12   putative class members.

13   36.   Axis Insurance Company contracts with third-party administrators,

14   including Defendants Cost Containment Group, HII, HPI, and ACI, to perform

15   consumer sales and administrative services related to insurance plans (in

16   California and across the country), including the "Liberty Health" plan purchased

17   by Plaintiffs, as well as substantially similar plans purchased by putative class

18   members.

19   37.   Axis Insurance Company knows that these plans are not

20   comprehensive health insurance, despite being marketed and sold as such. Axis

21   Insurance Company necessarily knew the plans were marketed in such a way as to

22   lead consumers to believe they were being provided comprehensive medical

23   coverage.  Specific to Plaintiffs, Axis Insurance Company knew that the "Liberty

24   Health" plan was marketed by Axis Insurance Company's agents (HPI, HII, ACI

25   and HEG) as a comprehensive PPO health plan that was part of the First Health

26

27   [4] Axis Insurance Company has waived any challenge to personal jurisdiction
     because Axis Specialty made a general appearance and did not challenge personal
28   jurisdiction.  Fed. R. Civ. Proc. 12(h).

-15-

PPO network when, in fact, it was not a PPO plan or any other type of comprehensive medical coverage.

38.    Axis Insurance Company and/or its state-side affiliates, including but not limited to Axis Specialty, also conduct a "verification" process during the sale of the sham insurance policies at issue.

39.    At all times relevant to this matter, Axis Insurance Company knew or should have known that it was an integral participant in the scheme to sell sham health insurance to consumers who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount, and availability of coverage provided under the purported "insurance" plans.  Axis Insurance Company reaped the benefits of the scheme alleged and received compensation in the form of premiums, commissions, or other monetary remuneration.

40.    Axis Insurance Company induced and aided and abetted the sale of sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including Defendants HEG, HII, HPI, and ACI, which sold and administered the "Liberty Health" plan purporting to provide access to First Health's PPO Network, all while knowing or that these plans did not provide the coverage promised to consumers.

41.    Indeed, Axis Insurance Company had a written contract with Defendant HII through which HII was the Managing General Agent that enrolled Plaintiffs and other consumers in the Liberty Health Plan and other similar coverages.  As discussed further in this Second Amended Complaint, the acts of a Managing General Agent "are considered to be the acts of the insurer on whose behalf it is acting."  Accordingly, any acts of Defendant HII will also be imputed to Defendant Axis Insurance Company.

42.    Axis Insurance Company participated in this conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt

acts in California in furtherance of the conspiracy.

**Axis Specialty**

43.    Defendant Axis Specialty is a Delaware Corporation and the U.S. subsidiary of Defendant Axis Insurance Company.  Axis Specialty is registered to do business in California and describes its business as "Insurance Services."  Axis Specialty maintains multiple offices in California, including but not limited to offices located at (i) 550 Gateway Drive, Suite 101, Napa, CA 94558, (ii) 725 South Figueroa Street, Suite 2250, Los Angeles, CA 90017 and 450 Sansome Street, Suite 1600, San Francisco, CA 94111.[5]  Axis Specialty holds California Insurance License #0E28821, through which is it authorized to broker Property, Casualty, Special Lines and Surplus Lines insurance.  Notably, Axis Specialty is not an insurer providing "Health Insurance Coverage" in California.[6]

44.    Axis Specialty is Axis Insurance Company's operational support entity and provides back-end support to Axis Insurance Company, allowing Axis Insurance Company to underwrite the "Liberty Health" coverage purchased by Defendants.  Axis Specialty contracts with third-party administrators, including Defendants HII, HPI, and ACI, to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs, as well as substantially similar plans purchased by putative class members.  Axis Insurance Company knows that these plans are not comprehensive health insurance, despite being marketed and sold as such.  Specific to Plaintiffs, Axis Specialty knew that the "Liberty Health" plan was marketed by Axis Specialty's agents (HPI, HII,

_____

[5] Axis Specialty has waived any challenge to personal jurisdiction because Axis Specialty made a general appearance and did not challenge personal jurisdiction.  Fed. R. Civ. Proc. 12(h).

[6] http://www.insurance.ca.gov/01-consumers/110-health/20-look/hcpcarriers.cfm (last accessed August 25, 2020).

ACI and HEG) as a comprehensive PPO health plan that was part of Defendant First Health's PPO network when, in fact, it was no such thing.  Additionally, Axis Specialty and/or its employees, affiliates, or agents conducted a sham "verification" process during the sale of the "insurance" policies sold to Plaintiffs and putative class members.

45.    At all times relevant to this matter, Axis Specialty knew or should have known that it was an integral participant in the scheme to sell sham health insurance to consumers, who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount and availability of coverage provided under the purported "insurance" plans.  Axis Specialty reaped the benefits of the scheme alleged herein and received compensation in the form of premiums or other monetary remuneration.

46.    At all times relevant to this Second Amended Complaint, Axis Specialty induced and aided and abetted the other Defendants to sell the sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including Defendants who sold these services, while knowing that these plans did not provide the coverage that Defendants promised to consumers and having no reasonable basis for believing that the plans provided the coverage that Defendants promised to consumers.  Moreover, Axis Specialty participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**ACI**

47.    Defendant ACI is a Pennsylvania corporation with its principal place of business in Wayne, Pennsylvania.  ACI is a claims administrator for the sham health insurance plans sold to Plaintiffs and the putative class members.  ACI is registered with the California Department of insurance as a non-resident administrator, License No. 0C38805.  ACI contracts with Axis Insurance

Company and/or Axis Specialty (together, "the Axis Defendants") to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs and substantially similar plans purchased by putative class members.

48.   ACI knew that these plans are illegally marketed and sold as comprehensive health insurance when they are not and yet did nothing to correct Plaintiffs' or the putative class members belief that they had been sold comprehensive medical coverage

49.   With regard to Plaintiffs, ACI was instructed by the Axis Defendants to pay the benefit amount at issue and to send statements of benefits to Plaintiffs in California.  ACI purposefully ignored Plaintiffs' requests for information concerning the "benefits" provided to conceal the true nature of the "sham insurance" and protect itself and other Defendants, including the Axis Defendants. ACI reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.

50.   Moreover, ACI provided substantial assistance to the other Defendants, including but not limited to the Axis Defendants, in perpetuating, aiding, and abetting the fraudulent scheme alleged in this Second Amended Complaint.  For example, ACI knew that Plaintiffs (and other consumers) believed they had purchased comprehensive medical insurance from ACUSA and the Axis Defendants.  Indeed, ACI was identified as the PPO Claims Administrator on Plaintiffs' insurance card.  ACI nonetheless protected itself and the other Defendants by screening calls and complaints when administering the "insurance" plan at issue.

51.   On information and belief, ACI was an integral participant in developing and administering the Liberty Health Plan as a whole, and without ACI's knowing participation, aiding, and abetting the scheme, the scheme would

-19-

1    not have been effectuated.

2         52.    At all times relevant to this Second Amended Complaint, ACI knew

3    or should have known that it was a direct, active and integral participant in a

4    scheme to defraud consumers, including Plaintiffs and putative class members.

5    *See* **Figure 6**.

6         53.    ACI participated in a conspiracy to defraud consumers with the other

7    Defendants in this matter, in which at least one conspirator committed overt acts

8    in California in furtherance of the conspiracy.

9                              <u>Figure 6</u>

10   **ACI working as Claims Administrator for Defendant AXIS, Group Name**

11                      **"Liberty Health" - ACUSA**



20       **HPI**

21         54.    Defendant HPI is a Delaware Corporation with its principal place of

22   business in Tampa, Florida.  HPI is a wholly owned subsidiary of Defendant HII.

23   HPI has contacts with California and the claims and causes of action at issue in

24   this Second Amended Complaint arise out of HPI's contacts with this state.  HPI

25   maintains an office in California, located at 444 Castro Street, #917, Mountain

26   View, CA 94041.  HPI is registered to do business in California and describes the

27   business or services it provides as "Insurance."  HPI has invoked the benefits and

28   protections of California law by, among other things, holding California Insurance

License No. 0I21968 as an "Accident and Health" administrator.  Pursuant to this license, HPI is authorized to transact and did transact business in California on its own behalf and on behalf of other Defendants, including Defendants Axis Insurance Company, Axis Specialty, First Health, ACUSA, and HEG related to the sale of sham insurance.  HPI has subjected itself to jurisdiction in the State by maintaining an office here, registering to do business here, and obtaining a license to sell insurance here.  Additionally, HPI has consented to the jurisdiction of this Court.  (ECF No. 94.)

55.    Through its contacts in California that gave rise to the claims alleged herein, HPI reaped the benefits of the scheme and received compensation in the form of "premiums," commissions or other monetary remuneration at the expense of consumers who expended money on these services.  HPI directed the other Defendants, as detailed further herein, including the Axis Defendants, HEG, and ACUSA to use "Liberty Health" as the marketing name for the limited benefit plan that was sold to Plaintiffs and putative class members in this state and across the country.

56.    HPI provided funding, trained the other Defendants' sales and underwriting agents, and issued and/or approved the script used by HEG and Axis Insurance Company to sell the "Liberty Health" insurance plan to Plaintiffs.

57.    Specifically, HPI entered contracts and had on-going relationships with Axis Insurance Company, Axis Specialty, and the other Defendants related to HPI's activities in California that gave rise the claims alleged here, including but not limited to contracting to perform consumer sales and administrative services related the "Liberty Health" policy and other policies sold in this State. On information and belief, **Figures 7 and 8** reflect HII and HPI "lead generators" that were used to sell the "Liberty Health" plan, including in California.  On information and belief, when Plaintiffs were searching for health insurance options during the relevant time-period, Plaintiffs viewed and relied on statements

-21-

on HII's and HPI's lead generating websites related to the Liberty Health Plan. This gave credence to Plaintiffs' belief that the Liberty Health Plan was ACA-compliant, comprehensive insurance coverage and was a substantial contributing factor to Plaintiffs' decision to purchase the Liberty Health Plan.  To the extent these advertisements are not demonstrably false, they nonetheless have a tendency to decieve and/or confuse the public, and, in fact, did exactly that to Plaintiffs and putative class members.

