David A. Fox (SBN  254651)
dave@foxlawapc.com
Joanna L. Fox (SBN 272593)
joanna@foxlawapc.com
Russell A. Gold (SBN 179498)
russ@foxlawapc.com
**FOX LAW, APC**
225 W. Plaza Street, Suite 102
Solana Beach, CA 92075
Tel:  858-256-7616
Fax: 858-256-7618


Timothy G. Blood (SBN 194343)
TBlood@bholaw.com
Leslie E. Hurst (SBN 178432)
LHurst@bholaw.com
Jennifer L. MacPherson (SBN 202021)
JMacpherson@bholaw.com
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619-338-1100
Fax: 619-338-1101

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC KETAYI, and MIRYAM KETAYI, both individually and on behalf of all others similarly situated and for the benefit of the general public, | CASE NO. 20cv1198 GPC (KSC) |
| Plaintiffs, | **CLASS ACTION** |
| v. | **FOURTH AMENDED CLASS ACTION COMPLAINT** |
| HEALTH ENROLLMENT GROUP, a Florida corporation; ADMINISTRATIVE CONCEPTS, INC., a Pennsylvania corporation; AXIS, a Bermuda corporation d/b/a Axis Insurance Company; AXIS SPECIALTY U.S. SERVICES, INC., a Delaware corporation; ALLIANCE FOR CONSUMERS USA, a Nebraska corporation; HEALTH PLAN INTERMEDIARIES | **DEMAND FOR JURY TRIAL ON ALL CAUSES OF ACTION SO TRIABLE** |

HOLDINGS, LLC, a Delaware
Corporation;
HEALTH INSURANCE
INNOVATIONS HOLDINGS, INC., a
Delaware Corporation;
COST CONTAINMENT GROUP, INC.,
a Delaware Corporation;
OCEAN CONSULTING GROUP, INC.,
a Delaware Corporation

Defendants.

Plaintiffs Eric Ketayi and Miryam Ketayi ("Plaintiffs") bring this Fourth Amended Class Action Complaint ("Fourth Amended Complaint") against Health Enrollment Group ("HEG"), Alliance for Consumers USA ("ACUSA"), Administrative Concepts, Inc. ("ACI"), AXIS ("Axis Insurance Company"), AXIS Specialty U.S. Services, Inc. ("Axis Specialty"), Health Plan Intermediaries Holdings, LLC ("HPI"), Health Insurance Innovations Holdings, Inc. ("HII"), Cost Containment Group, Inc., and Ocean Consulting Group, Inc. (collectively, "Defendants"). Plaintiffs bring this action individually and on behalf of all others similarly situated and for the benefit of the general public and allege the following upon personal knowledge as to Plaintiffs' acts and experiences as specifically identified, and as to all other allegations based on information and belief based on, among other things, investigation into such allegations conducted by Plaintiffs' attorneys.

## I.   **INTRODUCTION**

1.    This case concerns the deceptive, false, fraudulent, unlawful, and/or unfair advertising, marketing, sale, underwriting and administration of sham "health insurance" by Defendants.

2.    Using a convoluted web of companies, including shell and holding companies, Defendants trick consumers like Plaintiffs and the putative class members into purchasing limited benefit "insurance" plans and medical discount memberships that, as Defendants are aware, provide little to no value to the

purchaser.  Employing numerous websites promising "comprehensive coverage," names that sound like legitimate insurance companies, and salespeople, telephone operators and underwriting agents trained to follow a strict sales script that is uniformly delivered to all potential customers during phone calls, Defendants promote, advertise, offer for sale, sell, provide customer support and administer to consumers, like Plaintiffs and the putative class members, products that those consumers believe to be low-cost, comprehensive, Preferred Provider Organization ("PPO") medical health insurance coverage.[1]

3.     Defendants represent that they can provide such comprehensive coverage at a low cost by aggregating consumers into a plan in the same way a large corporation would.  Together, Defendants make consumers believe that they can "beat the system" and receive comprehensive insurance that meets the requirements of the 2010 Affordable Care Act ("ACA") when, in fact, what consumers  receive is essentially worthless, because it covers only a fraction of most health care costs.  In the end, what consumers receive is decidedly not ACA-compliant health coverage.

4.     Defendants, and each of them, know or should reasonably know, that the products and services they offer are essentially worthless.  But Defendants' businesses are based on duping consumers into believing that they are paying for, and receiving, valuable health insurance coverage.  Through deceptive advertising, material misstatements, and critical omissions, Defendants convince consumers, like Plaintiffs and the putative class members, that they are purchasing comprehensive health insurance coverage like that provided through a legitimate PPO.  In truth, consumers are paying for a product—represented to be "insurance"—that is often worth less than the "premiums" it costs and that does not

---

[1] As described herein, some Defendants are not licensed to sell health insurance in California or in many other states throughout the country where they purport to do so.

1    provide the coverage promised.

2         5.      Even after a sale is made, Defendants continue to deceive consumers.

3    Defendants make statements in deceivingly crafted fulfillment materials and on the

4    "insurance" cards provided to consumers through the mail that include the phrase

5    "Preferred Provider (PPO) Network Access" and point consumers to a "PPO"

6    Network website that represents to be "your national choice for PPO network

7    solutions." Defendants do so with knowledge that they have not actually sold,

8    underwritten, administered or provided any sort of PPO plan or other

9    comprehensive coverage to consumers.

10        6.      Defendants  also make representations to health care providers that

11   consumers' insurance coverage is "active" when a provider inquires about coverage

12   for a particular treatment.  Defendants do so with knowledge that the plans sold to

13   consumers are not actually comprehensive medical insurance coverage and will not

14   actually cover the costs of the treatment.  Nonetheless, Defendants make the

15   representation to health care providers that a consumer's coverage is "active" so

16   that consumers and providers are not alerted that the "insurance" that Defendants

17   market, sell, underwrite, and administer is, in fact, not comprehensive medical

18   coverage at all.  This is unscrupulous, unethical and immoral conduct.

19        7.      Throughout the life of the scheme, Defendants' affirmative claims and

20   omissions of material fact are likely to, and did, deceive consumers like Plaintiffs

21   and the putative class members into paying and/or continuing to pay, "premiums"

22   (sometimes for years on end) for what they believe is PPO health insurance

23   coverage that turns out to be illusory when they use it.

24        8.      Once consumers realize they have been cheated, it is too late.

25   Consumers are out hundreds or thousands of dollars in "premium" payments to

26   Defendants for sham health insurance coverage.  If they realize the issue at the point

27   when they have incurred actual injury or loss, it is difficult to get replacement

28   health care coverage—especially coverage that would cover the actual injury or

-3-

1    loss.  In some instances, consumers may also owe tens or—like Plaintiffs here—

2    hundreds of thousands of dollars in payments to medical providers for services that

3    Defendants claimed the "insurance" covered when in fact no or minimal coverage

4    was available.

5         9.     Defendants are presently under investigation by the California

6    Department of Insurance related to this scheme—which is pervasive and has

7    deceived consumers throughout California.  Indeed, Defendants have victimized

8    consumers all over the country and profited at consumers' expense.

9         10.    Defendants (specifically, Defendant HII) was the subject of a June

10   2020 Report issued by the U.S. House of Representatives Committee on Energy and

11   Commerce, Subcommittee on Health, which concluded "that HII, its subsidiary

12   companies, and the third-party agents and brokers that HII is in a contractual

13   relationship with defraud and deliberately mislead consumers seeking

14   comprehensive health coverage, leaving them saddled with hundreds of thousands

15   of dollars of medical debt."   This *exact* conduct by HII and its third-party agents

16   and brokers (who are the other Defendants in this case) is at issue here.

17        11.    Through today, Plaintiffs are in the market for and desire to purchase

18   inexpensive, but comprehensive medical insurance coverage.  Indeed, Plaintiffs

19   continually search for the ideal health insurance option for their family.  Plaintiffs

20   would consider purchasing coverage from Defendants if the coverage promised

21   were as it is represented to be—comprehensive PPO medical coverage for lower

22   premiums.  But Plaintiffs have no way to determine whether representations about

23   health insurance coverage are true or false.

24        12.    There is an imminent threat of actual future harm to Plaintiffs because

25   Defendants' lead generating and other websites are still functional, Defendants still

26   employ sales agents using the same uniform script, and Defendants continue to

27   engage in a fraudulent scheme to sell consumers, including Plaintiffs and putative

28   class members, sham health insurance products.  Plaintiffs continue to search for

-4-

comprehensive health coverage that fits their family's needs and are unable to determine if such coverage exists because Defendants have not been enjoined from making the representations on which Plaintiffs previously relied.  Plaintiffs and putative class members therefore will be unable to rely on Defendants' advertising, websites, sales agents, and insurance administrators in the future and may again be deceived into purchasing sham insurance products from Defendants in the future. Thus, Defendants' conduct must be enjoined.  Under these circumstances, Plaintiffs lack adequate remedies at law because Plaintiffs will have no way to prevent Defendants from engaging in the conduct described in this Fourth Amended Complaint in the future absent equitable relief.

13.     Plaintiffs and putative class members thus bring numerous causes of action against Defendants on behalf of themselves and all others similarly situated and for the benefit of the public, as applicable, and seek appropriate equitable and legal remedies under those causes of action.

14.     Specifically, Plaintiffs and putative class members seek damages for harms caused by  Defendants' illegal, deceptive, false, fraudulent, and unfair advertising, marketing, and sale of limited benefit plans and medical discount plans. In addition, to help put an end to and redress these illegal, deceptive, false, fraudulent, and unfair business practices (which practices are on-going), Plaintiffs and the putative class ask the Court to preliminarily and permanently enjoin Defendants from continuing to peddle this sham "health insurance" to thousands of unwitting Americans.

## II.    JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     Alternatively, this Court has subject matter jurisdiction over this action

-5-

1   pursuant to 28 U.S.C. § 1332(d) because this is a class action in which (1) there are

2   over 100 members in the proposed class; (2) members of the proposed class have a

3   different citizenship from Defendants; and (3) the claims of the proposed class

4   members exceed $5,000,000 in the aggregate, exclusive of interests and costs.

5        17.    In addition, this Court has subject matter jurisdiction over this action

6   pursuant to 28 U.S.C. § 1331 because Counts V and VI, for violations of the federal

7   civil RICO statute, arise under federal law, and the Court has supplemental

8   jurisdiction pursuant to 28 U.S.C. § 1367.

9        18. This Court has personal jurisdiction over Defendants because all

10  Defendants have sufficient contacts with California.  Plaintiffs' claims and causes of

11  action alleged herein arise out of Defendants' respective contacts with this State.

12  Moreover, all Defendants have purposely availed themselves of the privileges and

13  benefits of conducting business activities in California through their active

14  marketing, advertising, sale, underwriting, administration, and provision of "health

15  insurance" services in the State of California.  Moreover, Defendants HII and HPI

16  have consented to the jurisdiction of this Court.  (ECF No. 94 ("The Court has

17  personal jurisdiction over the HII Defendants in this case based on the HII

18  Defendants consent to the exercise of such jurisdiction").)  As further detailed

19  below, Defendants maintain systematic and continuous business contacts with

20  California, and many California residents do business with Defendants.

21       19. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because

22  Defendants engage in continuous and systematic business activities within the State

23  of California, a substantial portion of the underlying transactions and events

24  complained of occurred and affected persons and entities in this district, Defendants

25  received substantial compensation from transactions and business activities in this

26  district, and Plaintiffs reside in this district.

27

28

FOURTH AMENDED CLASS ACTION COMPLAINT

III.   **PARTIES**

**PLAINTIFFS**

20.     Plaintiff Eric Ketayi ("Eric") is a resident of San Diego County and over the age of eighteen.  On or about November 22, 2016, Defendants sold Eric what Eric reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care coverage that was represented to be in the form of a PPO health insurance plan.  Eric reasonably believed he was receiving comprehensive medical coverage based on false statements and other misrepresentations contained on Defendants' websites, including websites run, paid for, and/or maintained by Defendants HEG, HPI and HII and their affiliates, employees, or agents, as well as the uniform representations to Eric over the phone that he and his wife, Miryam, were (i) purchasing a PPO plan for their family, (ii) could see any doctor in the plan, and (iii) would have full medical coverage under this plan.  This "plan," which was called a "Liberty Health" plan under the Alliance for Consumers USA Group (the marketing name developed by HII and HPI for the plan) was underwritten by Defendants Axis Insurance Company and Axis Specialty and purported to be part of First Health's PPO Network.  In fact, as he only recently discovered, Eric had purchased a limited benefit plan, which was deceivingly marketed, advertised, sold, and administered and did not provide the promised scope of coverage.  Eric paid what amounted to $379 per month in "premium" payments starting in November 2016 based on his belief that he had purchased comprehensive PPO access to First Health's PPO network through the "Liberty Health" plan.  Eric paid via credit card charges using the internet, other wires and/or the mail.  Eric surrendered more in these transactions than he would have otherwise paid if the true facts had been disclosed, and he lost money or property because of the illegal scheme to defraud consumers. Eric continues his search for the best comprehensive health insurance option to meet his family's needs.