<u>**Figure 7**</u>

**"Liberty Health" Google Advertisement**



<u>**Figure 8**</u>

**"Liberty Health" Insurance "Quote Generator" / Information Gathering Tool**



58.   At all times relevant to this Second Amended Complaint, HPI knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  Other states have already issued cease and desist orders against HPI for using fraudulent and dishonest practices in attempting to sell sham health insurance within those states.[7]

59.   HPI participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.  Indeed, plaintiffs are informed and believe that HPI (together with HII below), entered into a Regulatory Settlement Agreement with multiple jurisdictions after an investigation into the same type of unscrupulous advertising and sales tactics used to deceive consumers as those alleged in this Second Amended Complaint herein.

**HII**

60.   Defendant HII is a Delaware Corporation with its principal place of business in Tampa, Florida.  HII is the parent company of Defendant HPI.  HII has contacts with California and the claims and causes of action at issue in this Second Amended Complaint arise out of HII's contacts with this state. Specifically, HII is the Managing General Agent that enrolled Plaintiffs (and other consumers) in the Liberty Health Plan.  Additionally, HII has consented to the jurisdiction of this Court.  (ECF No. 94.)

61.   AXIS explained HII's role in this scheme to the California Department of insurance as part of the Department's investigation.  *See* **Figure 9.**

///

///

---

[7]https://www.insurancejournal.com/news/southcentral/2016/03/28/403241.htm (last accessed June 25, 2020).

**<u>Figure 9</u> – AXIS Letter to California Department of Insurance**

**AXIS**

**AXIS Accident & Health**

1 University Square Drive
Suite 200
Princeton, NJ 08540

January 17, 2020

Department of Insurance                                              Sent Via Portal
State of California
Consumer Services and Market Conduct Branch
300 South Spring Street
Los Angeles, CA  90013
Attn:  Quintin Johnson
        Associate Insurance Compliance Officer

RE:   File No:               RUS-8238303
        Complainant:         Eric Ketayi
        Policy No.:          LHE0017443 (Liberty Health)
        Insurance Company:   AXIS Insurance Company; NAIC Number: 37273

Dear Mr. Johnson:

Please accept the following documents and information in response to Mr. Ketayi's inquiry.  Mr. Ketayi and his dependents were insured for Group Hospital Indemnity Coverage and Group Accident Coverage through polices issued to the Alliance for Consumers USA, Inc. ("ACUSA").  Through membership in ACUSA, individuals can apply for coverage underwritten by AXIS Insurance Company ("AXIS").  "Liberty Health" is the marketing name for this particular limited benefit product offering.  Health Insurance Innovations ("HII") is the managing general agent that enrolled the consumer in the coverage.  Administrative Concepts, Inc. ("ACI") is the claims administrator for AXIS Insurance Company.  The plan is a fully-insured Group plan and provides limited medical benefits which are excepted under the Affordable Care Act.

62.   Under California Insurance Code Article 5.4, known as the Managing General Agents Act, a Managing General Agent, like HII, is "any person [or] firm…who… manages all or part of the insurance business of an insurer (including the management of a separate division, department or underwriting office) and acts as an agent for that insurer …"

63.   Plaintiffs are informed and believe that HII's role as Managing

General Agent for the Axis Defendants is defined by a written contract because, pursuant to California Insurance Code § 769.83, no "MGA [Managing General Agent] shall place business with an insurer unless there is in force a written contract between the parties which sets forth the responsibilities of each party…"

64.   Plaintiffs are further informed and believe that, in its role as Managing General Agent for the Axis Defendants, HII collected funds on the Axis Defendants' behalf and retained those funds for purposes of paying claims made under the Liberty Health and other Axis underwritten plans, including the plans purchased by Plaintiffs and other putative class members.

65.   Under the California Insurance Code, "[A]cts of the MGA [Managing General Agent] are considered to be the acts of the insurer on whose behalf it is acting." *See* California Insurance Code § 769.85.  Accordingly, all HII's acts as alleged in this Second Amended Complaint are considered to be the acts of the Axis Defendants.

66.   In addition to being the Axis Defendants' Managing General Agent, HII also contracted with the Axis Defendants to perform consumer sales and administrative services related to insurance plans, including the "Liberty Health" plan purchased by Plaintiffs in California and substantially similar plans purchased by putative class members across the country.  Through its contacts in California that gave rise to the claims alleged herein, HII reaped the benefits of the scheme and received compensation in the form of "premiums," commissions or other monetary remuneration at the expense of consumers who expended money to purchase the plans.

67.   HII has a broad and wide-reaching holding company system.  In its Initial Public Offering Prospectus, it described itself as a "leading **developer and administrator** of affordable, web-based individual health insurance plans and

ancillary products."[8]  It touted that its platform allows for "mass distribution and online enrollment in our large and diverse portfolio of affordable health insurance offerings." It continued that it provided "significant operating leverage as [it] add[s] members and reduces the costs associated with marketing, selling, underwriting, and administering policies."[9]  On information and belief, HII did all of the above with regard to the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class members.

68.    HII "design[s] and structure[s] insurance products on behalf of insurance carrier companies," like the Axis Defendants here, and "market[s] them to individuals through our large network of distributors and managed member relations…"[10]  At the time of the IPO, HII was proud of its "large independent distribution network…consist[ing] of 32 licensed agent call centers and 248 wholesalers[.]"[11]  On information and belief, HII's large independent distribution network has grown significantly since the IPO.  It was through this network that HII controlled the sale of the Liberty Health Plan to Plaintiffs and substantially similar plans to putative class members.

69.    At all times relevant to this Second Amended Complaint, HII knew or

---

[8] *See* https://www.sec.gov/Archives/edgar/data/1561387/000119312513047216/d439448d424b4.htm (last accessed March 31, 2021.

[9] Id.

[10] Id.

[11] On information and belief, effective March 6, 2020, HII changed its name to Benefytt Technologies, Inc.  Shortly thereafter, on information and belief, Benefytt announced a private-equity backed take-private deal whereby it was purchased by Madison Dearborn Partners in an all-cash transaction with stock valued at $31 per share, which represented a large premium on Benefytt's average trading price. (Notably, a total of 13,576,316 were tendered, making the all-cash transaction worth at least $420 million).  Because of this transaction, HII (now called Benefytt) is no longer publicly traded and no longer required to make the same SEC disclosures.

1    should have known that it was an active and integral participant in a scheme to

2    defraud consumers, including Plaintiffs and putative class members.

3        70.    HII participated in a conspiracy with the other Defendants in this

4    matter, in which at least one conspirator committed overt acts in California in

5    furtherance of the conspiracy.  Indeed, plaintiffs are informed and believe that HII

6    (together with HPI above), entered into a Regulatory Settlement Agreement with

7    multiple jurisdictions after an investigation into the same type of unscrupulous

8    advertising and sales tactics used to deceive consumers as those alleged in this

9    Second Amended Complaint herein.

10   **Cost Containment Group, Inc.**

11       71.    Defendant Cost Containment Group, Inc. is a Delaware corporation

12   with its principal place of business in West Palm Beach, Florida.  Cost

13   Containment Group has contacts with California and the claims and causes of

14   action at issue in this Second Amended Complaint arise out of Cost Containment

15   Group's contacts with this state.   Specifically, once Mr. Ketayi made the decision

16   to purchase the Liberty Health Plan, he was "transferred to Cost Containment

17   Group to complete the transaction."[12]  An agent from Cost Containment Group

18   spoke to Mr. Ketayi concerning the sale of the plan at issue.  Cost Containment

19   Group "was responsible for verification of Mr. Ketayi's purchase, his enrollment

20   in the plan and customer service."  *See* **Figure 10**, Excerpts from HII's counsel's

21   Letter to the California Department of Insurance.

22   ///

23   ///

24   ///

25

26

27
     _____

28   [12] HII described this process in a February 4, 2020, letter from its counsel,
     Elizabeth Tosaris at Locke Lorde, to the California Department of Insurance.

**Figure 10, Excerpts Regarding Cost Containment Group's Role**



72.     On information and belief, Cost Containment Group is not licensed to sell, market, enroll, underwrite, or administer insurance in California, yet was doing exactly that on behalf of the Axis Defendants, HII and HPI (even by HII's own admissions).  The Axis Defendants, HII and HPI were aware of Cost Containment Group's unlicensed role in this scheme because Cost Containment Group was contracted by HII and HPI and regularly audited by the Axis Defendants.

73.     According to its website, Cost Containment Group is fully integrated into the insurance market and into this scheme with Defendants.  It provides email marketing, website development and hosting, and promotions mailing.  It also develops and provides the plan documents, including fulfillment books and ID cards.[13]

---

[13] *See* https://ccgfamily.com/services/marketing-graphics/ (last accessed March 31, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT

74.   On information and belief, Cost Containment Group together with HII, HPI and the Axis Defendants were responsible for the development of the ACUSA/Liberty Health fulfillment materials and ID card provided to Plaintiffs and the putative class members in this case.  These ACUSA fulfilment materials continuously touted "PPO Network Access," further causing Plaintiffs and the putative class members to believe that they had, in fact, purchased a PPO plan. *See* **Figures 11-13.**

<u>**Figure 11**</u>

**Back Side of Eric Ketayi's Insurance Card (Highlighting Added)**



<u>**Figure 12**</u>

**Website Identified on Mr. Ketayi's Insurance Card**



**<u>Figure 13</u>**

**Excerpt from Fulfillment Materials Developed and Developed by Cost Containment Group in Conjunction with the Axis Defendant, ACUSA and HPI/HII**



75.    Defendants purposefully disguise the entity that is responsible for each step in Defendants' coordinated scheme.  No consumer could tell, without significant investigation, which entity Defendant has which role in the scheme, which is exactly how Defendants have covered their tracks for so long.

76.    Each Defendant has aided and abetted every other Defendant's acts, conspired in furtherance of every other Defendant's fraud, and agreed to an overall fraudulent scheme, furthered by each Defendant's wrongdoing as alleged in more detail in this Second Amended Complaint.

77.    Each Defendant served as an agent of every other Defendant for

-30-

purposes of effectuating the fraudulent scheme alleged herein. Specifically, Defendant HII is the Managing General Agent for the Axis Defendants with respect to the Liberty Health Plan.