21. Plaintiff Miryam Ketayi ("Miryam") is a resident of San Diego County and over the age of eighteen. On or about November 22, 2016, Defendants sold Miryam what Miryam reasonably believed, in response to Defendants' material misrepresentations, to be "comprehensive" health care coverage that was represented to be in the form of a PPO health insurance plan. Miryam reasonably believed she was receiving comprehensive medical coverage based on false statements and other misrepresentations contained on Defendants' websites, including websites run, paid for, and/or maintained by Defendants HEG, HPI, HII and ACUSA, and their affiliates, employees, or agents, as well as the uniform representations to Miryam over the phone that she and her husband, Eric, were (i) purchasing a PPO plan for their family, (ii) could see any doctor in the plan, and (iii) would have full medical coverage under this plan. This "plan," which was called a "Liberty Health" plan under the Alliance for Consumers USA Group (the marketing name developed by HII and HPI for the plan) was underwritten by Defendants Axis Insurance Company and Axis Specialty and purported to be part of First Health's PPO Network.   In fact, as she only recently discovered, Miryam had purchased a limited benefit plan, which was deceivingly marketed, advertised, sold, and administered and did not provide the promised scope of coverage. Miryam paid what amounted to $379 per month in "premium" payments starting in November 2016, based on her belief that she had purchased comprehensive PPO access to First Health's PPO network through the "Liberty Health" plan. She paid via credit card charges using the internet, other wires and/or the mail. Miryam surrendered more in these transactions than she would have otherwise paid if the true facts had been disclosed, and she lost money or property because of the illegal scheme to defraud consumers. Miryam continues her search for the best comprehensive health insurance option to meet her family's needs.

**CORPORATE DEFENDANTS**

**HEG**

22.     Defendant HEG is a Florida corporation with its principal place of business in Fort Lauderdale, Florida.  At all times relevant to this suit, HEG billed itself as a "full service National Health Brokerage firm specializing in helping individuals simplify the process of shopping for health insurance."[2]  HEG claimed to "work with Major Insurance Companies in all 50 states . . . ***to help you find the most comprehensive insurance plan*** for the lowest possible price."  In reality, however, HEG brokered limited benefit plans and medical discount memberships that did not provide the promised comprehensive insurance coverage. These plans were essentially worthless.  *See* **Figures 1–3**.  HEG did not offer, and/or had no intent to supply, comprehensive or ACA-qualified health care coverage as represented to consumers.

**Figure 1**

**HEG's website proclaiming that HEG will "find the most comprehensive insurance plan"**



---

[2] Figures 1–3 are screenshots of HEG's website as it existed during at least a portion of the time period relevant to this action.

1

2

3

**Figure 2**

**HEG's website promoting "Private Health Insurance Plans" and "Obamacare"**

4

5

6

7

8

9

10

11

12

13

14

15



16

**Figure 3**

**HEG's website promoting its "PPO" Plans**

17

18

19

20

21

22

23

24

25

26

27

28

-10-

23.     To the extent these HEG advertisement are not demonstrably false, they nonetheless have a tendency to decieve and/or confuse the public, and, in fact, did exactly that to Plaintiffs and putative class members.

24.     HEG knew or should have known that it was an active and integral participant in a scheme to defraud consumers who enrolled in such services, including Plaintiffs and putative class members.  Moreover, at all times relevant, Defendant HEG reaped the benefits of the scheme alleged and received compensation from consumers in the form of premiums, commissions, or other monetary remuneration at the expense of these consumers.

25.     HEG has multiple contacts with California and Plaintiffs' claims and arise out of HEG's contacts with the State.  HEG does business in the state as the Health Enrollment Group and also as Health Enrollment Insurance Agency.  HEG reached into California to contact Plaintiffs over the internet and through multiple phone calls.  HEG, through its agents, including agent David Martinez made material misrepresentations to consumers in California, including Plaintiffs, about the products and services it was selling.

26.     HEG advertised, marketed, and sold the sham insurance policy at issue to Plaintiffs, who are California residents, and advertised, marketed, and sold substantially similar products to other putative class members.  In addition, HEG has contracts and relationships with the other Defendants, including HII, HPI, Axis Insurance Company, Axis Specialty, Cost Containment Group, Ocean Consulting Group and ACUSA to broker, advertise, generate sales and/or sell or administer insurance on their behalf in California.  HEG has invoked the benefits and protections of California law by, among other things, HEG registering with the California Department of Insurance as a non-resident "Life-Only" and "Accident and Health" agent, License No. 0K59431.

27.     HEG is one of the HII Defendants' many third-party agents that the HII Defendants utilize to sell their insurance products.

-11-

28.     At all times relevant, HEG knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.

29.     HEG participated in this conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**ACUSA**

30.     Defendant ACUSA is a Nebraska (purported) non-profit corporation with its principal place of business in Plano, Texas.  It purports to be a "Public Benefit Corporation" providing lifestyle benefits service to its institutional and corporate members, franchise members and trade group members that address the needs of today's consumers."[3] Despite being a Nebraska Corporation, ACUSA's corporate documents were notably executed in Palm Beach, Florida.

31.     At all times relevant to this suit, ACUSA offered memberships that enabled its members to purchase limited benefit plans and medical discount memberships like the ones at issue here, including the "Liberty Health" plan that was purchased by Plaintiffs.  Upon purchasing the sham health insurance, Plaintiffs and putative class members became "ACUSA Members."  ACUSA used its status the Master Group Policyholder on "insurance" underwritten by the AXIS Defendants to induce Plaintiffs and putative class members into believing that they were getting comprehensive PPO medical coverage at a reduced price because ACUSA was the aggregator of individuals from all over the country, and could therefore negotiate "great deals" on health insurance for its members, including in California.

32.     In addition to being the Group Master Policy Holder, ACUSA also

---

[3] ACUSA's Articles of Incorporation state that the purpose of ACUSA is for charitable and educational purposes.

1   was a party to a marketing agreement with HPI, dated February 9, 2016, through

2   which, on information and belief, ACUSA agreed to participate in marketing efforts

3   related to the Liberty Health Plan.

4       33.     In fact, the HII/HPI "Liberty Health" plan sold by HEG and

5   underwritten by the AXIS Defendants as part of the scheme to defraud consumers

6   was essentially worthless and not comprehensive medical coverage negotiated on

7   Plaintiffs' and putative class members' behalf.  Nonetheless, ACUSA reaped the

8   benefits of the scheme alleged and received compensation from consumers and the

9   other Defendants in this case in the form of premiums, commissions, or other

10  monetary remuneration at the expense of consumers who expended money on the

11  health "insurance" plans, which were actually of little to no value.

12      34.     In the Liberty Health Plan fulfillment materials, ACUSA describes

13  itself as "a network of hard working Americans, small business owners, hourly

14  workers and the self-employed across our country. We are focused on educating

15  and providing an array of programs and services that can help our member make

16  sound financial, personal and health decisions."

17      35.     ACUSA also touts that through ACUSA membership, plan

18  participants would have the First Health PPO Network available to them, making

19  members believe that they had, indeed, purchased a PPO plan.  This was stated in

20  the plan "Welcome Package" was sent to plan purchasers like Plaintiffs and

21  putative class members.  *See* Figure 4, Excerpt from Plan Welcome Package

22  (highlighting added).  These fulfillment materials are a form of advertising in their

23  own right.  To the extent they are not false, taken together with the representations

24  made during the sales call they are likely to and have a tendency to deceive and/or

25  confuse the public, and did exactly that to Plaintiffs.

26  ///

27  ///

28  ///

**Figure 4, Excerpt from "Insurance" Fulfillment Materials**



36.     ACUSA has minimum contacts with California that give rise to the claims in this Fourth Amended Complaint.  ACUSA registered to do business in California in 2015 and markets and offers memberships to Californians through its interactive website.  In addition, ACUSA is an associate of, and the Master Group policyholder for, the Axis Insurance Company products that Plaintiffs and putative class members purchased in California, for coverage in California.  ACUSA reached into California through provision of fulfillment materials and otherwise and purposefully availed itself of doing business in the state by enrolling California residents as ACUSA, including Plaintiffs and putative class members.

37.     Although ACUSA registered to do business in California, it has not always been in good standing with the California Franchise Tax Board (Entity ID

3795866).  For example, ACUSA was not in good standing to do business in California between at least June 2020 and April 2021. Nor to the best of Plaintiffs' knowledge is ACUSA licensed in the State of California to broker or sell any form of health insurance.  Any contracts ACUSA entered while not in good standing are voidable.  *See* Cal. Rev. & Tax. Code § 23304.1.

38.   At all times relevant, ACUSA knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.

39.   ACUSA participated in this conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**Axis Insurance Company**

40.   Defendant Axis Insurance Company is a foreign corporation with its headquarters in Bermuda.  Axis Insurance Company stock is sold on the New York Stock Exchange under the symbol AXS.  At 2019 year-end, AXS boasted of $7.4 billion in total capital and $25.6 billion in total assets.  As of March 16, 2022, AXS's stock price is $54.24 per share.

41.   Axis Insurance Company and its employees, affiliates, or agents "underwrite" the sham health insurance plans that were sold to Plaintiffs and putative class members.  Axis Insurance Company contracted with ACUSA to have ACUSA be the Master Group Policyholder, underwrote the policy as a whole and underwrote the individual policies that ACUSA issued to consumers like Plaintiffs and the putative class members.  Indeed, Axis Insurance Company issued two group policies to ACUSA: (1) Group Policy No. TGAD03829004, effective April 1, 2016, for group accident insurance, and (2) Group Hospital Indemnity Insurance to Defendant ACUSA, Group Policy No. TGHI02829009, effective August 1, 2016.

42.   Axis Insurance Company also contracts with third-party administrators, including Defendants Ocean Consulting Group, HII, HPI, and ACI,

-15-

to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs, as well as substantially similar plans purchased by putative class members.

43.    Axis Insurance Company knows that these plans are not comprehensive health insurance, despite being marketed and sold as such. Axis Insurance Company necessarily knew the plans were marketed in such a way as to lead consumers to believe they were being provided comprehensive medical coverage.  Specific to Plaintiffs, Axis Insurance Company knew that the "Liberty Health" plan was marketed by Axis Insurance Company's agents (HPI, HII, ACI and HEG) as a comprehensive PPO health plan that was part of the First Health PPO network when, in fact, it was not a PPO plan or any other type of comprehensive medical coverage.

44.    Axis Insurance Company and/or its state-side affiliates, including but not limited to Axis Specialty, also conduct a "verification" process during the sale of the sham insurance policies at issue.

45.    At all times relevant to this matter, Axis Insurance Company knew or should have known that it was an integral participant in the scheme to sell sham health insurance to consumers who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount, and availability of coverage provided under the purported "insurance" plans.  Axis Insurance Company reaped the benefits of the scheme alleged and received compensation in the form of premiums, commissions, or other monetary remuneration.

46.    Axis Insurance Company induced and aided and abetted the sale of sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including for Defendants HEG, HII, HPI, Cost Containment Group, Ocean Consulting Group, and ACI, which sold and

-16-

1    administered the "Liberty Health" plan purporting to provide access to First

2    Health's PPO Network, all while knowing or that these plans did not provide the

3    coverage promised to consumers.

4         47.    Indeed, Axis Insurance Company had a written contract with

5    Defendant HPI through which HPI was the Managing General Agent that enrolled

6    Plaintiffs and other consumers in the Liberty Health Plan and similar coverages.

7    This Managing General Agent Agreement was dated Jaunary 22, 2016.  As

8    discussed further in this Fourth Amended Complaint, the acts of a Managing

9    General Agent "are considered to be the acts of the insurer on whose behalf it is

10   acting."  Accordingly, any acts of Defendant HPI will also be imputed to Defendant

11   Axis Insurance Company.

12        48.    Axis Insurance Company participated in this conspiracy with the other

13   Defendants in this matter, in which at least one conspirator committed overt acts in

14   California in furtherance of the conspiracy.

15   **Axis Specialty**

16        49.    Defendant Axis Specialty is a Delaware Corporation and the U.S.

17   subsidiary of Defendant Axis Insurance Company.  Axis Specialty is registered to

18   do business in California and describes its business as "Insurance Services."  Axis

19   Specialty maintains multiple offices in California, including but not limited to

20   offices located at (i) 550 Gateway Drive, Suite 101, Napa, CA 94558, (ii) 725 South

21   Figueroa Street, Suite 2250, Los Angeles, CA 90017 and 450 Sansome Street, Suite

22   1600, San Francisco, CA 94111.  Axis Specialty holds California Insurance License

23   #0E28821, through which is it authorized to broker Property, Casualty, Special

24   Lines and Surplus Lines insurance.  Notably, Axis Specialty is <u>not</u> an insurer

25   providing "Health Insurance Coverage" in California.[4]

26

27   _____

28   [4] http://www.insurance.ca.gov/01-consumers/110-health/20-look/hcpcarriers.cfm
     (last accessed August 25, 2020).

-17-

50.     Axis Specialty is Axis Insurance Company's operational support entity and provides back-end support to Axis Insurance Company, allowing Axis Insurance Company to underwrite the "Liberty Health" coverage purchased by Plaintiffs.  Axis Specialty contracts with third-party administrators, including Defendants Cost Containment Group, Ocean Consulting Group, and ACI, to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs, as well as substantially similar plans purchased by putative class members.  Axis Insurance Company knows that these plans are not comprehensive health insurance, despite being marketed and sold as such.  Specific to Plaintiffs, Axis Specialty knew that the "Liberty Health" plan was marketed by Axis Specialty's agents (HPI, HII, ACI, Cost Containment Group, Ocean Consulting Group, and HEG) as a comprehensive PPO health plan that was part of First Health's PPO network when, in fact, it was no such thing.  Additionally, Axis Specialty and/or its employees, affiliates, or agents conducted a sham "verification" process during the sale of the "insurance" policies sold to Plaintiffs and putative class members.

51.     At all times relevant to this matter, Axis Specialty knew or should have known that it was an integral participant in the scheme to sell sham health insurance to consumers, who expended money on these services, which were of little to no value, based on material misrepresentations about the kind, type, amount and availability of coverage provided under the purported "insurance" plans.  Axis Specialty reaped the benefits of the scheme alleged herein and received compensation in the form of premiums or other monetary remuneration.