78.   At all times relevant to this Second Amended Complaint, HEG, ACUSA, ACI, Axis Insurance Company, Axis Specialty, HPI, HII, and Cost Containment Group have operated as a common enterprise and in a common course of conduct while engaging in the deceptive acts and practices and other violations of law alleged in this Second Amended Complaint.

79.   Defendants have conducted the business practices described below through interrelated companies, many of which have common ownership, officers, managers, business functions, and office locations, which have co-mingled assets, and hold themselves out as "Liberty Health" to consumers.  *See* **Figure 14**.

### Figure 14
**Eric Ketayi's "insurance" card identifying Defendants AXIS, "Liberty Health," ACUSA and ACI**

 

80.   Defendants operated as a common enterprise to accomplish the wrongs complained of in this Second Amended Complaint.  The purpose and effect of this common enterprise and common course of conduct complained of was to financially benefit Defendants at the expense of Plaintiffs and putative class members.

81.   Each of the Defendants was a direct, necessary, and substantial

participant in the common enterprise and common course of conduct complained of herein and was aware of its overall contribution to, and furtherance of, the common enterprise and common course of conduct.  Because Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices detailed herein.

### III.   FACTUAL ALLEGATIONS

### Defendants' Bait and Switch Scheme Traps Consumers

82.   Defendants work together to target consumers who are seeking comprehensive health insurance.  These consumers typically either do not have health insurance or pay high premiums for their insurance and are seeking comprehensive coverage that costs less than their current plans.

83.   Comprehensive health insurance plans generally involve an arrangement between an insurance company licensed to do business in the State of California and a consumer in which the company agrees to pay a substantial portion of the healthcare expenses that the consumer might incur in exchange for a consumer's premium payments.

84.   A preferred provider organization plan, commonly referred to as a PPO plan, is a type of comprehensive health insurance plan.  In a PPO plan, medical providers such as hospitals and doctors contract with an insurer or a third-party administrator to provide health care at reduced rates to the insurer's or the administrator's clients.

85.   Since at least November 2016 and at all times relevant during the class period, HEG, HPI, HII, and the Axis Defendants have uniformly claimed to offer consumers like Plaintiffs and putative class members comprehensive health insurance plans, including PPO plans, and will "enjoy savings" when using their "First Health Network Provider."  HEG, HPI, HII and the Axis Defendants lead consumers to reasonably believe that they will receive a comprehensive PPO health insurance plan that will cover preexisting medical conditions, prescription

-32-

drug medications, primary and specialty care treatment, inpatient and emergency hospital care, surgical procedures, and medical and laboratory testing.  Defendants HEG, HPI, HII and Cost Containment Group do so through their own websites and lead generation websites run either by them, or by third party agents on their behalf.

86.    Consumers often find these websites by conducting internet searches for "health insurance" or "Obamacare" and related terms.  Defendants own some of these sites themselves and also pay lead generators for leads generated on third-party sites.  **Figure 15** is an example of one of these lead generating websites:

### Figure 15
### Example of Lead Generating Website



87.    In their advertising and promotional materials that were made available since at least 2016, including on their websites (examples of which are set forth above), Defendants HEG, Cost Containment Group, HII, and HPI uniformly claim to offer a broad selection of comprehensive health care insurance policies.  Those plans, in reality, do not exist.  To the extent these advertising representations are not demonstrably false, they nonetheless have a tendency to decieve and/or confuse the public with respect to what insurnace is actually being sold, and, in fact, did exactly that to Plaintiffs and putative class members.

-33-

88.   HEG, for example, claimed its "PPO's work with over 80% of physicians Nationwide." HEG also claimed to "work with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance" and "Obamacare." **Figures 1–2**.  In using the term "Obamacare," HEG misleads consumers into believing that they are being offering comprehensive, ACA-qualified health insurance plans.

89.   With regard to the "Liberty Health" plan purchased by Plaintiffs (and substantially similar plans purchased by putative class members), HPI, HII and Cost Containment Group advertising promised "Top Rated Carriers," "Health Insurance," and "Avoid Tax Penalty."  Use of these phrases mislead consumers, including Plaintiffs who viewed websites owned, developed and/or run by HPI, HII and Cost Containment Group, and putative class members into believing that they are being offered comprehensive, ACA-qualified health insurance plans.

90.   In reality, HEG, HII, HPI and Cost Containment Group have no intent to sell consumers comprehensive health coverage, and the plans sold to consumers like Plaintiffs are not comprehensive health insurance or ACA-qualified health plans.  Rather, Defendants HEG, HII, and HPI have already contracted with Defendants ACUSA and the Axis Defendants to sell limited benefit plans, also known as limited benefit indemnity plans or hospital indemnity plans, and medical discount and wellness program memberships that are essentially worthless.

91.   In contracting with HEG, HII, HPI, and Cost Containment Group to market the plans they underwrite (including appointing HII as the Managing General Agent for the Liberty Plan), the Axis Defendants necessarily knew and continue to know how Defendants HEG, HII, HPI and Cost Containment Group will market and sell those plans—*i.e.* as comprehensive, ACA-qualified health insurance plans.  The Axis Defendants also know that they do not, in reality, underwrite any such comprehensive plans.  Accordingly, the Axis Defendants

-34-

1  understand, adopt, and endorse the other Defendants' unfair, false, and fraudulent

2  conduct and advertising.  Moreover, conduct committed by the Axis Defendants'

3  Managing General Agent HII is imputed to the Axis Defendants pursuant to the

4  California Insurance Code.

5      92.    The products advertised, sold, administered and underwritten by

6  Defendants do not provide consumers with the benefits promised.  Limited benefit

7  plans, in contrast to PPO plans, provide non-comprehensive coverage capped at a

8  specific amount for a specific service, treatment, condition, or disease.  There is

9  no agreement by which a health insurer agrees to pay a substantial portion of the

10  healthcare expenses that the consumer might incur in exchange for the consumer's

11  premium payments.  Moreover, the "insurer" incurs no risk whatsoever when a

12  consumer enrolls in a limited benefit plan, because often, as was the case with

13  Plaintiffs here, the "premiums" paid to obtain the plan based on the

14  representations that the plan is a PPO plan exceed the maximum amount of

15  coverage that the limited plan provides.

16      93.    After consumers are lured in by misleading websites offering

17  "comprehensive" health insurance, consumers typically connect with a sales

18  representative of HEG, HII, HPI, Cost Containment Group or ACI by phone, who

19  is acting as an agent for HEG, HII, HPI, or ACI and also as an agent or broker on

20  behalf of ACUSA and the Axis Defendants (the policyholder and

21  underwriter/insurer).  Consumers speak to one of the trained sales representatives,

22  who may identify themselves as an insurance agent supposedly licensed in the

23  consumer's state.  Sometimes consumers may also first speak to a pre-

24  qualification representative who gathers personal background information about

25  the consumer before transferring the call to another agent.  These "agents"

26  typically are not properly licensed insurance agents and may not even be working

27  under a licensed insurance agent.  Rather, they are simply salespeople at a call

28  center parroting a sales pitch from a script that was developed, drafted and/or

-35-

1    approved by HII and/or HPI.

2         94.   In fact, several of the named Defendants in this Second Amended

3    Complaint are not licensed in California to solicit, sell, broker, offer to sell,

4    underwrite, effect or enter into contracts or otherwise claim to provide <u>health</u>

5    <u>insurance</u> coverage or plans, whether authentic or sham.  As a result, their conduct

6    is illegal, and all resulting contracts are voidable and subject to rescission

7    pursuant to, among other statutes, California Insurance Code section 1621 ("[A]

8    person shall not solicit, negotiate, or effect contracts of insurance, or act in any of

9    the capacities defined in Article 1 (commencing with Section 1621) unless the

10   person holds a valid license from the commissioner authorizing the person to act

11   in that capacity."). Specifically, Cost Containment Group, which Defendant HII

12   contends "enrolled" Plaintiffs in the at-issue coverage, does not have a California

13   Insurance License.

14        95.   Using scripts written, disseminated and/or approved by HPI and HII

15   for use on sales calls like those directed at Plaintiffs, the sales representatives

16   make uniform statements to every potential customer, promising that the plans

17   will cover preexisting medical conditions, prescription medication,

18   hospitalization, lab work, and access to primary care physicians, specialists, and

19   other healthcare providers.  During the scripted speeches, sales representatives

20   refer to the monthly payments consumers must make as "premiums" and use other

21   insurance terms of art, such as "PPO," "copay," "deductible," "coverage," and

22   "preexisting conditions."  Because they are not actually providing comprehensive

23   health insurance, these terms have no relevance to the limited benefit plans and

24   discount memberships and their use is false and misleading.

25        96.   These statements are all part of a script that experienced sales

26   representatives and brokers are trained on by HEG, HPI and HII to deliver to each

27   potential customer in order to deceive consumers, like Plaintiffs, into purchasing

28   this sham health insurance service.  One former employee of Defendant HEG

-36-

described his role at the company as "mak[ing] calls to try to scam people into buying sub-par health insurance . . . ." This is exactly what happened to Plaintiffs and the putative class members.

97.    During these scripted calls, consumers are told by HPI, HII, HEG, and ACI that the "PPO" health insurance plan they are offering is widely accepted by doctors in the consumers' geographical area, or that it is accepted by virtually all doctors in the country. Consumers such as Plaintiffs and putative class members reasonably rely on these representations in purchasing "insurance" from Defendants, believing they are purchasing comprehensive health coverage when in fact they are being offered a limited benefit plan or medical discount membership that does not provide the represented coverage. These representations are uniformly made and convince consumers that the plans they are being offered are "comprehensive," or Obamacare, or will allow them to "avoid tax penalties." None of this is true.

98.    Once a consumer expresses interest in purchasing a plan, the HPI, HII, HEG or Cost Containment Group agent arranges for payment by asking for the consumer's credit card information. Just before taking the consumer's payment information, the representative transfers the call to a different person who, to the best of Plaintiffs' knowledge, works for the Axis Defendants or  Cost Containment Group and guides the consumer through a purported "verification" process.

99.    Just before the transfer, the sales representatives instruct consumers to disregard any statements in the sham "verification" process that may indicate that the consumer will not be receiving comprehensive health insurance that covers preexisting medical conditions. The sales representatives also direct consumers to disregard statements made by the verification agent that are inconsistent with Defendants' sales pitch, assuring consumers that the insurance they are sold during the sales process (as opposed to the verification process) is the insurance

-37-

they will receive.  The sales portions of these calls are not recorded.