52.     At all times relevant, Axis Specialty induced and aided and abetted the other Defendants to sell the sham health insurance by offering significant incentives, compensation, or commissions for brokers and agents, including Defendants who sold these services, while knowing that these plans did not provide the coverage that

-18-

Defendants promised to consumers and having no reasonable basis for believing that the plans provided the coverage that Defendants promised to consumers.  Moreover, Axis Specialty participated in a conspiracy with the other Defendants in this matter, in which at least one conspirator committed overt acts in California in furtherance of the conspiracy.

**ACI**

53.     Defendant ACI is a Pennsylvania corporation with its principal place of business in Wayne, Pennsylvania.  ACI is a claims administrator for the sham health insurance plans sold to Plaintiffs and the putative class members.  ACI is registered with the California Department of insurance as a non-resident administrator, License No. 0C38805.  ACI contracts with Axis Insurance Company and/or Axis Specialty (together, "the Axis Defendants") to perform consumer sales and administrative services related to insurance plans (in California and across the country), including the "Liberty Health" plan purchased by Plaintiffs and substantially similar plans purchased by putative class members.

54.     ACI knew that these plans are illegally marketed and sold as comprehensive health insurance when they are not and yet did nothing to correct Plaintiffs' or the putative class members belief that they had been sold comprehensive medical coverage

55.     With regard to Plaintiffs, ACI was instructed by the Axis Defendants to pay the benefit amount at issue and to send statements of benefits to Plaintiffs in California.  ACI purposefully ignored Plaintiffs' requests for information concerning the "benefits" provided to conceal the true nature of the "sham insurance" and protect itself and other Defendants, including the Axis Defendants. ACI reaped the benefits of the scheme alleged and received compensation in the form of premiums or other monetary remuneration at the expense of consumers who expended money on these services, which were of little to no value.

56.     Moreover, ACI provided substantial assistance to the other

-19-

1   Defendants, including but not limited to the Axis Defendants, in perpetuating,

2   aiding, and abetting the fraudulent scheme alleged in this Fourth Amended

3   Complaint.  For example, ACI knew that Plaintiffs (and other consumers) believed

4   they had purchased comprehensive medical insurance from ACUSA and the Axis

5   Defendants.  Indeed, ACI was identified as the PPO Claims Administrator on

6   Plaintiffs' insurance card.  ACI nonetheless protected itself and the other

7   Defendants by screening calls and complaints when administering the "insurance"

8   plan at issue.

9        57.    On information and belief, ACI was an integral participant in

10   developing and administering the Liberty Health Plan as a whole, and without

11   ACI's knowing participation, aiding, and abetting the scheme, the scheme would

12   not have been effectuated.

13        58.    At all times relevant, ACI knew or should have known that it was a

14   direct, active and integral participant in a scheme to defraud consumers, including

15   Plaintiffs and putative class members.  *See* **Figure 5**.

16        59.    ACI participated in a conspiracy to defraud consumers with the other

17   Defendants in this matter, in which at least one conspirator committed overt acts in

18   California in furtherance of the conspiracy.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

**Figure 5**

**ACI working as Claims Administrator for Defendant AXIS, Group Name "Liberty Health" - ACUSA**



**HPI**

60.    Defendant HPI is a Delaware Corporation with its principal place of business in Tampa, Florida.  HPI is a wholly owned subsidiary of Defendant HII.  HPI has contacts with California and the claims and causes of action at issue in this FourthAmended Complaint arise out of HPI's contacts with this state.  HPI maintains an office in California, located at 444 Castro Street, #917, Mountain View, CA 94041.  HPI is registered to do business in California and describes the business or services it provides as "Insurance."  HPI has invoked the benefits and protections of California law by, among other things, holding California Insurance License No. 0I21968 as an "Accident and Health" administrator.  Pursuant to this license, HPI is authorized to transact and did transact business in California on its own behalf and on behalf of other Defendants, including Defendants Axis Insurance Company, Axis Specialty, Ocean Consulting Group, Cost Containment Group, ACUSA, and HEG related to the sale of sham insurance.  HPI has subjected itself to jurisdiction in the State by maintaining an office here, registering to do business here, and obtaining a license to sell insurance here.  Additionally, HPI has consented to the jurisdiction of this Court.  (ECF No. 94.)

-21-

61.     Through its contacts in California that gave rise to the claims alleged herein, HPI reaped the benefits of the scheme and received compensation in the form of "premiums," commissions or other monetary remuneration at the expense of consumers who expended money on these services.  HPI directed the other Defendants, as detailed further herein, including the Axis Defendants, OCG, CCG, HEG, and ACUSA to use "Liberty Health" as the marketing name for the limited benefit plan that was sold to Plaintiffs and putative class members in this state and across the country.

62.     HPI provided funding, trained the other Defendants' sales and underwriting agents, and issued and/or approved the script used by HEG and Axis Insurance Company to sell the "Liberty Health" insurance plan to Plaintiffs.

63.     Specifically, HPI entered contracts and had on-going relationships with Axis Insurance Company, Axis Specialty, Cost Containment Group, Ocean Consulting Group and the other Defendants related to HPI's activities in California that gave rise the claims alleged here, including but not limited to contracting to perform consumer sales and administrative services related the "Liberty Health" policy and other policies sold in this State.  HPI was the General Managing Agent for for Axis Insurance Company with respect to the Liberty Health Plan, pursuant to a Managing General Agent Agreement dated January 22, 2016.  HPI also entered a Business Associate Agreement with Axis Insurance, dated February 1, 2017, related to the Liberty Health Plan.

64.     Under California Insurance Code Article 5.4, known as the Managing General Agents Act, a Managing General Agent, like HPI, is "any person [or] firm…who… manages all or part of the insurance business of an insurer (including the management of a separate division, department or underwriting office) and acts as an agent for that insurer …"

65.     Plaintiffs are further informed and believe that, in its role as Managing General Agent for the Axis Defendants, HPI collected funds on the Axis

-22-

1    Defendants' behalf and retained those funds for purposes of paying claims made
2    under the Liberty Health and other Axis underwritten plans, including the plans
3    purchased by Plaintiffs and other putative class members.

4        66.   Under the California Insurance Code, "[A]cts of the MGA [Managing
5    General Agent] are considered to be the acts of the insurer on whose behalf it is
6    acting." *See* California Insurance Code § 769.85.  Accordingly, all HPI's acts as
7    alleged in this Fourth Amended Complaint are considered to be the acts of the Axis
8    Defendants.

9        67.   On information and belief, **Figures 6 and 7** reflect examples of HII
10   and HPI "lead generators" that were used to sell the "Liberty Health" plan,
11   including in California.  On information and belief, when Plaintiffs were searching
12   for health insurance options during the relevant time-period, Plaintiffs viewed and
13   relied on statements on HII's and HPI's lead generating websites related to the
14   Liberty Health Plan.  This gave credence to Plaintiffs' belief that the Liberty Health
15   Plan was ACA-compliant, comprehensive insurance coverage and was a substantial
16   contributing factor to Plaintiffs' decision to purchase the Liberty Health Plan.  To
17   the extent these advertisements are not demonstrably false, they nonetheless have a
18   tendency to deceive and/or confuse the public, and, in fact, did exactly that the
19   Plaintiffs and putative class members.

20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27
28

-23-

**Figure 6**
**"Liberty Health" Google Advertisement**



**Figure 7[5]**

**"Liberty Health" Insurance "Quote Generator" / Information Gathering Tool**

68.     At all times relevant, HPI knew or should have known that it was an active and integral participant in a scheme to defraud consumers, including Plaintiffs and putative class members.  Other states have already issued cease and desist orders against HPI for using fraudulent and dishonest practices in attempting

---

[5] https://quote.firstquotehealth.com/?campaign_source=NG_HE_GSNC1& campaignmedium=search&s2=Liberty%20Health%20Insurance&s1=1394477420& gclid=CjwKCAjwte71BRBCEiwAU_V9h78ol3RKwxrx8wvvsAUET2z8e1JywLo HrDA4kHeIYswHqBZpUJEbThoCBagQAvD_BwE&utm_term=Liberty%20Healt h%20Insurance&utm_medium=search&utm_campaign=1394477420&utm_source= NG_HE_GSNC1 (last accessed June 25, 2020).

-24-

1    to sell sham health insurance within those states.[6]

2        69.    HPI participated in a conspiracy with the other Defendants in this

3    matter, in which at least one conspirator committed overt acts in California in

4    furtherance of the conspiracy.  Indeed, plaintiffs are informed and believe that HPI

5    (together with HII below), entered into a Regulatory Settlement Agreement with

6    multiple jurisdictions after an investigation into the same type of unscrupulous

7    advertising and sales tactics used to deceive consumers as those alleged herein.

8    **HII**

9        70.    Defendant HII is a Delaware Corporation with its principal place of

10   business in Tampa, Florida.  HII is the parent company of Defendant HPI.  HII has

11   contacts with California and the claims and causes of action at issue in this Fourth

12   Amended Complaint arise out of HII's contacts with this state.  Additionally, HII

13   has consented to the jurisdiction of this Court.  (ECF No. 94.)

14       71.    AXIS explained HII's role in this scheme to the California

15   Department of insurance as part of the Department's investigation.  See **Figure 8.**

16

17

18

19                      [INTENTIONALLY LEFT BLANK]

20

21

22

23

24

25

26

27   _____

         [6]https://www.insurancejournal.com/news/southcentral/2016/03/28/403241.ht
28   m (last accessed June 25, 2020).

                                    -25-

**Figure 8 – Axis Letter to California Department of Insurance**



72.     HII also contracted with the Axis Defendants to perform consumer sales and administrative services related to insurance plans, including the "Liberty Health" plan purchased by Plaintiffs in California and substantially similar plans purchased by putative class members across the country. Through its contacts in California that gave rise to the claims alleged herein, HII reaped the benefits of the scheme and received compensation in the form of "premiums," commissions or other monetary remuneration at the expense of consumers who expended money to purchase the plans.

73.     HII is a broad and wide-reaching holding company system. In its

-26-

Initial Public Offering Prospectus, it described itself as a "leading **developer and administrator** of affordable, web-based individual health insurance plans and ancillary products."[7]  It touted that its platform allows for "mass distribution and online enrollment in our large and diverse portfolio of affordable health insurance offerings." It continued that it provided "significant operating leverage as [it] add[s] members and reduces the costs associated with marketing, selling, underwriting, and administering policies."[8]  On information and belief, HII did all of the above with regard to the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class members.

74.    Further, HII "design[s] and structure[s] insurance products on behalf of insurance carrier companies," like the Axis Defendants here, and "market[s] them to individuals through our large network of distributors and managed member relations…"[9]  At the time of its IPO, HII was proud of its "large independent distribution network…consist[ing] of 32 licensed agent call centers and 248 wholesalers[.]"[10]  On information and belief, HII's large independent distribution network has grown significantly since the IPO and, as of 2019, consisted of more than 14,000 third party brokers and agents.  It was through this network that HII

[7] *See* https://www.sec.gov/Archives/edgar/data/1561387/000119312513047216/d439448d424b4.htm (last accessed March 31, 2021.

[8] Id.

[9] Id.

[10] On information and belief, effective March 6, 2020, HII changed its name to Benefytt Technologies, Inc.  Shortly thereafter, on information and belief, Benefytt announced a private-equity backed take-private deal whereby it was purchased by Madison Dearborn Partners in an all-cash transaction with stock valued at $31 per share, which represented a large premium on Benefytt's average trading price.  (Notably, a total of 13,576,316 were tendered, making the all-cash transaction worth at least $420 million).  Because of this transaction, HII (now called Benefytt) is no longer publicly traded and no longer required to make the same SEC disclosures.

1    controlled the sale of the Liberty Health Plan to Plaintiffs and substantially similar

2    plans to putative class members.

3          75.    At all times relevant to this Complaint, HII knew or should have

4    known that it was an active and integral participant in a scheme to defraud

5    consumers, including Plaintiffs and putative class members.

6          76.    In fact, HII has been the subject of investigation by the U.S. House of

7    Representatives Committee on Energy and Commerce, Subcommittee on Health.

8    In a June 2020 report, the Subcommittee on Health found that as of "September

9    2019, there were 14,000 independent agents and brokers licensed to sell insurance

10   products through HII's platform."  The Committee concluded that "that HII's

11   operation and business structure incentivizes third-party agents and brokers to

12   actively target vulnerable consumers seeking comprehensive health coverage and

13   deceive them into purchasing…medical discount plans."  The Committee Report is

14   available at https://www.hsdl.org/?abstract&did=841078 (last accessed July 27,

15   2021).

16         77.    The Congressional Subcommittee Report also found that HII "solicits

17   carriers and helps them develop products for HII's target markets" which include

18   "consumers who are looking to buy comprehensive health insurance."  In making

19   this conclusion, "[t]he Committee reviewed thousands of consumer complaints

20   made directly to HII in arriving at these findings, including complaints from

21   consumers who were deceptively enrolled in these plans."

22         78.    The Congressional Subcommittee also "conclude[d] **that HII, its**

23   **subsidiary companies, and the third-party agents and brokers that HII are in a**

24   **contractual relationship with defraud and deliberately mislead consumers**

25   **seeking comprehensive health coverage, leaving them saddled with hundreds**

26   **of thousands of dollars of medical debt**."  The Committee further found that "HII

27   affiliated brokers and agents also misleadingly advertise to consumers that these

28   policies provide "**access to extensive provider network**," and assure consumers

-28-

1    that they "can visit any doctor they want."

2        79.    The Congressional Subcommittee Report further concluded that

3    "**HII's business practices incentivize agents and brokers to engage in**

4    **fraudulent and misleading practices**." (Emphasis in original).