100.  During the verification process, consumers are asked to confirm a series of complex, lengthy statements that are read in monotone from a uniform script by the verification agent.  The trained salespersons, following their scripts, caution consumers not to ask any questions during the verification process because, if they do, the entire process will have to start over again.

101.  Purposefully included in the verification process is a statement that, in essence, asks the consumer to confirm that he or she understands that the insurance will be governed by plan documents (to be provided at a later date) and not by the representations made by the sales agents.  Because consumers have been instructed to do so by the sales representatives, consumers (including Plaintiffs and putative class members) answer "yes" and do not ask questions concerning this disclosure.

102.  Duped consumers, including Plaintiffs and putative class members, follow the instructions of the agent because they are told this is the required way for them to obtain the comprehensive coverage that they have been promised.  But the consumers are not provided the documentation to confirm such statements until after the process is completed, if at all, and thus would have no reason to believe that the paperwork will contradict what they have been told in order to get them to enter into the transaction.  Further, the consumers have been told to disregard any statements during the verification process that contradict what they were told during the sales pitch.

103.  After consumers proceed through the "verification" process, the agents from HII, HPI, ACI, or Cost Containment Group immediately request and obtain consumers' credit card information to begin charging their sale of such services.  Consumers are not given the opportunity to receive or review plan documents before they are charged.

104.  The Axis Defendants and/or Cost Containment Group record and save

-38-

the "verification" calls with consumers.  Only those portions of the conversation during which the consumers ultimately assent to the verification statements in order to purchase the product offered are recorded.  The sales portions of the calls with consumers are not recorded in an attempt to avoid a trail of evidence of the deception that is being perpetrated on everyday people, including Plaintiffs and putative class members.

105.  The deception continues even after the initial sale is made. Statements on the "insurance" cards provided to consumers through the mail include the phrase "Preferred Provider (PPO) Network Access" and point consumers to a "PPO" Network website that represents to be "your national choice for PPO network solutions."  This is done despite Defendants' knowledge that they have not actually offered (ACUSA), sold (HEG, HII, HPI), underwritten (Axis Defendants), administered (ACI) or otherwise provided any sort of PPO plan or other comprehensive coverage to consumers.  Indeed, the false representation by First Health on the ACUSA/Axis "Liberty Health" Insurance Card—that the "Liberty Health" plan offered access to First Health's PPO network—was designed to, and did, induce Plaintiffs and putative class members to continue paying "premiums" long after the initial sale transaction was completed.

106.  Plan "fulfillment" materials that were developed by the Axis Defendants together with ACUSA, Cost Containment Group, HII and HPI are also sent to consumers electronically using the wires.  Again, these fulfillment materials tout PPO network access, continuing the misrepresentations made to Plaintiffs.

107.  This fraudulent scheme has left thousands of consumers, including Plaintiffs and putative class members, with far less than the comprehensive health insurance they thought they were purchasing and essentially worthless health care coverage.  In addition to paying "premiums" for limited benefit plans and medical

-39-

discount memberships that provide benefits equal to or less than their cost, many of these consumers have incurred substantial medical expenses under the mistaken belief that these expenses would be covered by the health insurance they thought they had purchased.  As the situation with Plaintiffs shows, such premiums total thousands of dollars annually per class member—for Plaintiffs, close to $5,000 per year.  This amount has been fraudulently and/or illegally obtained, and stolen millions of dollars from Plaintiffs and putative class members.

108.  Courts have rightly put a stop to similar predatory schemes that follow the same practice engaged in here.  In May 2019, for example, a judge in the United States District Court for the Southern District of Florida entered a preliminary injunction against six corporate defendants and a related individual engaged in a "bait and switch scheme [that] led consumers to believe they were receiving comprehensive health insurance when, in fact, they received limited indemnity plans or discount memberships." *Fed. Trade Comm'n v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1353 (S.D. Fla. 2019).  There, as here, the defendants preyed on consumers who searched for health insurance online.  *Id.* at 1354.  There, as here, the defendants employed a sales script that "g[a]ve consumers the impression that the coverage provided by [the defendants'] limited benefit plan was equal to, if not better than, major medical insurance" and required consumers to complete a sham "verification" process.  *Id.* at 1355–56.  And there, as here, "Defendants made numerous misrepresentations to perpetrate their bait and switch scheme, including that: Defendants' limited benefits plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance; [and] Defendants' limited benefit plans and medical discount memberships are qualified health insurance plans under the ACA."  *Id.* at 1356.  Based on this conduct, the court found that the defendants had "devised a fraudulent scheme to use consumer funds to enrich themselves" and, accordingly, entered an injunction against them.  *Id.* at 1365.  The Eleventh Circuit affirmed

the court's ruling earlier this year.  *Fed. Trade Comm'n v. Simple Health Plans, LLC*, 801 F. App'x 685 (11th Cir. 2020).

### Eric and Miryam Fall Victim to Defendants' Scheme

109.  Eric and Miryam emigrated from Israel to the United States in 2004. Until the fall of 2016, they had comprehensive health insurance through Blue Cross/Blue Shield for themselves and their two children.  But they were caught in the "death spiral" of ever-increasing premiums, so they set out to look for less expensive options that provided comparable comprehensive PPO coverage.

110.  After searching for various options, Eric and Miryam found HEG's website.  They responded positively to the material claims, examples of which are set forth above, including that HEG's "PPO's work with over 80% of physicians Nationwide," and that HEG "work[ed] with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance," "Obamacare," and "PPO" plans.  Eric and Miryam relied on and believed HEG's statement that it took pride in its "ability to help you find the most comprehensive insurance plan for the lowest possible price."

111.  During their online research, Eric and Miryam also saw websites that, on information and belief, were developed and run by HII, HPI and Cost Containment Group, and related the Liberty Health Plan.  These websites also described comprehensive coverage and promised ACA-compliant healthcare. These websites lend further credence to Eric and Miryam's belief that the Liberty Health Plan (which was advertised on these sites) was comprehensive medical coverage.

112.  To learn more, Eric and Miryam spoke with representatives from HEG, HPI, or HII or Cost Containment Group[14] during three separate calls on

---

[14] As stated herein, part of Defendants' scheme is keeping consumers in the dark as to which entity is actually selling and providing the "insurance" plan.  The

November 22, 2016.  The "insurance" they were offered sounded just like the comprehensive insurance coverage they sought.  The sales representative identified by the Axis Defendants as David Martinez described the plan to Eric and Miryam as a PPO plan and compared it to the Blue Cross/Blue Shield coverage that they had at the time.   The representative knew, or reasonably should have known, however, that the plan being promoted was not a comprehensive PPO plan and was not comparable to the Plaintiffs' Blue Cross/Blue Shield comprehensive coverage.  Regardless, the agent convinced Eric and Miryam the Liberty Health Plan was right for them.

113.  The representative followed the script, confusing Eric and Miryam with industry lingo and falsely stating the care and coverage that the plan offered.  The representative claimed that Eric and Miryam would have very small co-pays and no deductible.  The representative also assured Eric and Miryam that this comprehensive coverage would apply if Eric, Miryam, or their children were to visit almost any doctor in the country.   Yet the representative knew or reasonably should have known that the plan being offered and sold would provide little to no coverage when used at almost any medical provider's office.

114.  The sales representative told Eric and Miryam that Defendants could offer the PPO for their family for $379 per month—a significant amount but still much less than Eric and Miryam had been paying for their Blue Cross/Blue Shield coverage—because Defendants aggregated individuals from all over the country like a large corporation and could therefore negotiate "great deals" on behalf of consumers.  HEG's website at the time said, "Remember we work for you not the

---

agents did not identify what company they worked for.  However, documents subsequently discovered by Plaintiffs through document requests made pursuant to the California Insurance Code seem to establish that Plaintiffs at the very least spoke with agents of HEG and Cost Containment Group, who were agents on behalf of HPI, HII and the Axis Defendants.

-42-

insurance company."

115.   When Eric and Miryam asked what the plan would cover, the sales representative again stated that the coverage was PPO and comprehensive and listed only two types of excluded care: pregnancy and mental health.  The implication, of course, was that the plan would cover all other types of care. Defendants knew or reasonably should have known that these were misrepresentations and omissions of material fact.  Yet the representative intended that Eric and Miryam reasonably rely on these misrepresentations and omissions of material fact to sign up for the "insurance" coverage promised.  Because Eric and Miryam were not planning to have another child, and because the representative made the plan sound so attractive, Eric and Miryam were willing to forgo their existing mental health coverage.

116.   Eric and Miryam were justified in relying on, and did reasonably rely on, Defendants' material representations and omission of material fact, examples of which are set forth above, and initiated the process of purchasing what they were led to believe was comprehensive health insurance.

117.   The sales representative then prepared to transfer Eric and Miryam to an agent[15] who could verify that Eric and Miryam "qualified" for the plan.  To the best of Plaintiffs' knowledge, the "agent" was an employee of Cost Containment Group, ACI or the Axis Defendants.  Before he did, though, the representative told Eric and Miryam that the verification agent would read them a series of statements, and that Eric and Miryam needed to say yes to all of those statements if they wanted to purchase the promised plan.  The representative also told Eric and Miryam to ignore any statements that did not apply to them or the product they were purchasing.  The representative directed Eric and Miryam not to

---

[15] Plaintiffs recall that the "verification" agent was named George or Joel.   It appears for some reason most if not all of Defendants' verification agents are named George or Joel.

interrupt or ask questions during the process.  The representative told them that if
they did, or if they answered no to any question, they would be forced to start the
entire process over from the beginning.  The representative assured Eric and
Miryam that, whatever was said during the verification call, Eric and Miryam
would receive the comprehensive health insurance that Defendants had touted,
and that the representative had described.

118.  Even though they did not understand or agree with everything that
was being said during the process, Eric and Miryam felt pressured to agree with
all the verification statements based on the representative's directions to them.
And because they wanted to obtain what Defendants had characterized as
comprehensive PPO health insurance for a low price, Eric and Miryam obeyed the
representative's command and answered yes to every question asked by the agent.

119.  With the sham verification completed, and at Defendants' request,
Eric and Miryam immediately provided their credit card information to cover the
first month's payment on their purchase.  Once done, Eric and Miryam believed
that they had successfully obtained comprehensive health insurance that covered
their entire family.  They paid the "premiums" for this coverage beginning in
November 2016.