5        80.    HII participated in a conspiracy with the other Defendants in this

6    matter, in which at least one conspirator committed overt acts in California in

7    furtherance of the conspiracy.  Indeed, Plaintiffs are informed and believe that HII

8    (together with HPI), entered into a Regulatory Settlement Agreement with multiple

9    jurisdictions after an investigation into the same type of unscrupulous advertising

10   and sales tactics used to deceive consumers as those alleged herein.

11       **Ocean Consulting Group**

12       81.    Defendant Ocean Consulting Group, Inc. is a Delaware corporation

13   with its principal place of business at 1555 Palm Beach Lakes Blvd, Suite 810,

14   West Palm Beach, Florida.  Ocean Consulting Group is a wholly owned subsidiary

15   of Cost Containment Group.

16       82.    At all times relevant, Ocean Consulting Group knew or should have

17   known that it was an active and integral participant in a scheme to defraud

18   consumers, including Plaintiffs and putative class members.

19       83.    Indeed, on March 24, 2016, Ocean Consulting Group entered into a

20   Marketing and Program Management Agreement with Defendant HPIH and non-

21   party Health Option One, which is another broker for the Liberty Health Plan.

22       84.    Moreover, Ocean Consulting Group purports to be a third party

23   adminstrator for purposes of customer support and payment processing for the

24   Liberty Health Plan.

25       85.    Ocean Consulting Group participated in this conspiracy with the other

26   Defendants in this matter, in which at least one conspirator committed overt acts in

27   California in furtherance of the conspiracy.

28   ///

1        **Cost Containment Group**

2        86.     Defendant Cost Containment Group is a Delaware corporation that

3    shares the 1555 Palm Beach Lakes Blvd address for its principal place of business

4    with Defendant Ocean Consulting Group.  Cost Containment Group is a holding

5    company that, on its own and through its subsidiaries—including through

6    Defendant Ocean Consulting Group—provides insurance-related needs, medical

7    savings and enhancement programs, and special risk and niche applications.  Cost

8    Containment Group often refers to itself as "CCG."[11]

9        87.     At all times relevant, Cost Containment Group knew or should have

10   known that it was an active and integral participant in a scheme to defraud

11   consumers, including Plaintiffs and putative class members.

12       88.     Cost Containment Group participated in this conspiracy with the other

13   Defendants in this matter, in which at least one conspirator committed overt acts in

14   California in furtherance of the conspiracy.

15       89.     In addition to sharing the same address, Cost Containment Group and

16   Ocean Consulting Group also have the same officers, directors and supervisors,

17   including individuals Robert Hodes, Tracy Bourandas and April Levine.

18       90.     Robert Hodes and Tracy Bourandas caused Cost Containment Group

19   to be formed in 2005 and have controlled Cost Containment Group from then

20   through today.  Hodes is Cost Containment Group's CEO.  Bourandas is Cost

21   Containment Group's Chief Operating Officer, Chief Financial Officer, and

22   Secretary.  Hodes and Bourandas have also served as Directors for Cost

23   Containment Group since 2005.  On information and belief, Levine is also a

24   Director of Cost Containment Group and a senior member of CCG's executive

25

26

27   _____

28

1   team.[12]

2       91.     Levine is also Ocean Consulting Group's President and CEO and a

3   Director.  Tracy Bourandas is also a Director of Ocean Consulting Group.

4       92.     During all relevant times, Ocean Consulting Group and Cost

5   Containment Group have not maintained corporate formalities.  Indeed, at all

6   relevant times neither Cost Containment Group nor Ocean Consulting Group have

7   held legitimate Board of Directors Meetings.  Nor have they kept records of

8   meetings and/or other corporate activities.  In addition, funds are co-mingled

9   between Cost Containment Group, Ocean Consulting Group, Hodes, Bourandas and

10  Levine.

11      93.     Cost Containment Group has numerous, systematic contacts with

12  California and the claims and causes of action at issue in this Fourth Amended

13  Complaint arise out of CCG's contacts with this state.   Specifically, once Mr.

14  Ketayi made the decision to purchase the Liberty Health Plan, he was "transferred

15  to Cost Containment Group to complete the transaction."

16

17

18

19                     [INTENTIONALLY LEFT BLANK]

20

21

22

23

24

25

26

27

28
[12] Cost Containment Group's website formerly had  a webpage identifying its
executive team.  Since the filing of this lawsuit, that website has been taken down.

**Figure 9, Excerpts from HII Response to California Dept. of Insurance**



94.     This occurred on November 22, 2016 and is reflected on a call log that was generated by CCG's "CRM Software."  Customer support calls are logged into CCG's CRM Software by the customer service representative who facilitated the call.  These calls must be logged before the customer service representative can exit out of the call.  Customer service representatives can also manually enter notes and comments into the CRM Software during a call with a customer.

95.     The CRM Software tracks and makes notes of which customer service representative took each call/provided customer support.  With respect to Plaintiffs Eric and Miryam Ketayi, each customer service representative with whom Plaintiffs interacted was an employee of Cost Containment Group acting within the course of scope of employment at the time of the respective call with Plaintiffs.  Thus, in addition to the enrollment/initial payment call that took place on November 22, 2016, Plaintiffs spoke directly with CCG employees on numerous occasions about their Lberty Health Plan.

96.     Specifically, on November 23, 2016, the day after Plaintiffs enrolled in the Liberty Health Plan, Plaintiffs spoke to Jennifer Cisneros about their Liberty Health Plan.  Ms. Cisneros was a Cost Containment Group employee acting within the course and scope of her employment at the time she spoke to Plaintiffs.[13]  A record of this call was logged in CCG's CRM Software.  At the time of this call, Ms. Cisneros was a registered insurance broker in California, holding two California insurance licenses.

97.     On Feburary 17, 2017, Plaintiffs spoke to Justin Starling about their Liberty Health Plan.  Mr. Starling was a Cost Containment Group employee acting within the course and scope of his employment at the time he spoke to Plaintiffs.[14]  A record of this call was logged in CCG's CRM Software.  According to the call notes in the CCG CRM Software, Mr. Starling "[g]ave dependent claims info" and informed that the "plan was active."

98.     On February 27, 2017, Plaintiffs spoke to Janell Robinson about their Liberty Health Plan.  Ms. Robinson was a Cost Containment Group employee acting within the course and scope of her employment at the time she spoke to Plaintiffs.[15]  A record of this call was logged in CCG's CRM Software.  According to the call notes in the CCG CRM Software, Ms. Robinson "advised" Plaintiffs about "other charges[.]"

99.     On April 27, 2017, Plaintiffs spoke to Imani Davis about their Liberty Health Plan.  Ms. Davis was a Cost Containment Group employee acting within

---

[13] Ms. Cisneros was employed by CCG from September 7, 2016, through January 20, 2017.

[14] Mr. Starling was employed by CCG from Jauary 3, 2017 through November 22, 2017.

[15] Ms. Robinson was employed by CCG from December 21, 2016, through the present.

the course and scope of her employment at the time she spoke to Plaintiffs.[16]   A
record of this call was logged into CCG's CRM Software.  According to the call
notes in the CCG CRM Software, Ms. Davis provided an explanation of benefits
for two visits "in network."

100.   On July 7, 2017, Plaintiffs spoke to Janet Grassadonio about their
Liberty Health Plan.  Ms. Grassadonio was a Cost Containment Group employee
acting within the course and scope of her employment at the time she spoke to
Plaintiffs.[17] A record of this call was logged into CCG's CRM Software.
According to the call notes in the CCG CRM Software, Ms. Grassadonio "went
over" benefits of the Liberty Health Plan with Plaintiffs.

101.   On August 18, 2017, Plaintiffs spoke to Florence Howard.  Ms.
Howard was a Cost Containment Group employee acting within the course and
scope of her employment at the time she spoke to Plaintiffs.[18]   A record of this call
was logged into CCG's CRM Software.  According to the call notes in the CCG
CRM Software, Ms. Howard cancelled Plaintiffs' plan, because Plaintiffs were
"[u]nsatisifed with Claims payout."

102.   In addition to these calls that Cost Containment Group employees had
directly with Plaintiffs, Cost Containment Group employees also spoke to
Plaintiffs' medical providers about Plaintiffs' Liberty Health Plan coverage on
multiple occasions.

103.   On March 22, 2017, Plaintiffs' provider from Beverly Hills
Dermatology called concerning Plaintiffs' Liberty Health Plan and spoke with Jane

---

[16] Ms. Davis was employed by CCG from January 3, 2017, through July 1, 2017.

[17] Ms. Grassadonio was employed by CCG from September 15, 2015 through October 15, 2019.

[18] Ms. Howard was employed by CCG from April 26, 2016, through the present.

1    Richman.  Ms. Richman was a Cost Containment Group employee acting within
2    the course and scope of her employment at the time of this call.[19]  A record of this
3    call was logged into CCG's CRM Software.  According to the call notes in the
4    CCG CRM Software, this call concerned "verifying coverage" for Plaintiffs under
5    the Liberty Health Plan.

6        104.    On March 29, 2017, Plaintiffs' provider from Beverly Hills
7    Dermatology spoke with Maria Galindo concerning Plaintiffs' Liberty Health Plan.
8    Ms. Galindo was a Cost Containment Group employee acting within the course
9    and scope of her employment at the time of this call.[20]  A record of this call was
10   logged into CCG's CRM Software.  According to the call notes in the CCG CRM
11   Software, the call concerned "eligibility and benefits" under the Liberty Health
12   Plan and was transferred "to Axis regarding a previous claim."

13       105.    On that same day, March 29, 2017, Plaintiffs' provider at Beverly
14   Hills Dermatology also spoke to Diamond Williams concerning Plaintiffs' Liberty
15   Health Plan. Ms. Williams was a Cost Containment Group employee acting within
16   the course and scope of her employment at the time of this call.[21]  A record of this
17   call was logged into CCG's CRM Software.  At the time of this call, Ms. Williams
18   was also a registered insurance broker in California.  According to the call notes in
19   the CCG CRM Software, Ms. Williams transferred this call concerning Plaintiffs'
20   Liberty Health Plan to ACI.

21       106.    On August 3, 2017, Plaintiffs' medical provider at Cedar Sinai spoke
22   to Gina Affatato concerning Plaintiffs' Liberty Health Plan.  Ms. Affatato was a

23

24
25        [19] Ms. Richman was employed by CCG from January 30, 2015 through the
     present.

26        [20] Ms. Galindo was employed by CCG from September 7, 2016 through May
27   5, 2017.

28        [21] Ms. Williams was employed by CCG from October 25, 2016 through May
     1, 2017.

-35-

Cost Containment Group employee acting within the course and scope of her employment at the time of this call.[22]  A record of this call was logged into CCG's CRM Software.  This call concerned coverage for Plaintiff Eric Ketayi's back surgery.  According to the call notes in the CCG CRM Software, Ms. Affatato "[a]dvised provider policy is active."

107.   Cost Containment Group is not licensed to sell, market, enroll, underwrite, or administer insurance in California.  Nonetheless, as set forth above, its employees actively adminster customer service and payment processing for the Liberty Health Plan, despite lacking a license to do so.

108.   Cost Containment Group is also involved in the financing, management, and operations of Ocean Consulting Group.  Indeed, Ocean Consulting Group has no employees.  It is merely a shell company designed to protect its parent, CCG from liability.  So, although Ocean Consulting Group enters into contracts (like here, the March 24, 2016, Marketing and Program Management Agreement with HPI), all the work to effectuate those contracts is completed by individuals who are underlined actually employed by Cost Containment Group.  Thus, Cost Containment Group not only directs Ocean Consulting Group's day-to-day operations, its employees actually conduct those day-to-day operations.

109.   Cost Containment Group and Ocean Consulting Group are fully integrated into the insurance market and into this scheme with the other Defendants as set forth above.  In addition, they provided email marketing, website development and hosting, and promotions mailing.  They also helped develop and provide plan documents, including fulfillment books and ID cards.[23]  *See* **Figure 10.**  Without Ocean Consulting Group and Cost Containment Group's

_____

[22] Ms. Affatato was employed by CCG from September 15, 2015 through April 16, 2018.

[23] *See* https://ccgfamily.com/services/marketing-graphics/ (last accessed March 31, 2021).

-36-

1  participation, this scheme could not have been effectuated.

2  **Figure 10 – Services Provided by CCG and Ocean Consulting Group**



12  110.    Cost Containment Group together with HII, HPI and the Axis

13  Defendants was responsible for the development of the ACUSA/Liberty Health

14  fulfillment materials and ID card provided to Plaintiffs and the putative class

15  members in this case.  Cost Containment Group reached into California through its

16  employees' multiple contacts with Plaintiffs and Plaintiffs' medical providers, as

17  well as to provide fulfillment materials to Plaintiffs through CCG's online portal.

18  These fulfilment materials continuously touted "PPO Network Access," further

19  causing Plaintiffs and the putative class members to believe that they had, in fact,

20  purchased a PPO plan.  Cost Containment Group developed and provided these plan

21  fulfillment materials along with the other Defendants with knowledge that the

22  materials would mislead consumers into believing that they had purchased

23  comprehensive PPO medical coverage.  *See* **Figures 11-13**. Cost Containment

24  Group did so in order to reap the financial benefits of the scheme alleged herein.

25  111.    Cost Containment Group is and has been registered with the

26  California Secretary of State since 2013. Cost Containment Group does, in fact, do

27  business in California, which business gave rise to Plaintiffs' claims against Cost

28

-37-

Containment Group in this case.  In particular, Cost Containment Group reaches into California to provide insurance related services, including provision of fulfillment materials to Plaintiffs and putative class members, customer service and payment processing to Plaintiffs and putative class members, and completion of other third-party adminstrator tasks related to the Liberty Health Plan in California.