120.  Even after the sale was made, Defendants continued to deceive Eric
and Miryam.  As an example, the back of the "insurance" cards provided to Eric
and Miryam through the mail included the phrase "Preferred Provider (PPO)
Network Access" and pointed Eric and Miryam to a "PPO" Network website that
represented to their "national choice for PPO network solutions."  Defendants did
so with knowledge that they had not actually sold, underwritten, or provided any
sort of PPO plan or otherwise comprehensive coverage to Eric and Miryam.

121.  Additional fulfillment materials developed by the Axis Defendants
together with Cost Containment Group, HPI, HII and ACUSA also touted this
PPO Network Access

-44-

122.  Eric and Miryam eventually discovered that the plan they had purchased, and for which they were paying, was almost entirely worthless.  On July 29, 2017, Eric was admitted to Cedars-Sinai Hospital for back surgery.  He stayed in the hospital for six nights before he was discharged on August 4, 2017.  It was a major surgery and a painful recovery.

123.  The hospital had also contacted Eric's "insurance" company to confirm that Eric was covered by insurance for the surgery.  Plaintiffs believe this call was routed either to the Axis Defendants or to Cost Containment Group.  There is a written record of this call, but it *still* unclear what entity responded to the call.  Regardless, the agent who spoke to Cedars-Sinai verified that Eric was covered for the surgery and the policy was active.  *See* **Figure 16** – Call Log

**Figure 16**

**Excerpt from Call Log Specific to Eric Ketayi (Highlighting Added)**



| Fulfillment:<br>MEMBER: downloaded<br>Membership Materials | 149219-Hospital Indemnity Certificate | Member: ERIC<br>KETAYI |
| General Questions:<br>Provider Called In | Verifying coverage Advised provider policy is active | Gina Affatato |
| Verification:<br>Provider Called | Provider Verification-CALLED FROM:Cedar Sinai SPOKEN<br>TO:Veronica REASON FOR CALL:Benefits | Gina Affatato |
| Fulfillment:<br>MEMBER: downloaded<br>Membership Materials | Member Verification Letter | CSR: |
| General Questions: | went over xrays benefits repriced under the contract rate if provider Janet Grassadonio | |

124.  Eric had the surgery and started a painful recovery.  The recovery was made even more painful when Eric received Explanation of Benefits (EOBs) statements from "Axis Insurance Company" and ACI regarding his "LIBERTY HEALTH – ACUSA" insurance in or about November 2017.  For the six-night hospital stay, Defendants paid only $1,500.  Eric's responsibility was $176,786.49.  For the surgery itself, Defendants paid $0.  Eric's responsibility was $16,250.  And for other necessary care provided during Eric's stay, Defendants paid $0, and Eric's responsibility was $1,330.24.  All told, the "insurance" that

1   Defendants had advertised, marketed, and sold as comprehensive PPO health
2   insurance covered only $1,500 for Eric's surgery, while Eric was left to cover
3   $194,366.73.  Yet by that time, Plaintiffs had paid Defendants about $4,500 in
4   "premiums"—around three times the amount that Defendants would ultimately
5   cover for Eric's surgery.  Plaintiffs thus have been injured in fact, suffered
6   damage, and lost money or property because of Defendants' illegal, fraudulent,
7   deceptive, and misleading business acts, and practices.

8       125.  After receiving these EOBs, Eric contacted the Axis Defendants to
9   dispute the lack of coverage under what Defendants represented to be
10  comprehensive coverage.  Despite Eric's complaints and attempts to resolve this
11  issue prior to initiating action, the Axis Defendants did not alter its level of
12  coverage or agree to further contribute to Eric's care.  Eric was unable to reach
13  any other Defendant to discuss the issue.

14      126.  Again, there is a written record of Mr. Ketayi's call but it is unclear to
15  whom at what entity Mr. Ketayi was speaking.  *See* **Figure 17.**

16

17

18

19

20                  [INTENTIONALLY LEFT BLANK]

21

22

23

24

25

26

27

28

**<u>Figure 17</u>**

**Record of Mr. Ketayi Disputing Coverage Amount**

| Show Top 5 phone logs | Email phone logs/notes | | |
|---|---|---|---|
| **Category:Subcategory** | **Message** | **Cust Rep** | **Entry Date-Time** |
| Cancellation: Summary | Member: Eric Ketayi [MemberId: LHE0017443] GroupId: 12220<br><br>Member was over one month from his/her effective date 12-01-2016<br><br>Following Steps are taken while processing cancellation<br><br>• As per Member's request, member is NOT refunded and will continue his/her plan till paid date.<br>• Reason for Cancellation: Not enough savings - Unsatisfied with Claims payout.<br>• Claims not checked, Member is not being issued a refund.<br>• Member do not have UCA AD Plan.<br>• Member is marked as 'Pending Term'.<br>• Auto-Billing for member is disabled.<br>• Member's Paid-Thru date is corrected.<br>• Recorded reasons for Cancellation in phone log.<br>• Cancellation Reference Number is 630206927 | Florence Howard | 8/18/2017 5:21 PM |
| Cancellation: Plan does not fit needs | Not enough savings - Unsatisfied with Claims payout:- [Cancellation Reference Number: 630206927] | FHoward | 8/18/2017 5:21 PM |
| Verification: Member Called | Member Verified for :- Member Called | Florence Howard | 8/18/2017 5:15 PM |

127.   Eric and Miryam now face debt collectors who are seeking to recover the extensive medical bills for which Defendants promised, but failed, to pay.

128.   Plaintiffs' experience does not appear to be an isolated, atypical, or unique occurrence.  There are hundreds of reports online from victims nationwide which corroborate Plaintiffs' allegations in this Second Amended Complaint: that Defendants claim to provide comprehensive health coverage but, in reality, offer a product that is virtually worthless.[16]

///

---

[16] *See, e.g.*, https://chicago.cbslocal.com/2019/02/11/simple-health-plans-insurance-scam-lawsuit-ftc-deceptive-sales-tactics/, where AXIS underwrote the at-issue sham "insurance."  (Last accessed June 25, 2020.)

SECOND AMENDED CLASS ACTION COMPLAINT

IV.     **CLASS ALLEGATIONS**

129.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Nationwide Class or, in the alternative, a Multi-State Class or California-Only Class (collectively "Class"):

**Nationwide Class**

All persons within the United States who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

**Multi-State Class**

All persons within California and other states with similar laws who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

**California-Only Class**

All persons in California who purchased a limited benefit plan or medical discount plan marketed, advertised, sold, or administered by Defendants.

130.  The Class includes all persons who purchased such services during the period at least four years from the date of the filing of the original Complaint in this matter and continues until the date that notice of this action is disseminated to putative class members.

131.  Excluded from any class are: (i) Defendants and their officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

132.  Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

133.  This action is properly maintainable as a class action pursuant to

-48-

Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) for the reasons set forth below.

134. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** Prospective class members, however defined, are readily ascertainable by way of Defendants' records and are so numerous that joinder of all members is impracticable.  Defendants have ready access to records that can easily determine the number of persons who have purchased these products.  Based on the number of complaints about this practice that they have seen online, Plaintiffs estimate that members of the class consist of thousands of individual consumers.

135. **Commonality—Federal Rule of Civil Procedure 23(a)(2).**  There are numerous and substantial questions of law or fact common to all members of the class that predominate over any individual issues.  Included within the common questions of law or fact are:

   a.   Whether Defendants engaged in unlawful, unfair, or fraudulent business acts or practices in advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health insurance, and omitted material facts to the contrary;

   b.   Whether Defendants made untrue or misleading statements or omitted material facts in connection with advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health insurance;

   c.   Whether Defendants engaged in a pattern or practice of making material misrepresentations or omissions of material fact to individuals in the process of advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health

-49-

insurance;

d.   Whether Plaintiffs and the class members are entitled to equitable monetary and/or injunctive relief;

e.   Whether Plaintiffs and the class members have sustained damage as a result of Defendants' unlawful conduct; and

f.   The proper measure of damages sustained by Plaintiffs and class members.

136.   **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the members of the class they seek to represent. Plaintiffs, like the class members, purchased Defendants' products after falling victim to Defendants' uniformly deceptive advertising and marketing scheme, including systematic false and misleading statements and omissions of material fact related to those products.  Thus, Plaintiffs' claims arise from the same practices and course of conduct and are based on the same legal theories that give rise to the claims of the other class members.  Defendants' unlawful, unfair, and/or fraudulent business acts and practices, including the use of internet websites and a scripted sales pitch, concern the same business practices described, irrespective of where they occurred or were experienced.  Plaintiffs and the class members also sustained similar injuries arising out of Defendants' conduct.

137.   **Adequacy—Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate representatives of the class they seek to represent because their interests do not materially or irreconcilably conflict with the interests of other members of the class.  On the contrary, Plaintiffs will fairly, adequately, and vigorously protect the interests of class members and have retained counsel experienced and competent in the prosecution of complex cases, including complex class action litigation.

138.   **Appropriate Class-wide Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**  For the reasons described, Defendants have acted on

1  grounds generally applicable to the class, thereby making final injunctive or

2  equitable relief appropriate with respect to the class as a whole.

3      139.  **Predominance and Superiority—Federal Rule of Civil Procedure**

4  **23(b)(3).**  As described above with respect to commonality, there are numerous

5  and substantial questions of law or fact common to class members that

6  predominate over any questions that affect only individual members.  In addition,

7  class treatment is superior to other available group-wide methods for the fair and

8  efficient adjudication of this action because it will permit a large number of

9  claims to be resolved in a single forum simultaneously, efficiently, and without

10  the unnecessary hardship that would result from the prosecution of numerous

11  individual actions and the duplication of discovery, effort, expense, and burden on

12  the courts that individual actions would entail.

13      140.  The benefits of proceeding as a class action, including providing a

14  method for obtaining redress for claims that would not be practical to pursue

15  individually, are superior to any other method available for the fair and efficient

16  group-wide adjudication of these claims.  Absent a class action, it would be highly

17  unlikely that Plaintiffs or any other putative class members would be able to

18  protect their own interests because the cost of litigation through individual

19  lawsuits might exceed expected recovery.