**Figure 11**

**Back Side of Eric Ketayi's Insurance Card (Highlighting Added)**



**Figure 12**

**Website Identified on Mr. Ketayi's Insurance Card**



FOURTH AMENDED CLASS ACTION COMPLAINT

**Figure 13**

**Excerpt from Fulfillment Materials**



112.    Cost Containment Group also touts its strengths as "insurance products," "discount programs," "consumer savings benefits," "customer service," "enrollment services," and "plan fulfillment (web/print)."  Cost Containment Group, through its employees, provided these services with respect to the "insurance" plans at issue in this case—specifically with respect to the Liberty Health Plan sold to Plaintiffs as set forth above. Cost Containment Group also directed and controlled the actions of its subsidiary, Ocean Consulting Group, through their common executive teams, which include Levine, Hodes and Bourandas.  All of Ocean Consulting Group's day-to-day operations are also completed by individuals actually employed by Cost Containment Group.

113.    Cost Containment Group also provided substantial assistance to the other Defendants, including but not limited to the Axis Defendants and the HII

Defendants, in perpetuating, aiding, and abetting the fraudulent scheme alleged in this Fourth Amended Complaint.  For example, Cost Containment Group developed fulfillment materials that misrepresented that coverage provided was "PPO" coverage.  Cost Containment Group knew, however, that the plans were not, in fact, comprehensive medical coverage at all.  Without Cost Containment Group's participation in this scheme, it would not have been effectuated.  Cost Containment Group also had numerous contacts directly with Plaintiffs and Plaintiffs' medical care providers concerning Plaintiffs' Liberty Health Plan, as set forth above.

114.   Defendant Ocean Consulting Group caters to insurance agents and brokers and touts that agents and brokers "can expect to receive the **highest level of compensation** without the hassles of market due diligence, multiple RFP submissions and rate analysis" by "utilizing [Cost Containment Group's] participating underwriting partners," which include the AXIS Defendants and the HII Defendants. Thus, Cost Containment Group and Ocean Consulting Group induce agents and brokers through high commissions to participate in this fraudulent scheme.  This comports with the U.S. Congressional Subcommittee's finding that the HII Defendants' network is used for this very purpose.

115.  Defendants purposefully disguise the entity that is responsible for each step in Defendants' coordinated scheme.  No consumer could tell, without significant investigation and legal discovery, which entity Defendant has exactly which role in the scheme.  This is exactly how Defendants have covered their tracks for so long.

116.  Each Defendant has aided and abetted every other Defendant's act(s), conspired in furtherance of every other Defendant's fraud, and agreed to an overall fraudulent scheme, furthered by each Defendant's wrongdoing as alleged in more detail in this Fourth Amended Complaint.

117.  Each Defendant served as an agent of every other Defendant for purposes of effectuating the fraudulent scheme alleged herein.

118.  At all times relevant to this Complaint, HEG, ACUSA, ACI, Axis Insurance Company, Axis Specialty, HPI, HII, Ocean Consulting Group and Cost Containment Group have operated as a common enterprise and in a common course of conduct while engaging in the deceptive acts and practices and other violations of law as alleged in this Fourth Amended Complaint.

119.  Defendants have conducted the business practices described below through interrelated companies, many of which have common ownership, officers, managers, business functions, and office locations, which have co-mingled assets, and hold themselves out as "Liberty Health" to consumers.  *See* **Figure 14**.

**Eric Ketayi's "insurance" card identifying Defendants AXIS, "Liberty Health," ACUSA and ACI**

 

120.  Defendants operated as a common enterprise to accomplish the wrongs complained of in this Fourth Amended Complaint.  The purpose and effect of this common enterprise and common course of conduct complained of was to financially benefit Defendants at the expense of Plaintiffs, consumers, and putative class members.

121.  Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and common course of conduct complained of herein and was aware of its overall contribution to, and furtherance of, the common enterprise and common course of conduct.  Because Defendants have operated as a

1   common enterprise, each of them is jointly and severally liable for the acts and

2   practices detailed herein.

3       **III.    FACTUAL ALLEGATIONS**

4           **Defendants' Bait and Switch Scheme Traps Consumers**

5       122.   Defendants work together to target consumers who are seeking

6   comprehensive health insurance.  These consumers typically either do not have

7   health insurance or pay high premiums for their insurance and are seeking

8   comprehensive coverage that costs less than their current plans.

9       123.   Comprehensive health insurance plans generally involve an

10   arrangement between an insurance company licensed to do business in the State of

11   California and a consumer in which the company agrees to pay a substantial portion

12   of the healthcare expenses that the consumer might incur in exchange for a

13   consumer's premium payments.

14       124.   A preferred provider organization plan, commonly referred to as a

15   PPO plan, is a type of comprehensive health insurance plan.  In a PPO plan,

16   medical providers such as hospitals and doctors contract with an insurer or a third-

17   party administrator to provide health care at reduced rates to the insurer's or the

18   administrator's clients.

19       125.   Since at least November 2016 and at all times relevant during the

20   class period, HEG, HPI, HII, CCG, OCG, ACUSA and the Axis Defendants have

21   uniformly claimed to offer consumers like Plaintiffs and putative class members

22   comprehensive health insurance plans, including PPO plans.  Defendants lead

23   consumers to reasonably believe that they will receive a comprehensive PPO health

24   insurance plan that will cover preexisting medical conditions, prescription drug

25   medications, primary and specialty care treatment, inpatient and emergency hospital

26   care, surgical procedures, and medical and laboratory testing.  They do so through

27   their own websites and lead generation websites run either by them, or by third

28   party agents on their behalf.

-42-

126.    Consumers often find these websites by conducting internet searches for "health insurance" or "Obamacare" and related terms.  Defendants own some of these sites themselves and also pay lead generators for leads generated on third-party sites.  **Figure 15** is an example of one of these lead generating websites:

**Figure 15**



127.    In their advertising and promotional materials that were made available since at least 2016, including on their websites (examples of which are set forth above), Defendants HEG, HII, and HPI uniformly claim to offer a broad selection of comprehensive health care insurance policies.  Those plans, in reality, do not exist.  To the extent these advertising representations are not demonstrably false, they nonetheless have a tendency to decieve and/or confuse the public with respect to what insurnace is actually being sold, and, in fact, did exactly that to Plaintiffs and putative class members.

128.    HEG, for example, claimed its "PPO's work with over 80% of physicians Nationwide."  HEG also claimed to "work with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance" and "Obamacare."  **Figures 1–3**.  In using the term "Obamacare," HEG misleads consumers into believing that they are being offering comprehensive,

-43-

1   ACA-qualified health insurance plans.

2        129.   With regard to the "Liberty Health" plan purchased by Plaintiffs (and

3   substantially similar plans purchased by putative class members), HPI, HII,

4   ACUSA, and Cost Containment Group advertising and fulfillment materials

5   promised "Top Rated Carriers," "Health Insurance," and "Avoid Tax Penalty" and

6   "PPO Network Access."  Use of these phrases mislead consumers, including

7   Plaintiffs who viewed websites owned, developed and/or run by HPI, HII, ACUSA

8   and Cost Containment Group, and putative class members into believing that they

9   are being offered comprehensive, ACA-qualified health insurance plans.

10       130.   In reality, HEG, HII, HPI, ACUSA, Axis and Cost Containment

11  Group have no intent to sell consumers comprehensive health coverage, and the

12  plans sold to consumers like Plaintiffs are not comprehensive health insurance or

13  ACA-qualified health plans.  Rather, Defendants HEG, HII, and HPI have already

14  contracted with Defendants ACUSA and the Axis Defendants to sell limited benefit

15  plans, also known as limited benefit indemnity plans or hospital indemnity plans,

16  and medical discount and wellness program memberships that are essentially

17  worthless.

18       131.   In contracting with HEG, HII, HPI, ACUSA and Cost Containment

19  Group and Ocean Consulting Group to market the plans they underwrite (including

20  appointing HPI as the Managing General Agent for the Liberty Plan), the Axis

21  Defendants necessarily knew and continue to know how Defendants HEG, HII,

22  HPI, ACUSA and Cost Containment Group will market, sell, and administer those

23  plans—*i.e.*, as comprehensive, ACA-qualified health insurance plans.  The Axis

24  Defendants also know that they do not, in reality, underwrite any such

25  comprehensive plans.  Accordingly, the Axis Defendants understand, adopt, and

26  endorse the other Defendants' unfair, false, and fraudulent conduct and advertising.

27  Moreover, conduct committed by the Axis Defendants' Managing General Agent

28  HPI is imputed to the Axis Defendants pursuant to the California Insurance Code,

-44-

1   Magaing General Agents Act.

2        132.    The products advertised, sold, administered and underwritten by

3   Defendants do not provide consumers with the benefits promised.  Limited benefit

4   plans, in contrast to PPO plans, provide non-comprehensive coverage capped at a

5   specific amount for a specific service, treatment, condition, or disease.  There is no

6   agreement by which a health insurer agrees to pay a substantial portion of the

7   healthcare expenses that the consumer might incur in exchange for the consumer's

8   premium payments.  Moreover, the "insurer" incurs no risk whatsoever when a

9   consumer enrolls in a limited benefit plan, because often, as was the case with

10  Plaintiffs here, the "premiums" paid to obtain the plan based on the representations

11  that the plan is a PPO plan exceed the maximum amount of coverage that the

12  limited plan provides.  This is unconscionable, unethical, immoral and unscrupulous

13  conduct.

14       133.    After consumers are lured in by misleading websites offering

15  "comprehensive" health insurance, consumers typically connect with a sales

16  representative of HEG, HII, HPI, Cost Containment Group, Ocean Consulting

17  Group or ACI by phone, who is acting as an agent for HEG, HII, HPI, or ACI and

18  also as an agent or broker on behalf of ACUSA and the Axis Defendants (the

19  policyholder and underwriter/insurer).  Consumers speak to one of the trained sales

20  representatives, who may identify themselves as an insurance agent supposedly

21  licensed in the consumer's state.  Sometimes consumers may also first speak to a

22  pre-qualification representative who gathers personal background information about

23  the consumer before transferring the call to another agent.  These "agents" typically

24  are not properly licensed insurance agents and may not even be working under a

25  licensed insurance agent.  Rather, they are simply salespeople at a call center

26  parroting a sales pitch from a script that was developed, drafted and/or approved by

27  HII and/or HPI.

28       134.    In fact, several of the named Defendants in this Fourth Amended

-45-

1  Complaint are not licensed in California to solicit, sell, broker, offer to sell,

2  underwrite, effect or enter into contracts or otherwise claim to provide <u>health</u>

3  <u>insurance</u> coverage or plans, whether authentic or sham.  As a result, their conduct

4  is illegal, and all resulting contracts are voidable and subject to rescission pursuant

5  to, among other statutes, California Insurance Code section 1621 ("[A] person shall

6  not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities

7  defined in Article 1 (commencing with Section 1621) unless the person holds a

8  valid license from the commissioner authorizing the person to act in that

9  capacity.").

10  135.    Using scripts written, disseminated and/or approved by HPI and HII

11  for use on sales calls like those directed at Plaintiffs, the sales representatives make

12  uniform statements to every potential customer, promising that the plans will cover

13  preexisting medical conditions, prescription medication, hospitalization, lab work,

14  and access to primary care physicians, specialists, and other healthcare providers.

15  During the scripted speeches, sales representatives refer to the monthly payments

16  consumers must make as "premiums" and use other insurance terms of art, such as

17  "PPO," "copay," "deductible," "coverage," and "preexisting conditions."  Because

18  they are not actually providing comprehensive health insurance, these terms have

19  no relevance to the limited benefit plans and discount memberships and their use is

20  false and misleading.

21  136.    These statements are all part of a script that experienced sales

22  representatives and brokers are trained on by HEG, HPI and HII to deliver to each

23  potential customer in order to deceive consumers, like Plaintiffs, into purchasing

24  this sham health insurance service.  One former employee of Defendant HEG

25  described his role at the company as "mak[ing] calls to try to scam people into

26  buying sub-par health insurance . . . ."  This is exactly what happened to Plaintiffs

27  and the putative class members.

28  137.    During these scripted calls, consumers are told by HPI, HII, HEG, and

-46-

1  ACI that the "PPO" health insurance plan they are offering is widely accepted by
2  doctors in the consumers' geographical area, or that it is accepted by virtually all
3  doctors in the country.  Consumers such as Plaintiffs and putative class members
4  reasonably rely on these representations in purchasing "insurance" from
5  Defendants, believing they are purchasing comprehensive health coverage when in
6  fact they are being offered a limited benefit plan or medical discount membership
7  that does not provide the represented coverage.  These representations are
8  uniformly made and convince consumers that the plans they are being offered are
9  "comprehensive," or Obamacare, or will allow them to "avoid tax penalties."  None
10 of this is true.

11         138.    Once a consumer expresses interest in purchasing a plan, the HPI, HII,
12 HEG, Ocean Consulting Group or Cost Containment Group agent arranges for
13 payment by asking for the consumer's credit card information.  Just before taking
14 the consumer's payment information, the representative transfers the call to a
15 different person who, to the best of Plaintiffs' knowledge, is employed by the Axis
16 Defendants or  Cost Containment Group and guides the consumer through a
17 "verification" process.

18         139.    Just before the transfer, the sales representatives instruct consumers to
19 disregard any statements in the sham "verification" process that may indicate that
20 the consumer will not be receiving comprehensive health insurance that covers
21 preexisting medical conditions.  The sales representatives also direct consumers to
22 disregard statements made by the verification agent that are inconsistent with
23 Defendants' sales pitch, assuring consumers that the insurance they are sold during
24 the sales process (as opposed to the verification process) is the insurance they will
25 receive.  Notably, the sales portions of these calls are <u>not</u> recorded but the
26 verification portions of the call are recorded.