20                          **COUNT I**

21  **Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §**

22                        **17200 *et seq.***

23                   **(Against All Defendants)**

24      141.  Plaintiffs reallege and incorporate by reference all allegations set forth

25  in paragraphs 1 through 101, as if fully set forth herein.

26      142.  Plaintiffs bring this claim under California's Unfair Competition Law,

27  Business and Professions Code section 17200 *et seq.* ("section 17200"), on behalf

28  of themselves and the class and for the benefit of the general public.  Section

-51-

17200 prohibits any "unfair," "fraudulent," or "unlawful" business act or practice.

143.  As specified in the preceding paragraphs, Defendants committed "unfair" business acts or practices by, among other things: (1) making the false and misleading statements described herein; (2) falsely and deceptively advertising their products as described herein; (3) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs, class members and the public as described herein; (4) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs, class members, and the public as described herein; (5) engaging in conduct that undermines or violates the spirit or intent of section 17200 or the laws detailed herein; and/or (6) engaging in conduct that is expressly prohibited by law with respect to the unlicensed sale of health insurance.

144.  As specified in the preceding paragraphs, Defendants committed "fraudulent" business acts or practices by making uniform misrepresentations and omissions of material fact regarding the limited benefit plans and medical discount plans described in the Second Amended Complaint.  Defendants' business practices as alleged herein are fraudulent under section 17200 because they are likely to deceive consumers into believing that the limited benefit plans and medical discount plans that Defendants offer are comprehensive PPO health insurance even though they are not.  This conduct is also fraudulent because Plaintiffs and consumers are reasonably led to believe that Defendants may legally offer such services, when in fact they are prohibited by law from doing so. Plaintiffs and the other members of the class have in fact been deceived because of Defendants' material representations, which outlined in detail above.

145.  As specified in the preceding paragraphs and as detailed in the factual and legal allegations in the Counts listed below, Defendants committed "unlawful" business acts or practices by, among other things: (1) violating California Insurance Code section 790.03(a), which makes it unlawful to make, or

-52-

cause to be made, any misrepresentations regarding the terms, benefits, or advantages of an insurance policy; (2) violating California Insurance Code section 790.03(b), which makes it unlawful to make, or cause to be made, any untrue, deceptive, or misleading statements with respect to the business of insurance; (3) violating California Insurance Code section 790.036(a), which states that it is an unfair and deceptive act or practice in the business of insurance for an insurer to advertise insurance that it will not sell; (4) violating California Insurance Code section 780, which bars misrepresentations regarding the terms, benefits, or privileges of an insurance policy; (5) violating California Insurance Code section 781, which bars misrepresentation in order to induce a person to take out a policy of insurance; (6) not having the licenses required by California law and acting in violation of, inter alia, California Insurance Code section 1621; (7) falsely and deceptively advertising their services as described herein in violation of California Business & Professions Code section 17500; (8) engaging in conduct that violates numerous provisions of the Consumers Legal Remedies Act as set forth below; (9) engaging in conduct that constitutes fraud and deceit as defined in California Civil Code section 1709; (10) violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1961 *et seq.*; and/or (11) engaging in conduct that violates other state laws as may be identified in the course of this action.

146.  Plaintiffs, individually and on behalf of the other class members, reserve the right to allege other conduct that constitutes other unfair, fraudulent, or unlawful business acts or practices, as Defendants' conduct is ongoing.

147.  Plaintiffs have suffered injury in fact and lost money because of Defendants' unlawful, unfair, or fraudulent business practices, as set forth above. Plaintiffs and putative class members were harmed by entering into transaction and paying for a product or service that is not what Defendants represented it to be, thereby surrendering more in a transaction than they otherwise would have if the true facts had been timely disclosed, if they would have entered into such

-53-

1  transactions at all.  Defendants were thereby unjustly enriched by such business

2  acts and practices.

3      148.  Moreover, Plaintiffs and putative class members face an actual and

4  imminent threat of future injury arising from Defendants' conduct, which is on-

5  going.  There is an imminent threat of actual future harm to Plaintiffs and putative

6  class members because Defendants' false and fraudulent advertising through lead

7  generating and other websites is on-going as those websites are still functional.

8  Moreover, Defendants still employ sales agents using the same uniform

9  false/fraudulent sales script, and Defendants continue to engage in a fraudulent

10  scheme to advertise and sell to consumers, including Plaintiffs and putative class

11  members, sham health insurance products.  Plaintiffs and putative class members

12  therefore will be unable to rely on Defendants' advertising, websites, sales agents

13  and insurance administrators in the future and there is a concrete threat that

14  Plaintiffs may be deceived into purchasing sham insurance products from

15  Defendants in the future.  Moreover, Defendants continue to actively disguise

16  which entity is responsible for what actions in furtherance of the unfair,

17  fraudulent, and illegal scheme alleged in this Second Amended Complaint.

18      149.  Pursuant to Business & Professions Code section 17203, Plaintiffs,

19  individually and on behalf of the class and for the benefit of the public, request all

20  applicable remedies and relief allowable under section 17200.  Plaintiffs seek an

21  order enjoining Defendants from engaging in the illegal business acts and

22  practices alleged herein.  Plaintiffs also seek an order awarding Plaintiffs and the

23  class restitution and restitutionary disgorgement of the money wrongfully

24  acquired and/or retained by Defendants by means of illegal business acts and

25  practices alleged herein.  This includes but is not limited to restitution of all

26  amounts paid in false "premiums" for "health insurance" that provided next to no

27  coverage, and the money and profits kept by Defendants because of not making

28  the payments for health care services and products that the Defendants promised

-54-

to make.  The remedies requested by statute are cumulative of and in addition to any other remedies that are available to Plaintiffs and class members under the other Counts set forth herein.

150.  Plaintiffs and the putative class members are further entitled to prejudgment interest as a direct result of Defendants' illegal, unfair and fraudulent business acts and practices.  The amount on which interest is to be calculated is a sum certain and capable of calculation, in an amount according to proof.

151.  Plaintiffs' counsel are also entitled to fees and costs pursuant to, inter alia, California Code of Civil Procedure section 1021.5.

## COUNT II

**False and Misleading Advertising in Violation of California Bus. & Prof. Code § 17500 *et seq.***

**(Against Defendants HEG, HPI, HII, the Axis Defendants and Cost Containment Group)**

152.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 101, as if fully set forth herein.

153.  As specified in the preceding paragraphs, Defendants use and disseminate advertising to sell their limited benefit plans and medical discount plans, including through use of the internet.  Specifically, Defendants HEG, HPI, HII and Cost Containment Group disseminate this advertising online, and, on information and belief, Plaintiffs viewed and relied on deceptive advertising disseminated by each of these Defendants.  Moreover, HII is the Managing General Agent for the Axis Defendants with regard to the Liberty Plan.  Therefore, pursuant to the California Insurance Code, all HII acts (including its advertising) are imputed to the Axis Defendants.

154.  As set forth above, this advertising is deceptive, untrue, or misleading within the meaning of California Business & Professions Code section 17500 *et seq.* ("section 17500"), because the statements made the websites and fulfillment

-55-

materials and by the sales representatives, are misleading or likely to deceive, and continue to deceive, members of the class and the general public regarding the services/products Defendants provide.

155.   In making and disseminating the statements alleged herein, HEG, HII, HPI, Cost Containment Group and the Axis Defendants knew or, by the exercise of reasonable care should have known, that the statements were untrue or misleading.

156.   Moreover, Plaintiffs and putative class members face an actual and imminent threat of future injury arising from Defendants' advertising conduct, which is on-going.  There is an imminent threat of actual future harm to Plaintiffs and putative class members because Defendants' false advertising through lead generating and other websites is on-going as those websites are still functional. Moreover, Defendants still employ sales agents using the same uniform false/fraudulent sales script, and Defendants continue to engage in a fraudulent scheme to advertise and sell to consumers, including Plaintiffs and putative class members, sham health insurance products.  Plaintiffs and putative class members therefore will be unable to rely on Defendants' advertising, websites, sales agents and insurance administrators in the future and there is a concrete threat that Plaintiffs may be deceived into purchasing sham insurance products from Defendants in the future.  Defendants also continue to disguise themselves, so Plaintiffs and putative class members will be unable to determine if future statements concerning their insurance needs are actually made by Defendants.

157.   The misrepresentations and omissions by Defendants of the material facts detailed above are false and misleading advertising and therefore violate section 17500 because it is likely that a significant portion of the general public and/or Defendants' targeted customers, acting reasonably under the circumstances, could be misled.

158.   As a result of these acts and practices, Defendants have improperly

-56-

1   and illegally obtained money from Plaintiffs and class members.

2       159.  Defendants' advertising conduct is ongoing and continues to harm

3   consumers, class members and the public.  Accordingly, Plaintiffs seek an order

4   enjoining Defendants from engaging in the illegal business acts and practices

5   alleged herein.  Plaintiffs also seek an order awarding Plaintiffs and the class

6   restitution and restitutionary disgorgement of the money wrongfully acquired

7   and/or retained by Defendants by means of illegal business acts and practices

8   alleged herein.  This includes but is not limited to restitution of all amounts paid

9   in false "premiums" for "health insurance" that provided next to no coverage, and

10  the money and profits kept by Defendants because of not making the payments for

11  health care services and products that the Defendants promised to make.  The

12  remedies requested by statute are cumulative of and in addition to any other

13  remedies that are available to Plaintiffs and class members under the other Counts

14  set forth herein.

## COUNT III

### Fraud and Deceit – Civil Code Section 1709

### (Against All Defendants)

18      160.  Plaintiffs reallege and incorporate by reference all allegations set forth

19  in paragraphs 1 through 151, as if fully set forth herein.

20      161.  As detailed above, Defendants made false representations, concealed

21  material facts, and acted with an intent to deceive Plaintiffs and class members

22  when uniformly advertising, marketing, selling, administering and underwriting

23  their limited benefit plans and medical discount plans.

24      162.  Defendants' uniform scripted misrepresentations and omissions of

25  material fact include, at minimum:

26      • That Defendants help consumers find the most comprehensive

27          insurance plan for the lowest possible price.

28      • That Defendants worked on behalf of consumers.