27         140.    During the verification process, consumers are asked to confirm a
28 series of complex, lengthy statements that are read from a uniform script by the

verification agent.  The trained salespersons, following their scripts, caution consumers not to ask any questions during the verification process because, if they do, the entire process will have to start over again.

141.    Purposefully included in the verification process is a statement that, in essence, asks the consumer to confirm that he or she understands that the insurance will be governed by plan documents (to be provided at a later date) and not by the representations made by the sales agents.  Because consumers have been instructed to do so by the sales representatives, consumers (including Plaintiffs and putative class members) answer "yes" and do not ask questions concerning this disclosure.

142.    Duped consumers, including Plaintiffs and putative class members, follow the instructions of the agent because they are told this is the required way for them to obtain the comprehensive coverage that they have been promised.  But the consumers are not provided the documentation to confirm such statements until after the process is completed, if at all, and thus would have no reason to believe that the paperwork will contradict what they have been told in order to get them to enter into the transaction.  Further, the consumers have been told to disregard any statements during the verification process that contradict what they were told during the sales pitch.

143.    After consumers proceed through the "verification" process, the agents from HII, HPI, ACI, or Cost Containment Group/Ocean Consulting Group immediately request and obtain consumers' credit card information to begin charging their sale of such services.  Consumers are not given the opportunity to receive or review plan documents before they are charged.

144.    The Axis Defendants and/or Cost Containment Group/Ocean Consulting Group record and save the "verification" calls with consumers.  Only those portions of the conversation during which the consumers ultimately assent to the verification statements in order to purchase the product offered are recorded.

The sales portions of the calls with consumers are not recorded in an attempt to avoid a trail of evidence of the deception that is being perpetrated on everyday people, including Plaintiffs and putative class members.

145.    The deception continues even after the initial sale is made. Statements on the "insurance" cards provided to consumers through the mail include the phrase "Preferred Provider (PPO) Network Access" and point consumers to a "PPO" Network website that represents to be "your national choice for PPO network solutions."  This is done despite Defendants' knowledge that they have not actually offered (ACUSA), sold (HEG, HII, HPI), underwritten (Axis Defendants), administered (ACI/CCG/OCG) or otherwise provided any sort of PPO plan or other comprehensive coverage to consumers.  Indeed, the false representation on the ACUSA/Axis "Liberty Health" Insurance Card—that the "Liberty Health" plan offered access to First Health's PPO network—was designed to, and did, induce Plaintiffs and putative class members to continue paying "premiums" long after the initial sale transaction was completed.

146.    Plan "fulfillment" materials that were developed by the Axis Defendants together with ACUSA, Cost Containment Group, HII and HPI are also sent to consumers electronically using the wires.  Again, these fulfillment materials tout PPO network access, continuing the misrepresentations made to Plaintiffs and putative class members.

147.    Making matters worse, when a health care provider calls to verify coverage before undertaking to treat a consumer/patient, an agent verifies that coverage is "active," so as to not alert the consumer or provider that the coverage is actually worthless, sham insurance coverage.  As set forth above, the agents who made such statements in this case were employees Defendant Cost Containment Group.  This is unscrupulous, unethical and immoral conduct.

148.    This fraudulent scheme has left thousands of consumers, including Plaintiffs and putative class members, with far less than the comprehensive health

insurance they were sold and essentially worthless health care coverage.  In addition to paying "premiums" for limited benefit plans and medical discount memberships that provide benefits equal to or less than their cost, many of these consumers have incurred substantial medical expenses under the mistaken belief that these expenses would be covered by the health insurance they thought they had purchased.  As the situation with Plaintiffs shows, such premiums total thousands of dollars annually per class member—for Plaintiffs, close to $5,000 per year.  This amount has been fraudulently and/or illegally obtained, and stolen millions of dollars from Plaintiffs and putative class members.

149.  Courts have rightly put a stop to similar predatory schemes that follow the same practice engaged in here.  In May 2019, for example, a judge in the United States District Court for the Southern District of Florida entered a preliminary injunction against six corporate defendants and a related individual engaged in a "bait and switch scheme [that] led consumers to believe they were receiving comprehensive health insurance when, in fact, they received limited indemnity plans or discount memberships." *Fed. Trade Comm'n v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1353 (S.D. Fla. 2019).  There, as here, the defendants preyed on consumers who searched for health insurance online. *Id.* at 1354.  There, as here, the defendants employed a sales script that "g[a]ve consumers the impression that the coverage provided by [the defendants'] limited benefit plan was equal to, if not better than, major medical insurance" and required consumers to complete a sham "verification" process. *Id.* at 1355–56.  And there, as here, "Defendants made numerous misrepresentations to perpetrate their bait and switch scheme, including that: Defendants' limited benefits plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance; [and] Defendants' limited benefit plans and medical discount memberships are qualified health insurance plans under the ACA." *Id.* at 1356.  Based on this conduct, the court found that the defendants had "devised a fraudulent scheme to use consumer

1   funds to enrich themselves" and, accordingly, entered an injunction against them.

2   *Id.* at 1365.  The Eleventh Circuit affirmed the court's ruling.  *Fed. Trade Comm'n*

3   *v. Simple Health Plans, LLC*, 801 F. App'x 685 (11th Cir. 2020).   Notably, Simple

4   Health (the defendant discussed above) was the largest distributor of plans

5   developed by the HII Defendants.

6   <center>**Eric and Miryam Fall Victim to Defendants' Scheme**</center>

7        150.  Eric and Miryam emigrated from Israel to the United States in 2004.

8   Until the fall of 2016, they had comprehensive health insurance through Blue

9   Cross/Blue Shield for themselves and their two children.  But they were caught in

10  the "death spiral" of ever-increasing premiums, so they set out to look for less

11  expensive options that provided comparable comprehensive PPO coverage.

12       151.  After searching for various options, Eric and Miryam found HEG's

13  website.  They responded positively to the material claims, examples of which are

14  set forth above, including that HEG's "PPO's work with over 80% of physicians

15  Nationwide," and that HEG "work[ed] with Major Insurance Companies in all 50

16  states" to provide, among other products, "Private Health Insurance," "Obamacare,"

17  and "PPO" plans.  Eric and Miryam relied on and believed HEG's statement that it

18  took pride in its "ability to help you find the most comprehensive insurance plan for

19  the lowest possible price."

20       152.  During their online research, Eric and Miryam also saw websites that,

21  on information and belief, were developed and run by HII, HPI and Cost

22  Containment Group, and related to the Liberty Health Plan.  These websites also

23  described comprehensive coverage and promised ACA-compliant healthcare.

24  These websites lend further credence to Eric and Miryam's belief that the Liberty

25  Health Plan (which was advertised on these sites) was comprehensive medical

26  coverage.

27       153.  To learn more, Eric and Miryam spoke with representatives from

28

<center>-51-</center>

HEG, HPI, or HII or Cost Containment Group/Ocean Consulting Group[24] during three separate calls on November 22, 2016.  The "insurance" they were offered sounded just like the comprehensive insurance coverage they sought.  The sales representative described the plan to Eric and Miryam as a PPO plan and compared it to the Blue Cross/Blue Shield coverage that they had at the time.   The representative knew, or reasonably should have known, however, that the plan being promoted was not a comprehensive PPO plan and was not comparable to the Plaintiffs' Blue Cross/Blue Shield comprehensive coverage.  The agent convinced Eric and Miryam the Liberty Health Plan was right for them.

154.    The representative followed the script, confusing Eric and Miryam with industry lingo and falsely stating the care and coverage that the plan offered.  The representative claimed that Eric and Miryam would have very small co-pays and no deductible.  The representative also assured Eric and Miryam that this comprehensive coverage would apply if Eric, Miryam, or their children were to visit almost any doctor in the country.   Yet the representative knew or reasonably should have known that the plan being offered and sold would provide little to no coverage when used at almost any medical provider's office.

155.    The sales representative told Eric and Miryam that Defendants could offer the PPO for their family for $379 per month—a significant amount but still much less than Eric and Miryam had been paying for their Blue Cross/Blue Shield coverage—because Defendants aggregated individuals from all over the country like a large corporation and could therefore negotiate "great deals" on behalf of

---

[24] As stated herein, part of Defendants' scheme is keeping consumers in the dark as to which entity is actually selling and providing the "insurance" plan.  The agents did not identify what company they worked for.  However, documents subsequently discovered by Plaintiffs through document requests made pursuant to the California Insurance Code seem to establish that Plaintiffs at the very least spoke with agents of HEG and Cost Containment Group/Ocean Consulting Group, who were agents on behalf of HPI, HII and the Axis Defendants.

1   consumers.  HEG's website at the time said, "Remember we work for you not the

2   insurance company."

3       156.    When Eric and Miryam asked what the plan would cover, the sales

4   representative again stated that the coverage was PPO and comprehensive and listed

5   only two types of excluded care: pregnancy and mental health.  The implication, of

6   course, was that the plan would cover all other types of care.  Defendants knew or

7   reasonably should have known that these were misrepresentations and omissions of

8   material fact.  Yet the representative intended that Eric and Miryam reasonably rely

9   on these misrepresentations and omissions of material fact to sign up for the

10  "insurance" coverage promised.  Because Eric and Miryam were not planning to

11  have another child, and because the representative made the plan sound so

12  attractive, Eric and Miryam were willing to forgo their existing mental health

13  coverage.

14      157.    Eric and Miryam were justified in relying on, and did reasonably rely

15  on, Defendants' material representations and omission of material fact, examples

16  of which are set forth above, and initiated the process of purchasing what they

17  were led to believe was comprehensive health insurance.

18      158.    The sales representative then prepared to transfer Eric and Miryam to

19  an agent[25] who could verify that Eric and Miryam "qualified" for the plan.  To the

20  best of Plaintiffs' knowledge, the "agent" was an employee of Ocean Consulting

21  Group/Cost Containment Group, ACI or the Axis Defendants.  Before he did,

22  though, the representative told Eric and Miryam that the verification agent would

23  read them a series of statements, and that Eric and Miryam needed to say yes to all

24  of those statements if they wanted to purchase the promised plan.  The

25  representative also told Eric and Miryam to ignore any statements that did not

26  _____

27      [25] Plaintiffs recall that the "verification" agent was named George or Joel.   It
    appears for some reason most if not all of Defendants' verification agents are

28  named George or Joel.

-53-

apply to them or the product they were purchasing.  The representative directed Eric and Miryam not to interrupt or ask questions during the process.  The representative told them that if they did, or if they answered no to any question, they would be forced to start the entire process over from the beginning.  The representative assured Eric and Miryam that, whatever was said during the verification call, Eric and Miryam would receive the comprehensive health insurance that Defendants had promised and that the representative had described.

159.   Even though they did not understand or agree with everything that was being said during the process, Eric and Miryam felt pressured to agree with all the verification statements based on the representative's directions to them.  And because they wanted to obtain what Defendants had characterized as comprehensive PPO health insurance for a low price, Eric and Miryam obeyed the representative's command and answered yes to every question asked by the agent.

160.   With the sham verification completed, and at Defendants' request, Eric and Miryam immediately provided their credit card information to cover the first month's payment on their purchase.  Once done, Eric and Miryam believed that they had successfully obtained comprehensive health insurance that covered their entire family.  They paid the "premiums" for this coverage beginning in November 2016.

161.   Even after the sale was made, Defendants continued to deceive Eric and Miryam.  As an example, the back of the "insurance" cards provided to Eric and Miryam through the wires and mail included the phrase "Preferred Provider (PPO) Network Access" and pointed Eric and Miryam to a "PPO" Network website that represented to their "national choice for PPO network solutions."  Defendants did so with knowledge that they had not actually sold, underwritten, or provided any sort of PPO plan or otherwise comprehensive coverage to Eric and Miryam.

162.   Additional fulfillment materials developed by the Axis Defendants together with Cost Containment Group, HPI, HII and ACUSA also touted this PPO

1   Network Access

2       163.   Eric and Miryam eventually discovered that the plan they had

3   purchased, and for which they were paying, was almost entirely worthless.  On July

4   29, 2017, Eric was admitted to Cedars-Sinai Hospital for back surgery.  He stayed

5   in the hospital for six nights before he was discharged on August 4, 2017.  It was a

6   major surgery and a painful recovery.

7       164.   The hospital had also contacted Eric's "insurance" company to

8   confirm that Eric was covered by insurance for the surgery.  Plaintiffs believe this

9   call was taken by Cost Containment Group and routed to either to the Axis

10   Defendants or to ACI, and also that coverage was verified.  There is a written

11   record of this call logged in Cost Containment Group's CRM Software.  Ms.

12   Affatato, a CCG employee acting in the course and scope of her employment, spoke

13   to Cedars-Sinai and verified that Mr. Ketayi was covered for the surgery and that

14   Plaintiffs' Liberty Health Plan policy was active.  *See* **Figure 16** – Call Log

15   Excerpt.

16   **Figure 16**

17   **Excerpt from Call Log Specific to Eric Ketayi (Highlighting Added)**

18



| Fulfillment: MEMBER: downloaded Membership Materials | 149219-Hospital Indemnity Certificate | Member: ERIC KETAYI |
|---|---|---|
| General Questions: Provider Called In | Verifying coverage Advised provider policy is active | Gina Affatato |
| Verification: Provider Called | Provider Verification-CALLED FROM:Cedar Sinai SPOKEN TO:Veronica REASON FOR CALL:Benefits | Gina Affatato |
| Fulfillment: MEMBER: downloaded Membership Materials | Member Verification Letter | CSR: |
| General Questions: | went over xrays benefits repriced under the contract rate if provider Janet Grassodonio | |

25       165.   Mr. Ketayi had the surgery and started a painful recovery.  The

26   recovery was made even more painful when Mr. Ketayi received Explanation of

27   Benefits (EOBs) statements from "Axis Insurance Company" and ACI regarding

28

his "LIBERTY HEALTH – ACUSA" insurance on or about November 2017. For the six-night hospital stay, Defendants paid only $1,500. Eric's responsibility was $176,786.49. For the surgery itself, Defendants paid $0. Eric's responsibility was $16,250. And for other necessary care provided during Eric's stay, Defendants paid $0, and Eric's responsibility was $1,330.24. All told, the "insurance" that Defendants had advertised, marketed, and sold as comprehensive PPO health insurance covered only $1,500 for Eric's surgery, while Eric was left to cover $194,366.73. Yet by that time, Plaintiffs had paid Defendants about $4,500 in "premiums"—around three times the amount that Defendants would ultimately cover for Eric's surgery. Plaintiffs thus have been injured in fact, suffered damage, and lost money or property because of Defendants' illegal, fraudulent, deceptive, and misleading business acts, and practices.