-57-

- That the "health insurance" Defendants offered was comparable to the comprehensive health insurance that consumers possessed and was comparable to PPO coverage.
- That Defendants' product would provide substantial coverage if Plaintiffs or class members were to visit almost any doctor in the country.
- That Defendants' product would cover every category of health care except pregnancy and mental health treatment.

163.  Defendants knew or reasonably should have known that their representations or omissions of material fact they were duty bound to disclose were false when made or made the representations recklessly and without regard for their truth.

164.  Defendants' statements, actions, and omissions were intended to deceive Plaintiffs and class members for Defendants' own benefit.

165.  Plaintiffs and class members justifiably relied on Defendants' misrepresentations and omissions, representative examples of which are set forth above.

166.  Plaintiffs and class members suffered financial damage in the form of, among other things, wasted payments and unpaid medical bills as a direct result of Defendants' misrepresentations, material omissions, and deceptive acts.

167.  Defendants' conduct was intended to cause injury to members of the class and/or was despicable conduct carried on with a willful and conscious disregard of the rights of members of the class, subjected members of the class to cruel and unjust hardship in conscious disregard of their rights, and was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with the intention to deprive members of the class of money, property, legal rights or to otherwise cause injury.  Such conduct constitutes malice, oppression, or fraud under California Civil Code section 3294 and entitles

-58-

1    Plaintiffs and members of the class to punitive or exemplary damages in an amount
2    appropriate to punish or set an example of and deter Defendants from engaging in
3    such conduct.

**COUNT IV**

**Aiding and Abetting Fraud**

**(Against All Defendants)**

7       168.  Plaintiffs reallege and incorporate by reference all allegations set forth
8    in paragraphs 1 through 151, as if fully set forth herein.

9       169.  As described in the preceding paragraphs of this Second Amended
10   Complaint, each Defendant substantially assisted or encouraged each other
11   Defendant's fraud through independently tortious conduct.  Moreover, each
12   Defendant had actual knowledge of the fraud and nonetheless provided substantial
13   assistance in perpetuating the fraud.

14      170.  Defendant HEG had actual knowledge that the Liberty Health Plan
15   purchased by Plaintiffs and substantially similar plans purchased by putative class
16   member were being marketed, sold, and administered as though they were
17   comprehensive medical coverage when they were, in fact, not such coverage.
18   Indeed, HEG reached a conscious decision to participate in the fraudulent activity
19   through selling and marketing the sham insurance plans, among other conduct
20   alleged in this Second Amended Complaint, in order to reap the financial benefits
21   of the fraud.  HEG therefore gave substantial assistance to the Axis Defendants,
22   ACUSA, Cost Containment Group, ACI, HII and HPI in executing the fraudulent
23   scheme and did so for its own financial gain.

24      171.  Defendants HII and HPI had actual knowledge that the Liberty Health
25   Plan purchased by Plaintiffs and substantially similar plans purchased by putative
26   class member were being marketed, sold, and administered as though they were
27   comprehensive medical coverage when they were, in fact, not such coverage.
28   Indeed, HPI and HII reached a conscious decision to participate in the fraudulent

-59-

activity through developing and acting as the Managing General Agent for the sham insurance plans, among other conduct alleged in this Second Amended Complaint, in order to reap the financial benefits of the fraud.  HPI and HII therefore gave substantial assistance to the Axis Defendants, HEG, ACI, ACUSA, and Cost Containment Group in executing the fraudulent scheme and did so for their own financial gain.

172.  The Axis Defendants had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class member were being marketed, sold, and administered as though they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, the Axis Defendants reached a conscious decision to participate in the fraudulent activity through developing and underwriting the sham insurance plans, among other conduct alleged in this Second Amended Complaint, in order to reap the financial benefits of the fraud.  The Axis Defendants therefore gave substantial assistance to HEG, Cost Containment Group, ACI, ACUSA, HII and HPI in executing the fraudulent scheme and did so for their own financial gain.

173.  Defendant ACI had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class member were being marketed, sold, and administered as though they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, ACI reached a conscious decision to participate in the fraudulent activity through administering the sham insurance plans, among other conduct alleged in this Second Amended Complaint, in order to reap the financial benefits of the fraud.  ACI therefore gave substantial assistance to the Axis Defendants, HEG, ACUSA, Cost Containment Group, HII and HPI in executing the fraudulent scheme and did so for its own financial gain.

174.  Defendant Cost Containment Group had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans

purchased by putative class member were being marketed, sold, and administered as though they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, Cost Containment Group reached a conscious decision to participate in the fraudulent activity for the purpose of selling the sham insurance plans and did so through its contracts with HPI and HII through which it provided fulfillment materials and customer service, among other conduct alleged in this Second Amended Complaint, related to the Liberty Health Plan in order to reap the financial benefits of the fraud.  Cost Containment Group therefore gave substantial assistance to the Axis Defendants, HEG, HII and HPI in executing the fraudulent scheme and did so for its own financial gain.

175.  Defendant ACUSA had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class member were being marketed, sold, and administered as though they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, ACUSA reached a conscious decision to participate in the fraudulent activity for the purpose of selling the sham insurance plans and did so through its contracts with HPI, HII, and the Axis Defendants through which it was the "policyholder" and provided fulfillment materials and customer service, among other conduct alleged in this Second Amended Complaint, related to the Liberty Health Plan in order to reap the financial benefits of the fraud.  ACUSA therefore gave substantial assistance to the Axis Defendants, HEG, ACI, Cost Containment Group, HII and HPI in executing the fraudulent scheme and did so for its own financial gain.

176.  Plaintiffs were damaged by Defendants' wrongful conduct, as alleged herein, in an amount to be proven at trial.

///

///

///

-61-

## COUNT V

### Conspiracy to Commit Fraud

### (Against All Defendants)

177.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 151, as if fully set forth herein.

178.  Defendants engaged in a conspiracy to commit fraud in the sale of sham health insurance products to Plaintiffs and to consumers, including putative class members, as alleged in the preceding paragraphs of this Second Amended Complaint.  The conspiracy was fully formed and involved HEG, HII, HPI, ACUSA, the Axis Defendants, Cost Containment Group, and ACI.  Each Defendant individually was part of the conspiracy and all Defendants agreed as to the purpose of the conspiracy, which was to sell sham health insurance to consumer for financial gain.

179.  Each Defendants was aware of the other Defendants' roles in the conspiracy to commit fraud, as alleged more specifically in the preceding paragraphs of this Second Amended Complaint.

180.  Each Defendant agreed with the other Defendants and intended that the fraud be perpetrated on Plaintiff and consumers, including putative class members.

181.  Each Defendant had contracts and/or on-going cooperative relationships with at least one other Defendant responsible for the harm suffered by Plaintiffs and putative class members.

182.  Significant wrongful conduct was committed in furtherance of the conspiracy, including the making of material fraudulent misrepresentations to Plaintiffs that induced Plaintiffs to purchase essentially worthless health "insurance" coverage under the belief that they were purchasing comprehensive PPO coverage.  Each Defendant committed at least one overt act in furtherance of the conspiracy.  These acts in furtherance of the conspiracy included, among

-62-

others, creating scripts to solicit, mislead and fraudulently induce consumers to purchase sham health insurance, training sales agents to fraudulently induce consumers to purchase sham health insurance, creating websites to induce consumers to purchase sham health insurance, selling sham health insurance, underwriting sham health insurance, conducting a fraudulent "verification" process during the sale of sham health insurance, funding the fraudulent activities of the other defendants, collecting debts from Plaintiffs and putative class members that were incurred based on Defendants' fraudulent misrepresentations, and/or facilitating any and all of Defendants' conduct as stated in this Second Amended Complain.

183.  Even if Defendants did not agree to harm Plaintiffs or putative class members specifically, the purpose of the acts they engaged in was to advance of the overall subject of the conspiracy (fraud), and harm to Plaintiffs and putative class members was a reasonably foreseeable consequence of Defendants' actions. Plaintiffs and putative class members were damaged by the conspiracy in an amount to be proven at trial.

## **<u>COUNT VI</u>**

### **Violation of Insurance Code section 781**

### **(Against Axis Insurance Company)**

184.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 151, as if fully set forth herein.

185.  California Insurance Code section 781 prohibits "twisting" in the insurance business.  Section 781(a) prohibits any statement that is known, or should have been known, to be a misrepresentation to any other person for the purpose of inducing, or tending to induce, such other person to take out a policy of insurance or cause of person to forfeit an existing policy of insurance.

186.  A violation of Insurance Code section 781 gives rise to a private right of action and is punishable by a fine not exceeding three times the amount of the

loss suffered by the victim.  *See Kentucky Central Life Ins. Co. v. LeDuc*, 814 F. Supp. 832, 835-37 (N.D. Cal. 1992) ("Supplying a private cause of action [for section 781] will further the policy prohibiting misrepresentation").

187.  An insurer who knowingly violates section 781, or who knowingly permits any officer, agent, or employee to do so, is subject to suspension of the insurer's certificate of authority to do the class of insurance with respect to which the violation occurred.

188.  In the fall of 2016, Plaintiffs had comprehensive health coverage through Blue Cross/Blue Shield and were looking for similar comprehensive coverage at a better price.  It was important to Plaintiffs that any coverage they obtained provided comparable comprehensive coverage to the PPO that they already had.

189.  After searching for various options, and viewing various websites that were, on information and belief, maintained by Defendants HPI, HII, and Cost Containment Group, Eric and Miryam found HEG's website.  They responded positively to the material claims on all these websites, examples of which are set in the paragraphs above, including that the "PPO's work with over 80% of physicians Nationwide," and that HEG "work[ed] with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance," "Obamacare," and "PPO" plans.  Eric and Miryam were impressed by HEG's statement that it took pride in its "ability to help you find the most comprehensive insurance plan for the lowest possible price" and the statements on the lead generating websites that they would receive comprehensive, ACA-compliant coverage if they purchased the Liberty Health Plan.

190.  During the sales call described in the preceding paragraph of this Second Amended Complaint, the sales agent for HEG, HPI and/or HII reiterated based on the uniform sales script issued by HPI/HII, that the coverage under the Liberty Health Plan was comprehensive PPO medical coverage.  This was not

-64-

true.  Axis Insurance Company made further misrepresentation by stating on the Liberty Health Insurance case that the plan provided PPO Network Access, which further induced Plaintiffs to continue paying "premiums" for the Liberty Health Plan.  These misrepresentations were repeated in plan fulfillment materials.