166. After receiving these EOBs, Eric contacted the Axis Defendants to dispute the lack of coverage under what Defendants represented to be comprehensive coverage. Despite Eric's complaints and attempts to resolve this issue prior to initiating action, the Axis Defendants did not alter its level of coverage or agree to further contribute to Eric's care. Eric was unable to reach any other Defendant to discuss the issue.

167. Again, there is a written record of Mr. Ketayi's call logged in CCG's CRM Software.

[INTENTIONALLY LEFT BLANK]

**Figure 17**

**Record of Mr. Ketayi Disputing Coverage Amount**



168.  Eric and Miryam now face debt collectors who are seeking to recover the extensive medical bills for which Defendants promised, but failed, to pay.

169.  Plaintiffs' experience does not appear to be an isolated, atypical, or unique occurrence.  There are hundreds of reports online from victims nationwide which corroborate Plaintiffs' allegations in this Complaint: that Defendants claim to provide comprehensive health coverage but, in reality, offer a product that is virtually worthless.[26]  The California Department of Insurance is investigating these

---

[26] *See, e.g.*, https://chicago.cbslocal.com/2019/02/11/simple-health-plans-insurance-scam-lawsuit-ftc-deceptive-sales-tactics/, where AXIS underwrote the at-issue sham "insurance."  (Last accessed June 25, 2020.)

-57-

1  Defendants.  And the U.S. House of Representative Subcommittee on Health

2  already concluded that "that HII, its subsidiary companies, and the third-party

3  agents and brokers that HII is in a contractual relationship with defraud and

4  deliberately mislead consumers seeking comprehensive health coverage, leaving

5  them saddled with hundreds of thousands of dollars of medical debt."

6    **IV.    CLASS ALLEGATIONS**

7        170.    Plaintiffs bring this action as a class action pursuant to Federal Rule of

8  Civil Procedure 23 on behalf of a Nationwide Class or, in the alternative, a Multi-

9  State Class or California-Only Class (collectively "Class"):

10      **Nationwide Class**

11      All persons within the United States who purchased a limited benefit plan or

12      medical discount plan developed, marketed, advertised, sold, underwritten or

13      administered in any way by Defendants.

14      **Multi-State Class**

15      All persons within California and other states with similar laws who

16      purchased a limited benefit plan or medical discount plan developed,

17      marketed, advertised, sold, underwritten or in any way administered by

18      Defendants.

19      **California-Only Class**

20      All persons in California who purchased a limited benefit plan or medical

21      discount plan developed, marketed, advertised, sold, underwritten or in any

22      way administered by Defendants.

23        171.  The Class includes all persons who purchased the Liberty Health Plan

24  or any substantially similar plan developed, marketing, sold, underwritten or

25  administered by Defendants, or each of them, during the period at least four years

26  from the date of the filing of the original Complaint in this matter, and continues

27  until the date that notice of this action is disseminated to putative class members.

28        172.  Excluded from any class are: (i) Defendants and their officers,

directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

173.   Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate subclasses, including subclasses related to distribution channels, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

174.   This action is properly maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) for the reasons set forth below.

175.   **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** Prospective class members, however defined, are readily ascertainable by way of Defendants' records and are so numerous that joinder of all members is impracticable.  Defendants have ready access to records that can easily determine the number of persons who have purchased these products.  Based on the number of complaints about this practice that they have seen online, Plaintiffs estimate that members of the class consist of at least thousands, if not hundreds of thousands, of individual consumers.

176.   **Commonality—Federal Rule of Civil Procedure 23(a)(2).**  There are numerous and substantial questions of law or fact common to all members of the class that predominate over any individual issues.  Included within the common questions of law or fact are:

    a.   Whether Defendants engaged in unlawful, unfair, or fraudulent business acts or practices in advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health insurance, and omitted material facts to the contrary;

    b.   Whether Defendants made untrue or misleading statements or

-59-

omitted material facts in connection with advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health insurance;

c.  Whether Defendants engaged in a pattern or practice of making material misrepresentations or omissions of material fact to individuals in the process of advertising, marketing, selling, or administering limited benefit plans and medical discount plans that are systematically represented to be comprehensive health insurance;

d.  Whether Plaintiffs and the class members are entitled to equitable monetary and/or injunctive relief;

e.  Whether Plaintiffs and the class members have sustained damage as a result of Defendants' unlawful conduct; and

f.  The proper measure of damages sustained by Plaintiffs and class members.

177. **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the members of the class they seek to represent. Plaintiffs, like the class members, purchased Defendants' products after falling victim to Defendants' uniformly deceptive advertising and marketing scheme, including systematic false and misleading statements and omissions of material fact related to those products.  Thus, Plaintiffs' claims arise from the same practices and course of conduct and are based on the same legal theories that give rise to the claims of the other class members.  Defendants' unlawful, unfair, and/or fraudulent business acts and practices, including the use of internet websites and a scripted sales pitch, concern the same business practices described, irrespective of where they occurred or were experienced.  Plaintiffs and the class members also sustained similar injuries arising out of Defendants' conduct.

178.   **Adequacy—Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate representatives of the class they seek to represent because their interests do not materially or irreconcilably conflict with the interests of other members of the class.  On the contrary, Plaintiffs will fairly, adequately, and vigorously protect the interests of class members and have retained counsel experienced and competent in the prosecution of complex cases, including complex class action litigation.

179.   **Appropriate Class-wide Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**  For the reasons described, Defendants have acted on grounds generally applicable to the class, thereby making final injunctive relief appropriate with respect to the class as a whole.

180.   **Predominance and Superiority—Federal Rule of Civil Procedure 23(b)(3).**  As described above with respect to commonality, there are numerous and substantial questions of law or fact common to class members that predominate over any questions that affect only individual members.  In addition, class treatment is superior to other available group-wide methods for the fair and efficient adjudication of this action because it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and burden on the courts that individual actions would entail.

181.   The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are superior to any other method available for the fair and efficient group-wide adjudication of these claims.  Absent a class action, it would be highly unlikely that Plaintiffs or any other putative class members would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

**COUNT I**

**Fraud and Deceit – Civil Code Section 1709**

**(Against Defendants HEG, HPI, HII, and the Axis Defendants)**

182.  Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 181, as if fully set forth herein.

183.  As detailed above, Defendants made false representations, concealed material facts, and acted with an intent to deceive Plaintiffs and class members when uniformly advertising, marketing, selling, administering and underwriting their limited benefit plans and medical discount plans.

184.  Defendants' uniform scripted misrepresentations and omissions of material fact include, at minimum:

- That Defendants help consumers find the most comprehensive insurance plan for the lowest possible price.
- That Defendants worked on behalf of consumers.
- That the "health insurance" Defendants offered was comparable to the comprehensive health insurance that consumers possessed and was comparable to PPO coverage.
- That Defendants' product would provide substantial coverage if Plaintiffs or class members were to visit almost any doctor in the country.
- That Defendants' product would cover every category of health care except pregnancy and mental health treatment.

185.  Defendants knew or reasonably should have known that their representations or omissions of material fact they were duty bound to disclose were false when made or made the representations recklessly and without regard for their truth.

186.  Defendants' statements, actions, and omissions were intended to deceive Plaintiffs and class members for Defendants' own benefit.

-62-

187.    Plaintiffs and class members justifiably relied on Defendants' misrepresentations and omissions, representative examples of which are set forth above.

188.    Plaintiffs and class members suffered financial damage in the form of, among other things, wasted payments and unpaid medical bills as a direct result of Defendants' misrepresentations, material omissions, and deceptive acts.

189.    Defendants' conduct was intended to cause injury to members of the class and/or was despicable conduct carried on with a willful and conscious disregard of the rights of members of the class, subjected members of the class to cruel and unjust hardship in conscious disregard of their rights, and was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with the intention to deprive members of the class of money, property, legal rights or to otherwise cause injury.  Such conduct constitutes malice, oppression, or fraud under California Civil Code section 3294 and entitles Plaintiffs and members of the class to punitive or exemplary damages in an amount appropriate to punish or set an example of and deter Defendants from engaging in such conduct.

## <u>COUNT II</u>

### Aiding and Abetting Fraud

### (Against All Defendants)

190.    Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 181, as if fully set forth herein.

191.    As described in the preceding paragraphs of this Fourth Amended Complaint, each Defendant substantially assisted or encouraged each other Defendant's fraud through independently tortious conduct.  Moreover, each Defendant had actual knowledge of the fraud and nonetheless provided substantial assistance in perpetuating the fraud.

192.    Defendant HEG had actual knowledge that the Liberty Health Plan

-63-

1   purchased by Plaintiffs and substantially similar plans purchased by putative class

2   member were being marketed, sold, and administered as though they were

3   comprehensive medical coverage when they were, in fact, not such coverage.

4   Indeed, HEG reached a conscious decision to participate in the fraudulent activity

5   through selling and marketing the sham insurance plans, among other conduct

6   alleged in this Fourth Amended Complaint, in order to reap the financial benefits of

7   the fraud.  HEG therefore gave substantial assistance to the Axis Defendants,

8   ACUSA, Ocean Consulting Group, Cost Containment Group, ACI, HII and HPI in

9   executing the fraudulent scheme and did so for its own financial gain.

10       193.    Defendants HII and HPI had actual knowledge that the Liberty Health

11   Plan purchased by Plaintiffs and substantially similar plans purchased by putative

12   class member were being marketed, sold, and administered as though they were

13   comprehensive medical coverage when they were, in fact, not such coverage.

14   Indeed, HPI and HII reached a conscious decision to participate in the fraudulent

15   activity through developing and acting as the Managing General Agent for the sham

16   insurance plans, among other conduct alleged in this Fourth Amended Complaint, in

17   order to reap the financial benefits of the fraud.  HPI and HII therefore gave

18   substantial assistance to the Axis Defendants, HEG, ACI, ACUSA, Ocean

19   Consulting Group and Cost Containment Group in executing the fraudulent scheme

20   and did so for their own financial gain.

21       194.    The Axis Defendants had actual knowledge that the Liberty Health

22   Plan purchased by Plaintiffs and substantially similar plans purchased by putative

23   class member were being marketed, sold, and administered as though they were

24   comprehensive medical coverage when they were, in fact, not such coverage.

25   Indeed, the Axis Defendants reached a conscious decision to participate in the

26   fraudulent activity through developing and underwriting the sham insurance plans,

27   among other conduct alleged in this Fourth Amended Complaint, in order to reap the

28   financial benefits of the fraud.  The Axis Defendants therefore gave substantial

-64-

assistance to HEG, Cost Containment Group, Ocean Consulting Group, ACI, ACUSA, HII and HPI in executing the fraudulent scheme and did so for their own financial gain.

195.    Defendant ACI had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class member were being marketed, sold, and administered as though they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, ACI reached a conscious decision to participate in the fraudulent activity through administering the sham insurance plans, among other conduct alleged in this Fourth Amended Complaint, in order to reap the financial benefits of the fraud.  ACI therefore gave substantial assistance to the Axis Defendants, HEG, ACUSA, Cost Containment Group, Ocean Consulting Group, HII and HPI in executing the fraudulent scheme and did so for its own financial gain.

196.    Defendant Cost Containment Group had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class member were being marketed, sold, and administered as though they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, Cost Containment Group reached a conscious decision to participate in the fraudulent activity for the purpose of selling the sham insurance plans and did so through its contracts with HPI and HII through which it provided fulfillment materials and customer service, among other conduct alleged in this Fourth Amended Complaint, related to the Liberty Health Plan in order to reap the financial benefits of the fraud.  Cost Containment Group therefore gave substantial assistance to the Axis Defendants, HEG, Ocean Consulting Group, HII and HPI in executing the fraudulent scheme and did so for its own financial gain.

197.    Defendant Ocean Consulting Group had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class member were being marketed, sold, and administered as though

they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, Ocean Consulting Group reached a conscious decision to participate in the fraudulent activity for the purpose of selling the sham insurance plans and did so through its contracts with HPI and HII through which it provided fulfillment materials and customer service, insurance "coverage" verifications and overall point-of-contact communications with Plaintiffs, among other conduct alleged in this Fourth Amended Complaint, related to the Liberty Health Plan in order to reap the financial benefits of the fraud.  Ocean Consulting Group therefore gave substantial assistance to the Axis Defendants, HEG, HII, HPI and Cost Containment Group in executing the fraudulent scheme and did so for its own financial gain.