191.  Based on these material misrepresentations made by Axis Insurance Company and its agents, including Axis Insurance Company's Managing General Agent HII, Plaintiffs were induced to purchase/take out the Liberty Health Plan. Plaintiffs were also induced to forfeit their existing Blue Cross/Blue Shield Coverage in favor of the Liberty Health Plan, which Plaintiffs were told provided comparable coverage for less money.

192.  Axis Insurance Company knew and at all relevant times intended that Plaintiffs would be induced to purchase the Liberty Health Plan based on these misrepresentations.

193.  Axis Insurance Company violated Insurance Code section 781 because it knew or should have known that its false statements and those of its Managing General Agent, HII (which statements are imputed to Axis Insurance Company pursuant to Insurance Code section 796.85 ("[A]cts of the MGA [Managing General Agent] are considered to be the acts of the insurer on whose behalf it is acting") would induce Plaintiffs to purchase/take out the Liberty Health Plan.

194.  As a result of these actions, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT VII

## Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C § 1961 *et seq.*

195.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 151, as if fully set forth herein.

196.  Each Defendant is a "person" capable of holding legal or beneficial

-65-

1  interest in property within the meaning of 18 U.S.C. § 1961(3).

2      197.  Each Defendant violated 18 U.S.C. § 1962(c) and (d) by the acts

3  described in this Second Amended Complaint.  Specifically:

4          a.  Each Defendant's activities affected interstate commerce;

5          b.  Each Defendant conducted or participated, directly or indirectly, in the

6              enterprise's affairs through a pattern of racketeering activity.

7          c.  Each Defendant conspired to participate, directly or indirectly, in the

8              enterprise's affairs through a pattern of racketeering activity.

9      198.  **The Enterprise.**

10         d.  Defendants, and each of them, formed an association-in-fact for the

11             common and continuing purpose described in this Second Amended

12             Complaint.  Together, they constitute an enterprise within the meaning

13             of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through

14             a continuing pattern of racketeering activity.  Defendants, as the

15             members of the enterprise, functioned as a continuing unit with

16             ascertainable structure separate and distinct from that of the conduct of

17             the pattern of racketeering activity.

18         e.  Defendants, and each of them, knowingly, willfully, and unlawfully

19             conducted or participated, directly or indirectly, in the affairs of the

20             enterprise through a pattern of racketeering activity within the meaning

21             on 18 U.S.C § 1691 *et seq.*  The racketeering activity was made

22             possible for Defendants' regular and repeated use of the facilities and

23             services of the enterprise.  Defendants have the specific intent to

24             engage in the substantive RICO violations alleged herein.

25         f.  Alternatively, Defendants HEG, ACI, ACUSA, Axis Insurance

26             Company, Axis Specialty, HII, and HPI each constitute a separate

27             enterprise within the meaning of 18 U.S.C. § 1961(4).

28         g.  Alternatively, some of Defendants, together, constitute a separate

-66-

enterprise within the meaning of 18 U.S.C. § 1961(4).

199.  Each enterprise has engaged in, and their activities have affected, interstate commerce.

200.  Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises alleged above by overseeing and coordinating the commission of multiple acts of racketeering as described below.

201.  **Pattern of Racketeering Activity.**  Defendants, each of whom are persons associated with, or employed by, the enterprise(s), did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), 1962(c), and 1962(d).  The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise.  Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

202.  Predicate acts of racketeering activity are acts which are indictable under the provisions of the U.S. Code listed in 18 U.S.C § 1961(1)(B) and which are more specifically discussed herein.  Each Defendant committed at least two such acts or else aided and abetted such acts.

203.  These acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission.  Further, the acts of racketeering by Defendants have been continuous.  There was repeated conduct during a period continuing to the present, and there is a continued threat of repetition of such conduct.

204.  The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond their racketeering activity.  Rather, they existed separate and apart from the pattern of

-67-

1    racketeering activity for legitimate business purposes.

2         205.  **Predicate Act: Use of Mails and Wires to Defraud.**  Defendants

3    committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343

4    in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs

5    and putative class members of money by means of false or fraudulent pretenses,

6    representations or promises.  For the purpose of executing their scheme or artifice,

7    Defendants caused delivery of various documents and things by the U.S. mails, via

8    the internet, via facsimile and/or by private or commercial interstate carriers or

9    received such therefrom.  Defendants also transmitted or caused to be transmitted

10   by means of wire communications in interstate commerce various writings, signs

11   and signals.

12        206.  The acts of Defendants set forth above were done with knowledge that

13   the use of the mails or wires would follow in the ordinary course of business, or

14   that such use could have been foreseen, even if not actually intended.  These acts

15   were done intentionally and knowingly with the specific intent to advance

16   Defendants' scheme or artifice.

17        207.  Defendants carried out their scheme in different states and could not

18   have done so unless they used the U.S. mails or private or commercial interstate

19   carriers or interstate wires.

20        208.  In furtherance of their scheme alleged herein, Defendants

21   communicated among themselves and with Plaintiffs and putative class members

22   in furtherance of the scheme to defraud Plaintiffs and putative class members.

23   These communications were typically transmitted by wire (i.e., electronically)

24   and/or through the United States mails or private or commercial carriers.

25        209.  Specifically, Defendants used the wires and/or U.S. mail or private or

26   commercial carriers for the purposes of their fraudulent scheme both in terms of

27   the promotional materials set forth above and sending and/or obtaining documents

28   from Plaintiffs and Class members.  Defendants also communicated by the wires

and/or U.S. mail or private or commercial carriers to facilitate payment of the "premiums"' by Plaintiffs and Class members pursuant to their fraudulent scheme.

210.   In addition, in furtherance of their scheme, Defendants used the wires and/or U.S. mail or private or commercial carriers to induce Plaintiffs to purchase this sham health insurance.  Defendants also communicated by the wires and/or U.S. mail or private or commercial carriers to facilitate the sales and subsequent purchases, including accepting payments in the form of "premiums" over the Internet or by mail.

211.   Plaintiffs and putative class members reasonably and justifiably relied on Defendants' false misrepresentations and deceptive communications as alleged in this Second Amended Complaint.

212.   Plaintiffs and putative class members have been damaged as a direct and proximate result of Defendants' participation in the enterprise.

213.   **Continuity of Conduct.**   Defendants' violations of state and federal laws as set forth in this Second Amended Complaint, each of which directly and proximately injured Plaintiffs and putative class members, constituted a continuous course of conduct spanning a period of time encompassing at least 2016 through the present.  Defendants' conduct was intended to obtain money through false representations, fraud, deceit, and other improper and other unlawful means, including the sale and underwriting of purported "insurance" when Defendants were not licensed to do so, fraudulently convincing consumers to pay "premiums" for purported coverage that was worthless, and duping consumers into believing they were receiving ACA qualified coverage when, in fact, consumers were not.

214.   Accordingly, Plaintiffs and putative class members seek an award of actual damages.  Plaintiffs further seek an award three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by statute.

///

## COUNT VIII

**Conspiracy to Violate Federal Civil RICO, 18 U.S.C § 1961 *et seq.***

215. Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 151, as if fully set forth herein.

216. In violation of 18 U.S.C. § 1962(d), Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in this Second Amended Complaint.

217. The conspiracy commenced at least as early as 2016 and is ongoing.

218. The conspiracy's purpose was to defraud consumers, like Plaintiffs and putative class members, for their own benefit.

219. Each Defendant committed at least one overt act in furtherance of the conspiracy. These acts in furtherance of the conspiracy included, among others, creating scripts to solicit, mislead and fraudulently induce consumers to purchase sham health insurance, training sales agents to fraudulently induce consumers to purchase sham health insurance, creating websites to induce consumers to purchase sham health insurance, selling sham health insurance, underwriting sham health insurance, conducting a fraudulent "verification" process during the sale of sham health insurance, funding the fraudulent activities of the other defendants, collecting debts from Plaintiffs and putative class members that were incurred based on Defendants' fraudulent misrepresentations, and/or facilitating any and all of Defendants' conduct as stated in this Second Amended Complaint.

220. Even if Defendants did not agree to harm Plaintiffs or putative class members specifically, the purpose of the acts they engaged in was to advance of the overall subject of the conspiracy, and harm to Plaintiffs and putative class members was a reasonably foreseeable consequence of Defendants' actions.

221. Plaintiffs and putative class members have been injured and continue to be injured by Defendants' conspiracy. The unlawful actions of Defendants, and

-70-

each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs and putative class members.

222.  Plaintiffs and putative class members seek an award of damages in compensation for, among other things, the money Defendants fraudulently obtained from Plaintiffs and putative class members.  Plaintiffs further seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, individually, and on behalf of all others similarly situated and for the benefit of the general public, as applicable, pray for relief pursuant to each cause of action set forth in this Second Amended Complaint as follows:

A.      An order declaring that this action can be maintained as a class action, certifying the Nationwide Class as requested herein, or, in the alternative, the Multi-State Class or California-Only Class, designating Plaintiffs as class representatives and appointing the undersigned counsel as class counsel;

B.      Restitution in such amounts so as to restore the status quo ante;

C.      Restitutionary disgorgement of all profits and unjust enrichment that Defendants obtained as a result of Defendants' illegal conduct as set forth herein;

D.      Temporary, preliminary, and permanent injunctive relief, including enjoining Defendants from continuing the illegal practices as set forth herein and ordering Defendants to engage in a corrective advertising campaign;

E.      Compensatory damages (except as to the claims under section 17200 and section 17500);

F.      Punitive or exemplary damages (except as to the claims under section 17200, section 17500, and RICO);

G.      Three times the damages sustained under applicable RICO statutes

1    and Insurance Code Section 781;

2         H.    Attorneys' fees and litigation costs under the theories and statutes set

3    forth above;

4         I.    Pre- and post-judgment interest on any amounts awarded to Plaintiffs

5    and class members; and

6         J.    Such other and further relief as may be just and proper.

7

8                    **JURY TRIAL DEMANDED**

9         Plaintiffs demand a jury trial on all causes of action and issues so triable.

10   Dated:  April 23, 2021              **FOX LAW, APC**

11                                       /s/ Joanna L. Fox
                                         David A. Fox
12                                       Joanna L. Fox
                                         Russell A. Gold
13

14                                       *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28