198.    Defendant ACUSA had actual knowledge that the Liberty Health Plan purchased by Plaintiffs and substantially similar plans purchased by putative class member were being marketed, sold, and administered as though they were comprehensive medical coverage when they were, in fact, not such coverage. Indeed, ACUSA reached a conscious decision to participate in the fraudulent activity for the purpose of selling the sham insurance plans and did so through its contracts with HPI, HII, and the Axis Defendants through which it was the "policyholder" and provided fulfillment materials and customer service, among other conduct alleged in this Fourth Amended Complaint, related to the Liberty Health Plan in order to reap the financial benefits of the fraud.  ACUSA therefore gave substantial assistance to the Axis Defendants, HEG, ACI, Cost Containment Group, HII and HPI in executing the fraudulent scheme and did so for its own financial gain.

199.    Plaintiffs were damaged by Defendants' wrongful conduct, as alleged herein, in an amount to be proven at trial.

///

///

///

-66-

## **COUNT III**

### **Conspiracy to Commit Fraud**

### **(Against All Defendants)**

200.    Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 181, as if fully set forth herein.

201.    Defendants engaged in a conspiracy to commit fraud in the sale of sham health insurance products to Plaintiffs and to consumers, including putative class members, as alleged in the preceding paragraphs of this Fourth Amended Complaint.  The conspiracy was fully formed and involved HEG, HII, HPI, ACUSA, the Axis Defendants, Ocean Consulting Group, Cost Containment Group, and ACI.  Each Defendant individually was part of the conspiracy and all Defendants agreed as to the purpose of the conspiracy, which was to sell sham health insurance to consumer for financial gain.

202.    Each Defendants was aware of the other Defendants' roles in the conspiracy to commit fraud, as alleged more specifically in the preceding paragraphs of this Fourth Amended Complaint.

203.    Each Defendant agreed with the other Defendants and intended that the fraud be perpetrated on Plaintiff and consumers, including putative class members.

204.    Each Defendant had contracts and/or on-going cooperative relationships with at least one other Defendant responsible for the harm suffered by Plaintiffs and putative class members.

205.    Significant wrongful conduct was committed in furtherance of the conspiracy, including the making of material fraudulent misrepresentations to Plaintiffs that induced Plaintiffs to purchase essentially worthless health "insurance" coverage under the belief that they were purchasing comprehensive PPO coverage. Each Defendant committed at least one overt act in furtherance of the conspiracy. These acts in furtherance of the conspiracy included, among others, creating scripts to solicit, mislead and fraudulently induce consumers to purchase sham health

insurance, training sales agents to fraudulently induce consumers to purchase sham health insurance, creating websites to induce consumers to purchase sham health insurance, selling sham health insurance, underwriting sham health insurance, conducting a fraudulent "verification" process during the sale of sham health insurance, creating and distributing misleading plan fulfillment materials, funding the fraudulent activities of the other defendants, verifying coverage as "active" to health care providers, collecting debts from Plaintiffs and putative class members that were incurred based on Defendants' fraudulent misrepresentations, and/or facilitating any and all of Defendants' conduct as stated in this Fourth Amended Complaint.

206.    Even if Defendants did not agree to harm Plaintiffs or putative class members specifically, the purpose of the acts they engaged in was to advance of the overall subject of the conspiracy (fraud), and harm to Plaintiffs and putative class members was a reasonably foreseeable consequence of Defendants' actions. Plaintiffs and putative class members were damaged by the conspiracy in an amount to be proven at trial.

## COUNT IV

### Violation of Insurance Code section 781

### (Against Axis Insurance Company)

207.    Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 181, as if fully set forth herein.

208.    California Insurance Code section 781 prohibits "twisting" in the insurance business.  Section 781(a) prohibits any statement that is known, or should have been known, to be a misrepresentation to any other person for the purpose of inducing, or tending to induce, such other person to take out a policy of insurance or cause of person to forfeit an existing policy of insurance.

209.    A violation of Insurance Code section 781 gives rise to a private right of action and is punishable by a fine not exceeding three times the amount of the

-68-

loss suffered by the victim.  *See Kentucky Central Life Ins. Co. v. LeDuc*, 814 F. Supp. 832, 835-37 (N.D. Cal. 1992) ("Supplying a private cause of action [for section 781] will further the policy prohibiting misrepresentation").

210.    An insurer who knowingly violates section 781, or who knowingly permits any officer, agent, or employee to do so, is subject to suspension of the insurer's certificate of authority to do the class of insurance with respect to which the violation occurred.

211.    In the fall of 2016, Plaintiffs had comprehensive health coverage through Blue Cross/Blue Shield and were looking for similar comprehensive coverage at a better price.  It was important to Plaintiffs that any coverage they obtained provided comparable comprehensive coverage to the PPO that they already had.

212.    After searching for various options, and viewing various websites that were, on information and belief, maintained by Defendants HPI, HII, and Cost Containment Group, Eric and Miryam found HEG's website.  They responded positively to the material claims on all these websites, examples of which are set in the paragraphs above, including that the "PPO's work with over 80% of physicians Nationwide," and that HEG "work[ed] with Major Insurance Companies in all 50 states" to provide, among other products, "Private Health Insurance," "Obamacare," and "PPO" plans.  Eric and Miryam were impressed by HEG's statement that it took pride in its "ability to help you find the most comprehensive insurance plan for the lowest possible price" and the statements on the lead generating websites that they would receive comprehensive, ACA-compliant coverage if they purchased the Liberty Health Plan.

213.    During the sales call described in the preceding paragraph of this Fourth Amended Complaint, the sales agent for HEG, HPI and/or HII reiterated based on the uniform sales script issued by HPI/HII, that the coverage under the Liberty Health Plan was comprehensive PPO medical coverage.  This was not true.

-69-

Axis Insurance Company made further misrepresentation by stating on the Liberty Health Insurance case that the plan provided PPO Network Access, which further induced Plaintiffs to continue paying "premiums" for the Liberty Health Plan. These misrepresentations were repeated in plan fulfillment materials.

214.    Based on these material misrepresentations made by Axis Insurance Company and its agents, including Axis Insurance Company's Managing General Agent HII, Plaintiffs were induced to purchase/take out the Liberty Health Plan. Plaintiffs were also induced to forfeit their existing Blue Cross/Blue Shield Coverage in favor of the Liberty Health Plan, which Plaintiffs were told provided comparable coverage for less money.

215.    Axis Insurance Company knew and at all relevant times intended that Plaintiffs would be induced to purchase the Liberty Health Plan based on these misrepresentations.

216.    Axis Insurance Company violated Insurance Code section 781 because it knew or should have known that its false statements and those of its Managing General Agent, HII (which statements are imputed to Axis Insurance Company pursuant to Insurance Code section 796.85 ("[A]cts of the MGA [Managing General Agent] are considered to be the acts of the insurer on whose behalf it is acting") would induce Plaintiffs to purchase/take out the Liberty Health Plan.

217.    As a result of these actions, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT V

### Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C § 1961 *et seq.*

### (Against All Defendants)

218.    Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 181, as if fully set forth herein.

219.     Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

220.     Each Defendant violated 18 U.S.C. § 1962(c) and (d) by the acts described in this Complaint.  Specifically:

    a.  Each Defendant's activities affected interstate commerce;

    b.  Each Defendant conducted or participated, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity.

    c.  Each Defendant conspired to participate, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity.

221.     **The Enterprise.**

222.     Defendants, and each of them, formed an association-in-fact for the common and continuing purpose described in this Complaint.  Together, they constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. Defendants, as the members of the enterprise, functioned as a continuing unit with ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

223.     Defendants, and each of them, knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning on 18 U.S.C § 1691 *et seq.*  The racketeering activity was made possible for Defendants' regular and repeated use of the facilities and services of the enterprise.  Defendants have the specific intent to engage in the substantive RICO violations alleged herein.

224.     Alternatively, Defendants HEG, ACI, ACUSA, Axis Insurance Company, Axis Specialty, HII, and HPI each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

225.     Alternatively, some of Defendants, together, constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

-71-

226.    Each enterprise has engaged in, and their activities have affected, interstate commerce.

227.    Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises alleged above by overseeing and coordinating the commission of multiple acts of racketeering as described below.

228.    **Pattern of Racketeering Activity.**  Defendants, each of whom are persons associated with, or employed by, the enterprise(s), did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), 1962(c), and 1962(d).  The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise.  Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

229.    Predicate acts of racketeering activity are acts which are indictable under the provisions of the U.S. Code listed in 18 U.S.C § 1961(1)(B) and which are more specifically discussed herein.  Each Defendant committed at least two such acts or else aided and abetted such acts.

230.    These acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission.  Further, the acts of racketeering by Defendants have been continuous.  There was repeated conduct during a period continuing to the present, and there is a continued threat of repetition of such conduct.

231.    The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond their racketeering activity.  Rather, they existed separate and apart from the pattern of racketeering activity for legitimate business purposes.

FOURTH AMENDED CLASS ACTION COMPLAINT

232.   **Predicate Act: Use of Mails and Wires to Defraud.**  Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs and putative class members of money by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents including but not limited to plan fulfillment materials and things by the U.S. mails, via the internet, via facsimile and/or by private or commercial interstate carriers or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals.

233.   The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

234.   Defendants carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

235.   In furtherance of their scheme alleged herein, Defendants communicated among themselves and with Plaintiffs and putative class members in furtherance of the scheme to defraud Plaintiffs and putative class members. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers.

236.   Specifically, Defendants used the wires and/or U.S. mail or private or commercial carriers for the purposes of their fraudulent scheme both in terms of the promotional and fulfillment materials set forth above and sending and/or obtaining documents from Plaintiffs and Class members.  Defendants also communicated by the wires and/or U.S. mail or private or commercial carriers to facilitate payment of

the "premiums"' by Plaintiffs and Class members pursuant to their fraudulent scheme.

237.    In addition, in furtherance of their scheme, Defendants used the wires and/or U.S. mail or private or commercial carriers to induce Plaintiffs to purchase this sham health insurance.  Defendants also communicated by the wires and/or U.S. mail or private or commercial carriers to facilitate the sales and subsequent purchases, including accepting payments in the form of "premiums" over the Internet or by mail.

238.    Plaintiffs and putative class members reasonably and justifiably relied on Defendants' false misrepresentations and deceptive communications as alleged in this Complaint.

239.    Plaintiffs and putative class members have been damaged as a direct and proximate result of Defendants' participation in the enterprise.

240.    **Continuity of Conduct.**   Defendants' violations of state and federal laws as set forth in this Complaint, each of which directly and proximately injured Plaintiffs and putative class members, constituted a continuous course of conduct spanning a period of time encompassing at least 2016 through the present. Defendants' conduct was intended to obtain money through false representations, fraud, deceit, and other improper and other unlawful means, including the sale and underwriting of purported "insurance" when Defendants were not licensed to do so, fraudulently convincing consumers to pay "premiums" for purported coverage that was worthless, and duping consumers into believing they were receiving ACA qualified coverage when, in fact, consumers were not.

241.    Accordingly, Plaintiffs and putative class members seek an award of actual damages.  Plaintiffs further seek an award three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by statute.

///

## <u>COUNT VI</u>

### Conspiracy to Violate Federal Civil RICO, 18 U.S.C § 1961 *et seq.*

### (Against All Defendants)

242.    Plaintiffs reallege and incorporate by reference all allegations set forth in paragraphs 1 through 181 and 218 through 241, as if fully set forth herein.

243.    In violation of 18 U.S.C. § 1962(d), Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in this Complaint.

244.    The conspiracy commenced at least as early as 2016 and is ongoing.

245.    The conspiracy's purpose was to defraud consumers, like Plaintiffs and putative class members, for their own benefit.

246.    Each Defendant committed at least one overt act in furtherance of the conspiracy.  These acts in furtherance of the conspiracy included, among others, creating scripts to solicit, mislead and fraudulently induce consumers to purchase sham health insurance, training sales agents to fraudulently induce consumers to purchase sham health insurance, creating websites to induce consumers to purchase sham health insurance, selling sham health insurance, underwriting sham health insurance, conducting a fraudulent "verification" process during the sale of sham health insurance, funding the fraudulent activities of the other defendants, collecting debts from Plaintiffs and putative class members that were incurred based on Defendants' fraudulent misrepresentations, and/or facilitating any and all of Defendants' conduct as stated in this Complaint.

247.    Even if Defendants did not agree to harm Plaintiffs or putative class members specifically, the purpose of the acts they engaged in was to advance of the overall subject of the conspiracy, and harm to Plaintiffs and putative class members was a reasonably foreseeable consequence of Defendants' actions.

248.    Plaintiffs and putative class members have been injured and continue

-75-

to be injured by Defendants' conspiracy.  The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs and putative class members.

249.    Plaintiffs and putative class members seek an award of damages in compensation for, among other things, the money Defendants fraudulently obtained from Plaintiffs and putative class members.  Plaintiffs further seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, individually, and on behalf of all others similarly situated and for the benefit of the general public, as applicable, pray for relief pursuant to each cause of action set forth in this Complaint as follows:

A.    An order declaring that this action can be maintained as a class action, certifying the Nationwide Class as requested herein, or, in the alternative, the Multi-State Class or California-Only Class, designating Plaintiffs as class representatives and appointing the undersigned counsel as class counsel;

B.    Temporary, preliminary, and permanent injunctive relief, including enjoining Defendants from continuing the illegal practices as set forth herein and ordering Defendants to engage in a corrective advertising campaign;

C.    Compensatory damages;

D.    Punitive or exemplary damages (except as to the claims under RICO);

E.    Three times the damages sustained under applicable RICO statutes;

F.    Attorneys' fees and litigation costs under the theories and statutes set forth above;

G.    Pre- and post-judgment interest on any amounts awarded to Plaintiffs and class members; and

H.    Such other and further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all causes of action and issues so triable.

Dated:  June 9, 2022                                   **FOX LAW, APC**

/s/ Joanna L. Fox
David A. Fox
Joanna L. Fox
Russell A. Gold

*Attorneys for Plaintiffs*